# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
-------------------------------------------------------------- X
```

UNITED STATES STEEL CORPORATION,        :
NIPPON STEEL CORPORATION, and NIPPON    :     Civil Action No.:2:25-cv-15
STEEL NORTH AMERICA, INC.,              :
                                        :
            Plaintiffs,                 :
                                        :     **JURY TRIAL DEMANDED**
      vs.                               :
                                        :
CLEVELAND-CLIFFS INC., LOURENCO         :
GONCALVES, and DAVID McCALL,            :
                                        :
            Defendants.                 :
```
-------------------------------------------------------------- X
```

## COMPLAINT

Plaintiffs United States Steel Corporation ("U. S. Steel"), Nippon Steel Corporation, and Nippon Steel North America, Inc. ("NSNA," and together with Nippon Steel Corporation, "NSC") (collectively, "Plaintiffs"), by and through their undersigned attorneys, as and for their complaint against Defendants Cleveland-Cliffs Inc. ("Cliffs"), Lourenco Goncalves, and David McCall (collectively, "Defendants") allege, on personal knowledge as to themselves and on information and belief as to others, as follows:

## INTRODUCTION

1.    Plaintiffs bring this action to stop Defendants' unlawful campaign to monopolize critical steel markets, destroy Plaintiffs' ability to compete, and cause them billions of dollars in damages. At the heart of this ongoing campaign are Cliffs, Cliffs' CEO Lourenco Goncalves, and David McCall, the unelected President of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "USW" or the "International Union"). Together, Defendants have engaged in a no-holds-barred campaign to undermine U. S. Steel's competitive vitality, prevent procompetitive investment, and ultimately

enable Cliffs to acquire U. S. Steel under distressed circumstances. Defendants' unlawful conduct has stifled competition and innovation in the steel industry, in violation of federal law and to the detriment of all Americans.

2.     In furtherance of their anticompetitive conspiracy, Defendants have engaged in unethical and unlawful conduct to prevent U. S. Steel's pending merger with NSC (the "Merger"). Defendants, recognizing the Merger would frustrate their agreed-upon goal of Cliffs obtaining an unlawful monopoly over key steel markets, spearheaded a campaign of lies and pressure tactics, while leveraging their unlawful agreement to force U. S. Steel to merge with Cliffs and prevent U. S. Steel from being sold to *anyone* else. Cliffs knows that the pending Merger with NSC will present it with a formidable competitor and that U. S. Steel must pursue other strategic alternatives to remain as competitive if the Merger fails. Cliffs, acting in concert with the USW's leadership, has thus not only worked to prevent the Merger from closing, but also made clear it will use the same thuggish tactics against any other bidder who might seek to acquire U. S. Steel. Cliffs' threat to U. S. Steel is plain: merge with Cliffs or be murdered.

3.     Absent an injunction, Defendants will not only rob Plaintiffs of the ability to fairly compete, but will obtain and maintain monopoly power and line their pockets at the expense of American consumers. As Cliffs' Senior Vice President of Finance stated, after U. S. Steel is "taken out," "[t]here will be less competition" and "one less competitor pushing down prices."

4.     Rather than compete on the merits, Cliffs has engaged in a years-long quest to monopolize steelmaking assets, in particular traditional blast furnaces, with the support of the USW's leadership. Cliffs' campaign against the Merger is only its latest salvo in a long-running anticompetitive scheme that must be enjoined to protect the integrity of U.S. steel markets and, in turn, the American economy. Cliffs' monopolization campaign stretches back to at least 2020,

when Cliffs embarked on a strategy of leveraging its market power in iron ore production—a critical input to the production of steel—by acquiring several key steel production facilities in the United States. Rather than innovate to address the challenges that had been buffeting the domestic steel industry for years, Cliffs sought to buy up the industry. It did so with the active support of the USW's leadership, which sought to entrench their own power and influence and to consolidate blast furnace steelmaking—a market that is largely unionized—under the control of Cliffs. Cliffs, already the dominant domestic producer of iron ore, quickly became the largest fully integrated blast furnace steel producer in the United States, purely by acquisition.

5.    Cliffs can now exercise market dominance over several critical steel markets. It controls almost half of North America's blast furnace steelmaking capacity and half of the production of exposed automotive steel. And it controls 100% of North American commercial production of electrical steel. To protect its position, Cliffs also abuses its dominance in the market for iron ore pellets by intentionally cutting off pellet supply to its competitors and preventing the emergence of new competitors.

6.    These markets are of critical importance to the U.S. economy, steel customers, and consumers. Certain steel products can be commercially manufactured at scale only in blast furnaces, including exposed automotive steel, a major component in cars driven by Americans every day. A competitive market among blast furnace steelmakers is necessary not only to keep prices and production at competitive levels, but also to foster innovation in steelmaking that will reduce carbon emissions in the domestic steel industry. At the same time, healthy competition for high-grade electrical steel products is necessary for the manufacturing of electric vehicles and to safeguard the U.S. power grid. And iron ore pellets are a necessary input to all of the above, and

more.  Cliffs' monopolistic tactics and ambitions, aided and abetted by the USW's leadership, threaten all of this.

7.     In a 2022 interview, Goncalves stated his anticompetitive aims bluntly:  "*I want everything*."  And in July 2023, buttressed by his illegal agreement with the USW, Goncalves attempted to cement Cliffs' monopoly power by, as Cliffs put it, "taking out" its most significant competitor, U. S. Steel.

8.     U. S. Steel, which publicly invested in projects and technologies that would bolster its long-term competitive viability in the markets described above, posed a specific threat to Defendants' monopolistic ambitions.  Fearing that threat and eager to continue executing on its monopolization strategy, Cliffs made an unsolicited bid to buy U. S. Steel in July 2023.  Had the bid been accepted, Cliffs would have gained control of at least 80% of blast furnace steelmaking capacity in North America (100% in the United States); 89% of iron ore reserves, extraction, and production in North America (100% in the United States); 100% of electrical steel production in North America and the United States; and approximately 65% of exposed automotive steel production in North America and the United States.  As Goncalves promised, Cliffs would own "everything."

9.     Cliffs tried to bully U. S. Steel into accepting its takeover at a lowball price, designed to enrich itself at the expense of U. S. Steel stockholders, American manufacturers, and consumers, relying on an unlawful agreement with the USW's leadership.  The USW would exclusively support a deal with Cliffs, work to force U. S. Steel into such a merger, and oppose an acquisition of U. S. Steel by any other buyer.  Consistent with its ongoing conspiracy with Cliffs to consolidate blast furnace production under Cliffs' control, the USW's leadership agreed to help Cliffs secure these monopolies and take out U. S. Steel.  They have done so without regard to the

concerns of rank-and-file steelworkers at U. S. Steel, who will be gravely harmed if Defendants succeed in executing their unlawful scheme. The aim of McCall and the USW's leadership is the same as Cliffs'—to create a steelmaking cartel, controlled by Cliffs, that will safeguard McCall and his cronies' power and protect Cliffs' blast furnace operations and other monopolies from healthy competition. This campaign not only harms the USW's members at U. S. Steel, which will be forced to shutter blast furnace facilities rather than modernize them (as NSC has committed to do upon closing of the Merger). It also harms the American economy, which is dependent on a competitive and innovative domestic steel industry.

10.    Defendants have not hidden their agreement. Goncalves, speaking on behalf of Cliffs and with the USW's leadership firmly in his pocket, warned U. S. Steel that it could do a deal with Cliffs or do a deal with no one:

> As we have explained to U. S. Steel since day 1, the United Steelworkers (USW) has declared they would only support Cleveland-Cliffs for a proposed acquisition of U. S. Steel. ***We see that as a de-facto veto power to disallow the acquisition of the entirety of U. S. Steel or USW-represented assets by anyone else other than Cleveland-Cliffs***.

11.    In fact, the USW has no legitimate veto power under the terms of its Basic Labor Agreement (the "BLA") with U. S. Steel. This was unequivocally confirmed by a Board of Arbitration in September 2024. Still, armed with his deal with the USW, Goncalves counted on his lies about the USW's power to block a transaction and the worries he and the USW's leadership were fomenting about labor strife, to scare off other potential buyers.

12.    U. S. Steel resisted Goncalves' threats. Following receipt of Cliffs' unsolicited bid, U. S. Steel's Board of Directors (the "Board") publicly announced an open and robust process to evaluate strategic alternatives. Cliffs' proposal, plagued by obvious antitrust issues, also came up short financially. On December 18, 2023, U. S. Steel entered into a $14.9 billion merger agreement

(the "Merger Agreement") with NSC, which beat Cliffs' lower cash and stock bid with an all-cash offer of $55 per share. Recognizing that NSC's offer was superior for all of U. S. Steel stakeholders—including its stockholders, employees, customers, and communities—the Board accepted NSC's bid, and U. S. Steel's stockholders overwhelmingly approved the Merger, with 99% of the shares represented at a special meeting of the company's stockholders voting in favor.

13.     NSC is one of the world's largest and most successful steelmakers, with the financial wherewithal and technologies to make U. S. Steel a more vigorous competitor to Cliffs. Moreover, NSC has for many years had U.S. subsidiaries that employ thousands of employees (including hundreds of USW members) and make other valuable contributions to the communities in which they operate. U. S. Steel remains confident the Merger—which represents a major investment in U. S. Steel and in the American steel industry—would serve the best interests of all of U. S. Steel's stakeholders, including its critical labor force. The transaction with NSC would also be a boon to innovation, accelerating U. S. Steel's entry into high-grade electrical steel production and introducing NSC's advanced decarbonization technologies into the American steel industry.

14.     Through the Merger, U. S. Steel would also obtain needed investment capital to upgrade or replace its aging blast furnace facilities. Over the last 20 years, the American steel manufacturing industry has faced significant challenges, in response to which U. S. Steel has focused on acquiring and building leading facilities to compete and reduce its carbon footprint. In spite of these efforts, until 2021, U. S. Steel lost money every year for ten years and, as a result, from 2019 onward, had been cutting costs and idling older blast furnace facilities. Prior to the Merger, U. S. Steel's stand-alone plan was to idle more blast furnace facilities across the United States, while the company attempted to invest in longer-term technologies and electric arc furnace

facilities.  But the Merger provides a lifeline:  NSC has pledged billions of dollars to extend the useful life of U. S. Steel's facilities and increase their production capacity—an enormous investment that Cliffs, by contrast, could never afford and would never make.  In addition to these investments, NSC has also offered to maintain U. S. Steel as a domestically organized company with a majority U.S. citizen board, as well as a ten-year guarantee that it will not reduce production capacity at U. S. Steel operations in numerous states absent government approval.  Maintaining production capacity at these facilities would entail huge investments likely in the billions of dollars over that ten-year period, on top of NSC's other existing commitments.  U. S. Steel's strategy prior to the Merger was to be "better, not bigger" by adding capacity and capabilities at its electric arc furnace facilities in Arkansas while idling its older blast furnace facilities in places such as Pennsylvania and Indiana.  But, in partnership with NSC, U. S. Steel would be both better *and* bigger—its blast furnaces, and the jobs that go with them, would not only be preserved but significantly updated and enhanced.  And because NSC has only a minimal overlapping presence in North America, the transaction would not reduce competition in the steel markets.  Put simply, the Merger is fundamentally procompetitive.

15.    Perhaps no one stands to benefit more from the Merger than the citizens of Pennsylvania, and in particular the workers in the Mon Valley.  NSC has committed to supporting the Pennsylvania steel industry and its workers, including by keeping U. S. Steel's headquarters in, and planning to move NSNA's headquarters to, Pittsburgh; offering U. S. Steel employees $5,000 closing bonuses; and pledging that the Merger will result in "no layoffs, and no idling or closures of any existing U. S. Steel facilities under operation at the time of closing except in extraordinary circumstances" through at least the term of the current BLA, which expires in 2026.  NSC also plans to spend at least $1 billion to upgrade or replace the vintage 1938 hot strip mill

and other facilities at Mon Valley Works. Because of these commitments, and because they recognize that the fate of the Mon Valley hangs in the balance, the rank-and-file members of the local USW union that represents Mon Valley Works have publicly bucked the International Union's leadership by holding vocal rallies in support of the Merger. They understand that McCall has betrayed his membership in cutting a backroom deal with Cliffs and Goncalves that requires the USW's leadership to sacrifice the interests of the rank-and-file workers in support of Cliffs' monopolistic ambitions. NSC's commitment to the steel industry and its workers has also won the support of multiple mayors in the Mon Valley towns most closely tied to the steel industry.

16.    NSC has made a similar commitment to revamp Blast Furnace #14 at U. S. Steel's Gary Works and maintain other existing blast furnaces there, which would likewise benefit the local steelworkers and their community in Gary, Indiana, earning the praise of its mayor as well. And NSC has further committed to maintaining production capacity for two years at U. S. Steel's facilities in Granite City, Illinois, which currently employ approximately 700 USW-represented steelworkers, and which U. S. Steel will have to shutter if the Merger fails.

17.    An acquisition by Cliffs would have presented a stark contrast. Cliffs has a history of failing to invest in its facilities. Cliffs has recently ceased operations at multiple plants, resulting in hundreds of workers losing their jobs. In fact, Cliffs is a serial cost-cutter and has conducted layoffs following several of its prior acquisitions, including closing plants less than two months after buying its first steelmaking company. Cliffs is not able to make the capital-intensive, long-term investments favored by NSC. Indeed, Cliffs has said that it has "excess . . . capacity" and so would close or significantly cut back operations in the Mon Valley (and "would have [] to figure out what to do with the union workforce" there) were it to acquire U. S. Steel. Pursuant to its "merge or murder" strategy, preventing U. S. Steel from obtaining NSC's committed capital

investments will lead to the shuttering of steel plants that U. S. Steel can no longer afford to run, the demise of their local communities, and harm to the very steelworkers that the Defendants deceitfully claim they are protecting through their actions. Thus, if Cliffs gets its way, steelmaking in the Mon Valley would have an expiration date. In the words of Clairton Mayor Richard Lattanzi, if the Merger does not go through, "***the Mon Valley is dead***."

18.    But Cliffs and Goncalves do not care about the Mon Valley, or what is best for the hard-working steelworkers of U. S. Steel or American consumers. They are monopolists and racketeers who have sought to weaponize Cliffs' illegal agreement with the USW and McCall to attack the Merger and cripple U. S. Steel in the process. No matter how hard NSC has worked to achieve a productive relationship with the USW, McCall—acting with Goncalves—has refused to engage in good-faith discussions with NSC or U. S. Steel. As Goncalves told one of U. S. Steel's largest stockholders on March 15, 2024, "there's no deal with the Union. That's not gonna happen." Instead, the USW, working in coordination with Cliffs, aimed to run out the clock: "They will negotiate, because they are not going to allow a lawyer to say they are not in compliance because they aren't negotiating." Rather, McCall "will continue to negotiate for the next three years if necessary. . . . [T]here will be no conclusion." And to this day, McCall continues his efforts to obstruct the deal with NSC and render U. S. Steel radioactive to any alternative strategic investor other than Cliffs. According to Goncalves, the USW will "burn down the plants if the deal [is] approved."

19.    Defendants also worked to prevent the Merger by subverting the U.S. government's review of the transaction. Since the Merger was first announced, McCall, Cliffs, and Goncalves have conspired on a multi-pronged effort to prevent it from closing. The USW's leadership placed

great pressure on President Biden to oppose the Merger before the Committee on Foreign Investment in the United States ("CFIUS")'s review had even begun.

20.    Goncalves makes no attempt to hide these efforts, brazenly claiming that he is pulling the strings in Washington and that senior Biden Administration officials will do his anticompetitive bidding like marionettes.  And, in fact, they have, abdicating their duty to the American people.  When pressed to explain how his comments could be squared with the legal processes that apply to merger review by CFIUS, Goncalves explained that there is "no process." Rather, according to Goncalves, members of CFIUS were and are just pawns in Defendants' broader scheme to kill U. S. Steel's deal with NSC and pursue Cliffs' goal of monopolizing critical steel markets—a position that is in direct conflict with CFIUS's mandate to safeguard national security and the Biden Administration's purported commitment to enforcing the antitrust laws and protecting the domestic steel industry.

21.    Defendants' efforts to corrupt the CFIUS process have caused CFIUS officials to violate their statutory confidentiality obligations.  Congress required that CFIUS not disclose "any information or documentary material filed" during the review process.  50 U.S.C. § 4565(c).  And CFIUS itself, which touts its "promise of strict confidentiality," interprets that law to bar disclosure of anything that would reveal information filed with CFIUS, including the fact of a filing and any information concerning the status of review or results of a filing.  Yet even before the formal CFIUS review process began, Goncalves admitted to being in regular communication with the Secretary of Commerce, a CFIUS member and co-lead for the transaction review.  And McCall has admitted that he was "actively engaged with [CFIUS]."  Defendants subsequently leaked information illegally provided by CFIUS to investors and to the public.  For example, on November 22, 2024, revealing confidential CFIUS information that would only become public

weeks later, Cliffs' CFO told U. S. Steel's investors that he knew there was "no consensus in CFIUS and so Biden will make [the] ultimate decision."

22.    Defendants' subversion of CFIUS's national-security review does not end there. Prior to the U.S. presidential election, and after months of being "actively engaged with CFIUS" to oppose the Merger, McCall was appointed by President Biden as an official advisor to Ambassador Katherine Tai, the United States Trade Representative (the "USTR") and a voting member of CFIUS.  This was just three weeks after Cliffs and Goncalves hosted Ambassador Tai along with USW leaders at a political event at a Cliffs facility.  The very next day, McCall issued a press release on behalf of the USW:  "We remain confident that our elected leaders will . . . take action to block this deal."  And Ambassador Tai reportedly told counterparts that backing McCall was essential to the Democrats' effort to win Pennsylvania.  In the end, Ambassador Tai was reportedly the most ardent opponent of the Merger on CFIUS and, by disregarding the consensus of other CFIUS members to approve the deal, provided President Biden with the opportunity to issue an executive order blocking the Merger on January 3, 2025.

23.    The CFIUS review culminating in President Biden's January 3, 2025 decision to block the Merger was, as Defendants worked to ensure, lawless.  There was and remains no good-faith basis to conclude that the Merger threatens any U.S. national security interest.  A separate petition has been filed in the D.C. Circuit challenging that sham process.  Plaintiffs fully expect to prevail.  U. S. Steel does not produce any military-grade products or have any government contracts.  Moreover, Japan is a vital American ally:  Japanese companies supply crucial products and services to the U.S. military, including PAC-3 advanced air defense missiles, and there are more than 50,000 U.S. troops stationed on Japanese soil.  Just one day before President Biden blocked the Merger, his administration approved the sale of advanced missiles to Japan, which it

said would "support the foreign policy goals and national security objectives of the United States by improving the security of a major ally[.]"  More fundamentally, NSC's investment in U. S. Steel will strengthen American steelmaking capabilities, not weaken them.  Allowing Cliffs to establish steel monopolies that would place a vital industry under the control of a single company is the true threat to national security.

