**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

--------------------------------------------------------------- X

|  |  |  |
|---|---|---|
| UNITED STATES STEEL CORPORATION, | : | |
| NIPPON STEEL CORPORATION, and | : | Civil Action No.: 2:25-cv-15 |
| NIPPON STEEL NORTH AMERICA, INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| CLEVELAND-CLIFFS INC., LOURENCO | : | |
| GONCALVES, and DAVID McCALL, | : | |
| | : | |
| Defendants. | : | |

--------------------------------------------------------------- X

**RICO CASE STATEMENT**

Pursuant to Local Civil Rule 7.1.B, Plaintiffs, by and through their undersigned attorneys, hereby submit this RICO Case Statement (the "Case Statement"). The allegations in the Complaint are based upon evidence in Plaintiffs' possession, as well as upon information and belief supported by, among other things, media reports and public statements. However, given the nature of the wrongdoing alleged in the Complaint, Plaintiffs expect that a significant amount of relevant information is exclusively in Defendants' possession and will only be available to Plaintiffs through discovery. Plaintiffs therefore reserve the right to supplement this Case Statement as additional information is learned and discovery is obtained.

**1.    State whether the alleged unlawful conduct is in violation of any or all of the provisions of 18 U.S.C. §§ 1962(a), (b), (c) or (d).**

The alleged unlawful conduct is in violation of 18 U.S.C. §§ 1962(c) and (d).

**2.    List each defendant and state the alleged misconduct and basis of liability of each defendant.**

Defendant Cleveland-Cliffs ("Cliffs") and its CEO Lourenco Goncalves obtained the support of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "USW" or the "International Union") and its President, McCall, in their "merge or murder" campaign to undermine the merger of Nippon Steel Corporation (together with Nippon Steel North America, Inc. ("NSNA"), "NSC") and U. S. Steel (the "Merger" or "NSC Merger"), and to otherwise severely undercut U. S. Steel's ability to compete.

As part of their unlawful campaign, all Defendants publicly spread falsehoods regarding the NSC Merger and abused both private and public processes to subvert the deal.  Defendants did so to gain leverage as part of an extortion campaign.  Defendants knew that threatening the NSC Merger would exert significant economic pressure on U. S. Steel and NSC.  Defendants undertook their unlawful campaign to threaten U. S. Steel and NSC with significant economic loss if U. S. Steel and NSC did not back away from the NSC Merger, and if U. S. Steel did not agree to be acquired by Cliffs.  Thus, all Defendants are liable for the RICO predicate act of extortion through fear of economic loss, as defined in the Hobbs Act, 18 U.S.C. § 1951.  *See Care One Mgmt. LLC* v. *United Healthcare Workers East*, 43 F.4th 126, 148 (3d Cir. 2022) (summary judgment on extortion through fear of economic loss inappropriate where defendant unions may have been abusing regulatory and criminal processes to pursue their objectives).

Cliffs and Goncalves, in exchange for the USW's opposition to any acquisition of U. S. Steel other than an acquisition by Cliffs, also delivered a thing of value to the USW and its President, McCall, in the form of a promise to share valuable benefits stemming from an anticompetitive Cliffs acquisition of U. S. Steel, even if doing so would harm the USW-represented workforce at U. S. Steel.  Thus, all Defendants are liable for the RICO predicate act of labor bribery under Section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186.

All Defendants also made numerous knowingly false or misleading statements through the use of wire, radio, or television communications to the public, U. S. Steel employees, and even the government, in an effort to deprive U. S. Steel and NSC of their contractual rights under the agreement governing the Merger (the "Merger Agreement").  *United States* v. *Porat*, 76 F.4th 213, 223 (3d Cir. 2023) (rejecting requirement of "convergence," or that a wire fraud scheme target property held by the party to whom the fraudulent statements are directed); *United States* v. *Christopher*, 142 F.3d 46, 54 (1st Cir. 1998) (same).  Thus, all Defendants are liable for the RICO predicate act of wire fraud under 18 U.S.C. § 1343.

**3.   List alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each.**

The USW, under the leadership of McCall, also conducted the affairs of the enterprise by coordinating an unlawful campaign to undermine the NSC Merger and otherwise assisting Cliffs in pursuing its monopolistic ambitions in key iron and steel markets.  Its misconduct includes:

- striking an unlawful agreement with Cliffs and Goncalves to wage an obstructionist campaign against U. S. Steel and NSC to undermine the NSC Merger, and any other acquisition of U. S. Steel other than an acquisition by

Cliffs, and to pressure U. S. Steel into agreeing to an anticompetitive merger with Cliffs;

- coordinating with Cliffs and Goncalves in prosecuting the effort to oppose the NSC Merger;

- misinforming the public, including other prospective bidders, regarding the USW's supposed "veto right" over any transaction;

- misinforming union members and the public regarding NSC's commitments to the USW; and

- otherwise tortiously interfering in U. S. Steel's and NSC's contractual relations and conspiring to allow Cliffs to monopolize key iron and steel markets.

**4.  List the alleged victims and state how each victim has been allegedly injured.**

U. S. Steel and NSC have been injured in their business and property by reason of Defendants' pattern of racketeering activity because it has prevented U. S. Steel and NSC from engaging in business relations to which they have a legal entitlement.  Specifically, U. S. Steel and NSC have been injured in their business and property because Defendants' pattern of racketeering activity has prevented U. S. Steel and NSC from closing a deal that would increase their profitability, give them a substantially stronger platform from which to compete in several key iron and steel markets, and enhance their workforces.  And U. S. Steel has been injured in its business and property because Defendants' pattern of racketeering activity threatens to torpedo the Merger through which NSC committed to making major capital investments in U. S. Steel's operations.  NSC's capital investments would preserve jobs and accelerate U. S. Steel's technological transformation.  Now, U. S. Steel risks losing these investments—and all their concomitant benefits—because of Defendants' pattern of racketeering activity.

U. S. Steel has also been injured in its business and property because Defendants' unlawful campaign and agreement encumbered its USW-represented assets, reducing the assets' value regardless of any transaction with NSC and limiting U. S. Steel's ability to obtain necessary capital in order for it to compete by way of a strategic alternative other than the NSC Merger. Both U. S. Steel and NSC have suffered injury to their business goodwill. U. S. Steel has also suffered injury to its workforce relations. The RICO enterprise's continued attacks on the Merger will likely result in substantial job loss and in the departure of key U. S. Steel employees. Over the last 12 months, U. S. Steel employees have become exhausted by the uncertainty surrounding the future of their company, as their livelihoods have been exploited by Goncalves and McCall to further their anticompetitive scheme, resulting in increased attrition rates.

Additionally, both U. S. Steel and NSC have been injured by the delay in closing the Merger caused by Defendants' illegal activity and will suffer further injury if such activity causes the Merger to fail to close or delays other strategic alternatives. U. S. Steel and NSC have also suffered injury resulting from Defendants' near-constant campaign of harassment, xenophobic remarks, rumor-mongering, and lies. Both victims have been forced to divert executive attention and immense resources from their core mission—producing steel—to responding to Defendants' unlawful campaign, including by expending legal fees.

U. S. Steel has also suffered injury insofar as Defendants' pattern of racketeering activity has precluded U. S. Steel from pursuing opportunities for improvement and innovation. These opportunities include seeking grants from the Department of Energy and other sources of funding, as well as investment opportunities related to decarbonization, energy, direct reduced iron, and electrical steels, seed investments in start-up companies through Carnegie Foundry, and

innovation partnerships related to steel homes, steel roofs, solar panels, and steel pallets.  This ongoing racketeering activity has also diminished U. S. Steel's value.

Finally, consumers will suffer injury from higher prices, decreased product choice, lower output, and diminished innovation due to the loss of competition.

