# Exhibit D



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

December 14, 2024

Ama Adams
Ropes & Gray LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006

Mark Plotkin
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001

Re:     CFIUS Case 24-154: Nippon Steel Corporation (Japan)/United States Steel Corporation

Dear Ms. Adams and Mr. Plotkin:

I am writing on behalf of the Committee on Foreign Investment in the United States ("CFIUS" or the "Committee") regarding CFIUS Case 24-154, involving the proposed indirect acquisition by Nippon Steel Corporation ("Nippon Steel"), a public Japanese corporation with its principal place of business in Tokyo, Japan, of 100 percent of United States Steel Corporation ("U.S. Steel" and together with Nippon Steel the "Parties"), a public Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania (the "Transaction").

As CFIUS representatives conveyed to you in a letter dated August 31, 2024 (the "August 31 Letter"), CFIUS identified risks to the national security of the United States arising from the Transaction. Such risks, to the extent they can be summarized at an unclassified level, relate to potential decisions and actions by Nippon Steel that could lead to a reduction in domestic steel production capacity. The August 31 Letter informed you that, in reaching this conclusion, the Committee relied upon analysis that assessed both classified and unclassified information, including U.S. Department of Commerce ("Commerce") analysis that considered that a robust commercial steel market is essential for national security, as the market-oriented U.S. steel industry requires steady revenue from sustained commercial production to meet critical industry steel requirements.[1] The letter further requested that you provide any new or relevant information for the Committee's consideration no later than the opening of business on Wednesday, September 4, 2024. You emphasized in your response to the August 31 Letter the importance of having additional time to engage on the Transaction with the Committee, and as noted below, the Committee subsequently granted the Parties' request to withdraw and refile the notice.

## A.     Procedural History

Following the August 31 Letter, you sent CFIUS a response dated September 3, 2024 (the "September 3 Letter"), challenging the assessments in the August 31 Letter, and reiterating the

---

[1] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended*, U.S. Department of Commerce, January 11, 2018.

Parties' request to withdraw and refile their notice, which request was first made in writing to the Committee on August 23, 2024. Additionally, in the September 3 Letter, the Parties proposed mitigation terms to address the national security risks identified in the August 31 Letter.

On September 6, 2024, these mitigation terms were discussed during a subsequent meeting between the Parties and representatives from Commerce and the Department of the Treasury ("Treasury" and together with Commerce, the "Co-Lead Agencies").

On September 9, 2024, you shared a proposed draft National Security Agreement ("Parties' September 9 NSA"). On September 17, 2024, CFIUS informed you that the Parties' request to withdraw and refile their notice was granted effective September 23, and that a new review period for the Transaction would commence on September 24, 2024.

In an October 11, 2024 phone call, representatives from the Co-Lead Agencies discussed with you the possibility of an in-person meeting to discuss the September 3 Letter and the Parties' September 9 NSA. On October 16, 2024, representatives from CFIUS met with the Parties and discussed some of the claims made in the September 3 Letter, updates to the Transaction and additional commitments made by Nippon Steel to U.S. Steel, and some of the mitigation terms from the Parties' September 9 NSA.

On October 29, 2024, the Parties shared a revised draft National Security Agreement proposal. On November 21, representatives from CFIUS held a phone call with Parties to discuss an upcoming meeting, including discussion of an agenda for the meeting.

On November 25, representatives from CFIUS and the Parties had an in-person meeting (the "November 25 Meeting"). At the November 25 Meeting, the Parties responded to questions about progress that has been made towards achieving Nippon Steel's commitments, U.S. Steel's plans if the Transaction does not receive CFIUS approval, the steel market outlook, and questions about the updated mitigation proposal.

Following the November 25 Meeting, on November 27, the Parties provided written submissions memorializing the statements made in the meeting. Additionally, on December 2, 2024, the Parties provided a third, further revised draft National Security Agreement (the "Parties' December 2 NSA").

On December 9, 2024, representatives from CFIUS met with the Parties in person. The Parties presented additional information about the current operating state of U.S. Steel and Nippon Steel's plans to uphold its commitments.

On December 13, 2024, executives from the Parties spoke by telephone with the Secretaries of Treasury and Commerce.

## B. Updated analysis in response to Parties' assertions

As summarized below, the Committee has considered the additional information provided by the Parties. The Committee informs you of the following findings with respect to this Transaction.

The Committee relied upon classified and unclassified information in its analysis. Additional unclassified information that the Committee has considered is provided as **Annex 1**.

As stated in the August 31 Letter, in assessing whether the foreign person in this Transaction has the intent and capability to take action to impair U.S. national security, CFIUS has considered several factors.

The August 31 Letter informed the Parties that one of the risks the Committee has identified as arising from this Transaction is that Nippon Steel may make decisions that reduce U.S. domestic steel production capacity. In the September 3 Letter, and in other communications to the Committee, Nippon Steel has stated that it has no intentions of idling, permanently closing, reducing staff, or otherwise modifying any of U.S. Steel's blast facilities through 2026. In addition, Nippon Steel has made a commitment to not idle or permanently close Gary Works BF 14 and Mon Valley Works through 2026, and Nippon Steel has stated it would invest $1.3 billion to modernize these facilities. However, the Committee continues to assess a risk to national security arising from the Transaction despite the commitment for these two facilities, as these represent 26 percent of U.S. Steel's steelmaking production capacity. Nippon Steel has acknowledged several contingencies that could reduce the continued state of operations of U.S. Steel's facilities and that those operations depend on myriad factors, including projected medium- and long-term demand, availability and cost of raw materials, health of the facility, and other overall cost considerations, notwithstanding the Parties' objections to the inclusion of this fact in the August 31 Letter.[2]

Additionally, although the Parties also stated in the September 3 Letter that "the overall production volume of steel does not necessarily decrease, in particular as older, less-efficient facilities are phased out and new, more efficient facilities are brought online," the Committee assesses that building new facilities for production and maintaining capacity require significant investment and capital that may be contrary to Nippon Steel's future business plans and incentives. The Committee notes that, as of October 2024, U.S. Steel maintains $5.2 billion in liquidity available to continue investing in its furnaces and production lines. Business plans and incentives may change; for example, U.S. Steel committed $1.5 billion in 2019 to expanding production at Mon Valley, and even spent $170 million towards this end, before cancelling such investment due to issues with obtaining required environmental permits to begin construction. U.S. Steel instead focused its investments towards Big River Steel 2, which will become operational in the fourth quarter of 2024 at a cost of $3.4 billion.

The Committee has considered the fact that Nippon Steel has continually restated its commitment to this planned investment. The Gary Works BF 14 is a significant element of U.S. Steel's portfolio that Nippon Steel likely would maintain as part of the significant production increase. U.S. Steel has claimed that Gary Works BF 14 will close absent this Transaction, and Nippon Steel could make a similar commercial decision to either idle the mill as planned or in the future, further reducing production in the United States, even if this decision is unlikely in the short term. The Parties' December 2 NSA includes a provision that would commit Nippon Steel to an investment in the mill. Concerning the Mon Valley investment, Nippon Steel, U.S. Steel, and Hatch (a third-party engineering firm) are meeting weekly to provide technical studies,

---

[2] CFIUS Case 24-038 Question Set 6, Question 4.

engineering reports, and budgeting related to three modernization investments being evaluated.[3]

The Parties' December 2 NSA includes a provision that would commit Nippon Steel to an investment in this mill.  Nippon Steel likely will encounter construction-execution risks similar to those that U.S. Steel experienced in trying to expand production lines at Mon Valley.  Parties have conveyed that the change in state administration increases the likelihood that permitting is received and this is reinforced by a recent executive order by Pennsylvania Governor Shapiro on permitting timelines.  However, U.S. Steel has not elaborated on the reason that the environmental permits were not issued for Mon Valley, precluding CFIUS from determining if the issue was solely based upon Pennsylvania's lack of timeliness as described by the parties.[4]  The Parties' December 2 NSA also includes a commitment to not reduce Production Capacity unless certain procedural and notice requirements are met.  Additionally, concerning the Gary Works investment, U.S. Steel's history of corporate direction changes, as noted above, calls into question the longevity of the Parties' current plan and stated decisions, given these actions are scheduled to take effect years into the future.

