## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES STEEL CORPORATION, NIPPON STEEL CORPORATION, and NIPPON STEEL NORTH AMERICA, INC. | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 2:25-cv-15 |
| v. | ) ) | Hon. Marilyn J. Horan |
| CLEVELAND- CLIFFS INC., LOURENCO GONCALVES, AND DAVID MCCALL | ) ) ) ) | |
| Defendants. | ) | |

## DEFENDANT DAVID MCCALL'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE EXPEDITED CLAIMS AND FOR AN AWARD OF ATTORNEY FEES, COURT COSTS, AND LITIGATION EXPENSES

Micheal Healey (Penn. Bar No. 27283)
HEALEY BLOCK LLC
PO Box 81918
Pittsburgh, PA 15217
(412) 760-0342
mike@unionlawyers.net

David R. Jury (Penn. Bar No. 77015)
Nathan L. Kilbert (Penn. Bar No. 313939)
Anthony Resnick (Penn. Bar No. 319682)
UNITED STEELWORKERS
INTERNATIONAL
60 Boulevard of the Allies, Room 807
Five Gateway Center
Pittsburgh, PA 15222
(412) 562-2545
djury@usw.org
nkilbert@usw.org
aresnick@usw.org

Bruce Lerner*
Leon Dayan*
Joshua Shiffrin*
Derrick C. Rice*
Rachel Casper*
BREDHOFF & KAISER, P.L.L.C.
805 15th Street NW
Suite 1000
Washington, DC 20005
(202) 842-2600
blerner@bredhoff.com
ldayan@bredhoff.com
jshiffrin@bredhoff.com
drice@bredhoff.com
rcasper@bredhoff.com

*Admitted Pro Hac Vice

Counsel to Defendant David McCall

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................................................................................ii

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 3

    I.   The Parties .................................................................................................................... 3

STANDARD OF REVIEW ........................................................................................................ 6

ARGUMENT ............................................................................................................................. 7

    I.   The *Noerr-Pennington* Doctrine Bars the Expedited Claims ............................................ 7

       A.   The *Noerr-Pennington* Doctrine Bars the Expedited Antitrust Claims ......................... 7

       B.   The *Noerr-Pennington* Doctrine Also Bars Plaintiffs' Tortious Interference Claims....11

    II.  Each of the Claims against Mr. McCall Fails for Additional, Independent Reasons.........11

       A.   The Complaint Does Not State a Claim for Violation of Sherman Act Section 1 Against Mr. McCall................................................................................................................... 12

       B.   The Complaint Does Not State a Claim for Violation of Sherman Act Section 2 Against Mr. McCall................................................................................................................... 15

       C.   The Complaint Does Not State a Tortious Interference Claim Against Mr. McCall .... 18

    III.  Plaintiffs' Prayer for Injunctive Relief Fails as a Matter of Law ..................................... 23

    IV.  The Expedited Claims Should be Dismissed with Prejudice ........................................... 25

    V.  Mr. McCall Should be Awarded his Legal Fees and Expenses........................................ 25

CONCLUSION........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. City of Pittsburgh*,
  586 F. Supp. 417 (W.D. Pa. 1984).................................................................24

*Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*,
  826 F.2d 1235 (3d Cir. 1987)......................................................................12

*Allen Bradley Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers*,
  325 U.S. 797 (1945).......................................................................................14

*Allied Aviation Serv. Co. of N.J., Inc.*,
  248 N.L.R.B. 229 (1980), *enforced* 636 F.2d 1210 (3d. Cir. 1980) ........................21

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988)...................................................................................8, 9

*Altemose Constr. Co. v. Bldg. & Constr. Trades Council of Phila. & Vicinity*,
  751 F.2d 653 (3d. Cir. 1985)........................................................................14

*BE & K Constr. Co.*,
  329 N.L.R.B. 717 (1999), *rev'd on other grounds* 536 U.S. 516 (2002) ...............21

*BE & K Constr. Co. v. United Bhd. of Carpenters*,
  90 F.3d 1318 (8th Cir. 1996) .......................................................................20

*Bensel v. Allied Pilots Ass'n*,
  387 F.3d 298 (3d Cir. 2004)........................................................................20

*Bill Johnson's Rests., Inc. v. NLRB*,
  461 U.S. 731 (1983).....................................................................................22

*Brownsville Golden Age Nursing Home, Inc. v. Wells*,
  839 F.2d 155 (3d Cir. 1988).........................................................................11

*Buck v. Hampton Twp. Sch. Dist.*,
  452 F.3d 256 (3d Cir. 2006)...........................................................................3

*Burlington N. Santa Fe Ry. Co. v. Int'l Bhd. of Teamsters Loc. 174*,
  203 F.3d 703 (9th Cir. 2000) .......................................................................24

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
  168 F.3d 119 (3d Cir. 1999)..........................................................................11

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
  499 U.S. 365 (1991)...........................................................................8, 10, 19

*Crowe & Assocs., Inc. v. Bricklayers & Masons Union Local No. 2 of Detroit,*
    713 F.2d 211 (6th Cir. 1983) ........................................................................24

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961)..........................................................................7, 8, 9

*Eastex, Inc. v. NLRB,*
    437 U.S. 556 (1978)........................................................................21

*Ehredt Underground, Inc. v. Commonwealth Edison Co.,*
    90 F.3d 238 (7th Cir. 1996) ........................................................20

*Eisai, Inc. v. Sanofi Aventis U.S., LLC,*
    821 F.3d 394 (3d Cir. 2016)........................................................13

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.,*
    602 F.3d 237 (3d Cir. 2010)....................................................17, 18

*Laborers' Pension Fund v. Murphy Paving & Sealcoating, Inc.,*
    450 F. Supp. 3d 815 (N.D. Ill. 2020) ........................................20

*Larry V. Muko, Inc. v. S.W. Pa. Bldg. & Constr. Trades Council,*
    609 F.2d 1368 (3d Cir. 1979)......................................................14

*Linn v. United Plant Guard Workers,*
    383 U.S. 53 (1966)........................................................................22

*Loc. 926, Int'l Union of Operating Eng'rs v. Jones,*
    460 U.S. 669 (1983)..................................................................20, 22

*Mack Trucks, Inc. v. UAW,*
    856 F.2d 579 (3d Cir. 1988).......................................................22

*Mass. Sch. of L. at Andover, Inc. v. ABA,*
    937 F. Supp. 435 (E.D. Pa. 1996), *aff'd,* 107 F.3d 1026 (3d Cir. 1997).................................15

*In re Merck Mumps Vaccine Antitrust Litig.,*
    No. 23-3089, 2024 WL 4432076 (3d Cir. Oct. 7, 2024)....................................9, 10

*In re NAHC, Inc. Secs. Litig.,*
    306 F.3d 1314 (3rd Cir. 2002) ....................................................25

*NLRB v. City Disposal Sys. Inc.,*
    465 U.S. 822 (1984)........................................................................22

*Petrochem Insulation, Inc.,*
    330 N.L.R.B. 47 (1999) ..............................................................21