24.    Regardless of the outcome of the Merger or Plaintiffs' D.C. Circuit challenge, however, Cliffs' anticompetitive schemes will continue.  Emboldened by their success to date in attacking the Merger, and undeterred by a recent court finding that Cliffs is a monopolist that should face a trial regarding its exclusionary practices,[1] Defendants continue to execute their strategy to monopolize North American steel manufacturing.   On November 1, 2024, Cliffs acquired Stelco Holdings, Inc. ("Stelco"), a Canadian steel company that holds an option to own a portion of U. S. Steel's iron ore reserves.  By acquiring Stelco, Cliffs obtained that option, which could put 79% of U.S. iron ore reserves (70% of North American reserves) effectively in the hands of one unscrupulous competitor.  The acquisition also further consolidated North America's blast furnaces under Cliffs' control.

25.    And Cliffs has promised that once it succeeds in driving a stake through the Merger it will continue to work to extinguish U. S. Steel's ability to continue, in Goncalves' words, as a "going concern."  Cliffs' goal is to plunder U. S. Steel's assets to secure the monopolies Cliffs has long sought.

---

[1] *See Mesabi Metallics Co. LLC* v. *Cleveland-Cliffs, Inc. (In re Essar Steel Minn. LLC)*, Adv. Proc. No, 17-51210 (CTG) 2024 WL 4047451, at \*27 (Bankr. D. Del. Sept. 4, 2024), Dkt. No. 1074 at 63 (granting partial summary judgment to Mesabi on issue of whether Cliffs monopolizes market for iron ore pellets in Great Lakes region and permitting case to proceed to trial on issues of Cliffs' exclusionary conduct, antitrust injury, and damages, finding "sufficient evidence" to conclude "that Cliffs' conduct was anticompetitive").

26.     Enough is enough.  Defendants, both through their unlawful agreement and their individual conduct, have violated, and continue to violate, Sections 1 and 2 of the Sherman Act.

27.     Cliffs, Goncalves, and McCall have violated Section 1 by entering into an agreement in restraint of trade among themselves and with the USW.  The unlawful agreement requires the USW to support Cliffs' effort to acquire U. S. Steel, to seek to force U. S. Steel to acquiesce in a deal with Cliffs, and to resist an acquisition of U. S. Steel by anyone other than Cliffs.  Cliffs and Goncalves also have violated Section 2 by seeking to acquire or maintain monopoly power in various steel markets.  And each of the Defendants have violated Section 2 by conspiring to execute and support that anticompetitive effort.  Defendants' ongoing illegal agreement and public statements, along with Cliffs' recent Stelco acquisition, make clear that Defendants will not halt their unlawful conduct absent intervention from this Court.

28.     Defendants are also engaged in an unlawful pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act.  Defendants' predicate racketeering acts, including extortion, wire fraud and labor bribery, are intended, among other things, to damage U. S. Steel as a competitor, to support Defendants' monopolistic scheme, and to force U. S. Steel into a merger with Cliffs.  This racketeering activity will continue even if the Merger is abandoned, and has already caused direct and substantial injury to U. S. Steel and NSC, rendering Defendants liable for treble damages and attorneys' fees.

29.     Each Defendant has also tortiously interfered with U. S. Steel's and NSC's contractual and prospective economic relations, including U. S. Steel's Merger Agreement with NSC.

30.     Defendants' "merge or murder" strategy has already caused substantial damage to U. S. Steel and NSC (not to mention serious harm to the U.S. economy), and if permitted to

continue will inflict billions of dollars in additional damages. Indeed, Goncalves himself has boasted of the damage Defendants have caused to U. S. Steel, repeatedly telling the market that Cliffs' final bid of $54 per share is no longer on the table and that, as a result of his scheme, U. S. Steel is now worth less than half of its original value. And, U. S. Steel's stockholders will lose out on a transaction worth billions. In addition, Defendants' conduct will prevent NSC from entering and expanding in U.S. iron and steel markets and also deprive NSC of substantial profits and synergies it would otherwise achieve through the Merger.

31. Plaintiffs therefore seek (1) preliminary and permanent injunctions ordering Cliffs, Goncalves, and McCall to cease their violations of both Sections 1 and 2 of the Sherman Act and their tortious interference in Plaintiffs' contractual and economic rights; and (2) damages, including punitive and trebled damages, flowing from Defendants' anticompetitive and illegal campaign to scuttle the Merger and otherwise monopolize the domestic steel industry.

## THE PARTIES

32. Headquartered in Pittsburgh, Pennsylvania, and incorporated in Delaware, Plaintiff U. S. Steel has been a prominent producer of iron, steel, and steel products in the United States for over 120 years. U. S. Steel has operations across the United States, where it employs approximately 14,000 people. It also has operations in Europe. Its annual steel production capacity is 22.4 million net tons as of 2023. The common stock of U. S. Steel trades on the New York Stock Exchange and the Chicago Stock Exchange under the ticker symbol "X."

33. Plaintiff Nippon Steel Corporation is Japan's largest steelmaker and the fourth largest steelmaker in the world. Incorporated in Japan and headquartered in Tokyo, its subsidiaries employ or invest in companies that employ approximately 106,000 people worldwide, including 4,000 in the United States, more than 600 of whom are represented by the USW. Nippon Steel

Corporation currently has a global crude steel production capacity of approximately 72.5 million tons, about 0.2 million tons of which are produced in North and Central America.

34.    Headquartered in Houston, Texas, and incorporated in New York, Plaintiff NSNA is the subsidiary of Nippon Steel Corporation through which Nippon Steel Corporation will own U. S. Steel as a result of the Merger.  NSNA has conducted business in the United States since 1972.

35.    Defendant Cliffs is a major iron and steel producer incorporated and headquartered in Ohio.  Cliffs employs approximately 30,000 people in North America.  The common stock of Cliffs trades on the NYSE under the ticker symbol "CLF."  Cliffs' U.S. steelmaking operations include more than twenty steelmaking facilities, one coal mine, two coke manufacturing facilities, and five iron ore mines.  Cliffs has operations in at least twelve states, including in the Western District of Pennsylvania.  Its annual steel production capacity is 20.5 million net tons as of 2023.

36.    Defendant Goncalves is the Chairman, President, and CEO of Cliffs, a position he has held since August 2014.  Cliffs' website describes Goncalves as having led Cliffs "through a major strategic initiative" that "transform[ed] Cliffs into a leading player in the U.S. steel industry."  Goncalves, a resident of Ohio and Florida, oversees all of Cliffs' steelmaking operations, including those in the Western District of Pennsylvania.

37.    Defendant McCall is the International President of the USW, a position he has held since he was appointed (without any vote by rank-and-file members) in September 2023 following the death of his predecessor.  As the USW's President, McCall, a resident of Ohio, serves as a USW officer in Pittsburgh and leads the International Union's 26-member International Executive Board.

38.    The USW, which is not named as a defendant, is a labor organization headquartered in Pittsburgh, Pennsylvania.  The USW is North America's largest industrial union, with 1.2 million members and retirees across the United States, Canada, and the Caribbean, including current and former employees of U. S. Steel, NSC, and Cliffs (inclusive of their subsidiaries and affiliates).  The USW has entered into collective bargaining agreements with U. S. Steel that cover approximately 10,000 USW members across the United States.  The USW has entered into collective bargaining agreements with Cliffs that cover more than 12,000 USW members across the United States.

## JURISDICTION AND VENUE

39.    This Court has subject-matter jurisdiction over this action pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and the Sherman Antitrust Act, 15 U.S.C. § 15(a), and pursuant to 28 U.S.C. § 1331.  This action arises under Sections 1 and 2 of the Sherman Antitrust Act.  This Court also has subject-matter jurisdiction over Plaintiffs' claims under 18 U.S.C. § 1962(c) pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  The Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between Plaintiffs and Defendants.

40.    The Court has personal jurisdiction over Defendants in this action under 15 U.S.C. §§ 15(a), 22.

41.    The Court also has personal jurisdiction over Defendants in this action because each Defendant has sufficient minimum contacts with the Commonwealth of Pennsylvania to satisfy its long-arm statute.  The Court's exercise of personal jurisdiction over Cliffs, Goncalves, and McCall would not offend traditional notions of fairness under the U.S. Constitution.

42.     Venue is proper in the U.S. District Court for the Western District of Pennsylvania pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b).   Cliffs transacts business with numerous customers in the Western District of Pennsylvania, including at its Butler Works facility in Butler County; Goncalves conducts Cliffs' business in the Western District of Pennsylvania; and McCall oversees the USW's 13 districts and conducts the USW's business at the USW's headquarters in Pittsburgh, where his office is located.   Defendants' unlawful conduct is directed at U. S. Steel, which is headquartered in the Western District of Pennsylvania.

## FACTUAL ALLEGATIONS

43.     Cliffs, led by Goncalves, has embarked on a years-long anticompetitive campaign to obtain and entrench monopoly power by serially acquiring North American steelmaking assets. Since at least 2020, Defendants and the USW have been engaged in an enterprise to support Cliffs' monopolistic ambitions.   As part of this effort, Defendants have worked together in a no-holds-barred "merge or murder" racketeering campaign to undermine U. S. Steel's competitive vitality, prevent procompetitive investment, and ultimately cause Cliffs to acquire U. S. Steel.   This campaign is key to Goncalves' monopolistic objectives.   And McCall has illegally conspired to assist Cliffs and Goncalves in this effort.

**A.      Cliffs Makes an Unsolicited Bid for U. S. Steel and, Leveraging Its Illegal Agreement with the USW, Attempts to Coerce U. S. Steel to Accept Its Unsolicited Low-Ball Offer.**

44.     Before Cliffs bought its way into the steel business, it was the largest independent iron ore producer in the United States.   Cliffs was a self-described "major supplier of iron ore pellets to the North American steel industry" but did not produce steel at all.   That changed in 2020, when Cliffs acquired AK Steel Corporation ("AK Steel") and ArcelorMittal USA LLC

("AM USA").  According to Goncalves, these acquisitions made Cliffs the largest flat-rolled steel[2] producer in North America virtually overnight, and the sole North American commercial producer of electrical steel.

45.     A few years later, Goncalves determined that the time was ripe for Cliffs to further pursue its monopolistic ambitions.  Having bought Cliffs' market share through unconstrained acquisitiveness, Goncalves turned next to U. S. Steel—Cliffs' closest competitor in blast furnace steel production and the company best positioned to challenge Cliffs' market power in non-grain oriented electrical steel ("NOES") and grain-oriented electrical steel ("GOES"), as reflected by recent prominent investments by U. S. Steel in its facilities that produce NOES.  Rather than compete on the merits in the marketplace, Cliffs and Goncalves sought to acquire U. S. Steel for the purpose of cementing Cliffs' dominant position in these key steel markets and taking out or weakening a significant competitive threat.

46.     On July 28, 2023, Goncalves informed U. S. Steel CEO David Burritt by telephone that Cliffs was making an unsolicited bid for the company.  Goncalves made no effort to hide his monopolistic intent.  A follow-on letter emphasized both companies' competing blast furnaces, underscoring the monopoly value that Goncalves perceived in a combination.  According to the letter, Cliffs sought to acquire U. S. Steel at a valuation of $35 per share (half in cash, and half in stock of Cliffs), representing a total enterprise value for U. S. Steel of approximately $10 billion. Cliffs demanded a response to its proposal by August 7, 2023.  The USW's leadership was in on Cliffs' plan from the start and had communicated with Cliffs regarding the bid before it was transmitted to U. S. Steel.

---

[2] Flat-rolled steel is a type of processed steel that is generated through melting and rolling under an applied force.  It is used to produce exposed automotive steel, electrical steel, and other steel products, and iron ore pellets are a critical input in its production.

47.    Seeking to force U. S. Steel's hand, the USW's leadership wrote a letter six days later, on August 3, 2023, stating that it had a "very strong relationship with Cliffs" and the two had reached an agreement:  the USW agreed to "unequivocally endorse" Cliffs' bid and "not endorse anyone other than Cliffs" in any bid for U. S. Steel.  Cliffs reached this agreement with the International Union's leadership, including the late USW President Thomas Conway and McCall, then Vice President of Administration, not the local leaders representing rank-and-file members working in the U. S. Steel plants that would be directly affected by such agreement.

48.    The USW did not actually have a contractual veto right over any transaction involving U. S. Steel in its collective bargaining agreement or otherwise.  But Cliffs' agreement with the USW representing U. S. Steel's indispensable work force became the cornerstone of Cliffs' anticompetitive and illegal campaign to secure and enhance monopolies and to ensure that no one else would acquire and enhance the competitiveness of U. S. Steel.  The agreement predated the emergence of NSC as U. S. Steel's acquirer, underscoring that Cliffs' intention—and the basis of its anticompetitive and illegal agreement with the USW—was to stop any buyer other than Cliffs from acquiring U. S. Steel.

49.    Refusing to be bullied into an unfair and anticompetitive deal, and consistent with the Board's fiduciary duties, U. S. Steel issued a press release on August 13, 2023 disclosing its decision to undertake a formal review process to evaluate its strategic alternatives.

50.    Threatened by the potential emergence of other bidders willing to make a transformative investment in U. S. Steel that would make it a stronger competitor, Cliffs immediately put its unlawful agreement with the USW to work.  Cliffs, seeking to deter other bidders and pressure U. S. Steel, went public with a false claim that the USW had a legal right to veto any deal with a buyer other than Cliffs.  In another press release a few days later, Goncalves

doubled down on his false claim that the USW could prevent any deal other than a Cliffs acquisition from closing: "Cliffs is the only realistic buyer. . . . [A sale] could not be consummated without the support of the USW."

51.    Of course, Cliffs and the USW knew that no contractual veto right existed, so they relied on their illegal agreement to make it effectively impossible for any other buyer to acquire U. S. Steel.  The USW had assigned its right to bid under the BLA to Cliffs—which Cliffs pursued before it ultimately lost out to NSC's superior offer.  But the USW had also separately agreed to actively obstruct all other bidders and improperly force U. S. Steel to accept a deal with Cliffs, or otherwise suffer competitive injury.  Thus, from at least August 2023 and continuing to this day, Cliffs and the USW, under the leadership ultimately of President McCall, conspired to force U. S. Steel to accept a deal with Cliffs, including by actively opposing any other counterparty.

52.    The antitrust risk posed by a Cliffs deal, however, made the likelihood it could close, and thus its value, highly uncertain.  A combination between Cliffs and U. S. Steel would almost surely be met with a challenge from antitrust regulators based on harm to competition in the iron and steel industries, American automakers (who rely on automotive steel), and, ultimately, consumers.  Due to U. S. Steel's extensive competitive overlap with Cliffs, a deal with Cliffs would have been possible only if Cliffs were willing to make substantial divestitures that would in turn break up U. S. Steel and undermine the value of Cliffs' part stock, part cash proposal.  Regardless, Cliffs proved unwilling to agree to any divestitures that would erode its goal of securing a dominant market position.

53.    On December 15, 2023, Cliffs delivered what it termed its "final proposal" to acquire U. S. Steel.  Cliffs' final proposal was to acquire all the outstanding shares of U. S. Steel's common stock for $27 in cash and 1.44 shares of Cliffs' stock per share of U. S. Steel common

stock. This offer was valued at $54 per share of Company common stock based on the closing price of Cliffs' stock on December 15, 2023, but notably was tied to fluctuations in Cliffs' stock price (and, as a result, is worth far less per share today than it was a year ago).

54.    NSC, by contrast, submitted a superior final offer at $55 per share, all in cash. An all-cash deal meant that there was no risk posed by fluctuations in the value of a stock component of the deal. Moreover, Nippon Steel Corporation, which would acquire U. S. Steel through its American subsidiary, NSNA, did not pose the antitrust risk inherent in a Cliffs deal. The U. S. Steel Board expressly recognized as much, concluding that the antitrust risks posed by a Cliffs deal "were not present" with NSC's proposal. And because Japan is one of the United States' most important allies, and because neither U. S. Steel nor NSC supplies products directly to the U.S. military, the Board did not believe the deal could lawfully be blocked on national security grounds. On the contrary, the Board, which includes a director who was formerly Secretary of Homeland Security (a department which is a voting member of CFIUS), believed the deal would enhance U.S. national security by making the domestic steelmaking industry stronger and more competitive.

55.    Thus, on December 17, 2023, the U. S. Steel Board unanimously approved execution of the Merger Agreement with NSC, by which NSNA would acquire all of the outstanding shares of U. S. Steel's common stock for $55 per share in cash. Given the higher value and greater closing certainty offered by NSC, the Board concluded that the transaction was superior to Cliffs' final proposal.

56.    The Merger between NSC and U. S. Steel was announced the following day, on December 18, 2023. That same day, the U.S. Ambassador to Japan praised the Merger, stating that it would "deepen [the] bonds" between Japan and the United States. Starting immediately on

December 18, 2023, and on numerous occasions thereafter, Nippon Steel Corporation and NSNA expressly confirmed to the USW that they would recognize the USW and assume all USW agreements with U. S. Steel, and that they had the financial wherewithal to do so. These commitments, as the Board of Arbitration later confirmed, satisfied the successorship provisions set out in the BLA.

**B.  Cliffs and the USW Pursue a Coordinated Campaign to Defeat a Procompetitive NSC Merger and Kill U. S. Steel.**

57.    Concerned that the Merger would enhance U. S. Steel's ability to compete against Cliffs, Cliffs and the USW undertook to kill the Merger and demonstrate, by any means available, that the only possible acquirer of U. S. Steel was and remains Cliffs. This strategy was a necessary consequence of their unlawful, anticompetitive agreement to obstruct any non-Cliffs deal.

58.    Cliffs and the USW (under the respective leadership of Goncalves and McCall) unleashed a campaign of lies, deception, and pressure tactics designed to plunge the Merger into chaos and weaken U. S. Steel as a stand-alone competitor. Each act they took was in furtherance of their illegal conspiracy to ensure that only Cliffs could acquire U. S. Steel and to prevent any other deal. The campaign was directed at preventing NSC—with its superior technology and ample capital—from reinvigorating U. S. Steel and in turn the iron and steel markets in which it competes, a course of action that Cliffs feared, including because it would undermine its monopolistic aims in these markets. Cliffs also sought to directly inflict harm on U. S. Steel, with Goncalves making no secret of his desire for a failed transaction that would leave U. S. Steel damaged and available to have all or parts of its business acquired by Cliffs at a significantly lower price. As one of Goncalves' deputies stated publicly, "U. S. Steel can either shut down [its blast furnaces] or sell them to us on the cheap"; either way, "[t]here will be less competition."

59.    When NSC emerged as U. S. Steel's acquirer, Defendants' coordinated, anticompetitive misinformation campaign immediately shifted into high gear.  On December 18, 2023, the very day that the Merger was announced, Goncalves appeared on CNBC to bad mouth the deal, cast aspersions on Nippon Steel Corporation as a Japanese company, and proclaim that "this thing is far from over":

> *We can't allow foreign ownership.*  We can't allow for a foreign company to come to just liquidate American jobs and take over what we have here.