**5.   Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim.  The description of the pattern of racketeering shall include the following information:**

**a.   A list of the alleged predicate acts and the specific statutes which were allegedly violated;**

Both the § 1962(c) claim and the § 1962(d) claim allege the same pattern of racketeering activity.  All Defendants repeatedly committed extortion under the Hobbs Act, *see* 18 U.S.C. § 1951, violated Section 302 of the LMRA, codified at 29 U.S.C. § 186, and repeatedly committed wire fraud under 18 U.S.C. § 1343.

**b.   The date of each predicate act, the participants in each such predicate act and the relevant facts surrounding each such predicate act;**

Defendants committed the below predicate acts, among others, as part of their pattern of racketeering activity:

1.   On July 28, 2023, Goncalves informed U. S. Steel CEO David Burritt by telephone that Cliffs was making an unsolicited bid for U. S. Steel.  Cliffs followed up with a private letter to Burritt and U. S. Steel's Board Chair sketching out the basic terms of its unsolicited offer.  In an effort to force U. S. Steel's hand, Cliffs informed U. S. Steel on August 3 that Cliffs had struck an agreement with the USW whereby the USW agreed to "not endorse anyone other than Cliffs" in any bid for U. S. Steel.  Cliffs (and Goncalves) struck a bargain with the USW to obtain the support of the

representative of the USW's workforce in exchange for Cliffs' promise to share valuable benefits stemming from an anticompetitive Cliffs acquisition of U. S. Steel, even if doing so would harm the USW-represented workforce at U. S. Steel.

Defendants Cliffs and Goncalves violated Section 302 of the LMRA by promising to the USW valuable benefits to which it is not entitled under the Basic Labor Agreement (the "BLA") in an effort to kickstart the RICO enterprise's pattern of racketeering activity.  The USW violated Section 302 of the LMRA by accepting Cliffs' promise of valuable benefits stemming from an anticompetitive Cliffs acquisition of U. S. Steel, even if doing so would harm the USW-represented workforce at U. S. Steel.  The promise of economic benefits is an unlawful thing of value within the meaning of Section 302.

2.    On August 13, 2023, Cliffs boasted that the USW "will not endorse anyone other than Cliffs for a [U. S. Steel] transaction," and falsely proclaimed that the USW had a legal veto right over any deal.

Defendant Cliffs violated the Hobbs Act by attempting to commit extortion through fear of economic loss.  As part of its efforts to prevent a merger with anyone but Cliffs, Cliffs wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger.  Cliffs sought to accomplish this objective by scaring away any bidder that might increase

U. S. Steel's competitive vitality, thereby raising U. S. Steel's fears of economic ruin if it were to reject a Cliffs merger.  Defendant Cliffs also violated Section 302 of the LMRA by promising the International Union valuable benefits stemming from an anticompetitive Cliffs acquisition of U. S. Steel, even if doing so would harm the USW-represented workforce at U. S. Steel.

3.  On August 17, 2023, Goncalves doubled down on his claim that "Cliffs is the only realistic buyer.  . . .  [A sale] could not be consummated without the support of the USW."

Defendant Goncalves violated the Hobbs Act by attempting to commit extortion through fear of economic loss.  As part of his efforts to prevent a merger with anyone but Cliffs, Goncalves wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger.  By disseminating this statement, Goncalves also intended to scare away other potential bidders wary of a contrived labor dispute.  This statement was part of Goncalves' broader effort to plunder U. S. Steel's property through a Cliffs-U. S. Steel merger by characterizing U. S. Steel as an unattractive target, thereby threatening U. S. Steel with economic ruin if U. S. Steel did not accede to Cliffs' demands.

Defendant Goncalves also violated Section 302 of the LMRA by promising the International Union valuable benefits stemming from an

anticompetitive Cliffs acquisition of U. S. Steel, even if doing so would harm the USW-represented workforce at U. S. Steel.

4.    On December 18, 2023, the very day the NSC Merger was announced, Goncalves falsely claimed that NSC, as a "foreign company," would "come to just liquidate American jobs and take over what we have here." Goncalves falsely told CNBC viewers that the deal with NSC is "not a deal, it's [a] proposal."  Asked if Cliffs would bid if the deal fell through, the CEO said "[a]bsolutely.  At that point, you have to be abundantly clear that I am the only viable buyer.  If they missed their chance to sell the company, they will end up selling the company to me later."

Defendant Goncalves violated the Hobbs Act by attempting to commit extortion through fear of economic loss.  As part of his efforts to undermine the NSC Merger, Goncalves wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger.  Goncalves sought to accomplish this objective by disseminating a falsehood calculated to undermine the prospects of any deal other than one with Cliffs, and thereby inflict fear of economic loss on U. S. Steel.

Defendant Goncalves also committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive U. S. Steel and NSC of their contractual rights under the Merger Agreement.

Specifically, Goncalves misrepresented NSC's plans for U. S. Steel's assets and falsely stated that NSC would liquidate American jobs.

5.    On December 19, 2023, McCall, recommitting to the bargain struck by the International Union with Cliffs months earlier, falsely claimed that there had been no "top-level contact" between NSC and the USW since the deal was announced.  McCall knowingly omitted that NSC provided McCall with a letter seeking a meeting on the day the deal was announced. McCall also knowingly omitted that NSNA sent a letter committing to the USW, in writing, that it recognized the USW "as the bargaining representative for the USW-represented employees" employed by U. S. Steel and that it would "continue to honor all commitments in all USW Agreements."

Defendant McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss by disseminating a falsehood calculated to undermine the prospects of any deal other than one with Cliffs, in order to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger as part of Cliffs' efforts to plunder U. S. Steel's property and exploit its assets.  In the alternative, McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss in order to seek NSC's consent to providing benefits not available under the BLA if the Merger does take place.

Defendant McCall also violated Section 302 of the LMRA by accepting Cliffs' promise of valuable benefits stemming from an anticompetitive Cliffs acquisition of U. S. Steel, even if doing so would harm the USW-represented workforce at U. S. Steel, as part of Defendants' unlawful agreement to subvert the NSC Merger or any other acquisition of U. S. Steel other than an acquisition by Cliffs.

Finally, Defendant McCall committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall falsely stated that there had been no "top-level contact" between NSC and the USW.

6.    On January 9, 2024, Paul Finan, Cliffs' Senior Vice President of Finance, and Robert Fischer, Cliffs' Executive Vice President of Human Resources & Labor Relations, hosted an investor call through an investment bank, Jefferies.  Rather than talking about Cliffs' performance, Finan and Fischer insisted that Cliffs was still aiming for an acquisition of U. S. Steel, but warned U. S. Steel investors on the call that the price would be lower than what Cliffs had previously offered.  Fischer further claimed to be involved in active dialogue with the USW about its position on the deal, and to have their "ear."

Defendant Cliffs violated the Hobbs Act by attempting to commit extortion through fear of economic loss.  As part of its efforts to undermine the NSC Merger, Cliffs wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger.  Cliffs sought to accomplish this objective by disseminating falsehoods calculated to undermine the prospects of any deal other than one with Cliffs, and thereby inflict fear of economic loss on U. S. Steel.

7.    On January 30, 2024, Goncalves disparaged U. S. Steel and its Board, ranting:  "[T]hat board did not want to sell to Cliffs.  Period.  Full stop.  They would like to break the back of the [USW].  That's what they are doing.  Let's talk turkey here.  That management team and that board had one goal in mind, and the goal was to break the back of the United Steelworkers.  And by breaking the back of the United Steelworkers to break the back of unionized labor in America.  I am a big supporter of unionized labor because it goes against bosses like Dave Burritt.  These type of people need to go.  So, that's my take on U. S. Steel.  Do I need to give you more color or that's enough?"