With respect to Nippon Steel's global reach and decision-making calculus, in the September 3 Letter, the Parties corrected the factual record regarding Nippon Steel's affiliates and subsidiaries, and the Committee has included this correction in its assessment.  Nippon Steel's website notes that as of March 31, 2024, Nippon Steel has 467 affiliates involved in steelmaking and steel fabrication, of which 34 are principal subsidiaries and 20 principal affiliates.[5]  Nippon Steel's steel operations span Japan, Thailand, South Africa, Nigeria, Italy, France, Finland, Saudi Arabia, the Philippines, Indonesia, Malaysia, the United States, Mexico, Sweden, China, the UAE, Vietnam, Brazil, and India.[6]

The Committee has taken note of the statements in the September 3 Letter regarding the People's Republic of China ("PRC" or "China").  Among other things, the Parties state that the PRC is "not a key market for Nippon Steel."  Currently, China accounts for less than five percent of Nippon Steel's total production and is limited to downstream capacity.[7]  The September 3 Letter also notes that Nippon Steel is ending its participation in one of its Chinese joint ventures, which will reduce its production capacity in China by 70 percent.[8]  While the Parties characterize China as "not a key market for Nippon," the Committee assesses that Nippon Steel's continued operations in China are relevant considerations in the context of risk analysis for this Transaction, due to the impacts China's non-market policies could have on domestic steel production capacity.[9]  Furthermore, while the Committee acknowledges that markets' being

---

[3] CFIUS Case No. 24-154: Progress on the Gary Works and Mon Valley Commitments.
[4] CFIUS Case 24-154 Question Set 1, Question 16. See also https://dced.pa.gov/newsroom/governor-shapiro-signs-executive-order-creating-the-pa-permit-fast-track-program-to-speed-up-government-drive-economic-growth-and-make-pennsylvania-more-competitive/. Accessed on December 13, 2024.
[5] https://www.nipponsteel.com/en/company/about/pdf/subsidiaries_and_affiliates.pdf. Accessed on September,10, 2024.
[6] Bloomberg L.P. Accessed on September 10, 2024.
[7] Per the parties, Nippon does not have any crude steel production capacity in China and "ranks behind Japan, India, the Associations of Southeast Asian Nations (ASEAN), South America, and North and Central America for Nippon Steel, in terms of overall steel production capacity by region." See Response to Risk Letter of August 31, 2024, Appendix C; CFIUS Case 24-038, Question Set 2, Question 3.
[8] CFIUS Case 24-088: Response to Risk Letter of August 31, 2024, Appendix C.
[9] *Ibid.*

affected by PRC exports precedes the Transaction, it is important background information that adds necessary context to the risk consideration.

As expressed in the August 31 Letter, the Committee also considered the willingness or ability of U.S. Steel to continue to engage as vigorously in trade matters were it to be owned by Nippon Steel. The Committee continues to evaluate that there is a risk that a Nippon Steel-owned U.S. Steel could reduce its participation in U.S. trade remedy investigations and reviews, with a possible adverse impact on the commercial viability of the domestic steel industry to the extent that U.S. Steel's non-participation impairs Commerce's ability to order remedies pursuant to such investigations and reviews. In the September 3 Letter, the Parties pointed out that Nippon Steel has participated in two trade remedy proceedings in Japan and argued that Nippon Steel's participation as a respondent "is not a signal that it resists trade relief for the U.S. steel industry" because Nippon Steel does not "choose" to participate as a respondent. However, Nippon Steel's selection or appearance as a respondent reflects its position as a global market leader that produces steel in numerous foreign jurisdictions and has been found to have dumped steel into the United States.[10] Commerce has imposed cash deposit rates on Nippon Steel or its affiliates ranging up to 256 percent.[11] This points to Nippon Steel's potentially divergent incentives on trade remedies enforcement from the balance of the U.S. steel industry. In other words, the Committee does not assess that Nippon Steel's cooperation or lack thereof signals the possibility of resistance to U.S. Steel pursuing trade relief, but rather Nippon Steel's potentially divergent longer-term commercial and legal incentives with respect to trade relief for U.S. industry could affect these choices with respect to U.S. Steel, especially as Nippon Steel notably has been found to have dumped steel in the U.S. market in investigations and reviews initiated by both the U.S. steel industry at large and U.S. Steel specifically.[12]

Further, U.S. Steel has petitioned for import duty relief from nearly every country in which Nippon Steel has steel manufacturing operations.[13] Import duties sought by U.S. Steel pertain to many of Nippon Steel's largest commodity types, including pipes, flat products, hot and cold rolled products, stainless steel, and tin. The bulk of Nippon Steel's operations will continue to be outside of the United States post-acquisition, the number of which is expected to grow as Nippon Steel expands its production capabilities in India and Southeast Asia. Regardless of whether Nippon Steel chooses to participate as a respondent in trade remedy reviews and investigations, it has in the past had potentially divergent commercial and legal incentives with respect to U.S. trade relief from the U.S. steel industry at large (and U.S. Steel specifically). If Nippon Steel were able to direct U.S. Steel's approach to trade actions, some of these incentives could be applied to decisions of U.S. Steel, depending on the overall trajectory and profitability of Nippon Steel's U.S. and global operations.

---

[10] Cash deposits are estimated anti-dumping/countervailing ("AD/CVD") duties paid at time of entry. Final duties are assessed after Commerce conducts an administrative review.
[11] ITA, [https://access.trade.gov/ADCVD_Search.aspx] Accessed on July 15, 2024. For example, in 2021, Commerce applied a 199.43 percent tariff in a final review of corrosion resistant steel to Nippon Steel's Chinese operations, causing Nippon Steel to cease shipments of those products to the United States altogether. 86 FR 16185; Corrosion-Resistant Steel Products from China, A-570-026. Nippon Steel has been subject to 77.7 percent AD duties on nickel plated flat steel, which has been reaffirmed in several subsequent administrative reviews, 71.35 percent duties on cold rolled steel from Japan, and over 100 percent cash deposit rates on carbon and alloy pipe.
[12] 86 FR 16185; Corrosion-Resistant Steel Products from China, A-570-026.
[13] Commerce SME Assessment of CFIUS Case 24-088: Response to Risk Letter of August 3 1, 2024, Appendix C.

The Parties argue in the September 3 Letter that the "number of cases that Nippon Steel and its affiliates have brought" is "not a reliable indicator of Nippon Steel's support for trade remedy action." In particular, Nippon Steel asserts that it could not or would not have participated in certain foreign actions due to, among other things, limitations on the products manufactured by the relevant affiliates, and/or the reduced efficacy of foreign trade remedy regimes. Nippon Steel also claims to have participated in proceedings in Japan, among other countries, and has stated that it "intends to participate in trade remedy proceedings under consideration by governments in Southeast Asia" in countries in which it operates, "assuming that the proposed trade remedy actions reflect the interest of Nippon Steel."[14]

The Committee has already recognized and considered the factors identified by the Parties and counted the sample cases identified by Nippon Steel in the September 3 Letter. The Committee assesses that, based upon publicly available information, Nippon Steel participates in a lower percentage of steel-related trade remedies proceedings in the jurisdictions in which it conducts operations than global competitors such as ArcelorMittal and U.S. firms such as Nucor.[15] This is true even when taking into consideration that there are more U.S. trade remedies cases than in many other countries; that firms cannot necessarily participate in each proceeding depending on the steel production in question; and that such proceedings may be less impactful in certain jurisdictions than in the United States.

The Committee recognizes that firms have a variety of commercial and business motivations for pursuing trade relief in any particular case or jurisdiction. These considerations include the relevant subject merchandise, the financial benefit of a successful petition, and the remedies available in the jurisdiction. The Committee has taken all of these factors into account in assessing the risks that would arise from a reduction in a Nippon Steel-owned U.S. Steel's engagement in AD/CVD proceedings and other trade tools. The Committee has already included the sample cases identified by Nippon Steel in reaching its assessment that, based upon publicly available information, Nippon Steel participates in a lower percentage of steel-related trade remedies proceedings in the jurisdictions in which it conducts operations than would be expected of a firm of its size and production levels. This remains true even taking into account that the United States tends to have more trade remedies proceedings than some other countries, and that a given firm cannot necessarily participate in each proceeding.[16] Concerning Nippon Steel's history regarding its use of trade measures, while these activities precede the Transaction, they are important background information that adds necessary context to the risk consideration.

Finally, the Committee recognizes that even in the absence of the participation of U.S. Steel in trade remedy measures, other domestic steel companies and labor unions such as the United

---

[14] 24-038, Question Set 16, Question 3a response. Of the seven cases identified by Commerce in which a Nippon-affiliate was involved in a foreign trade remedies petition, several involved joint ventures, not wholly owned subsidiaries, suggesting that Nippon's singular involvement in trade remedies proceedings globally is perhaps even lower.

[15] CFIUS recognizes again that certain countries limit the availability of data concerning their trade remedies proceedings. These figures are based on the data Commerce was able to collect.