*Phila. Rec. Co. v. Mfg. Photo-Engravers Ass'n of Phila.*,
    155 F.2d 799 (3d Cir. 1946)..................................................................................14

*Phila. Taxi Ass'n, v. Uber Techs., Inc.*,
    886 F.3d 332 (3d Cir. 2018)................................................................................17

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993)............................................................................................10

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)................................................................................12

*Salsberg v. Mann*,
    310 A.3d 104 (Pa. 2024)....................................................................................19

*San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*,
    125 F.3d 1230 (9th Cir. 1997) ......................................................................20, 22

*San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*,
    359 U.S. 236 (1959)..........................................................................................20

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
    401 F.3d 123 (3d Cir. 2005)....................................................................12, 13, 15

*Schachar v. Am. Acad. Of Ophthalmology, Inc.*,
    870 F.2d 397 (7th Cir. 1989) ..............................................................................13

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)..........................................................................................15

*Sweda v. Univ. of Pa.*,
    923 F.3d 320 (3d Cir. 2019)..................................................................................6

*United Mine Workers of Am.*,
    231 N.L.R.B. 573 (1977), *enforced in relevant part by Lone Star Steel Co. v.*
    *NLRB*, 639 F.2d 545 (10th Cir. 1980)..................................................................21

*United Mine Workers of America v. Pennington*,
    381 U.S. 657 (1965)..................................................................................8, 10, 14

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945)................................................................................17

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)..........................................................................................17

*V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc*,
    403 F. Supp. 643 (E.D. Pa. 1975), *aff'd*, 565 F.2d 154 (3d Cir. 1977)......................15, 16, 17

*Venetian Casino Resort, L.L.C. v. NLRB*,
  793 F.3d 85 (D.C. Cir. 2015) ..................................................................21

*Washington Hosp. Ctr. Corp.*,
  360 N.L.R.B. 846 (2014) .......................................................................21

*We, Inc. v. City of Phila.*,
  174 F.3d 322 (3d Cir. 1999) ..................................................................11

**Statutes**

42 Pa. Cons. Stat. § 8340.18 ....................................................................25

15 U.S.C. § 1 ............................................................................................12

15 U.S.C. § 18a .......................................................................................17

29 U.S.C. § 104 ...................................................................................23, 24

29 U.S.C. § 105 .......................................................................................24

29 U.S.C. § 157 .......................................................................................20

29 U.S.C. § 158 .......................................................................................20

50 U.S.C. § 4565 .......................................................................................1

**Other Authorities**

Restatement (Second) of Torts § 766 .......................................................19

# INTRODUCTION

On December 18, 2023, United States Steel Corporation (U.S. Steel or USS) announced a merger (Merger) with Nippon Steel Corporation (NSC) and its subsidiary Nippon Steel North America, Inc. (NSNA) (collectively, Nippon). Given the obvious national security implications posed by foreign ownership of domestic steel production resources, it was evident to all—and, indeed, contemplated by the Agreement and Plan of Merger (Merger Agreement) between U.S. Steel and Nippon—that the Merger would be subject to review and approval by the Committee on Foreign Investment in the United States (CFIUS) before it could be consummated. CFIUS is a committee made up of cabinet members and other government officials, and it investigates and makes recommendations to the U.S. President as to whether corporate transactions should be blocked on national security grounds. 50 U.S.C. §§ 4565(b) and (l). By law, the President's decisions following CFIUS review are essentially unreviewable. *See id.* § 4565(d) and (e).

On January 3, 2025, President Biden issued an executive order blocking the Merger on national security grounds. Within days, U.S. Steel and Nippon filed two lawsuits: one in the D.C. Circuit challenging the President's order, and the present suit against Cleveland-Cliffs, Inc. (Cliffs), Cliffs CEO Lourenco Goncalves, and David McCall, the President of the United Steelworkers (USW).

As relevant here, the Complaint asserts two claims under federal antitrust law (Counts One and Four) and two under Pennsylvania tortious interference law (Counts Eight and Nine) (the "Expedited Claims"). *See* ECF No. 74 (1/17/25 Order). Stripped of hyperbole, all four claims are based on a central, flawed premise: Cliffs, Mr. Goncalves, and Mr. McCall illegally agreed to engage in a public campaign to persuade the government to block the Merger so that Cliffs could acquire U.S. Steel at a discounted price. The USW made no secret of its preference for a merger

1

between Cliffs and U.S. Steel: the collective bargaining agreement between USW and U.S. Steel created a right for USW to organize a bid for U.S. Steel, and the USW had exercised that contractual right by assigning its right to bid to Cliffs. And since the Merger was announced, the USW has been vocal in its opposition to the Merger and the risks it poses to its collective bargaining relationship with U.S. Steel, the domestic steel industry, and national security. Yet none of the activities allegedly undertaken by the Defendants in connection with the alleged public campaign are within the reach of antitrust law or tortious-interference law.

As set out in Part I of the Argument, the principal reason for this is that Congress, in enacting the antitrust laws, and state courts, in developing the common law of tortious interference, have immunized from liability core speech and petitioning activities so as to give a wide berth to First Amendment freedoms. The law has long recognized that there can be no antitrust or tortious-interference liability for actions in connection with petitioning government officials—even if those actions are undertaken for anti-competitive purposes and even if those actions are deceptive.

The Expedited Claims fail not only for that reason but for independent reasons as well. *See infra* Part II. Further, as explained in Part III, given that these claims are before the Court on an expedited schedule because Plaintiffs have asserted a pressing need for preliminary injunctive relief, we show that the Complaint does not state *any* claim for injunctive relief, because the Norris LaGuardia Act bars injunctive remedies for the type of conduct alleged here even under certain circumstances where damages may be available. The Expedited Claims should be dismissed with prejudice, and the Court should award the Defendants their attorneys' fees and expenses under the Pennsylvania Uniform Public Expression Protection Act (PA-UPEPA). *See infra* Parts IV–V.

**FACTUAL BACKGROUND**

## I.     The Parties

Plaintiffs U.S. Steel and Nippon and Defendant Cliffs are international companies that produce steel. Compl. ¶¶ 32–35. Mr. Goncalves is the Chairman, President, and CEO of Cliffs. *Id.* ¶ 36. In September 2023, Mr. McCall became President of the USW, which is the exclusive representative of approximately 10,000 employees of U.S. Steel. *Id.* ¶¶ 37–38. The USW is also the exclusive representative of approximately 12,000 Cliffs employees. *Id.* ¶ 38.

The USW and U.S. Steel have entered into a series of collective bargaining agreements—commonly referred to as "Basic Labor Agreements" or "BLAs." *Id.* Among other things, U.S. Steel agreed in its BLAs with USW that, in the event U.S. Steel is presented with a bona fide offer to purchase its assets, U.S. Steel would notify the USW and "grant to the USW the right to organize" a competing offer for the assets, as well the right to assign its right-to-bid to a competitor of U.S. Steel. *See* Declaration of Joshua B. Shiffrin, Ex. A (BLA Art. II.D and XI.C).[1] The BLA also sets out obligations that must be satisfied as to the assumption of the agreements between U.S. Steel and the USW in the event U.S. Steel is the subject of a change-of-control transaction. *Id.*

## II.     The Alleged Illegal Agreement

On July 28, 2023, Cliffs made a bid for U.S. Steel's assets. Compl. ¶ 46. On August 3, 2024, the USW published a letter stating that "[t]he USW has a very strong relationship with Cliffs and will not exercise [its] right of a counter offer. It will, rather, unequivocally endorse such a transaction. Moreover, the USW will not endorse anyone other than Cliffs for such a transaction."