60.    McCall, for his part, publicly spread knowing lies about U. S. Steel and NSC and recommitted to carry out the bargain the USW had struck with Cliffs months earlier.  During an interview with Pittsburgh Action News 4 on December 19, 2023, McCall stated that "neither Nippon [n]or U. S. Steel contacted [the USW] prior to the announcement."  In fact, the day that the deal was announced, Hiroshi Ono, President and CEO of NSNA sent McCall a letter seeking to meet with him as soon as possible.  Separately, NSNA sent a letter recognizing the USW "as the bargaining representative for the USW-represented employees" employed by U. S. Steel and stating explicitly that NSNA would "continue to honor all commitments in all USW Agreements . . . including the BLA and pension, health & welfare plans and agreements."  Nippon Steel Corporation would later provide similar assurances.  (The Board of Arbitration later found that these assurances satisfied the BLA's successorship clause applicable to a change of control transaction.)  Likewise, David Burritt, CEO of U. S. Steel, called McCall about the Merger before it was announced, and emailed him asking for a call back—but McCall never bothered to return the call.  When a lawyer for U. S. Steel called another USW officer on the morning before the announcement, he was told that the USW was already aware—presumably through Cliffs.  But that did not matter to McCall; he was committed to lying to the public and his rank-and-file members from the start.

61.     Only two weeks after losing its bid to buy U. S. Steel, Cliffs welcomed a former union negotiator, with experience helping the USW tank deals that it does not like, as its newest board member.  In an eerily similar fact pattern, years earlier, the negotiator had helped the USW block a foreign buyer's acquisition of Wheeling-Pittsburgh Steel Corporation ("Wheeling"), forcing the company into bankruptcy.  (The USW's leadership does not like to tell how that story ended: NSC ultimately acquired Wheeling's stake in a joint venture between NSC and Wheeling ("Wheeling-Nippon") and revitalized its operations with a USW-represented workforce.)

62.     Cliffs and the USW's leadership also ran a coordinated public campaign against the Merger, U. S. Steel, and NSC.  On January 9, 2024, Paul Finan, Cliffs' Senior Vice President of Finance, and Robert Fischer, Cliffs' Executive Vice President of Human Resources & Labor Relations, hosted an investor call through the investment bank Jefferies.  Rather than discussing Cliffs' performance, however, Finan and Fischer used the call to tell U. S. Steel investors, a number of whom were in attendance that day, that Cliffs still intended to acquire U. S. Steel, but at a price lower than what Cliffs had previously offered.  Fischer further claimed to be in active dialogue with the USW about its position on the deal, and to have "their ear."  But Cliffs had more than the USW's ear—it had the unlawful agreement, pursuant to which the USW and McCall, with Cliffs' coordination and assistance, were committed to opposing the deal.

63.     Cliffs continued its slander campaign against the deal on January 30, 2024, during an investor earnings call ostensibly meant to address Cliffs' 2023 results.  Asked where Cliffs' attention might turn if the NSC transaction closed, Goncalves railed against U. S. Steel.  Claiming that Cliffs' first offer was a "good one"—even though its final proposal was almost 60% higher— Goncalves launched into a rant littered with false statements:

>  [T]hat board did not want to sell to Cliffs.  Period.  Full stop.  They
>  would like to break the back of the Union.  That's what they are

doing.  Let's talk turkey here.  ***That management team and that board had one goal in mind, and the goal was to break the back of the United Steelworkers.***  And by breaking the back of the United Steelworkers to break the back of unionized labor in America.  ***I am a big supporter of unionized labor because it goes against bosses like Dave Burritt.  These type of people need to go.***  So, that's my take on U. S. Steel.  Do I need to give you more color or that's enough?

64.     These egregiously false statements were designed to undermine U. S. Steel's relationship with the USW, interfere with U. S. Steel's and NSC's ability to close the Merger, and render U. S. Steel radioactive in the eyes of any other strategic partner.

65.     On February 2, 2024, Cliffs' executives continued Cliffs' smear campaign in a public webinar hosted by the investment bank Raymond James (the "February 2 Webinar"), which lasted 75 minutes and had approximately 130 attendees.  There, Celso Goncalves (Cliffs' CFO and the son of CEO Lourenco Goncalves), Fischer, and Finan doubled down on Cliffs' deceptive campaign to portray U. S. Steel Board members as incompetent stewards who mishandled the sale process and to portray an ultimate deal with Cliffs, backed by a McCall-led USW, as inevitable. "Dave McCall and the USW have already been clear that they don't want the deal to go through," the younger Goncalves explained.  So, even if CFIUS failed to "find any evidence of a supply chain problem or a national security problem [. . .], Joe Biden can take a look at that and say, 'Okay, that's great.  But my buddy, Dave McCall, the [. . .] international president of the USW doesn't want the deal.  So, I'm going to side with him.  And I'm gonna block.'"

66.     During the February 2 Webinar, Lourenco Goncalves' son reiterated the false and misleading claim that the Merger was motivated by anti-union animus, falsely asserting that NSC "assign[ed] no value to the unionized plants" owned by U. S. Steel, that NSC had "no plans to invest in [those plants]," and that NSC "said[] we're gonna execute under the existing plan of U. S. Steel which is to shut down unionized mills and to move production down to the non-union mills."

Celso Goncalves further proclaimed that "[t]here's nothing that [NSC] can do that's gonna bring the [USW] on their side.  Nothing,"  Goncalves was able to make that statement because he knew that Cliffs and the McCall-led USW had an illegal agreement by which the USW agreed to oppose any deal—including the NSC Merger—and only support a deal with Cliffs.

67.     While these statements about NSC's plans were knowingly false (indeed, NSC had publicly committed to making significant investments in U. S. Steel's unionized plants, above and beyond what was required by the BLA), one statement was correct:  the USW's illegal and anticompetitive agreement with Cliffs meant the USW would never accept NSC, or any other bidder.  Pursuant to the conspiracy with Cliffs, McCall—purporting to speak on behalf of the USW—made his plan explicit in a February 2024 phone interview with a reporter:  "***I want to kill this deal.***"

68.     Celso Goncalves further falsely claimed in the February 2 Webinar that, contrary to "what's in the proxy," Cliffs' and U. S. Steel's lawyers had worked together to analyze the antitrust risk and "found proof of no competitive harm to the customer base, including auto and other manufacturers," arising from a Cliffs acquisition of U. S. Steel.  That claim was knowingly and demonstrably false.  As the U. S. Steel Board concluded, an acquisition of U. S. Steel by Cliffs posed serious antitrust risks that were not ameliorated by Cliffs' offer to divest a modest amount of assets in response to concerns that would undoubtedly be voiced by antitrust regulators.

69.     That a deal between Cliffs and U. S. Steel faced certain antitrust challenges that could prevent it from closing or require the company to be broken up hardly mattered to Cliffs.  Cliffs knew that it would serve its monopolistic aims to tie up U. S. Steel in a potentially years-long process during which it could exercise veto power, through customary interim operating covenants, over U. S. Steel's strategic initiatives and investments.  The competitive threat to Cliffs

posed by U. S. Steel would be forestalled and undermined if it could get U. S. Steel to agree to a deal, even if it ultimately failed—a win-win situation from Cliffs' perspective as an unscrupulous competitor seeking to lock up critical steel markets. And, if U. S. Steel were broken up, so much the better for Cliffs as well—it would have taken out the only other domestic integrated steel operator.

70.    Cliffs has also repeatedly trafficked in xenophobic tropes as part of its unlawful campaign against the Merger. "[T]hese people know what happens when you allow foreign buyers to come in," Celso Goncalves asserted in the February 2 Webinar. "[E]ven if they sweet talk you in the beginning, they always let you down. They always end up shutting down production. They always end up firing people, doing layoffs, the things that we committed that we wouldn't do." Lourenco Goncalves sharpened the xenophobic stereotypes in an investor call hosted by investment bank TD Cowen on February 15, 2024, derisively imitating a Japanese accent while claiming that Japanese people, like Chinese people, cannot be trusted. And at an investor conference in mid-March 2024, Goncalves told investors that NSC's management would "commit seppuku" (a form of Japanese ritualistic suicide) if the Merger failed, drawing an imaginary knife across his abdomen and up his chest to make sure no one missed the point. Goncalves' conduct and tactics are more befitting of a mafia boss than the CEO of a publicly traded company. His actions were designed not only to drum up anti-Japanese sentiment in opposition to the deal, but to ensure that no other company would have the temerity to try to take on Cliffs and the USW if the NSC Merger were to fall apart.

71.    Around the same time, Cliffs sought to dissuade NSC directly from continuing with the Merger. In February 2024, Goncalves called one of NSC's advisors, requested an urgent face-to-face meeting with NSC's top leadership, and—in a direct attempt to induce NSC to breach and

abandon the Merger Agreement—suggested carving up U. S. Steel between the two companies. Goncalves presented himself as a puppeteer of the U.S. government, stating that he had been "talking directly with U.S. Secretary of Commerce Gina Raimondo."

72.     A month later, on March 14, 2024, Goncalves made clear to Bloomberg that he and McCall had jointly told the Biden Administration that Cliffs is the only acceptable buyer for U. S. Steel: "We have been in total contact with the administration, so I know what's going on," Goncalves said.  "***The contact is about making it abundantly clear between me and Dave McCall that the only buyer the union accepts for the union-represented assets is Cleveland-Cliffs.***"  The next day, Goncalves had a similar conversation with a major U. S. Steel stockholder.  Alluding to President Biden's announced opposition to the Merger the day before, he claimed:  "***I was behind all that.***"  Portraying CFIUS officials as puppets, he claimed that the President's decision to "kill [the] deal" was only a matter of time, and that "Nippon Steel is on the clock."  When the stockholder suggested CFIUS would undertake "a process," Goncalves corrected him:  "***No, there's no process.  This is not going to be a process.  CFIUS is just cover for a President to kill a deal.***"

73.     Goncalves also told the stockholder on March 15, 2024 that any USW negotiations with NSC were a farce:  "I promise you there's no deal with the Union.  That's not gonna happen." Instead, Goncalves explained, the USW would negotiate in bad faith:  "[T]hey are not going to allow a lawyer to say they are not in compliance because they aren't negotiating.  They will negotiate and they will negotiate for a long, long time."  Indeed, just as Goncalves promised, the USW, under McCall, has consistently declined meeting invitations from NSC, while continuing to disparage the Merger in the press.  On the few occasions that McCall actually attended meetings, it was purely for show—and not to negotiate.  Indeed, he followed up each meeting with public

misstatements about what transpired during the meetings. And by the last meeting, he did not even bother waiting for the meeting to be over before issuing a public statement that no progress was made. Repeated efforts by NSC's advisors to back-channel with representatives of the USW have also been unproductive. As a group of twenty mayors from Indiana and Western Pennsylvania observed in a December 23, 2024 joint letter to President Biden in support of the Merger, the USW's leadership has simply "refus[ed] to negotiate in good faith on this transaction."

74.    Goncalves has made no secret of his deal with the USW. As he put it at an investor conference in March 2024: ***"I have already fixed the situation in a way so that it cannot go against* me*. . . . I can work my magic to make a deal that I don't agree with not . . . close."*** Goncalves admitted to having "unusual" leverage over the USW, explaining that, "[n]obody has a relationship with the Union as I have." Indeed, Goncalves boasted on an investors' site visit that he was certain McCall did not want the Merger to go through and was so close to McCall that he could call him live in front of the investors to confirm.

75.    McCall, for his part, has abused his leadership position with the USW to implement Goncalves' monopolistic plan. As President of the USW and, in the words of Goncalves, "the guy really calling the shots," McCall has steered the USW in partnership with Cliffs to oppose the Merger through every available avenue. McCall has not attempted to negotiate in good faith with NSC regarding the Merger. Instead, he has repeatedly issued public statements replete with lies.

76.    For example, on March 7, 2024, eight days prior to Goncalves' promise that a deal with the USW was "not gonna happen," NSC met with the USW's leadership. At that meeting, which lasted for less than an hour, NSC delivered commitments related to trade, capital expenditures, layoff protections, and other significant commitments. Immediately following the meeting, the USW issued a pre-prepared press release claiming that no progress had been made.

In fact, with the conclusion predetermined as a result of Defendants' conspiracy, no progress would or could ever be made. And on April 10, 2024, the USW issued a press release, signed by McCall, falsely claiming that NSC "will continue to prioritize its Japanese operations at the expense of U.S. workers."

77.     The only reasonable inference from McCall's refusal to engage with NSC and continued loyalty to Cliffs is that the International Union's leadership has been promised benefits by Cliffs other than those that will clearly flow to the U. S. Steel's USW-represented rank-and-file workers as a result of the deal. In so doing, Cliffs and Goncalves have improperly bought the loyalty of McCall and the USW's leadership.

**C.     U. S. Steel Stockholders Approve the Merger, but Cliffs, Goncalves, McCall, and the USW Continue to Work to Undermine the Merger in Furtherance of Their Illegal Agreement.**

78.     On April 12, 2024, U. S. Steel stockholders overwhelmingly voted to approve the Merger despite Cliffs' misleading public statements. Cliffs, Goncalves, McCall, and the USW's leadership nonetheless continued their obstructionist campaign. In addition to myriad other public statements attempting to undermine the Merger, Celso Goncalves told the public on an April 23 earnings call that "[t]he Nippon deal is dead," that "the list of real buyers for [U. S. Steel] is . . . a party of one," and that "other buyers stand no chance to close a deal involving U. S. Steel's union assets."

79.     On the same call, Celso Goncalves reiterated Cliffs' determination to acquire U. S. Steel at a significantly lower price than what NSC and what Cliffs itself had offered months earlier. Two days later, Lourenco Goncalves explained to Bloomberg that, "[i]f possible[,] [Cliffs] will buy the entire thing."

80.     Lourenco Goncalves was crystal clear as to why a significantly lower price would be justified: Defendants' unlawful campaign had already sapped U. S. Steel's strength. Goncalves

put the point starkly during the American Iron and Steel Institute's annual meeting on May 14, 2024, where he spoke about the impact of his illegal tactics on U. S. Steel: "It's like a sick patient that sits on a bed with a bunch of tubes and sensors around him." U. S. Steel, Goncalves reiterated on another occasion, is "like a patient that is in a coma." On May 21, 2024, Goncalves warned U. S. Steel that it "cannot and will not close [the] announced deal with Nippon Steel."

81.    On July 23, 2024, on Cliffs' Q2 2024 earnings call, Goncalves reaffirmed Cliffs' plan to profit from his unlawful agreement with the USW by interfering with the Merger and eventually buying U. S. Steel on the cheap, reflecting the damage caused to U. S. Steel and its assets by Defendants' illegal campaign: "I can't let [U. S. Steel] go, and for my price that's now in the 20s, we can have a deal."

82.    Meanwhile, McCall made sure that the USW kept up its side of the bargain. NSC again met with the USW's leadership on July 12, 2024 to address their purported concerns, but it was given a mere 45 minutes of McCall's time. And when Nippon Steel Corporation Vice Chairman and Executive Vice President Takahiro Mori emailed McCall several days later to thank him for meeting, express interest in future meetings, and reiterate NSC's commitment to addressing any of the USW's concerns, McCall dismissively responded by emailing back 47 pages of scanned press releases condemning the Merger. Throughout mid to late August 2024, an NSC advisor—a former, senior elected member of government with extensive experience negotiating labor agreements, including with the USW—reached out multiple times to McCall via phone and email to discuss the USW's purported concerns and NSC's commitment to addressing them. But on August 30, 2024, McCall responded that he was unwilling to meet with NSC again until either an arbitration decision or a decision from CFIUS—whichever happened later. On September 3,

2024, Mori sent McCall additional commitments and a draft term sheet, but did not receive a response. McCall has continued to refuse to engage in good faith with NSC ever since.

83.    Cliffs has continued to lean on its agreement with McCall and the USW to further its anticompetitive scheme. The illegal agreement with the USW is the linchpin to its plans to deter other investors and ultimately buy U. S. Steel in whole or in part on the cheap, or to otherwise damage it as a stand-alone competitor. At an investor conference sponsored by UBS on September 5, 2024, Finan called NSC and U. S. Steel "deranged" and made clear Cliffs' continued desire to acquire all or part of U. S. Steel. Finan also claimed that, with the support of the USW, any potential antitrust issues could be overcome, despite the clear harm to American consumers that would result from putting all iron ore supply, blast furnaces, and electrical steel production in the United States in the hands of a single company. Finan also boasted that acquiring assets from U. S. Steel, along with Cliffs' proposed acquisition of Stelco, would shore up Cliffs' market power. The reason, as stated by Cliffs' Senior Vice President of Finance at the investor conference: "**There will be less competition.** *There will be one less competitor pushing down prices, technically two less competitors with Stelco taken out as well.*"

84.    That same day, Goncalves went on CNBC to emphasize that he would buy U. S. Steel at "a much, much lower price" and to reiterate his claim that Cliffs is "the only viable buyer." Goncalves also made it clear *why* Cliffs was the only viable buyer, highlighting his illegal agreement with the USW and calling McCall his "dear partner and friend."

85.    The next day, on September 6, 2024, in the wake of false reports that CFIUS would imminently block the Merger, Goncalves explained that Cliffs stood ready to buy U. S. Steel assets with "the continued exclusive and unwavering support of the United Steelworkers union."

**D.    U. S. Steel Prevails in Its Arbitration with the USW, But Defendants' Monopolistic Scheme Continues Undeterred.**

86.    The USW repeatedly attempted to delay the resolution of its own grievance regarding the successorship provision in the BLA that it filed challenging the Merger.  But it was finally heard by the full, three-member Board of Arbitration that oversees the BLA on August 15, 2024.  One month later, on September 16, 2024, the panel rejected the grievance.

87.    Yet, even after having exhausted its rights under the BLA, the USW, under McCall's direction, issued a press release on September 17, 2024 falsely claiming that NSC will import its excess blast furnace-produced slabs to run in U.S. hot mills and stating that the USW "must remain united as we fight to keep" the Merger from happening—all consistent with the illegal agreement with Cliffs.  On September 25, 2024, the USW issued another press release, signed by McCall, falsely claiming that NSC has a "long history of attacking American steel production and domestic steelworkers with its unfair trade practices."  And on October 2, 2024, the USW at McCall's direction issued yet another press release accusing the U. S. Steel CEO of blackmail, urging the Board to abandon the NSC transaction, and claiming the USW had "beaten" U. S. Steel's CEO, notwithstanding that the USW's grievances were decisively rejected by the Board of Arbitration.  McCall's opposition to the Merger was unwavering, even after the USW lost the labor arbitration, and Cliffs, the USW's preferred bidder, lost the bidding process for U. S. Steel in the face of NSC's superior offer.

88.    All of this was done in collusion with Cliffs and Goncalves.  Goncalves admitted as much in early October 2024.  Asked by a reporter whether he was concerned that his coordination with USW was collusive and that he had exposed Cliffs to litigation risk, Goncalves did not deny the collusion.  Instead, he responded, with typical bravado, that it was a "free country" where "everybody's free to sue everybody" and that Cliffs also "collude[s] with the UAW [United

Auto Workers], . . . the IAM [International Association of Machinists and Aerospace Workers], . . . [and] the non-union workers."