Defendant Goncalves violated the Hobbs Act by attempting to commit extortion through fear of economic loss.  As part of his efforts to undermine the NSC Merger, Goncalves wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger.  Goncalves sought to

accomplish this objective by disseminating falsehoods calculated to undermine the prospects of any deal other than one with Cliffs, and thereby inflict fear of economic loss on U. S. Steel.

8.     On February 2, 2024, Cliffs' executives continued Cliffs' smear campaign in a public webinar hosted by an investment bank, Raymond James, which lasted 75 minutes and had approximately 130 attendees.  There, Celso Goncalves (Cliffs' CFO and the CEO's son), Fischer, and Finan doubled down on Cliffs' deceptive campaign to portray U. S. Steel Board members as incompetent stewards who mishandled the process and to portray a deal with Cliffs as inevitable.  During that webinar, Celso Goncalves reiterated the false and misleading claim that the Merger was anti-union, asserting that NSC "assign[ed] no value to the unionized plants" held by U. S. Steel, that NSC had "no plans to invest in [those plants]," and that NSC "said[] we're gonna execute under the existing plan of U. S. Steel which is to shut down unionized mills and to move production down to the non-union mills."  The younger Goncalves also demonized foreign buyers:  "[T]hese people know what happens when you allow foreign buyers to come in," he explained.  "[E]ven if they sweet talk you in the beginning, they always let you down.  They always end up shutting down production.  They always end up firing people, doing layoffs, the things that we committed that we wouldn't do."  Celso Goncalves further claimed that, contrary to "what's in the proxy," Cliffs' and U. S. Steel's attorneys had worked together to analyze the antitrust

risk and "found proof of no competitive harm to the customer base, including auto and other manufacturers," arising from a Cliffs acquisition of U. S. Steel.  This was knowingly and demonstrably false.  Among other things, Cliffs' offer to divest assets generating up to $2 billion in annual revenue—although inadequate to allay anticompetitive harm in all of the affected markets—puts the lie to that claim.  Fischer, who had previously claimed to have the "ear" of the USW, proclaimed that "[t]here's nothing that [NSC] can do that's gonna bring the [USW] on their side.  Nothing." Fischer was able to make that statement because he knew that Cliffs and the USW had an agreement to oppose the deal or any other deal other than an acquisition of U. S. Steel by Cliffs.  These statements about NSC's plans were knowingly false because NSC had publicly committed to supporting U. S. Steel with significant investments in unionized plants, above and beyond what was required by the BLA.

Defendant Cliffs violated the Hobbs Act by attempting to commit extortion through fear of economic loss.  As part of its efforts to undermine the NSC Merger, Cliffs wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger.  Cliffs sought to accomplish this objective by disseminating falsehoods calculated to undermine the prospects of any deal other than one with Cliffs, and thereby inflict fear of economic loss on U. S. Steel.

Defendant Cliffs also committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant Cliffs misrepresented NSC's plans for U. S. Steel's assets and falsely stated that NSC would liquidate American jobs.

9.    On February 15, 2024, Goncalves sharpened his xenophobic stereotypes in an investor call hosted by investment bank TD Cowen, employing a mock Japanese accent in a rant about how Japanese people, supposedly like Chinese people, cannot be trusted.

Defendant Goncalves violated the Hobbs Act by attempting to commit extortion through fear of economic loss. As part of his efforts to undermine the NSC Merger, Goncalves wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel Merger. Goncalves sought to accomplish this objective by trafficking in xenophobic tropes calculated to ensure that no other company would have the temerity to take Cliffs on as a potential bidder, thereby inflicting fear of economic loss on U. S. Steel.

10.    In February 2024, Goncalves called an NSC advisor and requested an urgent face-to-face meeting with NSC's top leadership and suggested carving up U. S. Steel between the two companies. Goncalves presented

himself as a puppeteer of the U.S. government. He stated he had been "talking directly with U.S. Secretary of Commerce Gina Raimondo," who apparently told him that U.S. National Security Advisor Jake Sullivan was communicating with the Japanese Foreign Minister.

Defendant Goncalves violated the Hobbs Act by attempting to commit extortion through fear of economic loss. As part of his efforts to undermine the NSC Merger, Goncalves wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger. Goncalves sought to accomplish this objective by seeking to undermine the prospects of any deal other than one with Cliffs, and thereby inflict fear of economic loss on U. S. Steel.

11.     In February 2024, McCall, purporting to speak on behalf of the USW, said in a phone interview with a reporter: "I want to kill this deal."

Defendant McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss by disseminating a falsehood calculated to undermine the prospects of any deal other than one with Cliffs, in order to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger as part of Cliffs' efforts to plunder U. S. Steel's property and exploit its assets. In the alternative, McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss in order to

seek NSC's consent to providing benefits not available under the BLA if the Merger does take place.

12.     On March 7, 2024, NSC met with the USW for less than an hour.  At that meeting, NSC delivered commitments related to trade, capital expenditures, layoff protections, as well as other significant commitments. Immediately following that meeting, the USW issued a pre-prepared press release, approved by McCall, claiming that no progress had been made.  In fact, with the conclusion predetermined as a result of Defendants' conspiracy, no progress would or could ever be made.

Defendant McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss by disseminating a falsehood calculated to undermine the prospects of any deal other than one with Cliffs, in order to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger as part of Cliffs' efforts to plunder U. S. Steel's property and exploit its assets.  In the alternative, McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss in order to seek NSC's consent to providing benefits not available under the BLA if the Merger does take place.

Defendant McCall also violated Section 302 of the LMRA by accepting Cliffs' promise to share valuable benefits stemming from an anticompetitive Cliffs acquisition of U. S. Steel, even if doing so would harm the USW-represented workforce at U. S. Steel.

13.     On March 15, 2024, Goncalves had a conversation with a major U. S. Steel stockholder. Alluding to President Biden's announced opposition to the Merger the day before, he claimed: "I was behind all that." Portraying officials of the Committee on Foreign Investment in the United States ("CFIUS") as puppets, he claimed that the President's decision to "kill [the] deal" was only a matter of time, as "Nippon Steel is on the clock." When the stockholder suggested CFIUS would involve "a process," Goncalves pushed back: "No, there's no process. This is not going to be a process. CFIUS is just cover for a President to kill a deal." Goncalves also told the stockholder on March 15 that any USW negotiations with NSC were a farce: "I promise you there's no deal with the Union. That's not gonna happen." Instead, Goncalves explained, the USW would negotiate in bad faith: "[T]hey are not going to allow a lawyer to say they are not in compliance because they aren't in negotiating. They will negotiate and they will negotiate for a long, long time." The USW, working in coordination with Cliffs and Goncalves, would simply run out the clock on negotiations. Goncalves explained that he had "unusual" leverage, saying, "[n]obody has a relationship with the Union as I have." As Goncalves put it at an investor conference a few days later: "I have already fixed the situation in a way so that it cannot go against me. . . . I can work my magic to make a deal that I don't agree with not . . . close."

Defendant Goncalves violated the Hobbs Act by attempting to commit extortion through fear of economic loss. As part of his efforts to undermine the NSC Merger, Goncalves wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger. Goncalves sought to accomplish this objective by disseminating falsehoods calculated to undermine the prospects of any deal other than one with Cliffs, and thereby inflict fear of economic loss on U. S. Steel.

Defendants Cliffs and Goncalves also violated Section 302 of the LMRA by promising the International Union a share of valuable benefits stemming from an anticompetitive Cliffs acquisition of U. S. Steel, even if doing so would harm the USW-represented workforce at U. S. Steel. This was the source of Goncalves' "leverage" over the USW.