[16] In many foreign cases that Nippon does not appear to have joined, the steel product at issue in the foreign trade remedies proceeding is one produced by Nippon Steel and its affiliates *(e.g.,* cold-rolled steel, stainless steel plate, corrosion resistant steel, and grain-oriented electrical steel).

Steelworkers Union (USW) would still be able to initiate trade actions, and advocate for trade relief on products produced by those companies and/or unions. However, the Committee continues to assess that, given *inter alia* the significant investment required to initiate or support trade actions and the relatively limited number of relevant industry participants, a significant reduction in the participation of one of the most important firms in this market (U.S. Steel) could lead to a reduction in the efficacy of U.S. trade relief for the domestic steel industry overall.

The United States has a long history of implementing trade measures.[17] As the Parties stated in the September 3 Letter, "[i]t makes more financial sense for foreign producers to make significant investments locally and boost domestic U.S. production rather than continuing to export steel produced overseas to the United States." This is why the risk of decreased participation in trade measures is a crucial risk, as it would not only impact U.S. Steel, but the entire industry. A reduction in this national advantage would likely diminish the incentive to continue to focus on the U.S. market, considering the Parties stated in the September 3 Letter that the "effectiveness of U.S. trade policies is a key motivating factor in Nippon Steel's decision to invest in U.S. Steel." Capital is a limited resource, and Nippon Steel will make investment decisions based on the best use of its capital while considering such factors as the costs of production, costs of participating in trade policies, effectiveness of trade policies, and revenue generated from its U.S. subsidiaries, and comparing the same elements for all its domestic and foreign subsidiaries.

As stated in the August 31 Letter, in assessing whether the nature of the U.S. business makes it susceptible to exploitation that could impair national security, CFIUS has considered several factors.

In the September 3 Letter and other communications to the Committee, Parties asserted that the risks identified in the August 31 Letter predate the Transaction. The Committee acknowledges that some of the factors considered as context in the risk analysis do predate the Transaction. There is overcapacity in the steel industry globally, and operational costs in the United States are higher than in other regions, both of which have contributed to the erosion of the U.S. domestic steel industry. Further idling or closures of steel factories in the U.S. could significantly deepen the domestic supply deficit of domestically produced steel and erode the country's critical manufacturing base in primary metal and other critical manufacturing sectors to the detriment of national security.[18] This Transaction could degrade the domestic supply of multiple types of steel and further imperil primary metal manufacturing and electric motor manufacturing, critical manufacturing industries as identified by the National Infrastructure Protection Plan (NIPP) of 2013.[19]

Reduced output by U.S. Steel would represent reduced capacity for primary metals manufacturing, which could also negatively affect other critical manufacturing industries as identified by the NIPP as necessary to strengthen critical infrastructure security and resilience

[17] CFIUS Case 24-088: Response to Risk Letter of August 31, 2024.
[18] Critical Manufacturing Sector, Cybersecurity and Infrastructure Agency CISA. https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/critical-infrastructure-sectors/critical-manufacturing-sector. Accessed December 13, 2024.
[19] *Ibid.*

such as the electrical equipment, appliance, and component manufacturing sector, including the electric motor manufacturing industry, and the transportation equipment manufacturing sector, including the vehicle manufacturing industry. Critical manufacturing industries are crucial to the economic prosperity of the United States and disruption of certain elements of manufacturing, such as steel manufacturing, could disrupt essential functions critical to national security across multiple critical infrastructure sectors.[20]

In the September 3 Letter, Nippon Steel asserts that the capital investments agreed to by its Board in August 2024 represents a long-term commitment to providing capital and advanced technology to U.S. Steel. These proposed investments account for only two of U.S. Steel's facilities, and further investments remain subject to various factors, including economic conditions, Nippon Steel's global strategy, and market performance, as discussed above. This uncertainty and Nippon Steel's obligations to sustain production at the two facilities in the Parties' December 2 NSA could require U.S. Steel to divert capital for the investment, or capital needed to undertake core activities away from its other facilities, resulting in long-term decline in manufacturing profitability or commercial viability overall.[21]

Further, the proposed operational timeframes of those investments (ten to twenty years) would not by themselves address current insufficient production and capacity utilization to satisfy the factors highlighted by Section 721(f)(6), nor the current demand and increases in medium-term demand by domestic steel consumers, and would be exacerbated if Nippon Steel determines its global strategy includes reducing U.S. Steel capacity and production. As discussed above, the specific incentives for investing in the United States could, in some cases, be transitory, particularly if other countries referenced above such as India have sustained increases in steel demand.

The Parties note in the September 3 Letter that market fundamentals and various trade remedies such as AD/CVD proceedings currently incentivize Nippon Steel's investment in the United States. However, as explained below, many of these market incentives and legislative decisions could be transitory, with the associated possibility of a long-term reduction in investment into U.S. Steel if alternative markets become more profitable investments, such as in India or Brazil, or if market incentives, including grants and subsidies under recent legislation, disappear due to changing political or market environments. Nippon Steel's recent commitments to improve U.S. Steel may be limited by changes in both the global steel market and domestic market conditions that alter Nippon Steel's decisions. As described below, the Parties have proposed mitigation terms that they assert could address this concern.[22] If the market situation in the United States deteriorates, through a reduction in demand, decrease in investment incentives, or other reasons, Nippon Steel could decide to use the capital currently earmarked for improvement of U.S. Steel's aging assets for an alternative investment. Similarly, Nippon Steel could continue with the planned investments but, after using U.S. Steel's current and improved manufacturing assets for the remainder of the assets' viable lives, decline to provide any further capital infusions and

---

[20] Ibid.

[21] CFIUS Case 24-038 Question Set 3, Question 7. As noted below, even with Nippon board approval of additional investments, these efforts are also subject to engineering and other technical analysis as well as other factors that could alter investment plans.

[22] 24-154 - Draft NSA (12.2.24) (the "Parties' December 2 NSA").

effectively let U.S. Steel's production diminish, focusing new investments on more profitable strategies while Nippon Steel expands its operations outside the United States.

Concerning the steel demand outlook, the short-term outlook for steel demand in the United States shows stable growth compared to many other nations. This growth is spurred on by unconventional oil and gas industries, geopolitical de-risking from China, and significant legislative expenditures authorizing monetary and tax relief incentives to companies investing in manufacturing and production assets in the United States. However, some or even many of these factors, which Nippon Steel specifically stated as motivations for investing in the U.S. market in the September 3 Letter, could ultimately prove to be transitory. The domestic growth in the unconventional oil and gas industries may decline as the United States continues to shift towards renewable energy. Recent U.S. legislative actions authorizing large expenditures were also departures from typical spending levels during a period of increased federal spending. Future governmental decisions could impact spending levels and domestic demand. Alternative markets, such as India, are also seeing significant stable growth. The high growth in alternative markets along with a potential shift in geopolitical dynamics and reduction in government incentives creates uncertainty in Nippon Steel's commitment to the United States particularly if, in the long term, alternative markets become more appealing for Nippon Steel's investment. Investments to maintain U.S. Steel's competitive edge in the United States could shift towards alternative markets such as India where there are many factors supporting long-term growth.

## C.     Mitigation proposal

The Committee has taken note of the Parties' December 2 NSA proposal in its analysis. The Parties' December 2 NSA focuses on governance, supply assurance, and maintaining U.S. Steel's independence regarding certain decision making, including decision making related to U.S. Steel's participation in AD and CVD reviews and investigations as well as other trade remedy proceedings. The Committee has considered the following key provisions provided by the Parties:

U.S. Steel would remain a U.S. company and would retain its current headquarters in Pittsburgh, Pennsylvania.[23] Key management positions involved in the day-to-day operations of U.S. Steel would be filled by U.S. citizens.[24] U.S. Steel's Board of Directors would have nine members, a majority of whom would be non-dual U.S. citizens, with three U.S. directors who would be independent and approved by CFIUS Monitoring Agencies (CMAs).[25] The independent U.S. directors would establish and serve as the three members of a Compliance Committee of the U.S. Steel Board to oversee U.S. Steel's compliance with the NSA.[26]

The Parties' December 2 NSA would also require the Parties to maintain production capacity necessary "to meet market demand" needs; however, Nippon Steel could still close U.S facilities after meeting certain process requirements (*e.g.*, involvement of Compliance Committee) and notifying the CMAs. The Parties' December 2 NSA specifies that U.S. Steel's production would

---

[23] 24-154 -  Draft NSA (12.2.24), Article II A.
[24] 24-154 - Draft NSA (12.2.24), Article II, K.
[25] 24-154 - Draft NSA (12.2.24), Article II, E-G.
[26] 24-154 - Draft NSA (12.2.24), Article II, H.