---

[1]     On a motion to dismiss, the Court may consider "any matters incorporated by reference or integral to the claim." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (cleaned up). The BLA is referenced in the Complaint. Compl. ¶ 38.

ECF No. 52-3 (8/3/23 Letter). The letter went on to describe the reasons the USW supported an acquisition by Cliffs, including Cliffs' record regarding labor issues. *Id.* USW later exercised its right under the BLA to organize a bid and assigned its right to bid on U.S. Steel to Cliffs. Compl. ¶ 51. Although the August 3 letter does not refer to any "agreement," the Plaintiffs allege that the August 3 letter state the terms of an illegal agreement between the Defendants, *id.* ¶ 47.

### III. The Proposed Nippon-U.S. Steel Merger

After engaging in a strategic review to examine alternatives to Cliffs' bid, U.S. Steel subsequently rejected Cliffs' offer and accepted a competing bid from Nippon, the terms of which were memorialized in an Agreement and Plan of Merger (the "Merger Agreement"). *Id.* ¶ 12, 55; Shiffrin Decl. Ex. 4 at 15–127, ECF No. 50-1 (Merger Agreement). The Merger Agreement stated that, as conditions for closing the Merger, the Merger must receive (1) approval by U.S. Steel's shareholders through a shareholder vote, and (2) CFIUS approval. ECF No. 50-1 at 108.

The Merger was approved by U.S. Steel's shareholders in April 2024. Compl. ¶ 78. However, on January 3, 2025, the CFIUS review process culminated in President Biden issuing an executive order blocking the Merger on national security grounds. Compl. ¶ 98.

### IV. The Acts by Defendants in Furtherance of the Alleged Illegal Agreement

Plaintiffs allege that Defendants (as well as non-party USW, whose actions Plaintiffs ascribe wholesale to Mr. McCall) engaged in a coordinated "public campaign" of "lies and pressure tactics" aimed at preventing the USS-Nippon merger from being consummated through the CFIUS review process. *Id.* ¶¶ 2, 58–59, 62, 178 ("In January 2024, McCall and the USW publicly stated their opposition to the Merger and began pressuring President Biden to block it.").

In furtherance of this public campaign, Plaintiffs allege that Mr. McCall and the USW petitioned the White House and other government officials to block the deal, including by making

direct contact with those officials, *id.* ¶¶ 22, 184, making public appearances with key decisionmakers, *id.* ¶¶ 22, 89, and allegedly offering the Union's political endorsement in exchange for a decision to block the Merger, *id.* ¶ 180. Plaintiffs also allege that Mr. McCall made statements, some alleged to be false, to reporters and union members criticizing Nippon's labor practices and predicting that the Merger would be bad for U.S. workers. *See, e.g.*, *id.* ¶¶ 76, 87, 92.

Plaintiffs also allege that in furtherance of the alleged unlawful agreement, the USW filed a grievance under the BLA contending that the Merger violated the successorship provisions in its BLA with U.S. Steel.[2] *Id.* ¶¶ 56, 60, 86. Finally, Plaintiffs allege Mr. McCall was unwilling to engage in direct negotiations with Nippon (at least to Plaintiffs' satisfaction) pending the outcome of the arbitration of the grievance and CFIUS review. *Id.* ¶¶ 18, 73, 75, 82, 96.

Plaintiffs allege that Mr. Goncalves and Cliffs, too, engaged in direct lobbying of government officials in furtherance of the alleged unlawful agreement with Mr. McCall. *E.g.*, *id.* ¶ 22, 72, 89. As for public statements by Cliffs executives, Plaintiffs appear to take issue primarily with their public statements (a) expressing confidence that President Biden would block the Merger, *id.* ¶¶ 65, 72, 189, and (b) touting Cliffs' good relationship with USW and the effect of that relationship on Cliffs' prospects for eventually acquiring U.S. Steel at a reduced price, *id.* ¶ 50, 62, 74, 78, 84–85, 108, 169. Plaintiffs also allege that Cliffs executives publicly stated that a merger with Nippon, *id.* ¶¶ 63, 66, 70, or with any foreign entity, *id.* ¶¶ 59, 70, would be bad for

---

[2]     In September 2024, the USS-USW Board of Arbitration ruled that Nippon had satisfied the BLA successorship obligations through representations it made in communications to the USW well after the Merger Agreement was executed. *Id.* ¶ 86; Shiffrin Decl. Ex. B (Arbitration Decision). In its decision, the Board of Arbitration found that the USW "was justified in its contractual resistance to accept the NSNA and NSC's representations as to assumption and willingness because those representations were for a period ambiguous, equivocal and at one point plainly conditional." Arbitration Decision ¶ 27.

U.S. workers, and that Mr. Goncalves falsely stated "USW had a legal right to veto any deal with a buyer other than Cliffs," which had the effect of intimidating potential buyers. *Id.* ¶¶ 50, 198.

Plaintiffs further allege that Goncalves sought a meeting with "NSC's top leadership" to propose a deal under which Nippon and Cliffs would "carv[e] up U.S. Steel between the two companies," *id.* ¶ 71, although they do not allege that the proposed meeting ever occurred.

As to injury, Plaintiffs focus on what they contend are missed opportunities that resulted from the government's decision to block the Merger. *See, e.g., id.* ¶¶ 13–16, 163, 166–67 (touting the benefits of the Merger), ¶¶ 207–08 (highlighting the ways U.S. Steel will be less effective if the Merger fails), ¶¶ 14, 30, 166, 269 (lamenting "billions of dollars" in lost capital, profits, and shareholder returns that would have allegedly accrued with the consummation of the Merger). They also allege that, because of Defendants' "rumor campaign" and the resulting uncertainty whether President Biden would block the Merger, U.S. Steel suffered a decline in its stock price, higher-than-average employee attrition, and "reputational damages." *Id.* ¶¶ 80, 95, 171, 273.

## **STANDARD OF REVIEW**

On a Rule 12(b)(6) motion, the court must review the complaint "in the light most favorable to the plaintiff," to determine whether it "contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 325 (3d Cir. 2019) (cleaned up). In performing its analysis, the court disregards "rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *Id.*

**ARGUMENT**

I.    **The *Noerr-Pennington* Doctrine Bars the Expedited Claims**

   A.  The *Noerr-Pennington* Doctrine Bars the Expedited Antitrust Claims

   In a series of cases beginning with *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc*., 365 U.S. 127, 139 (1961), the Supreme Court has held that conduct aimed at influencing governmental action, as well conduct incidental to such conduct, is immune from antitrust liability. Those cases bar any liability for Defendants' alleged public campaign.