89.     Through their admittedly collusive efforts, Cliffs, Goncalves, McCall, and others in Cliffs and USW leadership continued to try to kill the Merger, including by subverting its review by CFIUS.  In early October 2024, Ambassador Tai—the USTR and a voting member of CFIUS— appeared at a political event at Cliffs' facility in Coatesville, Pennsylvania, where she was accompanied by Goncalves, the USW's district director for Pennsylvania, acting Secretary of Labor Julie Su (a non-voting member of CFIUS), and U.S. Representative Chrissy Houlahan of Pennsylvania.  During that event—which included a lengthy tour of the Cliffs facility and an hour-long "fireside chat" where Goncalves heaped praise on the Biden Administration just a month before the election—Goncalves again reiterated that President Biden "has the back[s] of the workers," using the same coded phrase President Biden and McCall had previously used in voicing their opposition to the Merger.  Without missing a beat, Ambassador Tai promised to continue her push for "worker-centered trade policy," by which she meant opposing the Merger and trying to swing the election to President Biden.  As Ambassador Tai told her counterparts, supporting the steel industry was vital for Democrats winning Pennsylvania in the upcoming election (even though blocking the Merger would harm the industry).

90.     Then, less than three weeks after Ambassador Tai's statements, President Biden announced the appointment of McCall to advise Ambassador Tai as a member of the USTR's Advisory Committee for Trade Policy and Negotiations.  Ambassador Tai reportedly would later become the only voting member of CFIUS to oppose the Merger, providing a pathway for President Biden to block it.

91.    All the while, McCall ignored the growing pro-Merger sentiment among USW's rank-and-file members.  For example, on October 21, 2024, union workers based out of the Mon Valley pleaded with McCall "just to go to the table and meet with [NSC]."

92.    But on November 14, 2024, McCall repeated his lies by issuing a press release falsely stating that NSC will "harvest[] USW represented facilities," transfer production to non-union facilities, and "import Japanese slabs."  And in an interview on November 15, 2024, McCall repeated his false claim that NSC plans to harvest U. S. Steel's assets and held firm to his agreement with Cliffs:  "I have no plans to meet with [NSC]."  And in that same interview, two months after the Board of Arbitration decided otherwise, McCall publicly and falsely stated that NSC had not yet committed to assume its obligations under the BLA—a claim that had already been rejected by the Board of Arbitration.  McCall also baselessly denigrated NSC's decarbonization technology.

93.    Cliffs' related effort to undermine U. S. Steel as a stand-alone competitor likewise shows no sign of slowing.  Cliffs spoke to no fewer than four of U. S. Steel's investors in the week of November 15, 2024 alone.  Cliffs told them that the deal would be blocked "in the near-term before the end of the month"; that "it's just a matter of time"; that it was "BS" that Secretary of Commerce Gina Raimondo was having second thoughts about CFIUS's decision to block the Merger; and that "U. S. Steel . . . didn't play the game."

94.    For his part, Celso Goncalves told investors on November 20, 2024 that "apparently Mori made no progress" in his recent meetings in the United States regarding the Merger.  And two days later, again evidencing Cliffs' highly coordinated actions with the USW, he sent an email to at least one major U. S. Steel investor stating that "McCall has no plan to meet with Mori" and that McCall was headed to the White House that evening.  Cliffs executives, including Celso

Goncalves, are still using their lines of communication with investors to harass and injure U. S. Steel.

95.    Cliffs knew that this rumor campaign would have and has had a direct effect on U. S. Steel's stock price, undermining its viability as an independent competitor and increasing its vulnerability to a renewed hostile bid by Cliffs.  Investors have described Celso Goncalves' prognostications as "discouraging," and one even told U. S. Steel the week of November 11, 2024 that "[p]art of the sell-off in the stock this week has been a result of those rumors going around. They [Cliffs] seem to have had inside information in the past and maybe have [it] again."  Another investor advised that U. S. Steel's stock dropped "around" the same time on November 20, 2024 that Celso Goncalves communicated with investors.  Lourenco Goncalves likewise depressed investors' opinions with his own statements, as recounted by one investor, that "'[i]t's just a matter of time before Biden blocks the deal from the CFIUS perspective.  He's just crossing the T's and dotting the I's.'  To hear [Goncalves] say it as consistently as he has been saying that has been discouraging."

96.    Later in November 2024, Governor Josh Shapiro of Pennsylvania attempted to faciliate talks between NSC and the USW, but, after just one meeting, McCall rebuffed Governor Shapiro's request to continue discussions and instead released a video blatantly and dishonestly mischaracterizing NSC's positions regarding the Merger and its commitments to the USW.

97.    By mid-December 2024, Goncalves was announcing to investors left and right that a block of the Merger was imminent even as final efforts to move McCall away from his illegal agreement with Goncalves continued.  And, true to the illegal agreement to support only a Cliffs deal, McCall and the International Union repeated their false claims about NSC's plans for U. S.

Steel's blast furnace facilities and rejected ongoing attempts to address any claimed remaining concerns, despite pleas from the rank-and-file workers and the mayors in the towns that will be most affected by a failed deal.  McCall's and the USW's abusive tactics did not change.  On December 19, 2024, in his last meeting with NSC, U. S. Steel, and mayors from the Mon Valley and Gary, Indiana—all of whom support the Merger—McCall even had the USW issue a press release about the meeting *while it was occurring and he was still in the room*.  Not represented at that meeting were the hundreds of union workers who rallied in the Mon Valley in support of the Merger just one week prior.

98.    Finally, on January 3, 2025, President Biden issued an executive order blocking the Merger.  Unlike past orders to block transactions under CFIUS, President Biden's order contains no detailed findings.  The same day, McCall commended President Biden's decision and continued to spread lies about NSC's post-Merger plans.  This litigation, and the separate challenge to President Biden's action, immediately followed.

## CLIFFS' MONOPOLIZATION SCHEME

**A.    Cliffs Is a Serial Acquirer that Has Been Seeking to Buy Its Way to Monopolies in Critical Steel Markets.**

99.    Not content with being the largest owner and operator of iron mines in the United States, Cliffs bought its way into the domestic steel industry, starting with an acquisition of the blast furnace and steelmaking facilities of AK Steel in March 2020.

100.    Goncalves boasted in a May 2020 earnings call that the acquisition of AK Steel gave Cliffs access to "a steel company with highly concentrated exposure to high-end markets," including "the automotive sector, a market which all steel companies would like to become part of."  Goncalves further bragged that Cliffs was now the sole producer of electrical steel products in North America.

101.    In December 2020, further aggregating U.S. blast furnace steel assets in Goncalves' hands, Cliffs completed its $1.4 billion acquisition of substantially all of AM USA, which had annual revenues at the time of $10.4 billion.

102.    Cliffs' serial-acquisition strategy, for which it has had the long-time support of the USW, worked as intended.   The two 2020 acquisitions, according to Goncalves, instantly transformed Cliffs into the largest flat-rolled steel producer in North America, vertically integrated with the ability to self-supply its steelmaking plants with necessary iron ore.   On a February 2021 earnings call, Goncalves remarked on Cliffs' newfound dominance in blunt terms: "[L]et me remind you [of] one thing.  One year ago, Cleveland-Cliffs was producing and selling zero tons of steel.  And we are now, one year later, the largest flat-rolled steel company in North America." And on another earnings call two months later, Goncalves trumpeted that the AK Steel and AM USA acquisitions would limit his automotive customers' options.   "[T]he real competition for the more sophisticated grades of steel that AK Steel and Cleveland-Cliffs own . . . the only real competition was AM USA. ***So now we own both***."

103.    McCall and other USW leaders have consistently supported Cliffs along its long path to monopoly, despite the deleterious effects not only on American steel production capacity but also on union workers.  McCall has lauded Goncalves for "recogniz[ing] the importance of providing good jobs and creating goodwill toward the company in the communities where we live and work."   But following Cliffs' two 2020 acquisitions, Goncalves proved to be faithless and permanently shut down three operations at AK Steel's Dearborn Works, eliminating over 200 union jobs at that facility.   Underscoring Cliffs' reliance on the USW to carry out its anticompetitive strategy is an unusual provision in the basic labor agreement reached between them in 2022.  Pursuant to that provision, the USW has committed to help Cliffs "aggressively

pursue opportunities" to "acquire steelmaking capacity; . . . expand[] its ownership of raw material (coke and iron ore) producing assets; and . . . add[] 'value-added' downstream capacity." Indeed, as Cliffs has consistently boasted in its 2024 quarterly reports, "[o]ur strong partnership with our union-represented employees was crucial in prior mergers and acquisitions."

104.    Defendants' unlawful campaign challenged here is yet another chapter in Cliffs' years-long course of anticompetitive conduct. But Cliffs has not let its quest to take out U. S. Steel delay its other monopolistic endeavors. In July 2024, Cliffs announced a $2.8 billion deal to purchase Stelco, which closed on November 1, 2024. Now owned by Cliffs, Stelco is a Canadian steelmaker with blast furnace operations in Nanticoke, Ontario and a finishing facility in Hamilton, Ontario. Stelco manufactures automotive steel—including exposed automotive steel and advanced high-strength steel sold to automotive original equipment manufacturers ("OEMs").

105.    McCall publicly supported Cliffs' acquisition of Stelco, stating that he was "excited for this transaction and proud to support [it]" and noting his "delight[]" to "further expand [the] already great partnership between Cliffs and the USW."

106.    Stelco purchases the iron ore pellets used in its blast furnace operations under a long-term supply agreement with U. S. Steel. In 2020, Stelco acquired an option from U. S. Steel (the "Stelco Option"), that, if exercised, would grant Stelco 25% ownership of U. S. Steel's Minntac mine.

107.    Thus, with its acquisition of Stelco, Cliffs effectively controls as much as 79% of U.S. iron ore reserves (70% of North American reserves). And owning the Stelco Option supplies Cliffs with a platform to interfere with U. S. Steel's efforts to develop its direct reduced iron

("DRI")[3] capabilities at its Minntac mine. Thus, in addition to seeking to capture U. S. Steel's blast furnace capacity, or at the very least to block NSC's capital investments in those facilities, Cliffs is also poised to interfere with U. S. Steel's growing electric arc furnace ("EAF") capacity by choking off access to the raw materials needed to make DRI, a critical input to production in those facilities.

108.    Cliffs has openly admitted that its Stelco acquisition was designed to protect and strengthen its market power and has acknowledged that its agreement with the USW is key to its monopolistic aims. In a meeting with investors on September 5, 2024, Cliffs' Paul Finan said explicitly:

> We don't think Stelco complicates this. We think we can get [U. S. Steel's] blast furnaces for a good price. When you're talking about antitrust, there's always remedies. With labor support, we always felt good about antitrust, especially under this administration, and maybe even under another administration. Who knows, maybe they're not as hawkish on deals. So that's certainly not a mitigating factor. **This industry needs consolidation. Flat-rolled needs consolidation.**

109.    And although Defendants falsely claim that NSC will not invest enough money in U. S. Steel facilities, it is *Cliffs*—with its dominant market position—that fails to invest in its own facilities, causing the loss of domestic production capacity and jobs. In 2022, Cliffs closed a coke-making plant, located in West Virginia, resulting in lost jobs and early retirements. Indeed, Cliffs has admitted it will reduce operations in the Mon Valley if it succeeds in acquiring U. S. Steel, which will again reduce domestic production, exposing Goncalves' empty promises and standing in sharp contrast to the procompetitive investments that NSC has committed to make to maintain and extend the life of those facilities after the consummation of the Merger. Meanwhile, Cliffs

---

[3] DRI refers to the removal of oxygen from iron ore in the solid state (*i.e.*, without melting). The reduced iron can then be used in electric arc furnaces and blast furnaces to produce steel.

spent over $700 million on stock buybacks in 2024 alone. Cliffs' own actions evidence its clear monopolistic preference to engage in buybacks and takeovers, and to reduce production by closing facilities, rather than prioritize investment in plants, equipment, and innovation. Cliffs' anticompetitive scheme has and will continue to undermine the competitiveness of the domestic steel industry, and sacrifice the livelihoods of steelworkers, unless it is enjoined.

110.   As set forth below, a merger with U. S. Steel, in whole or part, will significantly advance Cliffs' monopolistic ambitions. And, even without a Cliffs-U. S. Steel merger, damaging U. S. Steel as a competitor by preventing a merger with any other party will insulate Cliffs from the full competitive threat that a strengthened U. S. Steel would pose.

**B.   Cliffs Has or Approaches Monopoly Power in the Relevant Antitrust Product Markets.**

111.   Cliffs, with the support and assistance of the USW's leadership, is protecting its monopoly power in the relevant markets for the consumption and use of: (1) non-grain oriented electrical steel (NOES) and (2) grain-oriented electrical steel (GOES). Cliffs is also attempting to obtain monopoly power in the additional relevant market for the consumption and use of (3) exposed automotive steel sold to automotive OEM facilities in North America. Additionally, Cliffs has or is approaching monopoly power in the upstream antitrust market for the consumption and use of (4) iron ore pellets, a critical input for steelmaking. As set forth below, the relevant geographic market for these products is no broader than North America.

**1.   Cliffs Has or Approaches Monopoly Power in NOES.**

112.   High-grade electrical steel is specialty steel used in the cores of electromagnetic devices such as motors, generators, and transformers. It is an iron-silicon alloy tailored to produce useful magnetic properties, including low power loss and high permeability. In 2023, the U.S. Department of Energy (the "DOE") included electrical steel on its DOE Critical Materials List

because it both (i) has a high risk for supply chain disruption and (ii) serves an essential function in one or more energy technologies.

113.    High-grade electrical steel is a critical driver of the United States' transition to clean energy.  In May 2023, nine separate trade groups—including four representing the power sector and one electrical workers union—published a letter addressed to President Biden, warning that shortages of electrical steel are contributing to "significant and persistent" supply chain challenges. The organizations expressed their increasing concern "about the skyrocketing demand and limited availability of domestically produced electrical steel."  Cliffs, for its part, boasts that it is the "only producer of electrical steels in North America."

114.    High-grade electrical steel comes in two forms, NOES and GOES, each of which is used for different applications, constituting separate relevant product markets for antitrust purposes.  Developing sufficient capacity and competitive production of NOES and GOES is critical to addressing several important national priorities.  According to the trade organizations' letter, the limited availability of domestic electrical steel "poses challenges to the widespread adoption of electric vehicles, delays timelines for utilities to restore power following natural disasters, and is a contributing factor to an insufficient inventory of distribution transformers to meet the demand for new home and commercial construction."

115.    NOES is isotropic, meaning its magnetic properties are uniform in all directions.  It is used in applications where the direction of magnetic flux changes, such as electric motors, generators, and high-frequency converters, which are critical components of cleaner energy transportation and power generation.  NOES is a required input in the production of electric vehicle ("EV") motors and significantly impacts the electrical efficiency and performance of those motors.

116.    Cliffs recognizes the distinctive importance of NOES.  In a July 2023 earnings call, Cliffs CEO Goncalves noted that "[e]very electric vehicle on the road needs about 150 pounds of this material [NOES]."  In its July 2023 quarterly report filed with the SEC on Form 10-Q, Cliffs stated that high-grade electrical steel is "require[d]" for "increased EV adoption."

117.    NOES consumption is driven by the demand for EVs, which is expected to grow far faster than U.S. GDP in the coming years.  In response to changing federal and state regulations, automotive manufacturers are estimated to be spending more than $1 trillion to convert their fleets from internal combustion engines to EVs, with the goal of having 54 million EVs by 2030.  For every 1 million EVs, the demand for NOES is expected to increase by 72,500 tons.

118.    There are no reasonably interchangeable substitutes for NOES.  Given its unique uses and qualities, the demand for NOES does not meaningfully change in response to changes in price of other electrical steel products, such as GOES, or any other product.

119.    Absent the Merger, there is unlikely to be near-term or timely entry or expansion in this market sufficient to discipline Cliffs' anticompetitive pricing.  Manufacturing NOES suitable for EV motors requires a very high level of technical knowledge, specialized processing equipment, and investments exceeding $1 billion.  These high barriers to entry make NOES production unattainable for most steel suppliers in North America.

120.    Cliffs' market power enables it to profitably reduce output and otherwise exercise control over output and pricing in this market.  Cliffs is the only North American commercial producer of NOES—that is, it has a 100% share of North American and domestic commercial production of NOES.  However, in early 2024, U. S. Steel began to qualify production at a new NOES line, announced in October 2023, at its Big River Steel facility located in Osceola,

Arkansas.  The prospect of U. S. Steel beginning commercial NOES production poses a clear competitive threat to Cliffs, which Cliffs seeks to eliminate.

### 2.    Cliffs Has or Approaches Monopoly Power in GOES.

121.    GOES is an essential component in transformers critical to the U.S. electrical grid. GOES increases the voltage of electricity from power plants through transmission lines at extremely high voltages, minimizing line losses and improving efficiency.

122.    Cliffs recognizes that GOES is distinctively important.  Cliffs' own website states that GOES is "essential for the transformers that distribute power efficiently across the electrical grid" and that it is "essential to modern-day living."

123.    The demand for GOES is expected to grow.  Electrification will stress the U.S. power grid, necessitating the supply of new transformers to meet higher demand.  Moreover, a sizeable portion of existing transformers have exceeded their expected useful life and must be replaced.  Finally, the DOE's plan to implement tighter transformer standards by 2029, which will require larger and more efficient transformers, means more GOES will be needed.

124.    There are no reasonably interchangeable substitutes for GOES.  Given its unique uses and qualities, the demand for GOES does not meaningfully change in response to changes in price for other electrical steel products, such as NOES, or any other product.

125.    Absent the Merger, there is unlikely to be near-term or timely entry or expansion in this market sufficient to discipline Cliffs' anticompetitive pricing.  GOES production is out of reach for most North American steel suppliers.  GOES is the most difficult flat-rolled steel product to produce, and only Cliffs makes the grades required.  The technical knowledge necessary to produce this steel is higher than for any other steel product, and manufacturing GOES typically requires access to proprietary intellectual property.

126.    Cliffs' market power enables it to profitably reduce output and otherwise control output and pricing in this market.  Cliffs is currently the only North American manufacturer of GOES, meaning it has a 100% share of North American and domestically produced GOES.   In 2022, Cliffs anticipated record price increases for GOES and in 2023, Cliffs confirmed that it was, in fact, "able to achieve unprecedented price increases."

127.    U. S. Steel is a new entrant and emerging competitor in NOES and the most credible threat to Cliffs in the GOES market.  Having moved into NOES production, expansion into the GOES market would be a logical next step for U. S. Steel, especially because U. S. Steel is involved in the GOES supply chain through its European operations in Slovakia, where it produces coil products critical to GOES production.  Indeed, the production of GOES was part of the original business plan for Big River Steel and presents promising and higher-value expansion opportunities.  The prospect of U. S. Steel beginning to produce GOES domestically constitutes a clear competitive threat to Cliffs, which Cliffs likewise seeks to eliminate.

### 3.    Cliffs Has Significant Market Power in Exposed Automotive Steel Sold to Automotive OEM Facilities in North America.

128.    There are currently two methods of steelmaking:  (1) integrated steel mills that use blast furnaces (largely unionized) and (2) "mini-mills" that use EAFs (largely not).