Defendant McCall violated Section 302 of the LMRA by accepting Cliffs' and Goncalves' promise to share valuable benefits stemming from an anticompetitive Cliffs acquisition of U. S. Steel, even if doing so would harm the USW-represented workforce at U. S. Steel.

14. At an investor conference in mid-March 2024, Goncalves told investors that NSC's management would commit "seppuku" if the Merger failed, drawing an imaginary knife across his abdomen and up his chest to make sure no one missed the point.

Defendant Goncalves violated the Hobbs Act by attempting to commit extortion through fear of economic loss. As part of his efforts to undermine the NSC Merger, Goncalves wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger. Goncalves sought to accomplish this objective by trafficking in xenophobic tropes calculated to ensure that no other company would have the temerity to take Cliffs on as a potential bidder, thereby inflicting fear of economic loss on U. S. Steel.

15.     On March 18, 2024, McCall falsely claimed in an interview that NSC "never talked to [the USW]" regarding the Merger. McCall knowingly omitted that NSC provided McCall with a letter seeking a meeting on the very day the deal was announced. McCall also knowingly omitted that NSNA sent a letter committing to the USW, in writing, that it recognized the USW "as the bargaining representative for the USW-represented employees" employed by U. S. Steel and that it would "continue to honor all commitments in all USW Agreements."

Defendant McCall committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall falsely stated that NSC had "never talked to [the USW]" regarding the Merger.

16. On April 10, 2024, the USW sent out a press release, signed by McCall, falsely claiming that "[NSC] will continue to prioritize its Japanese operations at the expense of U.S. workers."

Defendant McCall committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall falsely stated that NSC would use the U. S. Steel acquisition as an opportunity to dump steel products, thereby undermining domestic steel production.

17. On May 14, 2024, Goncalves spoke at the annual meeting of the American Iron and Steel Institute about the impact of his illegal tactics on U. S. Steel:  "It's like a sick patient that sits on a bed with a bunch of tubes and sensors around him."

Defendant Goncalves violated the Hobbs Act by attempting to commit extortion through fear of economic loss.  As part of his efforts to undermine the NSC Merger, Goncalves wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger.  Goncalves sought to accomplish this objective by seeking to undermine the prospects of any deal other than one with Cliffs, and thereby inflict fear of economic loss on U. S. Steel.

18.    On May 21, 2024, Goncalves warned U. S. Steel that it "cannot and will not close [the] announced deal with Nippon Steel."

Defendant Goncalves violated the Hobbs Act by attempting to commit extortion through fear of economic loss.  As part of his efforts to undermine the NSC Merger, Goncalves wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger.  Goncalves sought to accomplish this objective by seeking to undermine the prospects of any deal other than one with Cliffs, and thereby inflict fear of economic loss on U. S. Steel.

19.    On May 30, 2024, Goncalves warned U. S. Steel that "the USW will strike and burn down the plants if the deal were to be approved!"

Defendant Goncalves violated the Hobbs Act by attempting to commit extortion through fear of economic loss.  As part of his efforts to undermine the NSC Merger, Goncalves wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger.  Goncalves sought to accomplish this objective by brazenly threatening U. S. Steel's property. Goncalves also sought to accomplish this objective by seeking to undermine the prospects of any deal other than one with Cliffs, and thereby inflict fear of economic loss on U. S. Steel.

20. In June 2024, McCall proudly proclaimed during a joint news conference that "the board of arbitration for U. S. Steel will either reject the deal or CFIUS will or they both will."

Defendant McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss by disseminating a falsehood calculated to undermine the prospects of any deal other than one with Cliffs, in order to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger as part of Cliffs' efforts to plunder U. S. Steel's property and exploit its assets. In the alternative, McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss in order to seek NSC's consent to providing benefits not available under the BLA if the Merger does take place.

21. NSC again met with the USW on July 12, 2024 to address the International Union's purported concerns—but was given a mere 45 minutes of McCall's time. And when Nippon Steel Corporation Vice Chairman and Executive Vice President Takahiro Mori emailed McCall several days later to thank him for meeting, expressing interest in future meetings and reiterating NSC's commitment to addressing any of the USW's concerns, McCall dismissively responded by emailing back 47 pages of scanned press releases condemning the Merger.

Defendant McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss by disseminating a falsehood

calculated to undermine the prospects of any deal other than one with Cliffs, in order to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger as part of Cliffs' efforts to plunder U. S. Steel's property and exploit its assets.  In the alternative, McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss in order to seek NSC's consent to providing benefits not available under the BLA if the Merger does take place.

Defendant McCall also violated Section 302 of the LMRA by accepting Cliffs' and Goncalves' promise to share valuable benefits stemming from an anticompetitive Cliffs acquisition of U. S. Steel, even if doing so would harm the USW-represented workforce at U. S. Steel.

22. Throughout mid to late August 2024, an NSC advisor reached out multiple times to McCall via phone and email to discuss the USW's purported concerns and NSC's commitment to addressing them.  But on August 30, McCall responded that he was unwilling to meet with NSC again until either an arbitration decision or a decision from CFIUS—whichever happened later.  On September 3, 2024, Mori sent McCall additional commitments and a draft term sheet, but did not receive a response. McCall has also been unreceptive to more recent efforts to engage with NSC and its representatives.

Defendant McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss by disseminating a falsehood

calculated to undermine the prospects of any deal other than one with Cliffs, in order to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger as part of Cliffs' efforts to plunder U. S. Steel's property and exploit its assets.  In the alternative, McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss in order to seek NSC's consent to providing benefits not available under the BLA if the Merger does take place.

23.     On September 5, 2024, Goncalves told CNBC viewers that "[w]hat I said to you on December 18th, 2023, is still valid," and that he would buy U. S. Steel at "a much, much lower price," reiterating his boast that "it will be abundantly clear that I am the only viable buyer."  Goncalves also made it clear *why* Cliffs was the only viable buyer, highlighting his agreement with the USW and calling McCall his "dear partner and friend."

Defendant Goncalves violated the Hobbs Act by attempting to commit extortion through fear of economic loss.  As part of his efforts to undermine the NSC Merger, Goncalves wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel Merger.  Goncalves sought to accomplish this objective by trafficking in xenophobic tropes calculated to ensure that no other company would have the temerity to take Cliffs on as a potential bidder, thereby inflicting fear of economic loss on U. S. Steel.

24.   At an investor conference sponsored by UBS on September 5, 2024, Finan called NSC and U. S. Steel "deranged" and made clear Cliffs' continued desire to acquire all or part of U. S. Steel.

Defendant Cliffs violated the Hobbs Act by attempting to commit extortion through fear of economic loss. As part of its efforts to undermine the NSC Merger, Cliffs wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger. Cliffs sought to accomplish this objective by disseminating falsehoods calculated to undermine the prospects of any deal other than one with Cliffs, and thereby inflict fear of economic loss on U. S. Steel.

25.   On September 6, 2024, in the wake of false reports that CFIUS would imminently block the Merger, Goncalves explained that Cliffs stood ready to buy U. S. Steel assets with "the continued exclusive and unwavering support of the [USW]."

Defendant Goncalves violated the Hobbs Act by attempting to commit extortion through fear of economic loss. As part of his efforts to undermine the NSC Merger, Goncalves wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger. Goncalves sought to accomplish this objective by seeking to undermine the prospects of any

deal other than one with Cliffs, and thereby inflict fear of economic loss on U. S. Steel.