be prioritized for the U.S. market.[27] The Parties' December 2 NSA would commit the Parties to invest at least $1.4 billion in U.S. Steel's existing facilities covered by the basic labor agreement (BLA), a commitment which Parties raised to $1.6 billion in written submission to the Committee on December 12, 2024. The December 2 NSA would also commit the parties to invest at least $1 billion for Mon Valley Works, and at least $300 million in Gary Works. The Parties would provide quarterly progress updates to the CMAs.[28] The Parties' December 2 NSA also reaffirms the Parties' commitments in the BLA with the USW, which lasts until 2026 and includes no layoffs or plant closures or idling, except as permitted under the BLA or otherwise agreed upon with the USW.[29] The Parties' December 2 NSA reaffirms Nippon Steel's commitment to transfer technology and know-how from Nippon Steel to U.S. Steel, on arm's length terms.[30] Under the Parties' December 2 NSA, the Parties would be required to formally notify the CMAs 120 days in advance if Nippon Steel determines there is a need to reduce U.S. Steel's capacity or production.[31]

In the Parties' December 2 NSA, Nippon Steel would commit to not influence U.S. Steel's decisions or actions related to AD/CVD orders, Section 232 activity, or any other trade-related measures.[32] Further, and as discussed above, U.S. Steel would establish a trade committee led by one or more senior management officers from U.S. Steel and comprised of U.S. Steel employees who are U.S. citizens to handle U.S. Steel's trade actions.[33] Approval by the compliance committee, with the affirmative vote of a majority of the independent U.S. directors, would be required for any decision by the trade committee to undertake any trade action that could cost over $1 million or to decline to join the USW or another U.S. party in a trade action concerning products manufactured by U.S. Steel.[34]

Other provisions of the Parties' December 2 NSA include the potential appointment of a non-voting observer to the U.S. Steel Board; regular meetings with CMAs; creation of a Security Officer; creation of an NSA Compliance Policy; potential third-party audits; reporting obligations, including annual compliance reports and a requirement to report violations or suspected violations within 72 hours of discovery; and standard recordkeeping requirements as well as access and inspection provisions.[35]

In the mitigation proposals shared by the Parties, the Parties have proposed the creation of a trade committee to supervise and oversee U.S. Steel's decisions with respect to AD/CVD, Section 232, and other trade matters. Per the parties, this trade committee would have independence from Nippon Steel's foreign-based management. Whether such a committee could fully address the national security concerns raised would depend on numerous factors, including the enforcement mechanisms.

---

[27] 24-154 - Draft NSA (12.2.24), Article III, A.
[28] 24-154 - Draft NSA (12.2.24), Article III, F, 2.
[29] 24-154 - Draft NSA (12.2.24), Article III, I.
[30] 24-154 - Draft NSA (12.2.24), Article Ill, G.
[31] 24-154 - Draft NSA (12.2.24), Article IV, A (4).
[32] 24-154 - Draft NSA (12.2.24), Article V, A.
[33] 24-154 - Draft NSA (12.2.24), Article V, B.
[34] 24-154 - Draft NSA (12.2.24), Article V, D (1-2).
[35] 24-154 - Draft NSA (12.2.24), Articles II, I; VI; VII; VIII, A; IX; X; XI; and XII, A-C.

Notwithstanding these potential commitments, it is possible Nippon Steel might in the future make decisions that could lead to a reduction in domestic steel production capacity due to considerations stemming from its global operations. As a global company with widespread operations in many jurisdictions, Nippon Steel faces a different set of commercial incentives than does U.S. Steel today.

By statute, a National Security Agreement may not be entered into with respect to a covered transaction unless the Committee determines that it "resolves the national security concerns posed by the transaction." The Committee has not yet reached consensus on whether the mitigation measures proposed by the Parties would be effective, allow for compliance in an appropriately verifiable way, and enable effective monitoring and enforcement, or whether they would resolve the risk to U.S. national security arising from the Transaction.

The President may ultimately make a decision about the identified risks and how to resolve them appropriately. As Section 721(d) of the DPA provides, the President may take such action for such time as the President considers appropriate to suspend or prohibit a covered transaction that threatens to impair the national security. The President must announce a decision on whether or not to take action no later than 15 days after the earlier of the date on which the investigation is completed or the date on which the Committee otherwise refers the transaction to the President.

CFIUS appreciates the Parties' continued cooperation, and representatives of CFIUS are available to discuss this matter further, should Parties seek to do so. If you have any questions regarding this letter or wish to update CFIUS regarding the matters discussed herein, please contact the case officer.

Sincerely,

Andrew Fair
Acting Assistant Secretary for
Investment Security
Department of the Treasury

## Annex 1: Additional Unclassified Information Considered by the Committee

Along with the narrative response provided above, the Committee is providing a list of additional unclassified information upon which it relied in making its assessment, below.

The Committee considered that:

- This transaction implicates the following factors under Section 721 of the Defense Production Act (DPA) (Section 721): "the control of domestic industries and commercial activity by foreign citizens as it affects the capability and capacity of the United States to meet the requirements of national security" (Section 721(f)(3)); "the potential national security-related effects on United States critical infrastructure" (Section 721(f)(6)); "the long-term projections of United States requirements for... critical resources and materials" (Section 721(f)(10)); and "such other factors as the President or the Committee may determine to be appropriate, generally or in connection with a specific review or investigation" (Section 721(f)(11)).

- Section 7(a) of Executive Order 11858 provides that CFIUS may seek to mitigate "any national security risk posed by a transaction that is not adequately addressed by other provisions of law."

- The President may take action to suspend or prohibit a covered transaction only if the President finds that "provisions of law, other than this section and the International Emergency Economic Powers Act, do not, in the judgment of the President, provide adequate and appropriate authority for the President to protect the national security in the matter before the President."[36]

- CFIUS therefore considered whether other laws provide adequate and appropriate authority to protect the national security with respect to this transaction.

- In particular, Section 232 of the Trade Expansion Act of 1962 (19 U.S.C. 1862), U.S. Antidumping and Countervailing Duty Laws, and Defense Priorities and Allocations Program authorities were considered.

- Section 232 allows the President to take action to adjust imports of an article and its derivatives following a finding from the Secretary of Commerce that the article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security. Section 232 authority is limited to adjusting imports.

- Thus, for example, if Nippon Steel were to decide to shutter U.S. Steel production capacity or decrease or eliminate U.S. production of certain steel products, Section 232 does not provide the President with authority to prohibit Nippon Steel from shuttering U.S. production facilities or to require Nippon Steel to maintain existing domestic

---

[36] 50 U.S.C. 4565(d)(4)(B).

production.

- While Section 232 could be used to limit imports with the goal of maintaining or increasing domestic production, if domestic facilities have been shuttered and domestic human and capital capabilities have been lost, replacing domestic production might be uneconomical (particularly given the extremely high capital costs of developing new steel production) and could take decades, during which time the United States would not have the domestic steel production capacity necessary for national security. Commerce does not assess any need to take additional action under Section 232 at this time, as the remedies and actions from the 2018 investigation are still in force and valid, primarily because domestic mills have not met the 80 percent capacity utilization rate defined by the 2018 investigation as being necessary to maintain a healthy domestic steel industry.

- The Defense Production Act (DPA), through Title I, is a powerful tool to influence domestic production and industrial mobilization but is limited in its ability address the concerns outlined in the U.S. Steel/Nippon Steel case.

- First, as practical matter, the U.S. Government cannot compel a private business to produce something that it says it cannot produce. Second, DOD already has the buying power to get the majority of goods needed through their regular acquisition practices, such as using DPA priority rated contracts for end items containing steel. Those rated orders will flow down to raw materials, including steel. This is daily practice for DOD and, as a consolidated purchaser of the items needed for defense needs, DOD's ability to obtain steel for its requirements will not be negatively impacted. Third, the majority of critical infrastructure in the United States is owned by private sector organizations. These organizations would have to petition the President or Department of Commerce to use the priority contracting function on a case-by-case basis. This cannot be effectively authorized to all critical infrastructure without weakening the power of the authority, because if all becomes a priority then there is no legitimate prioritization—effectively recreating the situation that currently exists.[37] It also could create additional bias in the system if only some critical infrastructure owner/operators received prioritization when others did not, thereby selecting who profits and who does not. This is a level of tactical operations that is not advisable for the U.S. Government.

- Lastly, although the President is authorized to allocate materials, services, and facilities, the powers granted for critical and strategic materials shall not be used to control the general distribution of any material in the civilian market unless the President finds (1) that such material is a scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship. This is an extreme measure that would require a level of knowledge to ascertain the economic feasibility to control the entire domestic steel industry, not just the company referenced in this case. The due diligence required to obtain data and understand the entirety of the

---

[37] Commerce SME assessment.

domestic steel industry and then manipulate it to allocate those resources is not an easy undertaking, nor could be executed in a timely manner.