   In *Noerr*, an association of railroad companies engaged in a public advocacy campaign aimed at weakening the emerging trucking industry with which it found itself in competition. The campaign was "designed to influence the passage of state laws relating to truck weight limits and tax rates on heavy trucks, and to encourage a more rigid enforcement of state laws penalizing trucks for overweight loads and other traffic violations." *Id.* at 131. It utilized tactics that included "deception of the public, manufacture of bogus sources of reference, and distortion of public sources of information." *Id.* at 140 (cleaned up). An association of truck operators brought suit under Sections 1 and 2 of the Sherman Act. *Id.* at 129.

   Based in part on constitutional considerations arising from the First Amendment right to petition, the Supreme Court held that there could be no antitrust liability under the Sherman Act for "mere attempts to influence the passage or enforcement of laws." *Id.* at 135; *see also id.* at 136 (explaining that this immunity applied to attempts to persuade both legislative and executive actions), 138 (describing constitutional underpinnings of the holding). This was so even if the attempts were undertaken in concert with others for an anticompetitive purpose—that is, even if the "railroads' sole purpose . . . was to destroy the truckers as competitors." *Id.* at 138. The Court

7

explained: "[i]t is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors." *Id.* at 139.

Notably, the Court found this immunity applied broadly to the railroads' publicity campaign that employed deliberately deceptive tactics. *Id.* at 145 ("[D]eception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned."). It also found that the immunity extended to alleged injuries that were only the "incidental effect[s]" of the campaign to influence governmental action—such as claims that some shippers quit doing business with the truckers as a result of the railroads' publicity campaign. *Id.* at 143 & n.23. *See also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988) ("[W]here, independent of any government action, the anticompetitive restraint results directly from private action, the restraint cannot form the basis of antitrust liability if it is 'incidental' to a valid effort to influence government action.") (citing *Noerr*, 365 U.S. at 136).

In *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), the Court applied these principles to an alleged illegal conspiracy between a union and a group of employers, one aim of which was to influence policy decisions by a public entity, the Tennessee Valley Authority. *Id.* at 660–61. Although the Court found that the union could face antitrust liability for conspiring with employers to use its market power over labor for anticompetitive purposes—a point addressed *infra* Part II.A—it re-affirmed *Noerr* with regard to the union's petitioning activity, holding that "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Id.* at 670.

The Supreme Court and the Third Circuit have applied this broad *Noerr-Pennington* immunity in the decades since. In *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991), the Court found no antitrust liability even where an alleged monopolist was accused

of conspiring directly with government officials to achieve an anti-competitive legislative outcome. Very recently, the Third Circuit applied the doctrine to find no liability where Merck intentionally withheld critical data from the FDA regarding its mumps vaccine in order to prevent market entry of new competitors. *In re Merck Mumps Vaccine Antitrust Litig.*, No. 23-3089, 2024 WL 4432076, at *1, 5–6 (3d Cir. Oct. 7, 2024). In *Merck*, the Third Circuit further found that that there was no liability where the alleged "antitrust injury" to a competitor "flows from" government action, and not from the private conduct itself. *Merck*, 2024 WL 4432076, at *9.

These principles are dispositive here. Under the *Noerr-Pennington* doctrine, the Defendants are immune from antitrust liability for their public campaign to influence government action. That is so even if, as alleged, the conduct involved speech directed at the public in addition to government officials (as in *Noerr*), deceptive or false speech (as in *Noerr* and *Merck*), or speech with government officials outside of proper channels and/or involved alleged corruption (as in *Omni*).

Further, as in *Merck*, the alleged "antitrust injury" that forms the basis of Plaintiffs' claims flows entirely from government action, *i.e.*, President Biden's executive order blocking the Merger following CFIUS review. *Supra* 4. The Complaint attributes even the purported injuries of a decline in U.S Steel's stock price and increased employee attrition during the government's review to the uncertainty caused by the public campaign to block the Merger. Compl. ¶¶ 95, 171. Because those injuries, as Plaintiffs concede on the face of the Complaint, were only the incidental result of the public campaign, the conduct underlying those injuries is immune from antitrust scrutiny. *See Noerr*, 365 U.S. at 143; *Allied Tube,* 486 U.S. at 499.

In a telling admission that their central legal theory is infirm, Plaintiffs devote a large section of their Complaint to attempting to argue that the *Noerr-Pennington* doctrine does not bar

its claims. Compl. ¶¶ 174-195. Plaintiffs' efforts, via a series of conclusory allegations, to solve this fatal defect in the central premise of their case falls way short. First, Plaintiffs assert that Defendants' conduct was not "petitioning activity" because it stems from an illegal agreement to further Cliffs' monopolistic aims. However, *Noerr, Pennington*, and their progeny are clear on this point: conduct aimed at influencing government action is immune from liability *even if* it is undertaken in concert with others as a component of a campaign to advance anticompetitive goals. *See Pennington*, 381 U.S. at 669 ("Nothing could be clearer from the Court's opinion [in *Noerr*] than that the anticompetitive purpose did not illegalize the conduct there involved."). Thus, attempting to re-characterize Defendants' petitioning of the government as generic anticompetitive conduct in furtherance of an illegal agreement does not save their claims.

Second, Plaintiffs argue in their Complaint that the so-called "'sham' exception" to *Noerr* immunity applies because, they allege, the regulatory process was a "charade." *See* Compl. ¶¶ 176, 183. Plaintiffs grossly misstate the sham exception. "The 'sham' exception to *Noerr* encompasses situations in which persons use the governmental process itself—as opposed to the outcome of that process—as an anticompetitive weapon." *Omni*, 499 U.S. at 380 (cleaned up). Plaintiffs have pled themselves out of court, as they themselves allege that the Defendants engaged in their campaign to seek a particular outcome and not merely to use government processes to impose costs and delay. *See, e.g.,* Compl. ¶ 178 ("In January 2024, McCall and the USW . . . began pressuring President Biden to block" the Merger.). Further, as a matter of law, the sham exception cannot apply when, as here, the party petitioning the government was successful. *See Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 58 (1993) ("A successful 'effort to influence governmental action . . . certainly cannot be characterized as a sham.'"); *see also Merck*, 2024 WL 4432076, at *5–6.

B.  The *Noerr-Pennington* Doctrine Also Bars Plaintiffs' Tortious Interference Claims

As noted *supra* at 7, the *Noer-Pennington* doctrine is derived in part from the First Amendment right to petition the government. Consequently, there is broad consensus that it applies to claims other than antitrust claims. The Third Circuit, "along with other courts, has by analogy extended the *Noerr-Pennington* doctrine to offer protection to citizens' petitioning activities in contexts outside the antitrust area." *We, Inc. v. City of Phila.*, 174 F.3d 322, 326–327 (3d Cir. 1999). Of particular note, the Third Circuit has applied *Noerr-Pennington* to bar tortious interference claims. *See Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999) (holding *Noerr-Pennington* barred tortious interference claims based on alleged misrepresentations to government regarding a competitor's product in a trade dispute); *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 159 (3d Cir. 1988) ("There can be no tortious action or impropriety when private citizens or public officials exercise their rights to notify the appropriate agencies or mobilize public opinion about a serious violation of the law.").