129.    The blast furnace is the heart of integrated steelmaking.  Blast furnaces require processed iron ore pellets, processed coal in the form of coke, and limestone to operate.  By comparison, the EAF steelmaking process traditionally uses mostly recycled steel scrap as its feedstock.  Depending on the product and composition of steel being produced, that scrap is often

supplemented by iron ore-based metallic units, such as pig iron, DRI, or hot-briquetted iron ("HBI")[4] to produce higher grades of steel.

130.    Additional blast furnace steelmaking capacity cannot be easily added. Barriers to entry are high, and constructing new production facilities is both expensive and time-consuming, often taking years to complete. Since 1980, no new blast furnace production capacity has been built in North America, and it is unlikely that there will be any new entry or expansion in blast furnace steelmaking capacity.

131.    While integrated steel mills are substitutable with mini-mills for the manufacture of many steel products, certain steel products can be commercially manufactured at scale only in an integrated steel mill. One of those products is exposed automotive steel. Control of blast furnaces thus provides blast furnace operators with substantial leverage over automotive OEMs, which use exposed automotive steel to build cars.

132.    Exposed automotive steel is made from flat-rolled carbon steel and is used for the visible components of the outer body of an automobile, such as the roof, hood, and side panels, where surface quality and formability are crucial. These steels are thinner and have a lower tensile strength relative to other types of automotive steel. Because this steel is exposed on the outside of an automobile, surface quality is critical. For this reason, it cannot be commercially manufactured at scale from steel produced in EAFs, which lacks the necessary surface quality. Instead, commercial production requires slabs made in blast furnaces. Most exposed automotive steel is produced as corrosion-resistant steel, given it is exposed to weather elements, and must also have a smooth, almost mirror finish. Exposed automotive steel also requires excellent press-formability

---

[4] Hot briquetted iron is a premium form of direct reduced iron that has been compacted into bricks that can be more easily stored and transported.

that keeps the steel from cracking when placed between a die and punch where the steel is stamped into its desired shape, such as the outer panel of a car door.

133.    Exposed automotive steel is an essential input into the manufacturing of automobiles and there are no readily and reasonably interchangeable substitutes for exposed automotive steel.  Given the unique uses and qualities of exposed automotive steel, automotive OEMs' demand for exposed automotive steel does not meaningfully change in response to changes in price for other automotive steel products.  Although automakers can and do use steel, aluminum, and other materials for car parts, these materials are not immediate, full economic and functional substitutes with one another.  Each material affects the manufacturing process, price, quality, and other design considerations of the car differently.  Further, carmakers cannot freely switch between exposed automotive steel and alternate materials once they have decided on the specifications of a vehicle platform—they tend to be locked in to their engineered material for the duration of that platform design, which is at least five years and often up to seven years.  In part as a result of these factors, most OEM facilities report that changes in the price of aluminum or other materials do not affect the price of exposed automotive steel.

134.    Prior to Cliffs' acquisition of Stelco, four steel suppliers controlled approximately 90% of North American blast furnace steelmaking capacity.  Those suppliers were ArcelorMittal Dofasco ("AM Dofasco"), Cliffs, Stelco, and U. S. Steel.  Along with another affiliate of ArcelorMittal, AM/NS Calvert LLC ("Calvert"), those were also the only significant exposed automotive steel suppliers in North America.[5]  Calvert, which does not operate any of its own blast

---

[5] Calvert is a 50/50 joint venture between ArcelorMittal S.A. and Nippon Steel Corporation, through its wholly owned subsidiary, NS Kote, Inc.  On October 11, 2024, Nippon Steel Corporation announced that it had entered into a definitive agreement to transfer all shares of NS Kote, Inc. to ArcelorMittal S.A.  This transfer is set to occur substantially concurrently with the consummation of the Merger.  NS Kote, Inc. holds NSC's entire equity interest in Calvert.

furnaces, relies on steel slabs produced by a limited group of other suppliers—including other branches of ArcelorMittal in Brazil and Mexico, and Cliffs—to compete in the exposed automotive steel market.

135.    In July 2021, AM Dofasco announced that it would transition its blast furnace facility into an EAF by 2026, a process that it began in 2023.  And Calvert's purchase of steel slabs from Cliffs is governed by an agreement that is set to expire at the end of 2025.

136.    On November 1, 2024, Cliffs completed its acquisition of Stelco.  With that completed acquisition and the impending retirement of AM Dofasco's blast furnace capacity, Cliffs will control almost 50% of North American blast furnace assets (*i.e.*, the means of production necessary to commercially manufacture exposed automotive steel at scale).  There will remain only two blast furnace operators in North America (Cliffs and U. S. Steel), and only three significant producers of exposed automotive steel (Cliffs, U. S. Steel, and Calvert, which, again, cannot produce its own slabs).

137.    Cliffs has already made clear how it intends to wield its significant market power, cutting back supply if it serves its interests.  As Goncalves said in Cliffs' April 2022 earnings call: "[Could we] sell[] more tonnage [of steel]?  Absolutely, but we'll be selling more tonnage for lower prices. . . .  So, tonnage is not the answer;  the answer is profitability. . . . That's what we're doing at Cleveland-Cliffs."

138.    According to Goncalves, what gives Cliffs leverage in exposed automotive steel, as he boasted to analysts in Cliffs' October 2022 earnings call, is that Cliffs is "the only one[] supplying exposed parts. . . .  We know that, [carmakers] know that. . . .  [W]e also keep reminding the car manufacturer[s] that the car is a complicated puzzle, and we are the only ones

that have all the pieces of the puzzle."  As Goncalves succinctly puts it:  "[I]n the United States, automotive steel means Cliffs."

139.    With a 50% share of exposed automotive steel produced in North America and other sources of leverage over automakers, Cliffs is already the leading producer of exposed automotive steel in North America.  As Cliffs boasts, it is "the largest supplier of steel to the automotive sector" and its position gives it leverage, it claims, in negotiations with customers.

140.    But Cliffs' significant market power is not the result of its competitive superiority: as Goncalves explained in that October 2022 earnings call, it is in large part the product of Cliffs' serial acquisitions of, and subsequent reduction in, North American steel production and capacity. Goncalves is clear on his tactics:  "In the past," there were several competitors, but, after a string of acquisitions and market exits, "they are all Cleveland-Cliffs, now.  So, car manufacturers know that.  And that's a very important part of our negotiation."

141.    Cliffs' ability to abuse its significant market power would only increase if Cliffs were to succeed in acquiring U. S. Steel, or even just its blast furnaces.  In that scenario, Cliffs would control at least 80% of the blast furnace steelmaking capacity in North America.  And its only significant North American competitor in the exposed automotive market, Calvert, would rely on Cliffs for its steel inputs.  Cliffs' market power would enable it to profitably reduce output and otherwise control output and pricing in this market.  Cliffs likewise wins if its "merge or murder" campaign results in U. S. Steel having to idle its blast furnaces.

142.    A trade group representing the manufacturers of vehicles sold in the United States agrees, warning in an October 2023 letter to Congress opposing a Cliffs acquisition of U. S. Steel that allowing Cliffs, as "the largest supplier of steel to the automotive industry in North America," to "consolidat[e] . . . steel production capacity in the U.S. will further increase costs across the

industry for both materials and finished vehicles, slow EV adoption by driving up costs for customers, and put domestic automakers at a competitive disadvantage relative to manufacturers using steel from other parts of the world."

143. In Cliffs' view, its customers need not bear the brunt of Cliffs' anticompetitive tactics. Instead, they can just pass on the higher costs to ordinary American consumers. After Cliffs recently implemented a surcharge for steel produced with direct reduced iron (to meet requirements that cars have greener steel), Goncalves blithely explained that the "surcharge should be passed along by the car manufacturers to the final consumer." The "final consumers," of course, are American car buyers. With more than 15 million new cars sold in the United States each year, Cliffs' surcharge alone is estimated to cost consumers an extra $800 million annually—but that does not matter to Goncalves. As for the automakers, as Goncalves observed, it's simple: they "are paying [Cliffs' surcharge] because if they don't pay, they don't get" the steel necessary to make cars. A competitively viable U. S. Steel with blast furnaces is thus necessary to serve as a competitive constraint on Cliffs in the relevant market for exposed automotive steel.

### 4. Cliffs Has or Approaches Monopoly Power in Iron Ore Pellets.

144. Iron ore pellets are produced from virgin iron ore and are a required input for the blast furnaces that are used to manufacture exposed automotive steel and other steel products as well as other steelmaking facilities.

145. Iron ore pellets are also used to manufacture pig iron, which is created when liquid iron is allowed to cool prior to the steelmaking process. Pig iron is sold as a raw material for steel made in blast furnaces, as well as feedstock for high-grade steel made in EAFs in combination with recycled steel scrap.

146. Other intermediate products made from iron ore pellets are DRI and HBI. These materials are used as a raw material input for high-grade steel made by EAFs. DRI and HBI are

interchangeable, with HBI being easier to transport.  As production of high-grade steel in EAFs increases, the demand for DRI and HBI in the United States is expected to outpace supply.  This additional DRI and HBI demand will require access to an increased supply of virgin iron ore pellets.

147.    There are no reasonably interchangeable substitute products for iron ore pellets. There are no substitutes at all for use in blast furnace steel production, and iron ore-based metallic units made from iron ore pellets, such as DRI and HBI, are required to produce higher-quality steel products in EAFs.  Given the unique uses and qualities of iron ore pellets, the demand for iron ore pellets does not meaningfully change in response to changes in price for other metallics.

148.    There is unlikely to be entry or expansion in this market sufficient to discipline Cliffs' anticompetitive pricing if it is able to maintain (or achieve) monopoly power.  Today, almost all North American iron ore pellet production comes from three suppliers:  ArcelorMittal (Canada and Mexico), Cliffs (United States), and U. S. Steel (United States).  No other companies own significant iron ore reserves in North America.

149.    Cliffs' market power enables it to profitably reduce output and otherwise exercise control over output and pricing in this market.  Cliffs has boasted that it is "the largest producer of iron ore pellets in North America" and that its "full control over the entire supply chain from pellets to HBI to prime scrap" advantages Cliffs at the expense of its competitors.  And, as noted, a federal court has already found Cliffs a monopolist in an iron ore market.  Following its acquisition of Stelco, Cliffs effectively controls approximately 70% of iron ore reserves in North America.  And it has exercised and intends to continue to exercise that control ruthlessly.  In an April 25, 2019 earnings call, Goncalves told investors:  "[T]he domestic U.S. market will starve [for] metallics.

They will beg for me to build a second HBI plant, and the second HBI plant is not going to happen . . . .  And you know well, . . . I like shortages.  It's good to start with a shortage."

150.    Cliffs leverages its control over the iron ore pellets market to tighten its grip over the steel markets more broadly.  North American steelmakers (*i.e.*, Cliffs' principal competitors) are increasingly dependent on access to iron ore pellets, which are a critical input to produce high grades of steel, including exposed automotive products, among other products.  Yet Cliffs has refused to supply steel competitors with iron ore pellets either directly or through merchants who would then resell it to those competitors, even though Cliffs has the production capacity to meet demand.  As Goncalves told investors in 2022:  "[W]e [Cliffs] have spare capacity. . . .  We could be selling more?  Yes, absolutely.  Do we have a compelling reason to do that?  No."  And as Goncalves said on a 2021 conference call hosted by the Association for Iron and Steel Technology, "[he] ha[s] enough [iron ore] pellets to . . . supply the market," but he is simply "not in [that] business."

151.    A strong U. S. Steel is necessary to serve as a competitive constraint on Cliffs in this critical steel input market.  Cliffs' business model is to constrict supply and raise prices.  By contrast, U. S. Steel's business model relies on producing as much as possible to serve its customers at the lowest cost and, unlike Cliffs, U. S. Steel supports the merchant market.

### C.    The Relevant Geographic Market

152.    The relevant geographic market for the consumption and use of each of the above products is no broader than North America.  Because domestic customers rely primarily on iron and steel supplied by producers in the United States and, in some cases, North America, Cliffs' dominance in domestic and North American production of the relevant products threatens

consumer welfare.[6] Cliffs' North American competitors are thus most significant when assessing harm to competition and consumers if Cliffs achieves its monopolistic aims.

153.    Imports from outside of North America make up a small percentage of the four relevant markets defined above.  U.S.-based steel and iron customers contract primarily with local and regional supply chain networks, which include producers in the United States, Mexico, and Canada.  The United States-Mexico-Canada Agreement (the "USMCA"), which went into force in July 2020, facilitates competition among North American suppliers to these customers.  The USMCA affords preferential treatment to North American manufacturers and incentivizes the use of certain minimum amounts of North American materials—for instance, providing benefits for products for which at least 70 percent of a producer's steel and aluminum purchases originate in North America.  Non-USMCA imports make up less than 10% of exposed automotive steel purchased in the United States.

154.    Industry participants likewise perceive domestic and North American production as crucial.  In its October 2023 letter, the Alliance for Automotive Innovation focused on the "domestic" industry and the "North America[n]" supply.  That is why they wrote to Congress to express concern about a potential Cliffs takeover of U. S. Steel.  Indeed, the North American automotive supply chain is highly integrated and characterized by collaborative production of many vehicles and parts, supply chain efficiencies allowing for just-in-time delivery systems, and regulatory alignment associated with safety and environmental standards.  Similarly, the electrical

---

[6] Regarding iron ore pellets, for certain customers, the relevant market may include only pellets produced in the Great Lakes region.  The *Mesabi* court accepted expert economic evidence that the cost of transporting pellets from eastern Canada was $41.85 per ton, more than double the transportation costs from within the Great Lakes region.  On that basis, the court concluded that the market for pellets was "appropriately limited to the Great Lakes region."  *See Mesabi Metallics Co.*, 2024 WL 4047451, at *16.  Cliffs likewise dominates supply in this market.

steel trade groups' May 22, 2023 letter to President Biden expressed increasing "concern[] about the skyrocketing demand and limited availability of domestically produced electrical steel," including NOES and GOES, and requested that Congress "put requisite financial resources toward shoring up domestic supply."

155.    Indeed, Cliffs has said that it considers its closest competitors to be those based in the United States or North America.  For example, Goncalves has claimed in earnings calls that trade cases and other barriers have successfully insulated Cliffs from foreign competition, and in particular that "we don't have any more . . . dumping effects of . . . Chinese steel;" that "by now, it is abundantly clear that the United States' domestic market is no longer the playground for [trade] cheaters;" and that "the U.S. [is] out of reach" for excess steel produced in China.  Goncalves has explained that "imports of flat-rolled steel, in general, have not been a major issue for [Cliffs] due to tariffs and duties we have in place," and that "the automotive industry, by and large, buys domestic steel.  They don't import."  He has also explained that Cliffs' "U.S. Iron Ore business is not seaborne and does not compete with seaborne," meaning that overseas iron production does not compete with North American iron ore production.

156.    Recent legislation also reflects that consumption is focused on domestic and North American supply, which Cliffs seeks to monopolize.  The Build America, Buy America Act, enacted as part of the Infrastructure Investment and Jobs Act on November 15, 2021, established a domestic content procurement preference for all federal financial assistance obligated for infrastructure projects after May 14, 2022.  The domestic content procurement preference requires that all iron, steel, manufactured products, and construction materials used in covered infrastructure projects be produced in North America.  In addition, the recently enacted Inflation Reduction Act provides substantial incentives for the use of domestically produced steel in clean

energy projects, including wind and solar projects, which consume a substantial amount of steel. Finally, the Buy American Act of 1933 governs purchases by the federal government and requires that final products be mined, produced, or manufactured in the United States.  If manufactured, either at least 55% of the cost of components (by value) must be manufactured in the United States or the end product must be a commercially available off-the-shelf item.  In March 2022, the Biden Administration announced that the domestic content threshold specific to federal procurement would increase from 55% to 60% later that year, to 65% in 2024, and all the way to 75% in 2029.

157.    In short, various U.S. policies, including tariffs, incentivize the purchase of NOES, GOES, iron ore pellets, and exposed automotive steel that is produced domestically or in North America, and the incoming Trump Administration has already promised to impose even higher tariffs on steel imports.  As a result of that and the increased supply-chain risks associated with imports, there are trade and commercial considerations that limit large-scale domestic or North American customers, including of NOES, GOES, iron ore pellets, and exposed automotive steel, from sourcing these products at scale from producers based outside of North America.  Moreover, it takes significant time for large-scale customers to switch providers, not least because those customers must qualify the new product for their particular use cases.

## ANTICOMPETITIVE EFFECTS AND INJURY

158.    Rather than compete on the merits, Cliffs and Goncalves, aided and abetted by the USW, have chosen to systematically take out other integrated steelmakers in North America through a strategy of serial acquisitions that, if allowed to continue unchecked, will give Cliffs control over virtually all North American blast furnace steelmaking assets.  This serves not only Cliffs' monopolization strategy, but also the goal of the USW's leadership to protect Cliffs' blast furnace operations from competition because they are largely unionized, even if it means

sacrificing the interests of rank-and-file members at U. S. Steel plants in places like the Mon Valley.

159.    Cliffs' 2020 acquisitions of AK Steel and AM USA in rapid succession made Cliffs the largest North American flat-rolled steelmaker essentially overnight.  Goncalves proudly touted Cliffs' "sizable gain in market share," its "leadership position in automotive [steel]," and the reduction in customers' competitive options resulting from these acquisitions.

160.    Following these acquisitions, Cliffs exercised its power in the market for consumption and use of iron ore pellets by "limiting the tonnage of iron ore pellets [Cliffs] sell[s] to third parties," including competitors.  According to Cliffs, once its existing contracts expired, Cliffs would no longer supply its competitors.  As Goncalves explained during Cliffs' April 2021 earnings call, "Now we are no longer a supplier for EAFs.  We're a competitor.  So I'm not going to supply them with pig iron."

161.    And like any would-be monopolist, Goncalves is far more inclined to raise Cliffs' prices in the face of increasing demand than to increase supply.  For example, he acknowledged in a July 2022 earnings call that Cliffs was "the sole supplier[] of . . . electrical steel[]" in the United States, and in a January 2024 earnings call that "that's why we pushed prices up.  We go until we can't go no more."

162.    Viewing U. S. Steel as a threat to its market power and eager to continue executing on its anticompetitive plans, Goncalves' strategy has been to "merge or murder" U. S. Steel:  Cliffs would either acquire U. S. Steel or prevent anyone else from doing so, leaving U. S. Steel deprived of the capital and technology it needs to compete effectively with Cliffs, particularly in blast furnaces.  Not surprisingly, domestic steel customers vigorously and publicly opposed Cliffs' proposed acquisition of U. S. Steel.  In an October 2023 open letter to various Congressional

officials, the Alliance for Automotive Innovation warned of "negative implications for the auto industry and increase[d] costs for average drivers," as a combined Cliffs and U. S. Steel would control "100 percent of blast furnace production in the U.S." and "[m]ore than 90 percent of U.S. advance high strength steel used for automotive underbody panels, bodyside reinforcements and impact areas." And as Autos Drive America, the leading trade association representing U.S. operations of international automakers, explained in a December 13, 2024 letter to President Biden, "a deal with Cleveland-Cliffs [would] put a single company in control of nearly all U.S. iron ore mining and processing facilities," and place "total control of blast furnace production in the United States in the hands of one company," which "will drive up the cost of steel and increase the cost of U.S.-made vehicles for all American consumers."