26.     On September 17, 2024, the USW sent out a press release, signed by McCall, warning that "[u]nless the owner of [U. S. Steel] commits to blast furnace operations, our country will lose these products to a market where they'll have no choice but to allow Nippon and others to import their 16 million tons of excess Japanese blast furnace-produced slabs to run in our hot mills."  The press release went on:  "Nippon has been a renegade company dumping products into the American market for years, and there is no reason to believe they will discontinue their past illegal trade practices."

Defendant McCall committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall misrepresented NSC's plans for U. S. Steel's assets and falsely stated that NSC would use the U. S. Steel acquisition as an opportunity to dump its excess blast furnace steel, thereby undermining domestic steel production.

27.     On September 25, 2024, after losing before the Board of Arbitration, the USW sent out a press release, signed by McCall, falsely claiming that NSC has a "long history of attacking American steel production and

domestic steelworkers with its unfair trade practices," and falsely claiming that NSC poses "risks . . . to our critical supply chains."

Defendant McCall committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall falsely stated that NSC would undermine domestic steel production, imperil the livelihoods of American steelworkers, and undermine supply chains.

28.    On October 2, 2024, the USW put out a press release [[approved by McCall]] calling the CEO of U. S. Steel a blackmailer and urging the Board to abandon the NSC transaction, claiming the Union had "beaten" the CEO, notwithstanding that in reality the USW's grievances were rejected unanimously by the Board of Arbitration in a unanimous ruling on September 16, 2024.

Defendant McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss by disseminating a falsehood calculated to undermine the prospects of any deal other than one with Cliffs, in order to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger as part of Cliffs' efforts to plunder U. S. Steel's property and exploit its assets.  In the alternative, McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss in order to

seek NSC's consent to providing benefits not available under the BLA if the Merger does take place.

29.    On November 14, 2024, the USW sent out a press release, signed by McCall, falsely stating that NSC plans to transfer production from USW-represented facilities to non-union facilities at Big River, and that upon acquiring U. S. Steel, NSC will "harvest[] USW represented facilities and then abandon[] our blast furnace and coke making facilities in order to import Japanese slabs."

Defendant McCall committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall falsely stated that NSC would use the U. S. Steel acquisition as an opportunity to dump steel products, thereby undermining domestic steel production. Defendant McCall also falsely stated that NSC would use the U. S. Steel acquisition to harvest and abandon U. S. Steel's blast furnace assets.

30.    In an interview on November 15, 2024, McCall held firm to his conspiracy with Cliffs, reaffirming his commitment to the illegal agreement even after losing before the Board of Arbitration: "I have no plans to meet with [NSC]." And, two months after the Board of Arbitration decided otherwise, McCall publicly and falsely stated that NSC had not yet

committed to assume its obligations under the BLA.  McCall also baselessly denigrated NSC's decarbonization technology.

Defendant McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss by disseminating a falsehood calculated to undermine the prospects of any deal other than one with Cliffs, in order to compel U. S. Steel's to submit to a Cliffs-U. S. Steel merger as part of Cliffs' efforts to plunder U. S. Steel's property and exploit its assets.  In the alternative, McCall violated the Hobbs Act by attempting to commit extortion through fear of economic loss in order to seek NSC's consent to providing benefits not available under the BLA if the Merger does take place.

31.    In that same interview, McCall baselessly denigrated NSC's plans for U. S. Steel's assets:  "[O]ur biggest concern, because [NSC is] so guilty of the various trade cases, [is] that eventually they'll harvest the assets of those facilities and start importing the 16 million tons of excess capacity that they have in Japan into the U.S. . . . I don't trust them."

Defendant McCall committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall misrepresented NSC's plans for U. S.

Steel's assets and baselessly asserted that NSC would transition to importing its excess capacity.

32.    During the week of November 15, 2024, Goncalves told investors that President Biden told McCall that he would block the Merger in November. In fact, Cliffs spoke to no fewer than four of U. S. Steel's investors in that week alone.  Cliffs told them that the deal would be blocked "in the near-term before the end of the month"; that "it's just a matter of time"; that it was "BS" that Gina Raimondo was having second thoughts about CFIUS's decision to block the Merger; and that "U. S. Steel . . . didn't play the game."

Defendant Goncalves violated the Hobbs Act by attempting to commit extortion through fear of economic loss.  As part of his efforts to undermine the NSC Merger, Goncalves wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger.  Goncalves sought to accomplish this objective by seeking to undermine the prospects of any deal other than one with Cliffs, and thereby inflict fear of economic loss on U. S. Steel.

33.    Celso Goncalves told investors on November 20, 2024, that "apparently [Nippon Steel Corporation Vice Chairman and Executive Vice President Takahiro] Mori made no progress" in his recent meetings in the United States regarding the Merger.  And two days later, he sent an email to at

least one major U. S. Steel investor stating that "McCall has no plan to meet with Mori" and that McCall was headed to the White House that evening.

Defendant Cliffs violated the Hobbs Act by attempting to commit extortion through fear of economic loss. As part of its efforts to undermine the NSC Merger, Cliffs wrongfully sought to plunder U. S. Steel's property and exploit its assets by seeking to compel U. S. Steel to submit to a Cliffs-U. S. Steel merger. Cliffs sought to accomplish this objective by seeking to undermine the prospects of any deal other than one with Cliffs, and thereby inflict fear of economic loss on U. S. Steel.

34.    On December 4, 2024, McCall mischaracterized NSC's positions regarding the transaction and its commitments to the USW. McCall stated that NSC would eventually transfer production from current facilities to non-union facilities at Big River in Arkansas. McCall also disparaged NSC's $1.4 billion capital commitment as for repair and maintenance only. McCall also stated that NSC's $1.3 billion investment in the Mon Valley Works and in Blast Furnace #14 at Gary Works, while "a good deal" for workers at those facilities, would "not [be] such a good deal after the next few years for all the raw material facilities, the mines and the coke plants, or in the downstream facilities and blast furnaces, BOFs, casters, finishing, and coating facilities. . . . The obvious conclusion is that it will be a good deal for workers at Big River and the communities in Arkansas, but not for us."

Defendant McCall committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall misrepresented NSC's capital investment plans and its plans for U. S. Steel's USW-represented workforce.

**c.    The time, place and contents of each alleged misrepresentation, the identity of persons by whom and to whom such alleged misrepresentation was made and if the predicate act was an offense of wire fraud, mail fraud or fraud in the sale of securities.  The "circumstances constituting fraud or mistake" shall be stated with particularity as provided by Fed. R. Civ. P. 9(b);**

1.    On December 18, 2023, Goncalves falsely claimed that NSC, as a "foreign company," would "come to just liquidate American jobs and take over what we have here."

Defendant Goncalves committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive U. S. Steel and NSC of their contractual rights under the Merger Agreement. Specifically, Defendant Goncalves misrepresented NSC's plans for U. S. Steel's assets and falsely stated that NSC would liquidate American jobs.

2.    On December 19, 2023, McCall, recommitting to the bargain the International Union had struck with Cliffs months earlier, falsely claimed that there had been no "top-level contact" between NSC and the USW

since the deal was announced.  McCall knowingly omitted that NSC

provided McCall with a letter seeking a meeting on the day the deal was

announced.  McCall also knowingly omitted that NSNA sent a letter

committing to the USW, in writing, that it recognized the USW "as the

bargaining representative for the USW-represented employees" employed

by U. S. Steel and that it would "continue to honor all commitments in all

USW Agreements."

Defendant McCall committed wire fraud by disseminating a false

statement through the use of wire, radio, or television communications,

with specific intent to defraud, as part of a scheme to deprive NSC and

U. S. Steel of their contractual rights under the Merger Agreement.

Specifically, Defendant McCall falsely stated that there had been no "top-

level contact" between NSC and the USW.