- The Committee also considered whether U.S. AD/CVD laws, which Commerce administers, would resolve the risks arising from the transaction.[38]

- Commerce processes petitions from firms that allege they have been harmed by unfair competition from imports (or, infrequently, self-initiates investigations), makes preliminary and final determinations about whether such imports were dumped or benefitted from government subsidiaries, and conducts (upon request) annual administrative review of AD/CVD orders.[39]

- Merchandise found to be subsidized or dumped is subject to duties as needed to offset the advantage conferred by the unfair practice. The AD law addresses the unfair trade practices of price discrimination among national markets or selling below cost.

- It provides for the imposition of antidumping duties when Commerce finds that the subject merchandise is being, or is likely to be, sold in the United States at less than normal value (below the price charged for the like product in the producer's home market. or below the cost of production).

- Before AD duties may be imposed, the U.S. International Trade Commission (ITC) must determine that an industry in the United States is materially injured or threatened with material injury, or that establishment of an industry is materially retarded, by reason of imports of the dumped goods.[40]

- The CVD law provides for the imposition of countervailing duties on goods exported to the United States which Commerce determines have benefited from a financial contribution provided by a foreign government to a specific industry or group of industries.

- For WTO members, or countries that have assumed substantially equivalent obligations (most of our trading partners), the ITC must determine that the imports are causing or threatening to cause material injury to the U.S. industry, or are materially retarding the establishment of an industry, before countervailing duties may be assessed.

- While the AD/CVD law allows for the imposition of duties in response to injurious, unfairly traded imports, as is discussed elsewhere, there are concerns that Nippon Steel would not instigate AD/CVD proceedings even if there were unfairly traded imports that were injuring the U.S. industry, which would limit the ability of the administration to impose AD/CVD tariffs.

---

[38] 19 USC§ 2171 note (Reorganization Plan No. 3).
[39] Dept. Organizational Order 40-1 § 7.
[40] 19 USC§ 1673 *et seq*.

- More significantly, as was the case for Section 232 remedies, the AD/CVD laws only allow import relief (in the case of AD/CVD in the form of tariffs) and, as was the case for Section 232, do not provide authority to respond to a decision to decrease or eliminate U.S. production of certain steel products.

- For these reasons, AD/CVD authorities would not be adequate to address the national security threat posed by Nippon Steel acquiring U.S. Steel.

In addition, the Committee considered that:

- Through its persistent use of market-distorting government interventions and other non-market polices, China has unfairly gained dominance in the global steel market allowing it to have an outsized impact, as it exports extensive surplus steel that artificially lowers international prices.[41]

- These conditions impact steel markets around the world, incentivizing global steel producers to pursue low-cost production.

- In 1978, when the PRC began to open its economy, the United States produced four times more steel than the PRC. Now, the PRC produces 12 times more steel than the United States does.[42]

- Nippon Steel does sometimes contest harmful PRC practices, such as when it filed a lawsuit in 2021 against Baoshan Iron & Steel Co., Ltd. (Baoshan), a subsidiary of Baowu Steel Group, alleging infringement of Nippon Steel's patents relating to electrical steel; however, it rarely does so using U.S. trade measures.[43]

- These considerations could reasonably lead to Nippon Steel making commercial decisions to reduce production and/or accelerate the closure of blast furnaces in the United States rather than seek other remedies to support its continued operations.

- Nippon Steel may also decline to support U.S. Steel's use of trade remedy tools, creating vulnerabilities in the efficacy of trade relief measures.

- Japan is the top foreign investor in the United States with a nearly $800 billion portfolio of foreign direct investment, while Japanese companies employ nearly 1 million Americans across all 50 states.[44]

---

[41] Global Forum on Steel Excess Capacity, Steel exports, trade remedy actions and sources of excess capacity, May 2024, paras. 9-11 [https://steelforum.org/gfsec-impacts-of-global-excess-capacity.pdf]. Section 721(f)(3);(6);(11). Accessed September 13, 2024.

[42] Leveling the Playing Field: How to Counter the CCP's Economic Aggression: Hearing before the U.S. House Select Committee on the Strategic Competition between the United States and the Chinese Communist Party, 118th Cong. (2023).

[43] CFIUS Case 24-038 Question Set 3, Question 2.

[44] See Kishida, Fumio Address to Joint Meeting of the U.S. Congress, "For the Future: Our Global Partnership." Delivered April 11, 2024. Page 7.

- Japan also joined the United States in imposing strict export controls on advanced semiconductors to the People's Republic of China (PRC) and to curtail Russian energy exports.[45]

- Nippon Steel is minority owned by The Master Trust Bank of Japan, Ltd. (Master Trust) (approximately 14 percent) and Custody Bank of Japan, Ltd. (approximately 5 percent), with no other shareholders having interests of greater than five percent.[46]

- The Government Pension Investment Fund of Japan holds an indirect 8.29 percent interest in Nippon Steel through its trust account at Master Trust.[47]

- CFIUS has conducted its risk-based analysis under the premise that an individual foreign investor in a specific transaction may raise national security concerns due to the unique facts and circumstances of that transaction even though the investor's country of origin is a vital ally and trade partner.

- As described below, these considerations could reasonably lead to Nippon Steel making commercial decisions to reduce production in the United States rather than seek other remedies to support its continued operations.

- Currently, China accounts for approximately five percent of Nippon Steel's total production.[48]

The Committee further considered that:

- Nippon Steel, as a multinational company, would have an inherently different decision-making process than an independent U.S. Steel.

- The Committee assesses that the proposed new Nippon Steel-owned U.S. Steel will be vulnerable to Nippon Steel's different motivations and potentially divergent priorities as a foreign-owned entity with over 80 percent of its steel petitions, investigations, and orders outside the United States.[49]

- While U.S. Steel has restarted production at such facilities several times in the last ten years, Nippon Steel may not elect to do so in the future for the commercial considerations

---

[45] For semiconductors, see: https://www.cnn.com/2023/03/31/tech/japan-china-chip-export-curbs-intl-hnk/index.html. Accessed December 13, 2024. For energy, see: https://www.spglobal.com/commodity-insights/en/news-research/latest-news/crude-oil/040822-japan-to-phase-out-russian-coal-imports-with-eye-to-suspend-it-on-g7-pledge-minister. Accessed December 13, 2024.

[46] CFIUS Case 24-038 JVN.

[47] CFIUS Case 24-038 JVN.

[48] Per the parties, Nippon does not have any crude steel production capacity in China and "ranks behind Japan, India, the Associations of Southeast Asian Nations (ASEAN), South America, and Noth and Central America for Nippon Steel, in terms of overall steel production capacity by region." See Response to Risk Letter of August 31, 2024, Appendix C.

[49] Analysis conducted by Commerce SMEs comparing Nippon's U.S.- and foreign-based trade remedy activities.

reviewed above.

- Nippon Steel could decide for business reasons, including cost, to shift production from U.S. Steel's aging blast furnaces to its other operations. Specifically, in the long term, overall cost and market considerations could reasonably lead to Nippon Steel making commercial decisions to reduce production in the United States in favor of production in lower cost jurisdictions where Nippon Steel already has significant operations.

- U.S. Steel may view the costs for restarting a temporarily idled facility as "generally immaterial" now, but future considerations by Nippon Steel may differ, especially if these costs were to rise in the future.[50]

- Such decisions are made similar to any other business decision and are based on factors such as cost/benefit analysis, company priorities, and resourcing.

- This uncertainty introduces risks to national security under Section 721(t)(3).

- Nippon Steel asserts that the capital investments agreed to in August 2024, represent a long-term commitment to providing capital and advanced technology to U.S. Steel.[51]

- As described above, Nippon Steel would have other considerations influencing its decision-making, aside from the purchase price and infusion of capital into U.S. Steel, such as considering the resourcing needs of its other subsidiaries, its global capital commitments, the relative size of its market presence in the United States compared to other regions, and other such factors that U.S. Steel would not need to consider due to Nippon Steel's status as a global company.

- Nippon Steel is also likely to significantly grow its production capacity in other foreign markets where it has existing operations.

- The Committee assesses that Nippon Steel could decide to not invest any additional capital into BF14 and continue with U.S. Steel's plan to idle the furnace in 2026, even with current Nippon Steel board approval.[52]

- The Committee assesses that, given Nippon Steel's other existing blast furnaces, an additional five to ten years of profit earning (useful life) ten years from now may be an incentive to put that $300 million into something more immediately profitable or with a longer lifespan, or alter the planned investment after initial work has started based on changing demand or other business conditions.