As discussed in greater detail *infra* Part II.C, Plaintiffs' tortious interference claims are predicated on the same allegations regarding Defendants' alleged public campaign as their antitrust claims. Thus, Counts Eight and Nine are due to be dismissed as a matter of law under the *Noerr-Pennington* doctrine as well.

II.     **Each of the Claims against Mr. McCall Fails for Additional, Independent Reasons**

The foregoing analysis is dispositive of the Expedited Claims against Mr. McCall. There are also additional, independent reasons why each of the Expedited Claims fails to state a claim for relief.

A. <u>The Complaint Does Not State a Claim for Violation of Sherman Act Section 1 Against Mr. McCall</u>

Count One of the Complaint asserts a claim against all Defendants for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which makes illegal certain concerted conduct that unreasonably restrains trade. Among other elements, a plaintiff in a Section 1 claim must prove that a defendant engaged in concerted action to restrain trade, and that "the concerted action was illegal." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997).[3] Plaintiffs' Section 1 claim falters fatally on that element.

As described *supra* at 4, Plaintiffs allege that Defendants conspired to carry out a public campaign that included making false statements to the public, investors, and the government. Even if one were to set aside that the alleged conduct in furtherance of the alleged campaign cannot be the basis for antitrust liability under the *Noerr-Pennington* doctrine, a public campaign is not the type of conduct made illegal by the Sherman Act. That is true even when speech in furtherance of that campaign is alleged to be false or misleading.

In *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, a manufacturer of toilet partitions falsely told government architects in charge of drafting specifications that a competitor's product was a fire hazard. 401 F.3d 123, 125–26, 128 (3d Cir. 2005). The Third Circuit found that providing false information in the marketplace, without more, does not constitute the type of "coercive measure[]" that the Sherman Act was intended to police. *Id.* at 132 ("We fail, however, to find 'restraint' in this alleged activity—and without a 'restraint,' there is 'no restraint of trade.'")

---

[3] To establish antitrust standing, a private plaintiff must also allege that they have suffered an antitrust injury, which is the type of injury that the antitrust laws were enacted to prevent. *See Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1241 (3d Cir. 1987) ("[A]ntitrust law aims to protect competition, not competitors."). Defendant McCall adopts the arguments advanced by Cliffs and Mr. Goncalves showing that Plaintiffs lack antitrust standing.

(citation omitted); *see also Eisai, Inc. v. Sanofi Aventis U.S., LLC,* 821 F.3d 394, 407 n.40 (3d Cir. 2016) (false statements about a rival will only support antitrust liability in "rare circumstances," and only when a plaintiff shows, "at [a] minimum," that (i) consumers relied on the false information and (ii) the plaintiff had no opportunity to correct the false information by supplying accurate information to the market).

Here, Defendants' alleged public campaign did not unlawfully coerce Plaintiffs. As in *Santana Products*, Plaintiffs have alleged no "enforcement device" that prevented U.S. Steel and Nippon from conducting their own public campaign "tout[ing]" the benefits of the Merger to "prove [Defendants] wrong." *Id.* at 133–134; *see also Schachar v. Am. Acad. Of Ophthalmology, Inc.,* 870 F.2d 397, 400 (7th Cir. 1989) ("If such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation, but more speech."). Plaintiffs were just as free to petition the government as Defendants. *Santana Prods.*, 401 F.3d at 134–35; *Eisai*, 821 F.3d at 407 n.40. In short, if Defendants were successful in convincing the government and the public of their point of view, that is the result of successful competition, not its abrogation.

Defendants' case against Mr. McCall is unprecedented in this respect. We have found no case in which a union—let alone an officer of a union, such as Mr. McCall—has been held liable under the Sherman Act for engaging in public advocacy about an employer. To be sure, there are cases, such as *Pennington*, in which courts have found that a union is *capable* of engaging in illegal antitrust conduct through concerted actions with employers. However, in *Pennington*, as in all similar antitrust cases against unions, what was problematic was the union's exercise of its market power over the supply of labor to achieve anti-competitive aims, not the union's exercise of free speech. In *Pennington*, the operator of a small mining operation alleged that a union conspired

with larger operators to impose unsustainable wage and royalty scales on the entire industry, with the "purpose and effect" of driving the smaller competitors out of the market, reducing output, and raising prices. *See* 381 U.S. at 661–62, 668. Aside from the petitioning of public officials at the Tennessee Valley Authority—which the *Pennington* Court expressly held to be outside the reach of antitrust laws—the union's role in the conspiracy was to seek to "impose" untenable contract terms on the smaller companies in collective bargaining, *i.e.,* through the threat of strike. *Id.* at 660, 666–67. Other cases in which a union has been found liable for antitrust claims all involve either a threat to use the union's market power over the labor supply to hamstring a competitor's ability to compete, *see, e.g., Allen Bradley Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers*, 325 U.S. 797, 807 (1945) (threat of work stoppage); *Phila. Rec. Co. v. Mfg. Photo-Engravers Ass'n of Phila.*, 155 F.2d 799, 801 (3d Cir. 1946) (same), or persuasion of a non-labor entity to use *its* market power to impose a vertical restraint on hiring non-unionized firms, *see, e.g., Altemose Constr. Co. v. Bldg. & Constr. Trades Council of Phila. & Vicinity*, 751 F.2d 653, 656 (3d. Cir. 1985); *Larry V. Muko, Inc. v. S.W. Pa. Bldg. & Constr. Trades Council*, 609 F.2d 1368, 1373 (3d Cir. 1979).

Here, although Plaintiffs allege that the USW "controls" the supply of "skilled and experienced steelmaking labor," Compl. ¶ 204, Plaintiffs notably do not follow that allegation with any allegation that Mr. McCall or the USW (at Cliffs' behest or otherwise) ever threatened to withhold labor from Plaintiffs, such as through a strike or picket. Nor, even on Plaintiffs' allegations, did the USW combine with suppliers or customers to impose a vertical restraint on Plaintiffs, their products, or their facilities. Simply put, there are no allegations that Mr. McCall ever directed the USW to use its market power to injure the operations of U.S. Steel or Nippon.

Rather, Plaintiffs merely accuse Mr. McCall of participating in a public campaign involving acts of advocacy or persuasion.[4] As the Third Circuit recognized in *Santana Prods.*, such speech cannot be the basis for a Sherman Act Section 1 Claim. *See Santana Prods.*, 401 F.3d at 132; *Mass. Sch. of L. at Andover, Inc. v. ABA*, 937 F. Supp. 435, 443 (E.D. Pa. 1996) ("[B]ecause the Constitution trumps the Sherman Act," protected speech "cannot be the basis for antitrust liability."), *aff'd*, 107 F.3d 1026 (3d Cir. 1997).

## B. The Complaint Does Not State a Claim for Violation of Sherman Act Section 2 Against Mr. McCall

Mr. McCall adopts the arguments advanced by Cliffs and Goncalves demonstrating that Plaintiffs lack antitrust standing and have also failed to plausibly allege the elements of a conspiracy. Those arguments are sufficient on their own to require dismissal of Plaintiffs' Section 2 claim against Mr. McCall. Mr. McCall also adds the following arguments.