163.    By contrast, the Merger would materially enhance U. S. Steel's competitive position in the various steel markets that Cliffs currently dominates without eliminating any material preexisting competition. NSC has committed to sharing its advanced iron and steel production technology with U. S. Steel and providing the necessary capital to invest in domestic production capacity and innovate. This technology and capital infusion from NSC would substantially enhance U. S. Steel's competitiveness in exposed automotive (made in blast furnaces) and high-grade electrical steel where NSC's capital and know-how will help jump start U. S. Steel's effort. The Merger is fundamentally procompetitive as it will boost domestic steel markets and benefit American workers and consumers by strengthening U. S. Steel's ability to supply high-grade steel that is critical for key industries in the American economy, including the automotive and renewable energy industries. Further, by bringing NSC's advanced green steelmaking technologies stateside, the Merger also will substantially further the United States' clean energy objectives and will help meet the growing demand for environmentally friendly steel.

Cliffs, an anticompetitive monopolist who seeks to profit by reducing output and imposing supracompetitive pricing, is terrified of this vision for a brighter future and so has instead worked with the USW to thwart it from ever being realized.

164.    Cliffs prefers to hold American consumers hostage by exploiting the growing domestic demand for exposed automotive steel, NOES, and GOES.  For instance, absent the Merger, and as demand for automobiles, particularly electric vehicles, rises, Cliffs will be in a position to exploit its power in the relevant markets for exposed automotive steel, NOES, and GOES.  Aided by a litany of legislation that limits imports and other market forces that favor domestic and North American supply, Cliffs will also be in a position to drive up the price for exposed automotive steel.  With Cliffs in control, consumers will suffer injury from higher prices, decreased product choice, lower output, and diminished innovation due to the loss of competition.

165.    In sum, Defendants' conduct is exclusionary and has manifestly anticompetitive effects—it will reduce product choice, reduce output, stifle innovation, degrade quality, and increase prices—and lacks any redeeming virtue.  It benefits Cliffs only by seeking to prevent U. S. Steel from obtaining beneficial capital and technological infusions from NSC, or from any other third-party strategic partner, and by otherwise undermining the competitive threat that U. S. Steel poses, or would pose, for Cliffs.  Cliffs has admitted as much, repeatedly and publicly.  The losers in all of this are steel customers and their American consumers, who will pay higher prices for steel products, have less reliable access to steel, and be deprived of much-needed innovation.

166.    Moreover, and by the same token, if Defendants' conduct is allowed to continue, U. S. Steel will need to consider strategic alternatives to compete effectively in the relevant iron and steel markets.  As part of the Merger, NSC has pledged to invest $2.7 billion in USW-represented U. S. Steel blast furnace facilities, including approximately $300 million to revamp

Blast Furnace #14 at U. S. Steel's Gary Works, and at least $1 billion to enhance the competitiveness of the Mon Valley Works. The capital infusion that would result from the Merger with NSC is critical for the future of U. S. Steel's production capacity, as well as for the preservation of union jobs and the Mon Valley economy. Without this infusion, U. S. Steel cannot modernize the Mon Valley Works hot strip mill. Nor can it overhaul Blast Furnace #14 at Gary Works and Granite City Works in Illinois, meaning that both will be permanently idled and 1,700 combined jobs lost. In effect, without the Merger (or a merger with another strategic partner), U. S. Steel will be forced to revert to its strategy prior to the Merger—namely being "better, *not* bigger" by seeking to compete in only certain steel markets, such as the markets for NOES, while rolling back exposed automotive steel production by eventually idling blast furnace facilities in places such as Pennsylvania and Indiana.

167.    The termination of the Merger would also mean that any effort by U. S. Steel to begin or expand domestic commercial production of NOES and GOES would be without the substantial technological know-how NSC brings to the table. NSC is a world leader in NOES, the production of which requires sophisticated technical knowledge. Aided by the substantial investment capital and technology that only a strategic merger partner like NSC can provide, U. S. Steel would compete more rapidly and effectively in the supply of NOES and GOES to customers. Defendants' anticompetitive scheme, by delaying and obstructing the consummation of the Merger, has cut off U. S. Steel's access to this know-how, just as it seeks to pursue critical technological advancements. As a result, U. S. Steel's successful commercialization of NOES production has already been significantly forestalled—precisely as Defendants intended.

168.    Defendants' anticompetitive scheme has likewise prevented Plaintiffs from benefiting from the synergies that would flow from the Merger (such as increased efficiency and

reduced production costs), which would in turn enhance Plaintiffs' ability to compete more effectively against Cliffs.

169.    Critically, U. S. Steel's ability to pursue any other strategic alternative is severely limited as a result of the illegal agreement between Cliffs, McCall, and the USW's leadership. This, of course, is the goal of Defendants' anticompetitive scheme.  Defendants' public campaign has repeatedly communicated to any would-be bidders that, owing to the USW's exclusive support, Cliffs is the only viable buyer of U. S. Steel.  "No one else has the [International] [U]nion," warned Goncalves early last year, "and there is *zero* chance anyone [else] will have the [U]nion." Defendants' goal is to harm U. S. Steel.  When Goncalves was asked why Cliffs has not proposed a partial company bid to Plaintiffs, he responded, "I have a plan.  . . .  I want them to come to me when they're desperate."  In fact, Defendants already believe they have succeeded in mortally wounding U. S. Steel:  as Goncalves crowed shortly after President Biden came out against the Merger, it was "game over" and "***now we just need to schedule [U. S. Steel's] funeral.***"  And as Goncalves reiterated on CNBC in March 2024, "[t]he Titanic has already hit the iceberg"—"***U. S. Steel is a going concern with no future***."

170.    The goal of Defendants' illegal agreement is to hamstring U. S. Steel's ability to compete in order to force a sale to Cliffs or otherwise entrench Cliffs' market dominance.  And, because of Defendants' unlawful conspiracy, the universe of non-NSC bidders for U. S. Steel, to the extent it exists at all, is vanishingly thin.  NSC was also the only bidder that was committed to maintaining all of U. S. Steel's production capacity, including investing in its aging blast furnaces, and to supporting U. S. Steel's ongoing growth across its enterprise.  Today, U. S. Steel is the only vertically integrated steel producer in North America other than Cliffs (and AM Dofasco, which is in the process of winding down its blast furnace operations), which affords its steelmaking

operations with reliable access to iron ore pellets that are tailored to U. S. Steel's blast furnaces. If U. S. Steel is broken up as a result of Cliffs' "merge or murder" conspiracy, the efficiencies that such vertical integration provides will be extinguished, resulting in a loss of competition to Cliffs that cannot be replicated through smaller, non-vertically integrated players. This, too, would be in Cliffs' monopolistic interests.

171.    Separate and apart from the direct competitive benefits flowing from the Merger of which U. S. Steel will be deprived, Defendants' unlawful agreement has also injured U. S. Steel's relations with its own rank-and-file workforce, which itself is a critical input to production. Over the last twelve months, U. S. Steel employees have become exhausted by the uncertainty surrounding the future of their company as their livelihoods have been exploited by Goncalves and McCall to further their anticompetitive scheme, resulting in increased attrition rates.

172.    In sum, Defendants' actions have hamstrung U. S. Steel's ability to compete effectively in significant steel markets by depriving it of the competitive boost that NSC has committed to provide and limiting its ability to pursue strategic alternatives in addition to its stand-alone plan. Likewise, Defendants' actions have severely hampered NSC's ability to enter and expand in U.S. iron and steel markets, deprived NSC of substantial profits and synergies connected to the Merger, and substantially tarnished NSC's reputation in the marketplace.

173.    If Defendants' conduct is not enjoined, Defendants will be able to eliminate the competitive threat that a combined NSC and U. S. Steel poses or would pose to Cliffs' market power and monopolistic ambitions and significantly undermine U. S. Steel as a stand-alone competitor. The inevitable outcome will be further consolidation of the steel markets by Cliffs. This will necessarily diminish competition in the relevant steel markets and is classic antitrust injury.

## UNAVAILABILITY OF *NOERR-PENNINGTON* DEFENSE

### A.    Defendants' Unlawful Campaign Is Not Petitioning Activity.

174.    Defendants' unlawful agreement and monopolization campaign is not protected by the *Noerr-Pennington* doctrine because it is not petitioning activity.  Here, Plaintiffs seek redress for harms stemming from Defendants' unlawful agreement, ***not*** from statements Defendants made to the government.  *See United Mine Workers of Am.* v. *Pennington*, 381 U.S. 657, 669 (1965) ("Thus the relevant labor and antitrust policies compel us to conclude that the alleged agreement . . . if proved, was not exempt from the antitrust laws.").

175.    The USW's agreement with Cliffs to help Cliffs monopolize the domestic steel industry dates back to at least 2020, after U. S. Steel first invested in its Big River Steel facility. The agreement to support only Cliffs as a buyer of U. S. Steel, to try to force U. S. Steel to acquiesce in such a transaction, and to oppose any other potential bidder was struck no later than August 2023—well before NSC was in the picture—and therefore likewise had nothing to do with any anticipated effort to influence CFIUS.  Moreover, the illegal agreement between Cliffs and the USW will not terminate as a result of the Merger being blocked, but rather will survive until its ultimate objective of forcing a deal with Cliffs, or limiting U. S. Steel's ability to compete with Cliffs, is realized.    The agreement between Cliffs and the USW thus concerns private, anticompetitive, and illegal conduct, not protected First Amendment petitioning activity.

### B.    Any Purported Petitioning Activity Is an Unprotected Sham.

176.    To the extent any of Defendants' conduct *could* be deemed petitioning activity, it is not protected by the First Amendment, but rather falls squarely within *Noerr-Pennington*'s "sham" exception.

1.    **Defendants Coopted the CFIUS Process and the Presidential Block to Deny Plaintiffs Due Process.**

177.    The outcome of the CFIUS review and President Biden's decision to block the Merger on January 3, 2025 were predetermined and unlawful.  The result was driven by Defendants' efforts to subvert due process, as opposed to any legitimate national security concerns.

178.    In January 2024, McCall and the USW publicly stated their opposition to the Merger and began pressuring President Biden to block it.  The White House responded immediately, expressing support for the USW, which in turn issued a press release stating that Biden had "personal[ly] assur[ed]" the USW that Biden "ha[d] [their] backs."

179.    On February 2, 2024, Celso Goncalves announced on an investor call that the USW "have already been clear that they don't want the deal to go through.  So I think the Administration has made it clear that *the decision's already been made*.  They're not gonna allow the deal to go through."  And, indeed, on March 14, 2024, in the midst of Defendants' pressure campaign and *before CFIUS even began its formal review*, President Biden announced that "it is vital" for U. S. Steel to "remain an American steel company that is domestically owned and operated."  The reason:  "I told our steel workers I have their backs, and I meant it."

180.    Less than a week after Biden announced his opposition to the Merger, the USW endorsed Biden for reelection.  That same day, Goncalves told investors that the President had requested the USW's endorsement "now" and, in return, provided assurances that CFIUS would block the Merger—a quid pro quo having absolutely nothing to do with national security or the legitimate scope of CFIUS's review.  As Goncalves told one investor, Goncalves was "behind" Biden's opposition, and his "partner, Dave McCall is in direct contact with the White House."

181.    Throughout the course of the CFIUS review process, which began about two weeks later, President Biden continued to reiterate his opposition to the Merger.  During this time, CFIUS

Chair and Secretary of the Treasury Janet Yellen further confirmed that there was a preordained outcome, stating that she "certainly accept[s] the President's view . . . that [U. S. Steel] should remain in American hands" for "the good of the workers and the country," even though the President "ha[d]n't said specifically that it's an issue of national security." There was, and remains, no evidence that the Merger poses a national security concern. But CFIUS had its marching orders, and the review process reflected that reality.

182. For the first several months of its review, CFIUS was unable to articulate any national security concerns (let alone engage in discussions about mitigating such concerns, as is customary). Finally, on a Saturday afternoon in the middle of Labor Day weekend 2024—five months after the review process began—CFIUS sent a letter to U. S. Steel and NSC purporting to identify various national security concerns. CFIUS demanded a response within *one business day*. As U. S. Steel and NSC were preparing their response on CFIUS's rushed timeline, the President appeared at a Pittsburgh rally with the Vice President (by then the Democratic nominee) and again "made it clear" that he would block the Merger. U. S. Steel and NSC promptly provided a point-by-point response to each of CFIUS's stated concerns and an explanation of how the Merger will strengthen, not endanger, U.S. national security. U. S. Steel and NSC also submitted a national security agreement with proposed measures to address any such concerns.

183. Later in September 2024, CFIUS finally granted U. S. Steel and NSC's request to extend the review period, but the President, just days later, confirmed that he had not "changed [his] mind" on blocking the Merger. The CFIUS process therefore remained a charade. In meetings with U. S. Steel and NSC, CFIUS staff admitted that they "were not authorized" by their superiors, the politically appointed CFIUS members, to have substantive discussions on the proposed national security agreement and other potential mitigation measures. That refusal to

engage was an unprecedented deviation from CFIUS's usual process, in which substantive mitigation measures are routinely the focus of back-and-forth discussion between staff members and representatives of the transaction parties. Indeed, the review process was so corrupted that Defendants effectively managed to obtain a seat at the table. On October 31, 2024, just weeks after Cliffs and Goncalves had hosted USTR Ambassador Tai at a Cliffs facility in Pennsylvania, President Biden appointed McCall to serve as an advisor to the USTR, a CFIUS member agency. The very next day, McCall issued a press release on behalf of the USW: "We remain confident that our elected leaders will . . . take action to block this deal," which is, of course, what ultimately happened, thanks to the recommendation of the USTR.

184.    The following month, when Defendants found out that Nippon Steel Corporation Vice Chairman and Executive Vice President Takahiro Mori was planning to meet with local USW leaders and others in Pennsylvania, as well as other officials in Washington, to allay any concerns regarding the Merger, Defendants asked President Biden and his team if the Merger could be blocked before Mori even arrived. Defendants' actions reveal that national security was always a smokescreen for their anticompetitive aims.

185.    On November 22, 2024, four members of Congress, including the chair of the Oversight and Investigations Subcommittee of the House Financial Services Committee, wrote to Treasury Secretary Janet Yellen and Commerce Secretary Gina Raimondo, both members of CFIUS, to express their "serious concerns regarding the impartiality and independence of [CFIUS]" and noting that recent statements and reports have "raise[d] broader issues about whether the statutory mandate of CFIUS to prioritize national security considerations has been subordinated to political interests." That same day, USTR Ambassador Tai met with McCall, her new advisor, at the White House.

186.    On December 14, 2024, U. S. Steel received a letter from CFIUS stating that CFIUS had still not reached consensus on how to resolve the supposed "risk to U.S. national security arising from the [Merger]," further forestalling the progress of the deal.  But CFIUS itself only received the letter minutes before U. S. Steel did, and most agencies on the Committee had no opportunity to review or comment on its contents before it was sent out—further proof that Goncalves and McCall had so corrupted and tainted the CFIUS process that there was no process.

187.    Then, on December 20, 2024, U. S. Steel and NSC had a telephone call with CFIUS in hopes of addressing any outstanding questions.  CFIUS did not ask a single question and quickly ended the call, with its own telephone operators at times muting Plaintiffs' representatives so they would not be heard.  This sham call was symbolic of the entire sham process.

188.    Finally, on December 23, 2024, CFIUS referred the transaction to the President. CFIUS informed the parties that it was unable to "reach [a] consensus" about whether the Merger presented a national security concern that could not be mitigated.  The minority opposition led by USTR Ambassador Tai from within CFIUS ensured that CFIUS would have to refer the Merger to the President, enabling him to make good on his earlier quid pro quo with the USW—which he ultimately did on January 3, 2025.

189.    Goncalves put it best:  "*[T]here's no process*.  This is not going to be a process. *CFIUS is just cover for a President to kill a deal*."  For once, Goncalves told the truth.

### 2.    Defendants' Purported Petitioning Activity is Neither Objectively Nor Subjectively Reasonable.

190.    Defendants' claims that the Merger would threaten national security also have no good faith, objective basis.  Japan is a vital American ally and the single largest provider of foreign direct investment in the United States, having invested over $775 billion in 2022 alone.  The President has never before prohibited an acquisition of a U.S. company by a company based in

Japan. And just days before the Merger was announced in December 2023, the U.S. House of Representatives' Select Committee on the Chinese Communist Party issued a bipartisan report recommending that Japan be added to CFIUS's "whitelist" of "Excepted Foreign States," meaning that its qualifying companies would be exempt from certain aspects of the CFIUS regulations, as well as mandatory filing requirements. Moreover, neither the Japanese government,[7] nor any other government or any shareholder, controls Nippon Steel Corporation, and Nippon Steel Corporation has worked closely with U.S. companies for more than 70 years. Indeed, Nippon Steel Corporation currently has stakes in 28 subsidiaries and affiliates in the United States, including NSNA. Finally, U. S. Steel is not a direct defense supplier, nor does U. S. Steel have any products, capability, or know-how that are specific to, or customized, for U.S. government applications, including U.S. military applications. The Merger thus easily passes muster under CFIUS's risk-based analysis of threat (a foreign person's intent and capability to take action against national security), vulnerabilities (a U.S. business's susceptibility to impairment of national security), and consequences (potential national security effects).

191. The CFIUS member agencies that have a national security pedigree have already concluded that any national security concerns would be mitigated by the national security agreement proposed by U. S. Steel and NSC. By contrast, the Office of the USTR, which has no national security bona fides, has consistently opposed the transaction from within CFIUS. This

---

[7] Japan is the single largest provider of foreign direct investment in the United States, having invested over $775 billion in 2022 alone. U.S. Dep't of Commerce, *Foreign Direct Investment (FDI): Japan* (Aug. 2023), https://www.trade.gov/sites/default/files/2023-09/Japan.pdf. NSC's proposed investment in U. S. Steel is consistent with the United States' historical practice of encouraging Japanese investment in the United States. This is why large U.S.-based transactions involving Japanese companies and sensitive industries have consistently closed without issue in recent years, including Renesas Electronics Corporation's 2024 acquisition of Altium Ltd., a printed circuit board design software company, for $5.9 billion.

opposition is baseless because, as a result of the Merger, U. S. Steel would become less vulnerable and more resilient by enhancing its production capabilities—and because any purported (even if bad-faith) concerns were readily addressed through binding mitigation measures that NSC repeatedly offered.

192.    Defendants' conduct is also subjectively baseless.  Any petitioning activity they undertook was premised on knowingly false, misleading, and often xenophobic statements. Goncalves has remarked that "we can't allow . . . a foreign company to . . . take over what we have here," and employed racist stereotypes of Japanese people by mocking their accents, suggesting Nippon Steel Corporation's vice chairman will commit "seppuku" if the Merger fails, and generally implying that Japan and its people cannot be trusted.