3.    On February 2, 2024, Cliffs' executives continued Cliffs' smear campaign

in a public webinar hosted by an investment bank, Raymond James, which

lasted 75 minutes and had approximately 130 attendees.  There, Celso

Goncalves demonized foreign buyers:  "[T]hese people know what

happens when you allow foreign buyers to come in," he explained.

"[E]ven if they sweet talk you in the beginning, they always let you down.

They always end up shutting down production.  They always end up firing

people, doing layoffs, the things that we committed that we wouldn't do."

Defendant Cliffs committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement.  Specifically, Defendant Cliffs misrepresented NSC's plans for U. S. Steel's assets and falsely stated that NSC would liquidate American jobs.

4. On March 18, 2024, McCall falsely claimed in an interview that NSC "never talked to [the USW]" regarding the Merger.  McCall knowingly omitted that NSC provided McCall with a letter seeking a meeting on the day the deal was announced.  McCall also knowingly omitted that NSNA sent a letter committing to the USW, in writing, that it recognized the USW "as the bargaining representative for the USW-represented employees" employed by U. S. Steel and that it would "continue to honor all commitments in all USW Agreements."

Defendant McCall committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall falsely stated that NSC had "never talked to [the USW]" regarding the Merger.

5.    On April 10, 2024, the USW sent out a press release, signed by McCall, falsely claiming that "[NSC] will continue to prioritize its Japanese operations at the expense of U. S. workers."

Defendant McCall committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall falsely stated that NSC would use the U. S. Steel acquisition as an opportunity to dump steel products, thereby undermining domestic steel production.

6.    On September 17, 2024, the USW sent out a press release, signed by McCall, warning that "[u]nless the owner of [U. S. Steel] commits to blast furnace operations, our country will lose these products to a market where they'll have no choice but to allow Nippon and others to import their 16 million tons of excess Japanese blast furnace-produced slabs to run in our hot mills."  The press release went on:  "Nippon has been a renegade company dumping products into the American market for years, and there is no reason to believe they will discontinue their past illegal trade practices."

Defendant McCall also committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and

U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall misrepresented NSC's plans for U. S. Steel's assets and falsely stated that NSC would use the U. S. Steel acquisition as an opportunity to dump its excess blast furnace steel, thereby undermining domestic steel production.

7. On September 25, 2024, after losing before the Board of Arbitration, the USW sent out a press release, signed by McCall, falsely claiming that NSC has a "long history of attacking American steel production and domestic steelworkers with its unfair trade practices," and falsely claiming that NSC poses "risks . . . to our critical supply chains."

Defendant McCall committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall falsely stated that NSC would undermine domestic steel production, imperil the livelihoods of American steelworkers, and undermine supply chains.

8. On November 14, 2024, the USW sent out a press release, signed by McCall, falsely stating that NSC plans to transfer production from USW-represented facilities to non-union facilities at Big River, and that upon acquiring U. S. Steel, NSC will "harvest[] USW represented facilities and

then abandon[] our blast furnace and coke making facilities in order to import Japanese slabs."

Defendant McCall committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall falsely stated that NSC would use the U. S. Steel acquisition as an opportunity to dump steel products, thereby undermining domestic steel production.  Defendant McCall also falsely stated that NSC would use the U. S. Steel acquisition to harvest and abandon U. S. Steel's blast furnace assets.

9.    In an interview on November 15, 2024, McCall baselessly denigrated NSC's plans for U. S. Steel's assets:  "[O]ur biggest concern, because [NSC is] so guilty of the various trade cases, [is] that eventually they'll harvest the assets of those facilities and start importing the 16 million tons of excess capacity that they have in Japan into the U.S. . . . I don't trust them."

Defendant McCall committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall misrepresented NSC's plans for U. S.

Steel's assets and baselessly asserted that NSC would transition to importing its excess capacity.

10. On December 4, 2024, McCall mischaracterized NSC's positions regarding the transaction and its commitments to the USW. McCall stated that NSC would eventually transfer production from current facilities to non-union facilities at Big River in Arkansas. He disparaged NSC's $1.4 billion capital commitment as for repair and maintenance only. McCall also stated that NSC's $1.3 billion investment in the Mon Valley Works and in Blast Furnace #14 at Gary Works, while "a good deal" for workers at those facilities, would "not [be] such a good deal after the next few years for all the raw material facilities, the mines and the coke plants, or in the downstream facilities and blast furnaces, BOFs, casters, finishing, and coating facilities. . . . The obvious conclusion is that it will be a good deal for workers at Big River and the communities in Arkansas, but not for us."

Defendant McCall committed wire fraud by disseminating a false statement through the use of wire, radio, or television communications, with specific intent to defraud, as part of a scheme to deprive NSC and U. S. Steel of their contractual rights under the Merger Agreement. Specifically, Defendant McCall misrepresented NSC's capital investment plans and its plans for U. S. Steel's USW-represented workforce.

**d.  Whether there has been a criminal conviction for violation of any predicate act and, if so, a description of each such act;**

To the best of Plaintiffs' knowledge, none of the predicate acts has resulted in a criminal conviction.

**e.  Whether civil litigation has resulted in a judgment in regard to any predicate act and, if so, a description of each such act;**

To the best of Plaintiffs' knowledge, there has been no civil litigation that has resulted in a judgment in regard to any of the predicate acts.

**f.  A description of how the predicate acts form a "pattern of racketeering activity."**

The predicate acts form a "pattern of racketeering activity" because all the predicate acts are related to Defendants' immediate goal of subverting the NSC Merger, scaring off other bidders, and ultimately forcing a U. S. Steel merger with Cliffs or otherwise preventing any party other than Cliffs from acquiring U. S. Steel and injuring U. S. Steel in the absence of a merger—the predicate acts are united both by their purpose and by the result they seek to obtain.  Additionally, Defendants are engaging in an open-ended pattern of racketeering activity because Defendants do not intend to stop their unlawful campaign until they prevent the NSC Merger and scare off any other bidders, with the result of either forcing U. S. Steel to consent to a merger or other transaction with Cliffs or be permanently injured as a competitor if it does not.  This is not a one-off dispute.  Consistent with their years-long conspiracy in connection with Cliffs' ongoing attempts to monopolize key steel and iron markets, Defendants will continue to engage in a pattern of racketeering activity that seeks to undermine any effort at consummating the

NSC Merger, to undermine any other merger by U. S. Steel, besides one with Cliffs, and to otherwise injure U. S. Steel as a competitor.

**6.   State whether the alleged predicate acts referred to above relate to each other as part of a common plan, and, if so, describe in detail the alleged enterprise for each RICO claim.  A description of the enterprise shall include the following information:**

**a.   The names of each individual partnership, corporation, association or other legal entity which allegedly constitute the enterprise;**

The above predicate acts were undertaken by the RICO enterprise described by both the § 1962(c) claim and the § 1962(d) claim.  The enterprise consists of Cleveland-Cliffs, the USW, Lourenco Goncalves, and David McCall.

**b.   A description of the structure, purpose, function and course of conduct of the enterprise;**

The enterprise is structured as an association-in-fact enterprise.  It has no formal hierarchy or formal means for decision-making.  The purpose and function of the enterprise, which has existed since at least 2020, is to support Cliffs' monopolistic ambitions through a serial acquisition strategy.  Through the coordinated unlawful activities of the enterprise's members, all Defendants engaged in, and continue to engage in, a course of conduct designed to further Cliffs' years-long campaign to monopolize key iron and steel markets, including the merge or murder pattern of racketeering activity focused on U. S. Steel.

**c.   Whether each defendant is an employee, officer or director of the alleged enterprise;**

While Goncalves and McCall are officers of two of the constituent entities (Cliffs and the USW, respectively), they are not officers of the enterprise, which is an association in fact distinct from any constituent entity.