- These considerations could reasonably lead to Nippon Steel making a commercial

---

[50] CFIUS Case 24-038, Question Set I, Question 4.
[51] CFIUS Case 24-088: Response to Risk Letter of August 31, 2024, Appendix C.
[52] The parties have proposed mitigation measures they assert will mitigated the expressed risks. See 24-154 Draft NSA (12.2.24).

decision to idle the mill as planned, further reducing production in the United States.

- While the parties have yet to discuss the logistics of the deal, it is reasonable to conclude that Nippon Steel must consider the same factors—cost, overall strategy, demand, amongst other considerations with this investment as with the Gary Works proposal and that the final implementation of the investment, along with next steps and future operation decisions, would be subject to Nippon Steel's different decision-making calculus.

- Were the transaction to take place, it is simply unknown the extent to which Nippon Steel would increase or decrease U.S. Steel's production.

- Nippon Steel's efforts on reducing costs and its carbon output likely could impact U.S. Steel's business plans, post-transaction.

- Although U.S. Steel announced in 2021 a goal of achieving net-zero carbon emissions by 2050, its acquisition by Nippon Steel would accelerate this process significantly to meet Nippon Steel's own environmental commitments.[53]

- The reduction of carbon output could accelerate U.S. Steel's current plans to expand its EAF production sites while closing down blast furnaces.

- Depending on the length of the development and refining process, Nippon Steel may not be able to use this method to achieve its environmental goals, increasing the likelihood that idling or modifying production at U.S. blasts furnaces may be required.

In addition, the Committee considered that:

- Nippon Steel has historically resisted AD/CVD relief under U.S. trade laws.

- Nippon Steel's relatively limited trade measure activity in other jurisdictions so sheds some light on how a U.S.-based subsidiary may approach AD/CVD cases under U.S. law.[54]

- This comparison is even starker, considering that Nippon Steel's global crude steel production capacity is approximately 72.5 million tons and its 2022 revenue was $53.9 billion, while U.S. Steel's production capacity is 22.4 million tons and its revenue was approximately $18.1 billion.

- Nippon Steel does not have a history of relying much on trade measure actions in any of the jurisdictions in which it operates. To the contrary, globally, Nippon Steel is far more likely to be found dumping or benefiting from countervailable subsidies than to seek

---

[53] Commerce SME assessment.
[54] Certain countries approach trade measures very differently depending on their institutional, political, economy, and legal structures. A reduced number of trade measure investigations in a given country may reflect that country's particular approach to trade measures, not just the activity level of firms.

relief from those practices.[55]

- Additionally, in any new cases filed by domestic steel producers naming Nippon Steel as a respondent, Nippon Steel would have to determine whether to have its U.S. affiliate support a petition that would likely result in additional costs for its other foreign affiliates or support its new U.S. production.

- The Committee further assesses that following Nippon Steel's acquisition of U.S. Steel, it could reduce its AD/CVD petitioning activity or take other actions that limit the efficacy of Commerce's AD/CVD authorities.

- Nippon Steel's choices concerning the support of AD/CVD tools to address PRC and other countries dumping and unfairly subsidizing of steel products on the U.S. domestic market could deviate significantly from U.S. Steel's choices.

- In particular, Nippon Steel may still have economic incentives to invest and increase production in lower-cost, high-margin markets such as Brazil, India, or Mexico and to weaken AD/CVD protections accordingly.[56]

- As a result, post-acquisition, unless Nippon Steel restructures all of U.S. Steel's operations and product lines to avoid competition with Nippon Steel's foreign businesses (which risks substantially reducing U.S. Steel's domestic production capacity), an apparent conflict could arise between the position of U.S. Steel in AD/CVD proceedings with the position of its prospective new parent, Nippon Steel, as a respondent in those same proceedings.

- As a global firm, Nippon Steel could direct U.S. Steel not to file petitions against foreign imports; not to make AD/CVD decisions that increase costs for Nippon Steel's affiliates in other countries; or decide to push back on AD/CVD protections vis-a-vis other markets in which Nippon Steel operates, which would erode the United States' ability to rely on current trade protections to ensure a competitive market for domestic steel.

- It is possible that Nippon Steel's longer-term commercial and strategic interests in its foreign businesses (the vast majority of its steel production post-acquisition) will eventually predominate over its stated interest in maintaining U.S. trade measures.[57]

- The Committee understands that the parties have proposed the creation of a trade committee to supervise and oversee U.S. Steel's decisions with respect to AD/CVD, Section 232, and other trade tools.

---

[55] Nippon Steel Corporation v. United States, I :2 l-cv-00533, (United States Court of International Trade), Court listener, https://courtlistener.com/docket/60401183/nippon-steel-corporation-v-united-states/], accessed on August 12, 2024.

[56] Commerce SME assessment.

[57] Commerce SME assessment and analysis of unclassified information; see also Bloomberg. May 12, 2024. Nippon Steel Equity Research 1. Nippon Steel Equity Outlook. Accessed on October 8, 2024.

- Per the parties, this Trade Committee would have independence from Nippon Steel's foreign-based management.

- The efficacy of such a committee would depend on numerous factors, including the enforcement mechanisms.

- Self-initiation by Commerce of AD/CVD investigations is not an adequate or appropriate authority to address the specific national security risk implicated by a major U.S. steel producer—and prior frequent participant—declining to participate in, or actively undermining, trade measure proceedings. Since 2016, Commerce has self-initiated only two investigations, compared to 561 initiated by petition.

- The question is not, as Nippon Steel implies, merely a failure of the U.S. Government to self-initiate more proceedings. The statutory necessity of obtaining an affirmative U.S. International Trade Commission (USITC) determination of injury to domestic industry and the indispensable role private industry plays in such determinations has limited the ability of Commerce to self-initiate.[58] Pursuing an injury determination in the USITC requires data (for example, on price effects) that is provided by participating domestic firms. Industry participants have observed that the failure of a major firm to participate in USITC proceedings and provide its data has had potentially adverse effects on the success of that case. The lack of cooperation of a major producer in the USITC's investigation could pose an obstacle to self-initiation. Private petitioners are therefore best positioned to identify the threat of injury to their own companies before such injury results in irreversible consequences. Commerce lacks the same degree of real-time information about competitive harm suffered by a domestic firm.

- This data is particularly critical in the highly competitive U.S. steel industry. Compared to domestic petitioners, Commerce is more likely to become aware of the conditions that cause injury only after the economic effects of unfair trade practices a reflected in the marketplace—for example, when steel companies start idling mills, by which time any relief may be inadequate.[59]

- Furthermore, domestic industry support is a statutory prerequisite to initiate an investigation based on a petition.[60]

- If a firm that accounts for a significant volume of U.S. production and/or workforce fails to support a petition, that could make a finding of industry support more difficult if the petition encountered other opposition from domestic (i.e., non-foreign owned) firms.

- While the risk that opposition from a Nippon Steel-owned U.S. Steel could jeopardize the threshold for industry support could be mitigated by the fact that as a foreign-owned company, U.S. Steel's position opposing the petition might be disregarded, its lack of

---

[58] 19 U.S. Code § 1677 (5).
[59] 19 U.S. Code § 1677 (5).
[60] 19 U.S. Code § 1677 (5).

support could increase the threshold for the industry support calculation and/or delay initiation.[61]

Furthermore, the Committee additionally considered:

- While this transaction may bring benefits to U.S. Steel in the near-term through access to certain superior technology and a planned capital infusion, risks remain.

- In 2023, U.S. Steel had a steel production capacity of 22.4 million tons and shipped 15.5 million tons of steel to customers globally, including 10.7 million tons to U.S. customers. In 2023, U.S. Steel had revenues of approximately $18.1 billion and had approximately 22,000 employees, approximately 14,000 of which were in the United States.[62]

- As of 2022, U.S. Steel's shares of the markets in which it operated were, by category: hot-rolled sheets and coils (14 percent); cold-rolled sheets and coils (17 percent); hot-dipped galvanized sheet (17 percent); tin mill products (29 percent); and seamless pipe and tube (11 percent).

- Currently, U.S. Steel does not supply products directly to the U.S. Government but may indirectly supply steel to U.S. Government agencies.

- In the last five years, pursuant to priority-rated orders, U.S. Steel provided commercial steel and flat-rolled substrate that U.S. Steel understands were indirectly supplied to the U.S. Government for use in bomb casings and Department of Defense (DOD) ships.

- Separately, U.S. Steel has had ten unclassified contracts with the U.S. Government in the last three years, of which eight are still active. Of the ten, nine are or were with the Department of Energy and one is with the Naval Surface Warfare Center.