To prove a claim for conspiracy to monopolize under Section 2 of the Sherman Act, a plaintiff must demonstrate (1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged. Where the underlying claim is attempted monopolization, a plaintiff must also show that the scheme has "a dangerous probability of success." *V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc*, 403 F. Supp. 643, 651 (E.D. Pa. 1975), *aff'd*, 565 F.2d 154 (3d Cir. 1977); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

---

[4] None of the non-speech conduct alleged conduct by the USW— *i.e.*, the filing of a contractual grievance under the USW-USS BLA that the Arbitration Board found to be well founded, or the choice to not engage fulsomely in negotiations with a party, Nippon, *see supra* 5— caused the Plaintiffs' antitrust injury, *i.e.*, the blockage of the Merger as a result of President Biden's executive order. Nor is this the type of "illegal conduct" that can be the basis of a Sherman Act claim. In this regard, we note that the USW was under no obligation to negotiate with Nippon at all, let alone to agree to terms that would (in the Plaintiffs' view) help facilitate the success of the Merger.

Count Four appears to assert two theories of liability. The first and principal claim is that Cliffs and Mr. McCall conspired to *attempt* to monopolize the market for automotive steel by consolidating blast furnace production under Cliffs' control. *See* Compl. ¶ 243. The Complaint also alludes, with little elaboration, to a conspiracy to *maintain* Cliffs' alleged monopolies in the electrical steel and iron ore pellet markets. *See id*. ¶ 242. Both theories fail as a matter of law.

Plaintiffs' central allegation with respect to its attempted monopoly claim is that McCall and Cliffs conspired "to force U.S. Steel to merge with Cliffs and prevent U.S. Steel from being sold to *anyone* else." *Id*. ¶ 2 (emphasis in original); *see also id.* ¶¶ 27 ("The unlawful agreement requires the USW to support Cliffs' effort to acquire U.S. Steel, to seek to force U.S. Steel to acquiesce in a deal with Cliffs, and to resist an acquisition of U.S. Steel by anyone other than Cliffs."), 201, 231. As Plaintiffs tell it, when U.S. Steel rejected the Cliffs/USW bid and accepted Nippon's offer in late 2023, the conspirators' focus shifted to blocking the Merger through their public campaign. ¶¶ 58, 178. Their goal, allegedly, was and remains to consolidate all integrated blast furnace production in North America under Cliffs' control, in order to slow the transition to more environmentally friendly modes of production. *Id.* ¶¶ 4, 239; *see also id.* ¶¶ 5, 8.

Plaintiffs' attempted-monopoly theory fails because the nature of the purported conspiracy precludes a finding that it has a "dangerous probability of success." *V. & L. Cicione*, 403 F. Supp. at 651. On the contrary, the success of the conspiracy—as it is described in the Complaint—is contingent on a series of events that are both speculative as well as within U.S. Steel's control. Assuming the D.C. Circuit does not overturn President Biden's order (despite Plaintiffs' assurances that they will prevail in that case, *see* Compl. ¶ 23), U.S. Steel would need to decide to put itself up for sale again. Then Cliffs would need to decide to bid for its assets, win its bid, and secure the approval of both U.S. Steel's board and shareholders. And if those contingencies were to occur, a

potential merger between U.S. Steel and Cliffs would be subject to scrutiny by "antitrust regulators," a mandatory process which Plaintiffs themselves contend would result in Cliffs being forced to make "substantial divestitures" of its assets, precisely to prevent it from obtaining a monopoly. *Id.* ¶¶ 52, 68; *see* 15 U.S.C. § 18a (requiring companies to file premerger notifications with the Federal Trade Commission and the Department of Justice).

All of that is to say, even if events were to play out exactly according to Plaintiffs' conjecture, the conspiracy would *still* not result in the successful monopolization of any relevant market.[5] As such, not only is the Complaint devoid of factual allegations plausibly establishing a "dangerous probability that monopoly would occur, . . . it does not show even a faint possibility of success." *V & L Cicione*, 403 F. Supp. at 652.

As to Plaintiffs' maintenance-of-monopoly, that theory fails because the non-conclusory allegations of the Complaint do not plausibly establish that Mr. McCall had the "specific intent to monopolize." *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010). Specific intent means "an intent which goes beyond the mere intent to do the act." *Id.* at 257. While it can be inferred from a defendant's conduct, specific intent to monopolize cannot be inferred from conduct that is "predominantly motivated by legitimate business aims." *Phila. Taxi Ass'n, v. Uber Techs., Inc.*, 886 F.3d 332, 341 (3d Cir. 2018) (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 627 (1953)).

---

[5]     Plaintiffs allege that U.S. Steel is, independent of any action by Defendants, planning to idle much of its blast furnace capacity. Compl. ¶¶ 14, 166. Even if U.S. Steel follows through on that plan, and that results in increased market share for Cliffs, the acquisition of a monopoly via "superior product, business acumen, or historic accident" is not unlawful. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *see also United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945) ("The successful competitor, having been urged to compete, must not be turned upon when he wins.").

At several places in the Complaint, Plaintiffs allude obliquely to conduct by the *USW* to "aid[] and abet[]" Cliffs' acquisitions of other firms, starting as early as 2020. *See* Compl. ¶ 158; *see also id.* ¶ 102 (alleging that Cliffs' "serial acquisition strategy" enjoyed USW's long-term support). However, nowhere does the Complaint explain what, exactly, *Mr. McCall individually* did to "aid and abet" those acquisitions (particularly considering that Mr. McCall did not become President until after USW's endorsement of Cliffs' bid in August 2023, *see id.* ¶¶ 37, 47) or why he would have been inclined to do so. Nor does the Complaint allege any facts that plausibly establish intent on the part of Mr. McCall specifically to help Cliffs maintain its alleged market dominance in the electrical steel or iron ore markets, rather than intend to merely pursue the union's legitimate and stated interest in supporting what it perceived to be a merger with an employer with which has a good relationship in Cliffs. *See supra* 3–4 (citing 8/3/23 letter). Indeed, there is nothing suspect or unlawful about the USW giving its endorsement to and pursuing a relationship with, an employer that, based on past experience, it believes will benefit its members in the long term over one that it believes will not. Instead, Plaintiffs rely only on conclusory allegations that recite the "specific intent" element, *see* Compl. ¶ 242, which cannot withstand a motion to dismiss. *See Howard Hess*, 602 F.3d at 258 ("At bottom, the Plaintiffs' allegations of specific intent rest not on facts but on conclusory statements strung together with antitrust jargon.").

C.   The Complaint Does Not State a Tortious Interference Claim Against Mr. McCall

In addition to their various federal claims, Plaintiffs advance state law claims that Mr. McCall tortiously interfered with "existing contractual relations," Compl. ¶¶ 265–74 (Count Eight), and with a "prospective business relationship," *id.* ¶ 275–85 (Count Nine). In both counts, the "contractual relations" and "prospective business relationship" referred to is the relationship

between the two Plaintiffs, Nippon and U.S. Steel. *Id.* ¶¶ 266, 276. The "prospective business relationship" claim also refers to relationships with unspecified "other bidders." *Id.* at ¶ 279.