193.    Indeed, Defendants, who have no legal standing before CFIUS, were not seeking to influence the review process, so much as to subvert the process altogether.  For example, Congress mandates that CFIUS not disclose "any information or documentary material filed" during the review process.  50 U.S.C. § 4565(c).  Further, CFIUS requires that information about an ongoing review process—including "[t]he fact of a filing" and any "[i]nformation about the status of review"—must remain confidential.[8]  But before U. S. Steel and NSC even had a chance to submit their notice to CFIUS, Goncalves publicly boasted that he was in regular communication with Secretary Raimondo, a CFIUS member and co-lead for the Merger review.  McCall likewise announced that he was "actively engaged with [CFIUS] to raise our concerns about the ramifications [of] this proposed deal."  And Celso Goncalves leaked information to U. S. Steel's investors regarding the lack of consensus within CFIUS weeks before it became public.

---

[8] Office of Inv. Sec., U.S. Dep't of the Treasury, *CFIUS Confidentiality*, https://home.treasury.gov/system/files/206/CFIUS-Confidentiality.pdf (last accessed Jan. 6, 2025).

Defendants' utter disregard for CFIUS's procedure and confidentiality requirements is further evidence that they had no interest in the actual merits of CFIUS's review, which would only hurt their case. Rather, they saw the CFIUS process as one of several bludgeons they could wield to try to destroy the Merger.

194. Cliffs, Goncalves, and McCall have also made public statements—which were knowingly and demonstrably false—calculated to subvert the CFIUS process and to give cover for the pre-ordained decision to block the Merger. These falsehoods concerned NSC and its plans for U. S. Steel's operations. On December 18, 2023, Goncalves falsely claimed that NSC, as a "foreign company," would "come to just liquidate American jobs and take over what we have here." And on the February 2 Webinar, Celso Goncalves demonized foreign buyers, claiming that "[t]hey always end up shutting down production. They always end up firing people, doing layoffs, the things that we committed that we wouldn't do," despite Cliffs having just done that itself, and despite knowing that NSC's announced plans for U. S. Steel post-Merger, and its track record at Standard Steel and Wheeling-Nippon, are expressly to the contrary.

195. The CFIUS review and the President's order blocking the Merger, which are separately being challenged, do not rescue Cliffs' or the USW's conduct from the sham exception. Plaintiffs' parallel legal challenge to CFIUS's review and the President's illegal order will demonstrate that the result was predetermined from the outset, that NSC and U. S. Steel were deprived of a meaningful opportunity to be heard and to respond to any purported national security concerns, and that CFIUS and the President unjustifiably treated the Merger differently from other similarly situated transactions in violation of the Equal Protection Clause. In other words, the entire CFIUS review process was a transparent sham. Any anticompetitive efforts to "petition" CFIUS are wholly unprotected by the *Noerr-Pennington* doctrine.

## PLAINTIFFS' NEED FOR INJUNCTIVE RELIEF

196.    Defendants' anticompetitive and unlawful campaign threatens irreparable harm to Plaintiffs' ability to compete in crucial steel markets, including the markets for NOES, GOES, iron ore pellets, and exposed automotive steel.

197.    Cliffs' and Goncalves' illegal agreement with the USW and McCall, and ongoing coordination with the USW pursuant to that agreement, continues to have the intended exclusionary effect of squelching competition in key markets.  These anticompetitive effects will persist regardless of whether the President's order blocking the transaction is set aside.  If Plaintiffs succeed in their challenge, the USW and Cliffs will continue in their efforts to undermine the Merger.  If Plaintiffs do not, U. S. Steel will be severely limited in its ability to seek out other strategic alternatives necessary to enhance its ability to compete in the relevant markets.   In addition, NSC will be blocked from entering the U.S. iron and steel markets as a competitor to Cliffs.

198.    Thus, Defendants' illegal agreement furthers Cliffs' monopolistic ambitions and otherwise enhances Cliffs' existing market power by preventing the Merger from closing, snuffing out competition from NSC and U. S. Steel, and deterring other prospective bidders from negotiating with, and potentially investing in or acquiring, U. S. Steel.  Defendants' illegal agreement also tortiously interferes with contractual and prospective business relations between U. S. Steel and NSC.  Further, Cliffs, Goncalves, and McCall continue to wield their (made up) "de facto veto right" over any U. S. Steel transaction not involving Cliffs, even as the USW has lost or abandoned every legal avenue to challenge the NSC Merger.  Their unlawful conspiracy will continue to have anticompetitive effects unless and until it is enjoined.

199.    Immediate relief, including the injunctive relief sought herein, is necessary to stop Defendants' ongoing anticompetitive conduct, which threatens ongoing irreparable harm to Plaintiffs and irreparable harm to American customers and consumers by stifling competition in critical markets in the steel industry, thereby rendering money damages a necessary but ultimately inadequate remedy.

## CLAIMS FOR RELIEF

## COUNT ONE

### Claim for Unlawful Conspiracy Under Section 1 of the
### Sherman Act (Against All Defendants)

200.    Plaintiffs incorporate and repeat each and every allegation above as if fully set forth herein.

201.    In a coordinated scheme, Cliffs and Goncalves reached an agreement with McCall and the USW that the USW would only support Cliffs as a prospective buyer of U. S. Steel, would seek to force U. S. Steel into a deal with Cliffs, and would work with Cliffs to obstruct any other deal.  This agreement is wholly separate from any basic labor agreement between USW and Cliffs, as well as the BLA.

202.    Because of the USW's exclusive support, Cliffs maintains it is the only viable bidder to purchase U. S. Steel or material U. S. Steel assets.  As a practical matter, no other company can bid successfully, or engage with U. S. Steel in other strategic alternatives, while the illegal agreement among Cliffs, Goncalves, McCall and the USW is in place.

203.    Additionally, Goncalves and McCall made repeated public pronouncements about Cliffs' exclusive ability to buy U. S. Steel due to Cliffs' agreement with the leadership of the USW, further deterring current or prospective bidders and investors.

204.    The USW controls an essential input into steelmaking:  skilled and experienced steelmaking labor.  By coordinating with the USW, Cliffs seeks to ensure that no one else besides Cliffs can buy U. S. Steel.

205.    The agreement prevents Plaintiffs from effectively competing with Cliffs including by timely challenging Cliffs' monopolies or near-monopolies in the relevant NOES and GOES

markets.  Absent relief, Defendants will continue to deter bidders and block Plaintiffs from challenging Cliffs' dominance and providing a competitive alternative to Cliffs in those markets.

206.    Moreover, the agreement prevents Plaintiffs from challenging Cliffs in the relevant markets for iron ore pellets and exposed automotive steel.  Absent relief, Defendants will continue to deter bidders and block U. S. Steel from providing as robust of a competitive alternative to Cliffs in those markets as it would otherwise.

207.    Defendants' agreement to interfere with the Merger and deter any other bidders has manifestly anticompetitive effects—by eliminating or stifling a key competitor in favor of a monopolist, it will necessarily decrease product choice, reduce output, stifle innovation, degrade quality, and increase prices.  The agreement lacks any redeeming virtue and is therefore *per se* unlawful.  Alternatively, the agreement is anticompetitive under and violates the rule of reason because it will reduce competition, choice, output, innovation, and quality and will lead to higher prices in the relevant markets for NOES, GOES, iron ore pellets, and exposed automotive steel.

208.     If Defendants' conspiracy continues, domestic purchasers of NOES, GOES, iron ore pellets, and exposed automotive steel—and, ultimately, end consumers—will suffer injuries from decreased product choice, lower output, less innovation, degraded quality, loss of competition, and higher prices, which are all harms that the antitrust laws are intended to prevent. And Plaintiffs will continue to suffer competitive injuries from reduced sales and reduced ability to compete that will flow to these purchasers and consumers.

209.    Plaintiffs are entitled to injunctive relief under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.  In addition, Defendants' conduct has caused and continues to cause Plaintiffs substantial financial harm.

## COUNT TWO

**Claim for Monopolization, or, in the Alternative, Attempted Monopolization Under
Section 2 of the Sherman Act in the Markets for NOES, GOES,
and Iron Ore Pellets (Against Cliffs)**

210.    Plaintiffs incorporate and repeat each and every allegation above as if fully set forth herein.

211.    Cliffs' anticompetitive campaign violates Section 2 of the Sherman Act, as Cliffs monopolizes, or, in the alternative, attempts to monopolize each of the relevant markets for NOES, GOES, and iron ore pellets.

212.    Each of those markets constitutes a substantial part of interstate commerce and is a relevant market.  There is no product that is reasonably interchangeable with any of NOES, GOES, or iron ore pellets.  Purchasers are thus reliant on sufficient production of each of them, including, among other purchasers, electric vehicle producers (NOES); power utilities (GOES); and steelmakers, especially producers of greener steel (iron ore pellets).

213.    As set forth above, the relevant geographic market for each of these markets is no broader than North America.

214.    A well-accepted methodology for determining a relevant market for antitrust analysis is to ask whether a hypothetical monopolist over all products in the proposed market could profitably impose a small but significant and non-transitory increase in price, or "SSNIP." *Federal Trade Comm'n* v. *Hackensack Meridian Health, Inc.*, 30 F.4th 160, 167 (3d Cir. 2022).  A hypothetical monopolist of either NOES, GOES, or iron ore pellets could profitably increase prices by at least a SSNIP because customers are unlikely to substitute away from those products in sufficient quantities to make that price increase unprofitable.  Therefore, the sale of NOES, GOES, or iron ore to customers in markets no broader than North America are relevant antitrust markets.

215. Cliffs has monopoly power, or, in the alternative, near-monopoly power in all three markets. It controls 100% of NOES and GOES commercial production and 70% of iron ore pellet production in North America. Further, Cliffs uses its monopoly in iron ore pellets to exercise greater control in the other relevant markets.

216. Cliffs began its monopolization campaign in 2020, when it became North America's largest flat-rolled steel producer purely through acquisition. Cliffs' serial acquisition strategy is the primary means by which it pursues its monopolies, and, through Cliffs' purchase of Stelco in late 2024 and its effort to force a takeover of U. S. Steel, it shows no signs of abating.

217. Cliffs, including through its anticompetitive agreement with the USW, is attempting to exclude and eliminate U. S. Steel as an actual competitor (with respect to NOES and iron ore pellets) and a potential competitor (with respect to GOES) from the relevant markets. Cliffs' actions are designed to block U. S. Steel from obtaining the infusion of capital and technology from NSC and other strategic partners that will allow Plaintiffs to compete more effectively and threaten Cliffs' monopolies. By attempting to kill the Merger and deter other strategic partners for U. S. Steel, by acquiring Stelco, and by attempting to acquire U. S. Steel itself, Cliffs is seeking to entrench its monopolistic positions in the relevant markets.

218. If Cliffs succeeds in its exclusionary campaign, it will have monopolized the relevant markets, or maintained its monopolies, not as a result of superior products, business acumen, or historical accident, but instead as a result of its anticompetitive and unlawful conduct.

219. For each of the relevant markets in which Cliffs is not found to already have monopoly power, there is a dangerously high probability that it will attain such power if its conduct is permitted to continue.

220.    Cliffs is acting with a specific intent to monopolize.  There are no procompetitive justifications for Cliffs' conduct.  There is no business logic to its actions except to eliminate a major competitor and thereby maintain or achieve monopoly power.  In the absence of a plausible procompetitive justification for Cliffs' conduct, its words and actions, as set forth above, evidence an explicit monopolistic intent.

221.    If Cliffs' conduct is allowed to continue, U. S. Steel will imminently suffer competitive injury, including by the denial of NSC's and other strategic partners' technology and capital, which promise to enhance and accelerate U. S. Steel's entry into and expansion in the relevant markets.  NSC will imminently suffer competitive injury, including through their substantial foreclosure from competing in the relevant markets.  At bottom, Plaintiffs' ability to compete in the relevant markets will be diminished, reducing sales and profits, and causing harms to Plaintiffs and consumers that the antitrust laws were intended to prevent.

222.    And if Cliffs' conduct is allowed to continue, competition will be reduced and customers will suffer injuries from higher prices, decreased product choice, lower output, and diminished innovation due to the loss of competition.

223.    Plaintiffs are entitled to injunctive relief under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.  In addition, Defendants' conduct has caused and continues to cause Plaintiffs substantial financial harm.  As a direct and proximate result of Cliffs' wrongdoing alleged herein, Plaintiffs have been injured in their businesses, having suffered, among other things, substantial lost revenue and profits, and will likely suffer further damages if Cliffs is not enjoined from engaging in its anticompetitive conduct.

## COUNT THREE

**Claim for Attempted Monopolization Under Section 2 of the Sherman Act in the Market for Exposed Automotive Steel (Against Cliffs)**

224.    Plaintiffs incorporate and repeat each and every allegation above as if fully set forth herein.

225.    Cliffs' anticompetitive campaign violates Section 2 of the Sherman Act, as Cliffs attempts to monopolize the market for exposed automotive steel sold to automotive OEM facilities.

226.    This market constitutes a substantial part of interstate commerce and a relevant market for antitrust analysis purposes.  There is no product that is reasonably interchangeable with exposed automotive steel, and there is no means of efficient, at-scale production of exposed automotive steel that is reasonably interchangeable with blast furnaces.  Purchasers are thus reliant on each of them, including, among other purchasers, automotive OEM facilities in North America.

227.    As set forth above, the relevant geographic market for this product is no broader than North America.

228.    A well-accepted methodology for determining a relevant market for antitrust analysis is to ask whether a hypothetical monopolist over all products in the proposed market could profitably impose a SSNIP.  *Hackensack Meridian Health, Inc.*, 30 F.4th at 167.  A hypothetical monopolist of exposed automotive steel sold to automotive OEM facilities in North America could profitably increase prices by at least a SSNIP because domestic customers are unlikely to substitute away from that product in sufficient quantities to make that price increase unprofitable.  Therefore, this is a relevant antitrust market.

229.    Cliffs controls almost 50% of exposed automotive steel production in North America and almost 50% of blast furnace steelmaking capacity, which is necessary to commercially manufacture exposed automotive steel at scale.  Further, Cliffs uses its monopoly in

iron ore pellets to exercise greater control in this relevant market by, for example, artificially constraining supply.

230.    Cliffs began its monopolization campaign in 2020, when it became North America's largest flat-rolled steel producer purely through acquisition. Cliffs' serial acquisition strategy is the primary means by which it pursues its monopolies, and, through Cliffs' purchase of Stelco in late 2024 and its effort to force a takeover of U. S. Steel, it shows no signs of abating.

231.    Cliffs, including through its anticompetitive agreement with the USW, is attempting to exclude and eliminate U. S. Steel, an actual competitor, from the relevant markets. Cliffs' actions are designed to block U. S. Steel from obtaining the infusion of capital and technology from NSC or any other strategic partner that will allow Plaintiffs to continue to compete and threaten Cliffs' market power. By attempting to kill the Merger and deter other strategic partners for U. S. Steel, by acquiring Stelco, and by attempting to acquire U. S. Steel itself, Cliffs is seeking to entrench its current dominance in the relevant markets.

232.    If Cliffs succeeds in its exclusionary campaign, it will have attained its monopolies not as a result of superior products, business acumen, or historical accident, but instead as a result of its anticompetitive and unlawful conduct. There is a dangerously high probability that Cliffs will attain monopoly power if its conduct is permitted to continue.

233.    Cliffs is acting with a specific intent to monopolize. There is no procompetitive justification for its conduct. In the absence of a plausible procompetitive justification for Cliffs' conduct, its words and actions, as set forth above, evidence an explicit monopolistic intent.

234.    If Defendants' conduct is allowed to continue, U. S. Steel has and will imminently suffer competitive injury, including by the denial of NSC's and other strategic partners' technology and capital, which promise to enhance and promote U. S. Steel's participation in the relevant

markets.  NSC will imminently suffer competitive injury, including through their substantial foreclosure from competing in the relevant markets.  At bottom, Plaintiffs' ability to compete in the relevant markets will be diminished, reducing sales and profits, and causing harms that the antitrust laws were intended to prevent.

235.    If Cliffs' conduct is allowed to continue, competition will be reduced, and customers in a market no broader than North America will suffer injuries from higher prices, decreased product choice, lower output, and diminished innovation due to the loss of competition.

236.    Plaintiffs are entitled to injunctive relief under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.  In addition, Defendants' conduct has caused and continues to cause Plaintiffs substantial financial harm.  As a direct and proximate result of Cliffs' wrongdoing alleged herein, Plaintiffs have been injured in their businesses, having suffered, among other things, substantial lost revenue and profits, and will likely suffer further damages if Cliffs is not enjoined from engaging in its anticompetitive conduct.

## COUNT FOUR

### Claim for Conspiracy to Monopolize Under Section 2 of the Sherman Act (Against All Defendants)

237.    Plaintiffs incorporate and repeat each and every allegation above as if fully set forth herein.

238.    Cliffs, Goncalves, and the USW's leadership, including McCall, have conspired since at least 2020 to monopolize the steel markets identified above.  Not content with being the largest owner and operator of iron mines in the United States, Cliffs bought its way into the domestic steel industry, starting with an acquisition of the blast furnace and steelmaking facilities of AK Steel in March 2020.

239.    The USW controls an essential input into steelmaking: skilled and experienced labor. By coordinating with the USW, Cliffs ensured that it would have a free path to pursue its serial acquisition strategy. The USW leadership's support and assistance for Cliffs' monopolization strategy have been driven by their desire to entrench their own power. Since 2020, Cliffs has been the only major U.S. steelmaker operating only unionized assets after U. S. Steel invested in a non-unionized mini-mill. The USW's leadership feared that U. S. Steel's investment in this new facility would allow for the emergence and scaling of newer and more environmentally friendly technologies for certain steel products, such as the production of high-grade electrical steel using EAFs, while hastening the retirement of traditional blast furnace production. In response, the USW's leadership chose to make an illegal pact with Cliffs to support Cliffs' ambition to own all integrated blast furnace/unionized production in North America while obstructing any other buyer for U. S. Steel. Although doing so clearly comes at the expense of rank-and-file workers in U. S. Steel facilities such as in the Mon Valley, the USW has chosen to act in this manner in an attempt to protect Cliffs' blast furnace facilities from competition by helping Cliffs control all existing unionized steel assets in the United States.

240.    Cliffs' serial acquisition strategy is the primary means by which it pursues its monopolies, and, through Cliffs' purchase of Stelco in late 2024 and its effort to force a takeover of U. S. Steel through its illegal agreement with McCall and the USW, it shows no signs of abating. The USW's leadership has supported Cliffs at every step along the way.

241.    The conspiracy prevents existing and potential competitors, including Plaintiffs, from effectively challenging Cliffs' attempt to achieve monopoly power in exposed automotive steel sold to North American OEM facilities, which is dependent on blast furnace production. Absent relief, Defendants will hinder U. S. Steel's ability to compete in that market by way of their

agreement to exclusively support a deal with Cliffs, work to force U. S. Steel into such a merger, and oppose an acquisition of U. S. Steel by any other buyer. And each of the Defendants have taken other overt acts in furtherance of their conspiracy.

242. Each of the Defendants, by way of their unlawful conspiracy, also specifically intends for Cliffs to entrench its monopolies in the relevant NOES, GOES, and iron ore pellets markets. The agreement prevents Plaintiffs from effectively challenging Cliffs' monopolies in those markets. Absent relief, Defendants will continue to deter bidders and block Plaintiffs from challenging Cliffs' monopolies in those markets.