**d.   Whether each defendant is associated with the alleged enterprise;**

All individuals and entities are associated with the enterprise.

**e.   Whether it is alleged that each defendant is an individual or entity separate from the alleged enterprise, or that such defendant is the enterprise itself, or a member of the enterprise; and**

All individuals and entities are separate from the association in fact enterprise.

**f.   If any defendant is alleged to be the enterprise itself, or a member of the enterprise, an explanation whether each such defendant is a perpetrator, passive instrument or victim of the alleged racketeering activity.**

Not applicable.

**7.   State and describe in detail whether it is alleged that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

The pattern of racketeering activity is distinct from the enterprise.  The purpose and function of the enterprise, which has existed since at least 2020, is to support Cliffs' monopolistic ambitions through a serial acquisition strategy.  The relationships between the associated Defendants in the enterprise are structured toward this end.  And the enterprise is durable—it has the longevity to survive while Cliffs continues to grow its market share.  By contrast, Defendants direct their racketeering activity toward a more particular goal of the overall enterprise:  blocking the NSC Merger, preventing other bidders from acquiring U. S. Steel, forcing a Cliffs takeover of U. S. Steel, and injuring U. S. Steel as a standalone competitor in the process.  Even if the Merger were to fail, each of the Defendants will continue to coordinate their unlawful activities in pursuit of their shared goal of driving U. S. Steel towards Cliffs and ensuring no other bidder is permitted to complete a transaction, or to otherwise injure U. S. Steel as a competitor of Cliffs.  They will also continue their ongoing conspiracy to support Cliffs' monopolistic ambitions.

**8. Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity. Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.**

Defendants formed their association in fact enterprise no later than 2020, when Cliffs, with the USW's support, launched its serial acquisition strategy in key iron and steel markets. It has been reinforced by various statements and agreements since that time. Cliffs submitted an unsolicited bid to buy U. S. Steel in August 2023 as part of that enterprise. This bid was the opening salvo in the enterprise's "merge or murder" campaign and the pattern of racketeering activity aimed at forcing U. S. Steel to consent to a merger with Cliffs or suffer significant injury as a competitor. The enterprise will exist even if the NSC Merger were to be stymied, because the purpose of the enterprise is to support Cliffs' monopolistic ambitions.

**9. Describe what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering.**

All Defendants are engaging in the pattern of racketeering activity described above because it is the first step to sharing valuable benefits stemming from an anticompetitive Cliffs acquisition of U. S. Steel, even if doing so would harm the USW-represented workforce at U. S. Steel, upon the consummation of a merger between Cliffs and U. S. Steel, or as a result of injuring U. S. Steel as a competitor.

**10. Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

The primary effect of the activities of the enterprise is to support Cliffs' monopolistic ambitions, including by delaying and potentially outright preventing a pro-competitive investment in the American steel industry. This means reducing competitiveness in markets for non-grain oriented electrical steel, grain-oriented electrical steel, and iron ore pellets, as well as in the markets for exposed automotive steel. Healthy competition in these markets is critical to

several U.S. interests, including power grid resilience, climate change mitigation, infrastructure, and consumer welfare.

**11. If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

      **a.  The recipient of the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**

      Not applicable.

      **b.  A description of the use or investment of such income.**

      Not applicable.

**12. If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

Not applicable.

**13. If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

      **a.  The identity of each person or entity employed by, or associated with, the enterprise and**

The persons and entities associated with the enterprise are Cleveland-Cliffs, the USW, Lourenco Goncalves (the CEO of Cleveland-Cliffs), and David McCall (the President of the USW).

      **b.  Whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

These persons and entities are distinct from the association in fact enterprise, which is the consequence of an agreement between the USW and Cliffs to support Cliffs' monopolistic ambitions.  Standing alone, for example, none of these persons or entities has the capacity to see a Cliffs merger with U. S. Steel to completion, a key goal of the

pattern of racketeering undertaken by the enterprise. Cliffs needs the support of the USW to encumber U. S. Steel's USW-represented assets with an unlawful obstructionist campaign—support Cliffs can obtain by providing a share of valuable benefits stemming from an anticompetitive Cliffs acquisition of U. S. Steel. And the USW obviously cannot dictate the terms or conditions of a Cliffs merger absent Cliffs' assent. But together, Cliffs, the USW, Goncalves, and McCall have the wherewithal, through a pattern of racketeering activity, to block the NSC Merger, prevent other bidders from acquiring U. S. Steel, and eventually consummate a Cliffs deal or otherwise prevent any party other than Cliffs from acquiring U. S. Steel.

**14. If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.**

All Defendants conspired to violate 18 U.S.C. § 1962(c) by agreeing to participate in the unlawful agreement to undermine the NSC Merger, or any other acquisition of U. S. Steel other than an acquisition by Cliffs, through a pattern of racketeering activity, agreeing to operate and manage the affairs of the enterprise described above while knowing the nature of the conspiracy, and by agreeing to commit and committing each predicate act described above, all of which constitute overt acts undertaken in furtherance of the conspiracy. Specifically, all Defendants agreed to violate and did violate Section 302 of the LMRA when Cliffs and Goncalves proposed—and McCall accepted—that Cliffs provide the USW with a promise to share valuable benefits stemming from an anticompetitive Cliffs acquisition of U. S. Steel. Additionally, all Defendants agreed to and attempted to commit extortion through fear of economic loss when Cliffs and Goncalves obtained McCall's help in conducting the misinformation and interference campaign. Finally, all Defendants committed wire fraud by making numerous knowingly false statements concerning the Merger in an effort to deprive U. S. Steel and NSC of their contractual

rights under the Merger Agreement.  All Defendants knew that the predicate acts they agreed to commit and did commit were part of a pattern of racketeering activity because all Defendants understood that the unlawful campaign would continue so long as it could inflict harm on U. S. Steel and NSC, since the goal of the campaign was to undermine the NSC Merger at every possible turn, discourage other bidders and strategic alternatives thereby imposing long-term injury on U. S. Steel, and leave Cliffs as the only viable bidder for ownership of U. S. Steel.

**15. Describe the alleged injury to business or property.**

U. S. Steel and NSC have been injured in their business and property because Defendants' pattern of racketeering activity has prevented U. S. Steel and NSC from engaging in business relations to which they have a legal entitlement.  Specifically, U. S. Steel and NSC have been injured in their business and property because Defendants' pattern of racketeering activity has prevented them from closing the Merger that would increase their profitability, give them a substantially stronger platform from which to compete in several key iron and steel markets, and enhance their workforces.  And U. S. Steel has been injured in its business and property because Defendants' pattern of racketeering activity threatens to torpedo the Merger through which NSC committed to making major capital investments in U. S. Steel's operations.  NSC's capital investments would preserve jobs and accelerate U. S. Steel's technological transformation.  Now, U. S. Steel risks losing these investments—and all their concomitant benefits—because of Defendants' pattern of racketeering activity.

U. S. Steel has also been injured in its business and property because Defendants' unlawful campaign and agreement encumbered its USW-represented assets, reducing the assets' value regardless of any transaction with NSC.  The unlawful campaign also limits U. S. Steel's

ability to obtain necessary capital in order for it to compete by way of a strategic alternative other than the NSC Merger.

Both U. S. Steel and NSC have suffered injury to their reputations and business goodwill. U. S. Steel has also suffered injury to its workforce relations. The RICO enterprise's continued attacks on the Merger will likely result in substantial job loss and in the departure of key U. S. Steel employees. Over the last 12 months, U. S. Steel employees have become exhausted by the uncertainty surrounding the future of their company as their livelihoods have been exploited by Goncalves and McCall to further their anticompetitive scheme, resulting in increased attrition rates.