- Pursuant to these contracts, U.S. Steel participates in research projects that primarily aim to reduce energy consumption and increase efficiency in its steel production. U.S. Steel does not supply products through these contracts.[63]

- Electrical steel is also an essential product for national security applications, including the nation's electrical grid and critical transportation infrastructure.

- The Committee notes that this transaction may bring benefits to U.S. Steel in the near-term through superior technology and a planned capital infusion.

---

[61] *See* Section 702(4)(8) of the Act ("In determining industry support under subparagraph (A), the administering authority shall disregard the position of domestic producers who oppose the petition, if such producers are related to foreign producers, as defined in section 771(4XB)(ii), *unless such domestic producers demonstrate that their interests as domestic producers would be adversely affected by the imposition of a countervailing duty order.").* Emphasis added); Domestic industry opposition or a requirement to poll the industry can also delay the initiation of investigations and, as a result, the ultimate trade relief. *See e.g.,* 19 U.S. C. 1613 a(c)(l)(B).
[62] CFIUS Case 24-038 JVN.
[63] CFIUS Case 24-038 JVN.

- The Committee assesses that historically, U.S. Steel has remained profitable enough to sustain operations, although its profitability has fluctuated over time due to variations in business strategies and markets.

- U.S. Steel has a history of inadequate attempts to improve its competitiveness with frequently changing operational priorities that limits analysis of how U.S. Steel will proceed in the absence of this transaction.

- Considering its track record of programs failing to deliver, U.S. Steel likely will continue to alter its business decisions but remain profitable enough to cover its operations and debt in the absence of this transaction.

- Based on previous steel requirements during prior national emergencies, current domestic steel production and capacity utilization, the Committee assesses, would likely be insufficient to satisfy national security needs under Section 72l(f)(6), as producers would need to increase production by nearly 150 percent, an unattainable figure that takes into account U.S. Steel's current production levels.[64]

- Without U.S. Steel, or if U.S. Steel were operating under decreased capacity, this number could climb even higher and further out of the domestic steel market's reach. Further idling or closures would significantly deepen the domestic supply deficit of domestically produced steel to the detriment of national security. The introduction of further weaknesses in the domestic steel industry could result in even greater levels of dependency on imports.

- As background, the Committee emphasizes that the domestic industry (of which U.S. Steel is a principal player) drives essentially all remedial activity in the AD/CVD space, and that ongoing participation of firms with substantial market share is vital for Commerce to identify and redress injury to critical, sensitive domestic industries.[65]

- A relatively small number of petitioners—U.S. Steel, Nucor, Cleveland-Cliffs, Steel Dynamics, and a handful of others—drive a majority of trade measure cases in the sector. U.S. Steel has participated in hundreds of AD/CVD petitions. Placing aside the commercial and strategic dynamics that could arise from this transaction, U.S. Steel would likely be in a position to file further petitions naming Nippon Steel as a respondent on additional steel-related products in the future.

- Domestic industry ordinarily participates in these reviews, as necessary, to maintain duties and keep protections for businesses and workers in place. If a petitioner fails to advocate for maintaining duties as part of the review process, Commerce does not benefit from the additional evidence and arguments that could justify ongoing relief.

---

[64] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018.

[65] 19 U.S.C. §§ 1671, 1673.

- Large firms such as U.S. Steel play an especially valuable role, since this advocacy requires the retention of expert counsel and can be costly and time-consuming to undertake.

- U.S. Steel is not the only active firm in the trade measure space; however, it is a consequential party to following AD/CVD cases through to completion. Even if U.S. Steel only trims or relaxes its trade measure activity, that change could have broader adverse implications for the rest of the industry.[66]

- This reduction in the effectiveness of U.S. trade measures to protect the U.S. steel industry could adversely affect U.S. national security due to steel's essential role in critical infrastructure and other national security applications, presenting the type of national security concern that CFIUS and the President are directed to consider.[67]

The Committee additionally considered:

- Nippon Steel acknowledged that the continued state of operations of U.S. Steel's facilities beyond 2026 would depend on a myriad of factors, including projected medium- and long-term demand, availability and cost of raw materials, health of the facility, and other overall cost considerations.[68]

- Although Nippon Steel appears committed to providing capital and advanced technology to U.S. Steel, none of these commitments go beyond 2026, which creates a potential consequence where U.S. Steel might not have the capital needed when required to undertake core activities to maintain profitability in the long-term.

- The return-on-investment period is over ten years, which could be seen as evidence of a long-term commitment to this particular facility; however, this is not a definitive nor a binding commitment. In contrast, this risk scenario envisioned by the Committee extends significantly through 2026.

- In addition, the benefits to the domestic steel industry, including capital injections or efficiency improvements, alone would not be sufficient to reverse the industry's decline and create a competitive environment with firms from non-market economies under current market conditions described above and considered under Section 72l(f).

---

[66] GAO, December 12, 2022 (https://www.gao.gov/products/gao-23-105794). Accessed on July 1, 2024; In the view of Commerce SMEs, in the circumstance in which Nippon chose to reduce U.S. Steel's ADICVD footprint, the fact that other large firms would continue to petition does not fully mitigate the risk of weakened protections for the domestic steel market. As noted, petitions are costly and depend on a wealth of data and industry expertise; each additional petitioner brings incremental value and increases the likelihood of relief. Conversely, opposition by U.S. Steel could undermine a case brought by other firms. In an industry where 3-4 firms dominate AD/CVD activity, the potential reduction to 2-3 firms could have materially adverse effects on trade measures and protections in this space.
[67] Section 721(f)(l)-(3).
[68] CFIUS Case 24-038 Question Set 6, Question 4.

- Given the numerous contingencies, the Committee assesses that a potential Nippon Steel investment in the Mon Valley Works does not provide assurance that this facility will continue to operate after this transaction and, in any event, would not fully address the risks discussed elsewhere in this document.[69]

- Nippon Steel's decision to reduce the operation of U.S. Steel's facilities would pose a risk to the domestic steel supply chain.[70] The variability in restarting production lines depends on numerous factors.[71]

Additionally, the Committee considered the following:

- In considering Section 721(f)(3) of the Defense Production Act (DPA) (Section 721), the Committee assesses that, in the long-term, Nippon Steel could make commercial decisions that result in further weakening of the domestic steel market through loss of production capabilities and a reduction of the efficacy of trade remedy tools such as anti-dumping and countervailing duties (AD/CVD) to protect the U.S. steel industry that in turn could negatively affect U.S. national security.

- For instance, this could affect the capability and capacity of the United States to meet the requirements of national security as determined in Commerce's report under Section 232 of the Trade Expansion Act of 1962, which found that domestic steel production to meet national security needs depends on a healthy and competitive U.S. industry.

- In considering Section 721(f)(6), the Committee assesses any significant reduction in domestic steel capacity would likely jeopardize the U.S. steel industry's ability to maintain commercial production and meet the full spectrum of national security requirements to include critical infrastructure sectors such as transportation, infrastructure, construction, and agriculture, amongst others.

- The consequence of this risk is possible supply chain disruptions to sectors critical to national security under Section 721(f)(6), particularly transportation, infrastructure, construction, and agriculture. These critical infrastructure sectors would be impacted by a reduction of domestic steel capacity.

- If Nippon Steel were to reduce U.S. Steel's production and/or idle or shutter its mills, including its blast furnaces, there would be an overall reduction in the total capacity of the U.S. steel industry, reducing the steel capacity that critical infrastructure, such as critical manufacturing, energy, transportation, and communications (all vital to national security) relies on for maintenance and repairs.

- Potential critical infrastructure failures could lead to a variety of negative consequences

---

[69] The parties have proposed mitigation measures they assert will mitigated the expressed risks. *See* 24-154 Draft NSA (12.2.24).

[70] The parties have proposed mitigation measures they assert will mitigated the expressed risks. *See* 24-088 - Draft NSA (9.9.24).

[71] CFIUS Case 23-038, Question Set 1, Question 4.

for U.S. national security caused by delays in repairs to aging infrastructure.

- However, EO 14083 states that, while "the United States recognizes the importance of cooperating with its allies and partners to secure supply chains... certain foreign investment may undermine supply chain resilience efforts and therefore national security."[72]

- This transaction creates a national security risk by giving the foreign acquirer control over the third-largest domestic steel producer, allowing Nippon Steel to control and direct U.S. Steel's future business decisions and production, thereby potentially resulting in a further weakened U.S. domestic steel market.