Counts Eight and Nine are not conspiracy claims, so the question as to both claims is whether Plaintiffs have alleged non-conclusory facts to that plausibly establish that Mr. McCall interfered with an existing or prospective relationship through his *personal* conduct. Plaintiffs assert that Mr. McCall's "interference" has sought to "undermine" the relationship between the Plaintiffs, induce Nippon to breach the Merger Agreement, and "cause a termination of the Merger Agreement by preventing the conditions necessary for its closing from being achieved." *Id.* ¶ 267. Plaintiffs further allege that Mr. McCall's "interference" has "delayed" their efforts to close the Merger, made Nippon's performance "more expensive and burdensome," and deprived U.S. Steel of "synergies" and "substantial profits." *Id.* ¶¶ 268–70, 279–80. Although Plaintiffs studiously do not identify what specific conduct they contend constitutes Mr. McCall's or other Defendants' "interference," it is evident from these allegations that they are referring to the alleged public campaign to persuade the government to block the Merger.

At the outset, both tortious interference claims are barred by the *Noerr-Pennington* doctrine to the extent they are premised on Mr. McCall's alleged participation in the public campaign. *See supra* 10–11. Both claims are also due to be dismissed for additional, independent reasons.

First, Plaintiffs' claim for tortious interference with an existing contract fails because there has been no breach or non-performance by U.S. Steel or Nippon—a necessary element of the claim. *See Salsberg v. Mann*, 310 A.3d 104, 119 (Pa. 2024); Restatement (Second) of Torts § 766.

Second, the Complaint does not—and could not—plausibly allege causation, *i.e.*, that the government would not have blocked the Merger but for Defendants' efforts. In fact, it would be beyond the provenance of this Court to decide such a question. *Cf. Omni*, 499 U.S. at 377

("[D]etermination of 'the public interest' in the manifold areas of government regulation entails not merely economic and mathematical analysis but value judgment, and [the Court's antitrust jurisprudence] was not meant to shift that judgment from elected officials to judges and juries.").

Mr. McCall adopts all arguments made by Cliffs and Mr. Goncalves on these points on his own behalf. There is an additional, independent reason why the claim against Mr. McCall must be dismissed as a matter of law, which is that it is preempted by federal labor law. Federal labor law preempts state laws when it is "clear or may fairly be assumed" that the underlying conduct "protected by § 7 of the National Labor Relations Act, . . . constitute[s] an unfair labor practice under § 8" of the Act, or is "arguably subject to § 7 or § 8."[6] *San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 244–45 (1959); *see Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 321 (3d Cir. 2004). Federal courts applying *Garmon* have regularly held that state tort actions for interference with a business or contractual relationship are preempted. *E.g., Loc. 926, Int'l Union of Operating Eng'rs v. Jones*, 460 U.S. 669, 677–78 (1983); *BE & K Constr. Co. v. United Bhd. of Carpenters*, 90 F.3d 1318, 1328 (8th Cir. 1996); *Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240–41 (7th Cir. 1996); *San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1235 (9th Cir. 1997); *Laborers' Pension Fund v. Murphy Paving & Sealcoating, Inc.*, 450 F. Supp. 3d 815, 829–31 (N.D. Ill. 2020).

Here, Mr. McCall is alleged to have taken part in a multi-pronged public campaign to convince the government to block the U.S. Steel-Nippon merger. As part of that campaign, the

---

[6]     Section 7 of the NLRA protects the right of employees "to form, join, or assist labor organizations, to bargain collectively, . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8, in turn, prohibits a number of employer- and union-side "unfair labor practices," including interference with employees' Section 7 rights, anti-union discrimination, refusal to bargain in good faith, and several types of secondary boycott activity. 29 U.S.C. § 158(a), (b).

Union, sometimes over the signature of Mr. McCall, publicly expressed its view that the Merger would adversely affect U.S. Steel's employees' working conditions and job security. USW also directly lobbied CFIUS and the Biden Administration to block the Merger.

All of the public statements attributable to Mr. McCall directly concern Nippon's trade and labor practices (as well as U.S. Steel's leadership), and, therefore, the Merger's effect on the jobs of USW's represented employees. *See* Compl. ¶¶ 76, 87, 92, 96. In addition, the terms of successorship themselves are a mandatory subject of bargaining that directly affect employees' working conditions. *United Mine Workers of Am.*, 231 N.L.R.B. 573, 575 (1977), *enforced in relevant part by Lone Star Steel Co. v. NLRB*, 639 F.2d 545, 556 (10th Cir. 1980). In short, Mr. McCall's public statements in his capacity as USW President about USW's dispute with U.S. Steel regarding whether the Plaintiffs had satisfied their BLA successorship obligations were "concerted activities for the purpose of collective bargaining or other mutual aid or protection" protected by Section 7. *Washington Hosp. Ctr. Corp.*, 360 N.L.R.B. 846, 849 (2014); *see also Allied Aviation Serv. Co. of N.J., Inc.*, 248 N.L.R.B. 229 (1980), *enforced* 636 F.2d 1210 (3d. Cir. 1980).

Turning next to USW's lobbying activities, federal labor laws do not—and cannot—proscribe the right to petition one's government. *See Venetian Casino Resort, L.L.C. v. NLRB*, 793 F.3d 85, 89–91 (D.C. Cir. 2015). Section 7 protects employees who "seek to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship," including political advocacy. *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978); *see also BE & K Constr. Co.*, 329 N.L.R.B. 717, 725 (1999) (union's lobbying government officials was protected activity), *rev'd on other grounds* 536 U.S. 516 (2002); *Petrochem Insulation, Inc.*, 330 N.L.R.B. 47, 49 (1999) (union's intervening in administrative proceedings was protected activity).

Nor does the allegation that some of Mr. McCall's statements were false change this analysis. *See San Antonio Cmty. Hosp.*, 125 F.3d at 1235 (federal law preempts a state-law interference with prospective economic advantage against union for posting a false or misleading banner); *cf. Linn v. United Plant Guard Workers*, 383 U.S. 53, 58 (1966) ("Labor disputes are ordinarily heated affairs" that "are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions.").

Plaintiffs' allegations about the non-speech conduct attributable to Mr. McCall fare no better. The USW's filing of a grievance seeking the enforcement of a collectively bargained for right—here, the union's rights with respect to a change-of-control transaction—is conduct protected by Section 7 of the NLRA. *NLRB v. City Disposal Sys. Inc*., 465 U.S. 822, 840 (1984). Though there is no basis for any contention that the USW had an obligation to negotiate with Nippon during the pendency of the Merger, even if there was such an obligation, failing to negotiate in good faith falls squarely within the NLRB's jurisdiction. *See Jones*, 460 U.S. at 680 ("[P]reemption doctrine not only mandates the substantive preemption by the federal labor law in the areas to which it applies, but also protects the exclusive jurisdiction of the NLRB over matters arguably within the reach of the Act."); *Mack Trucks, Inc. v. UAW*, 856 F.2d 579, 586 (3d Cir. 1988) (discussing how "violations of good faith bargaining . . . would trigger the NLRB's exclusive jurisdiction"). [7]

---

[7]     If anything, Plaintiffs' lawsuit appears to be unlawful retaliation against Mr. McCall for his protected conduct. *See Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 744 (1983) (holding it unlawful for an employer to initiate a baseless lawsuit to retaliate against the exercise of rights under Section 7 of the NLRA).