243. Defendants' conspiracy has manifestly anticompetitive effects—it will reduce product choice, reduce output, stifle innovation, degrade quality, and increase prices—and lacks any redeeming virtue and therefore is *per se* unlawful. As a monopolist, Cliffs' attempt to acquire a competitor is also *per se* unlawful. Alternatively, the conspiracy is anticompetitive and violates the rule of reason because it will increase prices and reduce competition in the relevant markets for NOES, GOES, iron ore pellets and exposed automotive steel.

244. If Defendants' conspiracy continues, competition will be reduced and domestic purchasers of NOES, GOES, exposed automotive, and iron ore pellets—and, ultimately, end consumers—will suffer injuries from decreased choice, lower output, less innovation, loss of competition, and higher prices, which are all harms that the antitrust laws are intended to prevent. And Plaintiffs will suffer injuries from reduced sales and reduced ability to compete that will flow to these purchasers and consumers.

245. Plaintiffs are entitled to injunctive relief under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26. In addition, Defendants' conduct has caused and continues to cause Plaintiffs substantial financial harm.

## COUNT FIVE

### Claim for Monopolization and Attempted Monopolization Under Section 2 of the Sherman Act (Against Goncalves)

246. Plaintiffs incorporate and repeat each and every allegation above as if fully set forth herein.

247. Defendant Lourenco Goncalves is a corporate officer and director of Cliffs. Goncalves is Cliffs' CEO, President, and Chairman.

248. Goncalves, by masterminding, spearheading, and executing much of Cliffs' monopolistic campaign, actively directed and participated in Cliffs' unlawful acts as described in Count Two and Count Three, which are incorporated herein.

249. Plaintiffs are entitled to injunctive relief under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26. In addition, Goncalves' conduct has caused and continues to cause Plaintiffs substantial financial harm. As a direct and proximate result of Goncalves' wrongdoing alleged herein, Plaintiffs have been injured in their businesses, having suffered, among other things, substantial lost revenue and profits, and will likely suffer further damages if Goncalves is not enjoined from engaging in his anticompetitive conduct.

## COUNT SIX

### Claim under RICO § 1962(c) (Against All Defendants)

250. Plaintiffs incorporate and repeat each and every allegation above as if fully set forth herein.

251. Each of the Defendants is a "person" under 18 U.S.C. §§ 1961(3) and 1962(c).

252. Defendants Cliffs, Goncalves, and McCall, together with the USW, constitute an "enterprise" engaged in and whose activities affect interstate commerce within the meaning of 18

U.S.C. §§ 1961(4) and 1962(c).  The enterprise, through the coordinated unlawful activities of its members, pursued a years-long campaign for Cliffs to monopolize key iron and steel markets.

253.    Each of the Defendants was and is associated with the enterprise.

254.    Each of the Defendants agreed to and did conduct and participate in the enterprise's affairs through a pattern of racketeering activity under 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).  Pursuant to and in furtherance of their unlawful scheme, Defendants committed multiple, repeated, and continuous violations of the Hobbs Act, by way of an extortion campaign, whereby they sought to put Plaintiffs to a choice:  accept a deal with Cliffs on the enterprise's terms or face the economic loss associated with the destruction of the Merger.  Each of the Defendants also pursued this attempted extortion campaign to either obtain more economic value in connection with an eventual deal with Cliffs, or in the alternative, to obtain more economic value from NSC in return for acquiescing to the Merger.

255.    Each of the Defendants committed violations of Section 302 of the Labor Management Relations Act and 18 U.S.C. § 1951.  Specifically, Cliffs and Goncalves delivered a thing of value to the USW and McCall by agreeing to provide the International Union benefits other than those that might go to union members at U. S. Steel in exchange for the USW's and McCall's efforts to defeat the Merger.  Given the benefits of the NSC transaction for the rank-and-file workers at U. S. Steel, there is no reasonable explanation for the International Union's and McCall's continued intransigence.  The only reasonable inference from McCall's refusal to engage with NSC and continued loyalty to Cliffs is that the International Union's leadership has been promised benefits by Cliffs other than those that will clearly flow to the U. S. Steel's USW-represented rank-and-file workers as a result of the deal.

256.    Each of the Defendants engaged in racketeering activity under 18 U.S.C. § 1951(5), pursuant to and in furtherance of their unlawful scheme, by committing multiple, repeated, and continuous violations of 18 U.S.C. §§ 1341 and 1343 by utilizing mail, wire, radio, or television communications in interstate or foreign commerce to transmit written materials amongst each other and to third parties with the intent to obtain money and property through false representations.  Specifically, Cliffs, Goncalves, McCall, and the USW's leadership each utilized wire, radio, and/or television communications, including the internet, to publicly broadcast their false representations about Plaintiffs and the Merger, to communicate false and fraudulent statements to CFIUS about Plaintiffs and the Merger, and to privately communicate and plot the execution of their misinformation campaign, with the ultimate intent of depriving Plaintiffs of property by way of their false representations and profiting as a result.

257.    Defendants' racketeering activity will continue unabated.  The members of the enterprise will continue to coordinate their unlawful activities in pursuit of their shared goal of driving U. S. Steel towards Cliffs and ensuring no other bidder is permitted to complete a transaction.  Even if the Merger were to fail, each of the Defendants would continue their efforts to pressure U. S. Steel to accept only a deal with Cliffs or suffer resulting injury.  The members of the enterprise will also continue to work together to pursue Cliffs' monopolistic aims, as they have been since at least 2020.

258.    As a direct and proximate result of each of the Defendants' violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.  Cliffs CEO Goncalves has repeatedly acknowledged that the enterprise's actions have injured Plaintiffs and diminished U. S. Steel's value, including by asserting that U. S. Steel is now "like a sick patient that sits on a bed with a bunch of tubes and sensors around him" and "like a patient that is in a coma."  If the unlawful

agreement is allowed to continue, Plaintiffs' damages stemming from delays to the procompetitive and lucrative Merger (and, ultimately, its collapse) will continue to increase as a result. These damages include the prospective benefits of the Merger itself and legal fees expended by U. S. Steel and NSC in their efforts to mitigate the harm caused by Defendants' unlawful campaign. Plaintiffs' damages also include loss of business goodwill attributable to Defendants' unlawful agreement to smear Plaintiffs and undermine the Merger. Additionally, Defendants' unlawful campaign has effectively placed an encumbrance on U. S. Steel's USW-represented assets, thereby diminishing the value of those assets.

## COUNT SEVEN

### Claim under RICO § 1962(d) (Against All Defendants)

259.     Plaintiffs incorporate and repeat each and every allegation above as if fully set forth herein.

260.     Each of the Defendants is a "person" under 18 U.S.C. §§ 1961(3) and 1962(c).

261.     Defendants Cliffs, Goncalves, and McCall, together with the USW, constitute an "enterprise" engaged in and whose activities affect interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). The enterprise, through the coordinated unlawful activities of its members, pursued a years-long campaign for Cliffs to monopolize key iron and steel markets.

262.     Each of the Defendants were and are associated with the enterprise.

263.     Each of the Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, each of the Defendants has intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Each of the Defendants knew of the enterprise's corrupt activities and agreed to the commission of predicate acts to further the scheme described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c).

264.     As a direct and proximate result of each of the Defendants' violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.  If the unlawful agreement is allowed to continue, Plaintiffs' damages stemming from delays to the procompetitive and lucrative Merger (and, ultimately, its collapse) will continue to increase as a result.  These damages include the prospective benefits of the Merger itself and legal fees expended by U. S. Steel and NSC in their efforts to mitigate the harm caused by Defendants' unlawful campaign.  Plaintiffs' legal damages also include loss of business goodwill attributable to Defendants' unlawful agreement to smear Plaintiffs and undermine the Merger.  Additionally, Defendants' unlawful campaign has effectively placed an encumbrance on U. S. Steel's USW-represented assets, thereby diminishing the value of those assets.

## <u>COUNT EIGHT</u>

### Claim for Tortious Interference with Existing Contractual Relations
### (Against All Defendants)

265.     Plaintiffs incorporate and repeat each and every allegation above as if fully set forth herein.

266.     The Merger has been publicly announced and the Merger Agreement has been publicly filed.  The Merger Agreement is a binding and enforceable contract.  Defendants are fully aware of the contractual relationship existing between U. S. Steel and NSC, including the fact that a binding and enforceable contract exists between these parties.  Further, the Merger Agreement makes U. S. Steel stockholders third-party beneficiaries for purposes of obtaining the Merger consideration and authorizes U. S. Steel to act on behalf of its stockholders to pursue the loss of the Merger premium as damages.

267.     Despite that awareness, Defendants have improperly interfered with and impeded the performance of the contract by purposefully taking actions that are specifically intended to

undermine the existing contractual relationship between U. S. Steel and NSC, to attempt to directly induce NSC to breach the Merger Agreement, and to cause a termination of the Merger Agreement by preventing the conditions necessary for its closing from being achieved. Such actions have also made the performance of the Merger Agreement more expensive and burdensome, and delayed the Plaintiffs' efforts to close the Merger. Both U. S. Steel and NSC stand ready, willing, and able to perform under the Merger Agreement, but Defendants have persisted in their interference.

268.    Defendants' interference has harmed U. S. Steel by attempting to induce or cause a breach or nonperformance by NSC of the Merger Agreement and by making NSC's performance under the Agreement more expensive and burdensome. As a consequence of their actions, U. S. Steel has suffered pecuniary loss in the form of being deprived of the synergies and other benefits that would arise from the Merger, such as NSC's capital infusion and reduced production costs. And its stockholders have lost out on the promised merger consideration.

269.    Defendants' interference has separately harmed NSC by attempting to induce or cause a breach or nonperformance by U. S. Steel of the Merger Agreement and by making U. S. Steel's performance under the Agreement more expensive and burdensome. As a consequence of Defendants' actions, NSC has suffered pecuniary loss in the form of being barred from expanding its footprint and deprived of substantial profits that would result from the Merger, together with the synergies that would arise from it (such as increased efficiency and reduced production costs).

270.    Defendants have intended to cause the termination of the Merger Agreement so that Cliffs could achieve what it failed to achieve through the competitive bidding process: the acquisition of U. S. Steel or its assets on terms markedly inferior to those reflected in the Merger Agreement with NSC. Defendants' conduct has been and remains anticompetitive and designed

to entrench Cliffs' position as a monopolist in the relevant markets for high-grade electrical steel and iron ore pellets, and to monopolize the relevant market for exposed automotive steel.

271.    Defendants' actions have been knowingly and purposefully intended to interfere with Plaintiffs' contractual relations with each other, and they are not protected by any privilege or justification.  Defendants' actions are not privileged as legitimate competition.

272.    There is no societal interest in protecting the actions taken by Defendants described herein and no societal interest that outweighs Plaintiffs' contractual interests.  Cliffs had an opportunity to participate in the publicly announced strategic alternatives review process that was conducted by U. S. Steel's Board.  U. S. Steel's Board had a fiduciary obligation to secure the best deal that it could—and that is what it did.  Cliffs' bid was objectively inferior to NSC's bid.

273.    Plaintiffs have suffered pecuniary, consequential, and reputational damages as a result of Defendants' interference, and those injuries are ongoing and increasing every day.  And, if that interference is successful, U. S. Steel would be deprived of the opportunity to negotiate any alternative transaction and of the pecuniary benefits of such potential transactions, and its stockholders would be deprived of the Merger premium.

274.    Although Plaintiffs have suffered damages as a result of Defendants' tortious interference, Plaintiffs are also threatened with irreparable and ongoing harm in the form of Defendants' relentless campaign to induce a breach or termination of the Merger Agreement, rendering money damages a necessary but ultimately inadequate and incomplete remedy. Injunctive relief enjoining Defendants from interfering with Plaintiffs' existing contractual relationship is therefore appropriate to ensure their misconduct is halted and injury to Plaintiffs is alleviated.

## COUNT NINE

**Claim for Tortious Interference with Prospective Business Relations**
**(Against All Defendants)**

275.    Plaintiffs incorporate and repeat each and every allegation above as if fully set forth herein.

276.    The Merger has been publicly announced and the Merger Agreement publicly filed. Defendants are fully aware of the prospective business relationship between U. S. Steel and NSC, namely the intention, as set forth in the Merger Agreement between those parties, that U. S. Steel be acquired by Nippon Steel Corporation's subsidiary NSNA.  Defendants are also fully aware that U. S. Steel, absent a transaction with NSNA, would need to consider strategic alternatives including transactions with other bidders that, unlike Cliffs, would make procompetitive investments in U. S. Steel and enhance competition in the NOES, GOES, iron ore pellets, and exposed automotive steel markets.  Further, the Merger Agreement makes U. S. Steel stockholders third-party beneficiaries for purposes of obtaining the Merger consideration and authorizes U. S. Steel to act on behalf of its stockholders to pursue the loss of the Merger premium as damages.

277.    There is an objectively reasonable probability that the contemplated business relationships would materialize absent Defendants' anticompetitive and unlawful interference. Plaintiffs have stated their intent to consummate the Merger Agreement and have invested substantial time and resources into realizing the economic advantage that the transaction contemplates.  Plaintiffs have far more than a mere hope that, absent Defendants' interference, the threatened economic advantage will materialize.

278.    Despite Defendants' awareness of this, they have taken purposeful actions specifically intended to prevent these prospective business relationships from being consummated.

279.    Defendants' interference has harmed U. S. Steel by barring its access to the capital investment, reduced production costs, and other synergies and other benefits that would result from a business relationship with NSC, as well as other bidders.  U. S. Steel stockholders will also lose out on the merger consideration.

280.    Defendants' interference has separately harmed NSC by depriving it of the economic advantage (such as entry into the U.S. iron and steel markets) that would result from a business relationship with U. S. Steel.

281.    Defendants intend to destroy U. S. Steel's prospective business relations with NSC and all other bidders so that Cliffs can weaken U. S. Steel and further entrench its monopoly power in multiple markets.  If permitted to continue, Defendants' conduct threatens to do exactly that.

282.    Defendants' actions are knowingly and purposefully intended to interfere with Plaintiffs' prospective business relationships and are not protected by any privilege or justification. Their actions are not privileged as legitimate competition.

283.    There is no societal interest in protecting the actions taken by Defendants described herein and no societal interest that outweighs Plaintiffs' business interests.

284.    If the interference is allowed to continue, Plaintiffs would, as a direct and proximate result, suffer the loss of a substantial prospective economic advantage.  Plaintiffs have suffered pecuniary, consequential, and reputational damages as a result of Defendants' interference, and those injuries are ongoing and increasing every day.

285.    Although Plaintiffs have suffered damages as a result of Defendants' tortious interference, Plaintiffs are also threatened with irreparable and ongoing harm, rendering money damages a necessary but ultimately inadequate remedy.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is halted and injury to U. S. Steel is alleviated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

(a)    For an order declaring that Defendants' conduct violates Section 1 and Section 2 of the Sherman Act, the civil RICO statute, and the other laws alleged;

(b)    For an order enjoining Cliffs, Goncalves, and McCall from continuing their anticompetitive conduct intended to undermine any bidder besides Cliffs from purchasing U. S. Steel or agreeing to other strategic alternatives with U. S. Steel in violation of Section 1 of the Sherman Act;

(c)    For an order enjoining Cliffs from continuing its unlawful maintenance of its monopoly in the relevant markets for NOES, GOES, and iron ore pellets in violation of Section 2 of the Sherman Act;

(d)    For an order enjoining Cliffs from continuing its unlawful attempt to achieve a monopoly in the relevant market for exposed automotive steel sold to automotive OEM facilities in North America in violation of Section 2 of the Sherman Act;

(e)    For an order enjoining Cliffs, Goncalves, and McCall from conspiring to monopolize the relevant markets for NOES, GOES, iron ore pellets, and exposed automotive steel sold to automotive OEM facilities in North America in violation of Section 2 of the Sherman Act;

(f)    For an order enjoining Cliffs, Goncalves, and McCall from continuing to tortiously interfere in Plaintiffs' existing contractual relations with regard to the Merger Agreement;

(g)    For an order enjoining Cliffs, Goncalves, and McCall from continuing to tortiously interfere in Plaintiffs' prospective economic relations as well as U. S. Steel's prospective economic relations with future bidders;

(h)     For any available form of damages, including punitive damages;

(i)     For treble damages in an amount to be proven at trial;

(j)     On their RICO claims, for treble damages pursuant to 18 U.S.C. § 1964(c) together

with pre-judgment and post-judgment interest;

(k)     For pre- and post-judgment interest;

(l)     For attorneys' fees and costs, to the extent provided by law; and

(m)     For any other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury on all issues and claims so triable.

January 6, 2025

OF COUNSEL:

Grant R. Mainland (NY 4628319)
(*pro hac vice* forthcoming)
James H. Weingarten (DC 985070)
(*pro hac vice* forthcoming)
MILBANK LLP
55 Hudson Yards
New York, NY  10001
Phone:  (212) 530-5000
Fax:  (212) 530-5219
Email:  gmainland@milbank.com
jweingarten@milbank.com

Jonathan M. Moses (NY 2836054)
(*pro hac vice* forthcoming)
Adam L. Goodman (NY 5207816)
(*pro hac vice* forthcoming)
WACHTELL, LIPTON,
ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
Phone:  (212) 403-1000
Fax:  (212) 403-2000
Email:  jmmoses@wlrk.com
algoodman@wlrk.com

*Attorneys for Plaintiff United States Steel Corporation*

David B. Hennes (NY 2773190)
(*pro hac vice* forthcoming)
Alexander B. Simkin (NY 4463691)
(*pro hac vice* forthcoming)
Andrew S. Todres (NY 5347521)
(*pro hac vice* forthcoming)
Stefan P. Schropp (DC 1026864)
(*pro hac vice* forthcoming)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY  10036
(212) 596-9000
David.Hennes@ropesgray.com
Alexander.Simkin@ropesgray.com
Andrew.Todres@ropesgray.com
Stefan.Schropp@ropesgray.com

*Attorneys for Plaintiffs Nippon Steel North America, Inc. and Nippon Steel Corporation*

Respectfully submitted,

*/s/ Thomas E. Birsic*
Thomas E. Birsic (PA 31092)
Eric R.I. Cottle (PA 78152)
Wesley A. Prichard (PA 324411)
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA  15222
Phone:  (412) 355-6538
Fax:  (412) 355-6501
Email:  thomas.birsic@klgates.com
eric.cottle@klgates.com
wesley.prichard@klgates.com

*Attorneys for Plaintiff United States Steel Corporation*

*/s/ Daniel I. Booker*
Daniel I. Booker (PA 10319)
Christopher R. Brennan (PA 313534)
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA,  15222
Phone:  (412) 288-3131
Fax:  (412) 288-3063
Email:  DBooker@reedsmith.com
CBrennan@reedsmith.com

*Attorneys for Plaintiffs Nippon Steel North America, Inc. and Nippon Steel Corporation*

93