Additionally, both U. S. Steel and NSC have been injured by the delay in closing the Merger caused by Defendants' illegal activity and will suffer further injury if such activity causes the Merger to fail to close or delays other strategic alternatives. U. S. Steel and NSC have also suffered injury resulting from Defendants' near-constant campaign of harassment, xenophobic remarks, rumor-mongering, and lies. Both victims have been forced to divert executive attention and immense resources from their core mission—producing steel—to responding to Defendants' unlawful campaign, including by expending legal fees.

U. S. Steel has also suffered injury insofar as Defendants' pattern of racketeering activity has precluded U. S. Steel from pursuing opportunities for improvement and innovation. These opportunities include seeking grants from the Department of Energy and other sources of funding, as well as investment opportunities related to decarbonization, energy, direct reduced iron, and electrical steels, seed investments in start-up companies through Carnegie Foundry, and innovation partnerships related to steel homes, steel roofs, solar panels, and steel pallets. This ongoing racketeering activity has also diminished U. S. Steel's value.

Finally, consumers will suffer injury from higher prices, decreased product choice, lower output, and diminished innovation due to the loss of competition.

**16. Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.**

U. S. Steel and NSC were injured by reason of Defendants' pattern of racketeering activity because Defendants' coordinated campaign to torpedo the Merger, force a merger with Cliffs, and otherwise injure U. S. Steel as a competitor interfered with U. S. Steel's and NSC's legal entitlements to business relations, encumbered U. S. Steel's assets, damaged both companies' reputations and business goodwill, injured U. S. Steel and NSC in their ability to pursue strategic opportunities, and forced both U. S. Steel and NSC to incur expenses in countering the unlawful campaign.

**17. List the damages sustained by each plaintiff for which each defendant is allegedly liable.**

U. S. Steel and NSC have been injured in their business and property because Defendants' pattern of racketeering activity has prevented U. S. Steel and NSC from engaging in business relations to which they have a legal entitlement. Specifically, U. S. Steel and NSC have been injured in their business and property because Defendants' pattern of racketeering activity has prevented them from closing the Merger that would increase their profitability, give them a substantially stronger platform from which to compete in several key iron and steel markets, and enhance their workforces. And U. S. Steel has been injured in its business and property because Defendants' pattern of racketeering activity threatens to torpedo the Merger through which NSC committed to making major capital investments in U. S. Steel's operations. NSC's capital investments would preserve jobs and accelerate U. S. Steel's technological transformation. Now,

U. S. Steel risks losing these investments—and all their concomitant benefits—because of Defendants' pattern of racketeering activity.

U. S. Steel has also been injured in its business and property because Defendants' unlawful campaign and agreement encumbered its USW-represented assets, reducing the assets' value regardless of any transaction with NSC. The unlawful campaign also limits U. S. Steel's ability to obtain necessary capital in order for it to compete by way of a strategic alternative other than the NSC Merger.

Both U. S. Steel and NSC have suffered injury to their reputations and business goodwill. U. S. Steel has also suffered injury to its workforce relations. The RICO enterprise's continued attacks on the Merger will likely result in substantial job loss and in the departure of key U. S. Steel employees. Over the last 12 months, U. S. Steel employees have become exhausted by the uncertainty surrounding the future of their company as their livelihoods have been exploited by Goncalves and McCall to further their anticompetitive scheme, resulting in increased attrition rates.

Additionally, both U. S. Steel and NSC have been injured by the delay in closing the Merger caused by Defendants' illegal activity and will suffer further injury if such activity causes the Merger to fail to close or delays other strategic alternatives. U. S. Steel and NSC have also suffered injury resulting from Defendants' near-constant campaign of harassment, xenophobic remarks, rumor-mongering, and lies. Both victims have been forced to divert executive attention and immense resources from their core mission—producing steel—to responding to Defendants' unlawful campaign, including by expending legal fees.

U. S. Steel has also suffered injury insofar as Defendants' pattern of racketeering activity has precluded U. S. Steel from pursuing opportunities for improvement and innovation. These

opportunities include seeking grants from the Department of Energy and other sources of funding, as well as investment opportunities related to decarbonization, energy, direct reduced iron, and electrical steels, seed investments in start-up companies through Carnegie Foundry, and innovation partnerships related to steel homes, steel roofs, solar panels, and steel pallets. This ongoing racketeering activity has also diminished U. S. Steel's value.

Finally, consumers will suffer injury from higher prices, decreased product choice, lower output, and diminished innovation due to the loss of competition.

The damages listed above amount to billions of dollars. The damages to which U. S. Steel and NSC are entitled will be proven at trial, following discovery.

**18.     List all other federal causes of action, if any, and provide the relevant statute numbers.**

U. S. Steel and NSC allege violations of Sections 1 and 2 of the Sherman Act, codified at 15 U.S.C. §§ 1-2.

**19. List all pendent state claims, if any.**

U. S. Steel and NSC allege tortious interference with prospective business relations and tortious interference with existing contractual relations under Pennsylvania law.

**20. Provide any additional relevant information that would be helpful to the court in processing the RICO claim.**

Plaintiffs hereby incorporate their Complaint against Defendants for additional information supporting their RICO claim against Defendants. Given the nature of the wrongdoing alleged in the Complaint, Plaintiffs expect that a significant amount of relevant information is in Defendants' possession and will become available only after discovery.

Therefore, Plaintiffs reserve the right to amend this Case Statement upon the discovery of additional information.

January 6, 2025

Respectfully submitted,

OF COUNSEL:

Grant R. Mainland (NY 4628319)
James H. Weingarten (DC 985070)
(*pro hac vice* forthcoming)
MILBANK LLP
55 Hudson Yards
New York, NY  10001
Phone:  (212) 530-5000
Fax:  (212) 530-5219
Email:  gmainland@milbank.com
jweingarten@milbank.com

Jonathan M. Moses (NY 2836054)
(*pro hac vice* forthcoming)
Adam L. Goodman (NY 5207816)
(*pro hac vice* forthcoming)
WACHTELL, LIPTON,
ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
Phone:  (212) 403-1000
Fax:  (212) 403-2000
Email:  jmmoses@wlrk.com
algoodman@wlrk.com

*Attorneys for Plaintiff United States Steel Corporation*

David B. Hennes (NY 2773190)
(*pro hac vice* forthcoming)
Alexander B. Simkin (NY 4463691)
(*pro hac vice* forthcoming)
Andrew S. Todres (NY 5347521)
(*pro hac vice* forthcoming)
Stefan P. Schropp (DC 1026864)
(*pro hac vice* forthcoming)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY  10036
(212) 596-9000
David.Hennes@ropesgray.com
Alexander.Simkin@ropesgray.com
Andrew.Todres@ropesgray.com
Stefan.Schropp@ropesgray.com

*Attorneys for Plaintiffs Nippon Steel North America, Inc. and Nippon Steel Corporation*

*/s/ Thomas E. Birsic*
Thomas E. Birsic (PA 31092)
Eric R.I. Cottle (PA 78152)
Wesley A. Prichard (PA 324411)
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA  15222
Phone:  (412) 355-6538
Fax:  (412) 355-6501
Email:  thomas.birsic@klgates.com
eric.cottle@klgates.com
wesley.prichard@klgates.com

*Attorneys for Plaintiff United States Steel Corporation*

*/s/ Daniel I. Booker*
Daniel I. Booker (PA 10319)
Christopher R. Brennan (PA 313534)
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA  15222
Phone:  (412) 288-3131
Fax:  (412) 288-3063
Email:  DBooker@reedsmith.com
CBrennan@reedsmith.com

*Attorneys for Plaintiffs Nippon Steel North America, Inc. and Nippon Steel Corporation*