- Specifically, under Section 721(f)(3) and (10), the Committee assesses that, in the long-term, Nippon Steel could make commercial decisions that result in further weakening of the domestic steel market through loss of production capabilities and a reduction of the efficacy of trade remedy tools such as anti-dumping and countervailing (AD/CVD) duties.

- In turn, this could affect the capability and capacity of the United States to meet the requirements of national security as determined in Commerce's report under Section 232 of the Trade Expansion Act of 1962, which found that domestic steel production to meet national security needs depends on a healthy and competitive U.S. industry.

- The Committee assesses that the long-term potential negative impacts on the domestic market and subsequent national security impacts outweigh any short-term benefits resulting from this transaction.

- The Committee assesses that the maintained operations will continue to provide the necessary capacity for the national security needs of the United States.

- As stated above, Nippon Steel's ownership of U.S. Steel could jeopardize the re-starting of idled facilities, result in the closing of more facilities, or a reduced future production output.

- If Nippon Steel were to idle or shutter some of U.S. Steel's production, which could include blast furnaces, there would be an overall reduction in capacity in the U.S. steel industry from which national security users of steel could draw.

- This scenario would pose a risk to U.S. national security by reducing capacity which hinders the overall U.S. steel industry's ability to meet increased demand during a national emergency or other time of increased demand.

---

[72] EO 14083, *Executive Order on Ensuring Robust Consideration of Evolving National Security Risks by the Committee on Foreign Investment in the United* States, section 2(a)(i), September 15, 2022.

- Reducing available capacity and eliminating domestic sources of numerous grades and types of steel could result in supply gaps that would leave manufacturers and suppliers of parts and components for critical infrastructure sectors without the steel needed to complete customer orders. This, in turn, could impact the resiliency, effectiveness, and integrity of critical infrastructure during a national crisis.

- This conflict of interest may create a vulnerability that a Nippon Steel-owned U.S. Steel could reduce its AD/CVD petitioning activity, oppose AD/CVD petitions brought by other domestic firms, and/or stop advocating to maintain duties in ongoing reviews for particular products and situations, taking into account case-specific supply chain concerns.[73]

- If Nippon Steel's global commercial interests diverged from the domestic industry, U.S. Steel, once controlled by Nippon Steel, could file to have orders revoked or take actions that could lead Commerce to revoke the order.[74]

- While this risk could be mitigated in cases where other domestic producer petitioners remained party to the proceedings, this may not be the case with all AD/CVD actions.

- The Committee assesses that potential reduced output by U.S. Steel from Nippon Steel could lead to supply shortages of critical components and production delays that could reverberate throughout industries critical to national security under Section 721(f)(6).

- These industries include the infrastructure, transportation, communication, and energy sectors, by reducing U.S. production capacity, rendering the domestic steel industry incapable of meeting demand and creating additional supply chain vulnerabilities.[75]

- Without available steel, critical infrastructure sectors may be forced to delay critical repairs or upgrades, or substitute inferior materials-including foreign-produced steel or materials of lessor strength and suitability-when repairs or maintenance cannot be delayed.[76]

- Such supply chain disruptions could exacerbate situations such as electrical grid or transformer outages or bridge or tunnel collapses, by delaying critical repairs due to a lack of available necessary parts that rely on domestic steel production.

- If Nippon Steel were to idle or shutter some of U.S. Steel's production, there would be an

---

[73] This risk is partially mitigated by the fact that Nippon Steel and U.S. Steel's opposition to a petition may be disregarded by Commerce under certain circumstances. Nippon Steel has stated to the Committee that it "will not interfere" in U.S. Steel's ability to participate in AD/CVD proceedings.
[74] 19 CFR § 351.216; 19 CFR § 351.218.
[75] For complete list, *see* Appendix H to *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018; *See also* This presents potential national security concerns of the type that the President and CFIUS are directed to consider. *See, e.g.,* Section 721(t)(6).
[76] Commerce SME Assessment.

overall reduction in capacity in the U.S. steel industry from which national security users of steel could draw.

- This scenario would pose a risk to U.S. national security by reducing capacity which hinders the overall U.S. steel industry's ability to meet increased demand during a national emergency or other time of increased demand (see below for additional information).

- Without U.S. Steel, or if U.S. Steel were operating under decreased capacity, this number could climb even higher and further out of the domestic steel market's reach. A continued loss of viable commercial production capabilities and related skilled workforce will jeopardize the U.S. steel industry's ability to meet the full spectrum of national security requirements.[77]

- Further, the lengthy process to restart operations would likely exacerbate any supply shortages created by other steel producers' pivot to steel for national security needs.[100] In this case, U.S. Steel's commercial steel production capabilities would be a crucial backstop for steel used for commercial and industrial industries that support critical infrastructure needs under Section 72l(f)(6).

- For instance, U.S. Steel is a major supplier of the transportation sector, one of DHS's sixteen critical infrastructure sectors, including components for trains, trucks and buses.

- Any further reduction in production in the long-run, or decrease in utilization, would have negative impacts across multiple critical infrastructure supply chains.

- In times of increased steel requirements, critical industries would have increased difficulty acquiring enough domestically produced steel to meet demand if capacity were reduced due to idling or closures of U.S. Steel's facilities.[78]

- In turn, this could cause critical industries to reduce or delay production of critical components due to a lack of available steel or rely on imported steel thus increasing their use of lower-quality Chinese steel, which could lead to a variety of negative consequences, including critical infrastructure failures caused by delayed repairs to aging infrastructure.

- Being forced to rely on foreign owned facilities introduces significant risk and potential delay for the development of new steel technologies and production of needed steel products, particularly in times of national emergency.[79]

---

[77] *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as amended,* U.S. Department of Commerce, January 11, 2018.
[78] Commerce SME Assessment.
[79] 24-038 Question Set *5,* Question 2; *The Effect of Imports of Steel on the National Security, An Investigation Conducted Under Section 232 of the Trade Expansion Act of /962, as amended,* U.S. Department of Commerce, January 11, 2018.

- Without a second fully integrated blast furnace manufacturer, automotive and other commercial steel production used for machinery, in construction, and for other industrial purposes would drop precipitously if Cleveland-Cliffs and other producers had to shift its production capacities to national security-related steel products, harming national security.[80]

- The Committee assesses that, without backup capacity, increases in national security-related steel production would come at the expense of the production of commercial and industrial steel products.

- Further, commercial and industrial industries that support national security industries would face increasing domestic supply chain shortages that would ultimately harm national security through potential upstream disruptions in the supply chains for critical national security products.

- Lack of access to high purity steel, produced in blast furnaces, could cause bottlenecks and disruptions to supply chains for industries crucial to national security. Two sectors that would be particularly affected by a disruption in the domestic steel supply are transportation (including the automotive industry) and energy.

- The Committee assesses it would be expensive and labor intensive to restart or ramp up production during a reduction in U.S. Steel's overall capacity, harming national security.

- Shortfalls in supply could slow down or stop the production of certain automotive and other transport components, which would result in supply chain disruptions and delays throughout the industry.

- The loss of domestic production is a critical national security concern given the ubiquitous nature of steel throughout multiple critical industries.

- A reduced U.S.-produced supply would force manufacturers to turn to imports, where possible, to meet their needs, further weakening the vulnerable U.S. steel market.

- Without an assured domestic supply of these products, the Committee assesses that the United States cannot be certain that it could effectively respond to large power disruptions affecting civilian populations, critical infrastructure, and U.S. industrial production facilities and installations in a timely manner.

- These risks affect the potential production and markets for NOES (electrical steel). which must be produced at adequate volumes to support an expansion of EV production.

- A decline in the rate or effectiveness of trade tools for steel-related products could conversely lead to additional risk to the overall production capacity and supply of the U.S. steel industry.

---

[80] Commerce SME Assessment.

- The Committee assesses that lack of support would hinder the U.S. Government's ability to provide adequate trade protection measures and leave the U.S. economy more exposed to dumping and unfair subsidization of steel, leading to a weakened U.S. domestic steel production capability.

- A reduction in U.S. Steel's support for trade measures on steel imports could weaken the protections available to the domestic steel industry and significantly reduce domestic production capacity.[81]

- If U.S. Steel were to substantially reduce its affirmative participation in AD/CVD cases targeting any major steel-producing or circumventing jurisdiction, other domestic steel producers could also experience decreased import duty protection and face a relatively greater volume of dumped or unfairly subsidized imports.

- Per the parties, the alternative final bid for U.S. Steel was from Cleveland-Cliffs; however, Nippon Steel was selected because Nippon Steel provided the highest value and certainty while presenting less regulatory risk than Cleveland-Cliffs.[82]

---

[81] A national security concern per Section 721(f)(3).
[82] CFIUS Case 24-088 Question Set 2, l(b).