### III. Plaintiffs' Prayer for Injunctive Relief Fails as a Matter of Law

For the reasons stated above, the Court should dismiss the expedited claims in their entirety. We would be remiss if we did not point out, however, that there is an additional reason, stemming from federal labor law, why Plaintiffs have failed to state a claim for *injunctive* relief with respect to the alleged public campaign that is the heart of this case.

Under Section 4 of the Norris LaGuardia Act (NLGA), a federal court cannot issue an injunction "in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute" from, amongst other things, "(e) Giving publicity to the existence of, or the facts involved in, any labor dispute . . . ; (g) Advising or notifying any person of an intention to do any of the acts heretofore specified; [or] (h) Agreeing with other persons to do or not to do any of the acts heretofore specified." 29 U.S.C. § 104. Put simply, Section 4 is a statutory ban against injunctions restraining speech and publicity campaigns that arise out of labor disputes. And here, the injunction sought by the Complaint would (a) restrain speech and (b) do so in the context of a labor dispute.

Plaintiffs have told the Court that they seek an injunction restraining speech. *See* Pls.' Reply in Supp. of Expedited Proceedings 8, ECF No. 56 (Plaintiffs' brief explaining that they seek to enjoin Defendants from, among other things, "making false assertions concerning the Merger.").

The Complaint's allegations further demonstrate that this case "involv[es]" a labor dispute. Plaintiffs allege that USW, a union representing thousands of employees at U.S. Steel, has responded to a potential merger that it believes is not in the interest of its represented employees by engaging in a campaign both to exercise its rights under the successorship provisions of its collectively bargained BLA, and publicly advocating and petitioning to prevent that merger.

Issues concerning successorship and change-of-control transactions on a bargaining unit are directly related to employees' working conditions. *See supra* 21. To this point, the USW has bargained for successorship protections in its BLA with U.S. Steel, including the right to organize a bid to compete with a potential suitor for U.S. Steel and to assign that right to another entity, such as Cliffs. *Supra* 21. Thus, the protection of Section 4 of the NLGA applies with full force in this case, prohibiting any injunction against Mr. McCall—or, for that matter, the other Defendants—related to the alleged public campaign.

Nor does it matter for purposes of the NLGA that Plaintiffs allege an unlawful antitrust conspiracy. That is plain both from the text of the statute, *see* 29 U.S.C. §§ 104(h) and 105, and precedent, *see Burlington N. Santa Fe Ry. Co. v. Int'l Bhd. of Teamsters Loc. 174*, 203 F.3d 703, 712 n.12 (9th Cir. 2000) ("[T]he [NLGA] bars injunctive relief in labor disputes even when the union's actions violate the antitrust laws.") (citing *Milk Wagon Drivers' Union, Loc. No. 753 v. Lake Valley Farm Prods.*, 311 U.S. 91, 103 (1940) ("For us to hold . . . that the federal courts have jurisdiction to grant injunctions in cases growing out of labor disputes, merely because alleged violations of the Sherman Act are involved, would run counter to the plain mandate of the act and would reverse the declared purpose of Congress."); *Crowe & Assocs., Inc. v. Bricklayers & Masons Union Local No. 2 of Detroit*, 713 F.2d 211, 214 (6th Cir. 1983) ("[T]he entire history of the [NLGA] suggests that activities must not be enjoined merely because they violate the antitrust laws.").[8]

---

[8] The NLGA's statutory bar against injunctions against speech arising out of a labor dispute obviates the need to consider whether the First Amendment's prior restraint doctrine would bar an injunction based on the allegations here. *See generally ACLU v. City of Pittsburgh*, 586 F. Supp. 417, 421 (W.D. Pa. 1984) ("The doctrine of prior restraint, reduced to its simplest form, is that no prior restraint may prevent exercise of free speech, although criminal or civil action may result from that speech." (citing *Near v. Minnesota*, 283 U.S. 697 (1931)).

IV.    **The Expedited Claims Should be Dismissed with Prejudice**

As demonstrated in Parts I and II, the Expedited Claims fail on the fundamental ground that Plaintiffs are attempting to attach liability to speech and petitioning conduct that is immunized from antitrust and tortious interference liability by the *Noerr-Pennington* doctrine and that, even independent of that immunity, is not actionable under either antitrust or tortious-interference law. Because those defects go to the fundamental premise of the Expedited Claims, granting leave to amend those claims would be futile and therefore not in the interests of justice. *See In re NAHC, Inc. Secs. Litig.*, 306 F.3d 1314, 1332 (3rd Cir. 2002). Moreover, Plaintiffs are sophisticated, well-represented litigants who have filed a 93-page, detailed complaint describing their claims (and anticipating the primary argument against those claims). There is no reason to believe they need more time to develop additional facts or legal theories.

V.    **Mr. McCall Should be Awarded his Legal Fees and Expenses**

For the reasons articulated by Cliffs and Mr. Goncalves in their brief, the claims against Mr. McCall should be dismissed, and he should be awarded his attorneys' fees and expenses, under the PA-UPEPA. 42 Pa. Cons. Stat. § 8340.18.

## CONCLUSION

For the foregoing reasons, and those stated in the brief of Cliffs and Mr. Goncalves, Counts One, Four, Eight, and Nine of the Complaint should be dismissed with prejudice, and Mr. McCall should be awarded his attorneys' fees, court costs, and expenses.

Dated: February 4, 2025

Respectfully submitted,

*/s/ Michael Healey*
Micheal Healey (Penn. Bar No. 27283)
HEALEY BLOCK LLC
PO Box 81918
Pittsburgh, PA 15217
(412) 760-0342
mike@unionlawyers.net

David R. Jury (Penn. Bar No. 77015)
Nathan L. Kilbert (Penn. Bar No. 313939)
Anthony Resnick (Penn. Bar No. 319682)
UNITED STEELWORKERS
INTERNATIONAL
60 Boulevard of the Allies, Room 807
Five Gateway Center
Pittsburgh, PA 15222
(412) 562-2545
djury@usw.org
nkilbert@usw.org
aresnick@usw.org

Bruce Lerner*
Leon Dayan*
Joshua Shiffrin*
Derrick C. Rice*
Rachel Casper*
BREDHOFF & KAISER, P.L.L.C.
805 15th Street NW
Suite 1000
Washington, D.C. 20005
(202) 842-2600
blerner@bredhoff.com
ldayan@bredhoff.com
jshiffrin@bredhoff.com
drice@bredhoff.com
rcasper@bredhoff.com

*Admited* Pro Hac Vice

*Counsel to Defendant David McCall*