**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

```
-------------------------------------------------- X
UNITED STATES STEEL CORPORATION,              :
NIPPON STEEL CORPORATION, and NIPPON          :
STEEL NORTH AMERICA, INC.,                     :        Civil Action No.: 2:25-cv-15
                                               :
            Plaintiffs,                        :
                                               :
        vs.                                    :
                                               :
CLEVELAND-CLIFFS INC., LOURENCO               :
GONCALVES, and DAVID McCALL,                   :
                                               :
            Defendants.                        :
-------------------------------------------------- X
```

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**
**COUNTS I, IV, VIII, AND IX**

Thomas E. Birsic
K&L GATES LLP
210 Sixth Avenue
Pittsburgh, PA 15222

Grant R. Mainland
MILBANK LLP
55 Hudson Yards
New York, NY 10001

Jonathan M. Moses
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019

*Attorneys for Plaintiff United States Steel*
*Corporation*

Daniel I. Booker
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222

David B. Hennes
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036

*Attorneys for Plaintiffs Nippon Steel*
*Corporation and Nippon Steel North*
*America, Inc.*

(*Additional counsel listed on signature page*)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ......................................................................................3

    A.    Cliffs Acquires a Monopoly in Critical Steel Markets. ...............................3

    B.    Cliffs and the USW Agree to Force a Cliffs Acquisition of U. S. Steel.................5

    C.    U. S. Steel Commences an Auction Process and Agrees to a Deal with NSC.............................................................................................................7

    D.    After Losing the Auction, Defendants Wage War on Plaintiffs and the Merger........................................................................................................8

    E.    After the Merger Is Blocked, Defendants Try Again to Force a Sale to Cliffs. .......................................................................................................12

LEGAL STANDARD...........................................................................................13

ARGUMENT ......................................................................................................14

I.    THE FIRST AMENDMENT DOES NOT IMMUNIZE DEFENDANTS' UNLAWFUL AGREEMENT. .....................................................................14

    A.    The Complaint Challenges an Illegal Agreement, Not Constitutionally Protected Speech.....................................................................................14

    B.    Plaintiffs' Claims Are Not Barred by the *Noerr-Pennington* Doctrine. ................18

        1.    The Complaint Challenges Unlawful Private Commercial Conduct, Not Protected Petitioning Activity.............................................18

        2.    The Complaint Alleges Harm Independent of and Not Incidental to Any Petitioning Activity. .......................................................23

        3.    Any Purported Petitioning Activity Is an Unprotected "Sham." ..............25

II.    PLAINTIFFS ADEQUATELY PLEAD CLAIMS UNDER THE SHERMAN ACT.....................................................................................................27

    A.    The Complaint Adequately Pleads an Agreement. ................................27

    B.    The Complaint Adequately Pleads Antitrust Standing. ........................34

    C.    The Complaint Adequately Pleads a Conspiracy to Monopolize. ........36

III.    PLAINTIFFS ADEQUATELY PLEAD CLAIMS FOR TORTIOUS INTERFERENCE..................................................................................38

    A.    The Complaint Adequately Pleads Tortious Interference with Contract..............38

B.     The Complaint Adequately Pleads Tortious Interference with Prospective Contractual Relations.............................................................................41

C.     The Complaint Adequately Pleads the Absence of Privilege. ................................43

IV.    DEFENDANT MCCALL'S SEPARATE ARGUMENTS ARE MERITLESS. ..............44

A.     Plaintiffs Have Adequately Alleged a Section 1 Claim Against McCall. .............44

B.     Plaintiffs Have Adequately Alleged a Section 2 Claim Against McCall. .............45

C.     Plaintiffs' Tortious Interference Claims Against McCall Are Not Preempted. ..................................................................................................46

D.     The Norris-LaGuardia Act Does Not Bar Injunctive Relief.................................47

V.    PA-UPEPA HAS NO APPLICATION TO PLAINTIFFS' STATE LAW CLAIMS. ...........................................................................................................49

CONCLUSION......................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acumed LLC* v. *Advanced Surgical Servs., Inc.*,
   561 F.3d 199 (3d Cir. 2009)........................................................................41

*Allegheny Eng'g Co.* v. *Havtech LLC*,
   2018 WL 4599882 (W.D. Pa. Jan. 30, 2018)..............................................44

*Allen Bradley Co.* v. *Local Union No. 3, Intern. Broth. of Elec. Workers*,
   325 U.S. 797 (1945)....................................................................................45

*Allen Fam. Foods, Inc.* v. *Capitol Carbonic Corp.*,
   2011 WL 1205138 (Del. Super. Ct. Mar. 31, 2011) .........................40 n.23

*Altemose Constr. Co.* v. *Bldg. & Constr. Trades Council of Philadelphia &
   Vicinity*, 751 F.2d 653 (3d Cir. 1985) .......................................................47

*Am. Freedom Def. Initiative* v. *Se. Penn. Transp. Auth.*,
   92 F. Supp. 3d 314 (E.D. Pa. 2015) ....................................................16 n.8

*Avenarius* v. *Eaton Corp.*,
   898 F. Supp. 2d 729 (D. Del. 2012).....................................................31 n.17

*Bell Atlantic Corp.* v. *Twombly*,
   550 U.S. 544 (2007).......................................................................14, 32, 33

*Bensel* v. *Allied Pilots Ass'n*,
   387 F.3d 298 (3d Cir. 2004).......................................................................46

*BIEC Int'l, Inc.* v. *Glob. Steel Servs., Ltd.*,
   791 F. Supp. 489 (E.D. Pa. 1992) .............................................................38

*Black Box Corp.* v. *Avaya, Inc.*,
   2008 WL 4117844 (D.N.J. Aug. 29, 2008) ...............................................37

*Boshears* v. *PeopleConnect, Inc.*,
   2022 WL 888300 (W.D. Wash. Mar. 25, 2022) .........................................49

*Bral Corp.* v. *Johnstown Am. Corp.*,
   919 F. Supp. 2d 599 (W.D. Pa. 2013)...................................................38, 41

*Burlington N. Santa Fe Ry. Co.* v. *Int'l Bhd. of Teamsters Loc. 174*,
   203 F.3d 703 (9th Cir. 2000) ...............................................................47, 48

*Burtch* v. *Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011).............................................................33 n.19

*Busch* v. *Domb*,
  2017 WL 6525779 (E.D. Pa. Dec. 21, 2017) ................................40 n.22

*Cal. Motor Transp. Co.* v. *Trucking Unlimited*,
  404 U.S. 508 (1972)........................................................... *passim*

*Cap. Builders, Inc.* v. *Twp. of Robinson*,
  2024 WL 1285776 (W.D. Pa. Mar. 26, 2024) .....................................26

*City of Columbia* v. *Omni Outdoor Advert., Inc.*,
  499 U.S. 365 (1991)......................................................................21 n.10

*Coal. for ICANN Transparency, Inc.* v. *VeriSign, Inc.*,
  611 F.3d 495 (9th Cir. 2010) .................................................................22

*Connell Constr. Co.* v. *Plumbers and Steamfitters Loc. Union No. 100*,
  421 U.S. 616 (1975)..............................................................................3, 45

*Continental Ore Co.* v. *Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962).................................................................18, 19, 30

*Crowe & Assocs., Inc.* v. *Bricklayers & Masons Union Loc. No. 2 of Detroit*,
  713 F.2d 211 (6th Cir. 1983) ...............................................................48

*Crystallex Int'l Corp.* v. *Petroleos De Venezuela, S.A.*,
  879 F.3d 79 (3d Cir. 2018)....................................................................40

*CT Espresso LLC* v. *Lavazza Premium Coffees Corp.*,
  2022 WL 17156759 (S.D.N.Y. Nov. 22, 2022) ....................................21

*Danieli Corp.* v. *SMS Grp., Inc.*,
  2022 WL 2541981 (W.D. Pa. Mar. 18, 2022) ...............................25 n.13

*Deborah Heart & Lung Ctr.* v. *Penn Presbyterian Med. Ctr.*,
  2012 WL 1390249 (D.N.J. Apr. 19, 2012) ............................................33

*E. Frank Hopkins Seafood, Co.* v. *Olizi*,
  2017 WL 2619000 (E.D. Pa. June 16, 2017) ........................................43

*E.R.R. Presidents Conf.* v. *Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961)......................................................................21, 25

*ES Dev., Inc.* v. *RWM Enterprises, Inc.*,
  939 F.2d 547 (8th Cir. 1991) ...................................................... *passim*

iv

*Evans Hotels, LLC* v. *Unite Here Loc. 30*,
   433 F. Supp. 3d 1130 (S.D. Cal. 2020)......................................................................21 n.10

*Flood* v. *Kuhn*,
   309 F. Supp. 793 (S.D.N.Y. 1970) ...................................................................................49

*FTC* v. *Superior Court Trial Lawyers Ass'n*,
   493 U.S. 411 (1990)...................................................................................................15, 16

*Galveston Linehandlers, Inc.* v. *Int'l Longshoremen's Ass'n*,
   140 F. Supp. 2d 741 (S.D. Tex. 2001) ............................................................................46

*Gemini Physical Therapy & Rehab., Inc.* v. *State Farm Mut. Auto. Ins. Co.*,
   40 F.3d 63 (3d Cir. 1994)................................................................................................39

*Gen. Nutrition Corp.* v. *Javaid*,
   2018 WL 1089758 (W.D. Pa. Feb. 26, 2018) .................................................................27

*Geomatrix, LLC* v. *NSF Int'l*,
   82 F.4th 466 (6th Cir. 2023) ...........................................................................21 n.11, 24

*Glacier Northwest, Inc.* v. *International Brotherhood*
   *of Teamsters Local Union No. 174*, 598 U.S. 771 (2023) ..............................................46

*Gulf States Reorganization Grp., Inc.* v. *Nucor Corp.*,
   466 F.3d 961 (11th Cir. 2006) ........................................................................................35

*Hanover 3201 Realty, LLC* v. *Vill. Supermarkets, Inc.*,
   806 F.3d 162 (3d Cir. 2015)...............................................................................18, 25, 26

*hiQ Labs, Inc.* v. *Linkedin Corp.*,
   485 F. Supp. 3d 1137 (N.D. Cal. 2020) ..........................................................................22

*Howard Hess Dental Lab'ys. Inc.* v. *Dentsply Intern., Inc.*,
   602 F.3d 237 (3d Cir. 2010)......................................................................................27, 37

*IGT* v. *Alliance Gaming Corp.*,
   2006 WL 8441916 (D. Nev. Jan. 10, 2006).............................................................22 n.12

*In re Buspirone Patent Litig.*,
   185 F. Supp. 2d 363 (S.D.N.Y. 2002).............................................................................22

*In re Cardizem CD Antitrust Litig.*,
   105 F. Supp. 2d 618 (E.D. Mich. 2000)..........................................................................19

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   313 F. Supp. 3d 931 (N.D. Ill. 2018) ..............................................................................29

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
    733 F. Supp. 2d 1348 (N.D. Ga. 2010) .........................................................32 n.18

*In re Diisocyanates Antitrust Litig.*,
    2022 WL 17668470 (W.D. Pa. Oct. 19, 2022) .......................................................34

*In re Domestic Drywall Antitrust Litig.*,
    2019 WL 3254090 (E.D. Pa. July 19, 2019).........................................................31

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004)................................................... 33 & n.19, 34 n.20

*In re Flat Glass Antitrust Litig. (II)*,
    2009 WL 331361 (W.D. Pa. Feb. 11, 2009) ........................................................13

*In re Generic Pharms. Pricing Antitrust Litig.*,
    338 F. Supp. 3d 404 (E.D. Pa. 2018) ...................................................... 31 & n.17

*In re NCAA Student-Athlete Name & Likeness Litig.*,
    2010 WL 5644656 (N.D. Cal. Dec. 17, 2010) .......................................................15

*In re Suboxone Antitrust Litig.*,
    622 F. Supp. 3d 22 (E.D. Pa. 2022) ...................................................... 22 & n.12, 23

*In re Travel Agency Comm'n Antitrust Litig.*,
    898 F. Supp. 685 (D. Minn. 1995)........................................................32 n.18

*In re Valassis Commc'ns, Inc.*,
    2006 WL 1367833 (F.T.C. Complaint Apr. 19, 2006) ...................................32 n.18

*Inline Packaging, LLC* v. *Graphic Packaging Int'l, Inc.*,
    164 F. Supp. 3d 1117 (D. Minn. 2016).........................................................26 n.15

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)........................................................33 n.19

*Int'l Constr. Prods. LLC* v. *Caterpillar Inc.*,
    2016 WL 4445232 (D. Del. Aug. 22, 2016) ........................................................31

*Int'l Union, United Auto., Aerospace &*
    *Agr. Implement Workers of Am., UAW* v. *Mack Trucks, Inc.*,
    820 F.2d 91 (3d Cir. 1987)........................................................47

*Invidior Inc.* v. *Dr. Reddy's Laby's S.A.*,
    2020 WL 4932547 (D.N.J. Aug. 24, 2020) ........................................................37

*Jefferson Cnty. Sch. Dist. No. R-1* v. *Moody's Investor's Servs., Inc.*,
    175 F.3d 848 (10th Cir. 1999) ........................................................15

*Krajewski* v. *Gusoff*,
    53 A.3d 793 (Pa. Sup. Ct. 2012) ...........................................................................16

*Lifewatch Services Inc.* v. *Highmark Inc.*,
    902 F.3d 323 (3d Cir. 2018)...................................................................................31

*Lin* v. *Rohm & Haas Co.*,
    865 F. Supp. 2d 649 (E.D. Pa. 2012) ....................................................................42

*Litton Sys., Inc.* v. *Am. Tel. & Tel. Co.*,
    700 F.2d 785 (2d Cir. 1983)...................................................................................19

*Maio* v. *Aetna, Inc.*,
    221 F.3d 472 (3d Cir. 2000)...................................................................................14

*Mass. Sch. of Law at Andover, Inc.* v. *Am. Bar Ass'n*,
    107 F.3d 1026 (3d Cir. 1997).....................................................................21 n.11, 24

*Mass. Sch. of Law at Andover, Inc.* v. *Am. Bar Ass'n*,
    937 F. Supp. 435 (E.D. Pa. 1996) ...............................................................17, 24

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
    475 U.S. 574 (1986)...............................................................................................33

*Mid-Tex. Comm'cns Sys., Inc.* v. *Am. Tel. and Tel. Co.*,
    615 F.2d 1372 (5th Cir. 1980) ...............................................................................19

*Mid-West Paper Prods. Co.* v. *Continental Grp., Inc.*,
    596 F.2d 573 (3d Cir. 1979)...................................................................................36

*Milk Wagon Drivers' Union, Loc. No. 753* v. *Lake Valley Farm Prods.*,
    311 U.S. 91 (1940).................................................................................................48

*Monsanto Co.* v. *Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)...............................................................................................32

*Nat'l Soc'y of Pro. Engs.* v. *United States*,
    435 U.S. 679 (1978)...............................................................................................15

*Neyer, Tiseo & Hindo, Ltd.* v. *Russell*,
    1993 WL 334951 (E.D. Pa. Aug. 26, 1993) ..........................................................39

*NIBCO Inc.* v. *Viega LLC*,
    354 F. Supp. 3d 566 (M.D. Pa. 2018).....................................................................44

*Norfolk Monument Co.* v. *Woodlawn Mem'l Gardens, Inc.*,
    394 U.S. 700 (1969)...............................................................................................30

*P.V.C. Realty ex rel. Zamias* v. *Weis Markets*,
  56 Pa. D. & C. 4th 304 (Cambria Cty. Ct. Com. P. 2000) .......................................................40

*Phila. Marine Trade Ass'n* v. *Int'l Longshoremen's Ass'n*,
  368 F.2d 932 (3d Cir. 1966) ...........................................................................................47

*Phillips* v. *Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ...........................................................................................32

*Premier Comp Sols. LLC* v. *UPMC*,
  163 F. Supp. 3d 268 (W.D. Pa. 2016) .......................................................................... *passim*

*Pro. Real Est. Invs., Inc.* v. *Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993) ................................................................................................26 n.15

*Ride the Ducks of Philadelphia, LLC* v. *Duck Boat Tours, Inc.*,
  2005 WL 1583514 (3d Cir. 2005) ...................................................................................38

*Rossi* v. *Standard Roofing, Inc.*,
  156 F.3d 452 (3d Cir. 1998) ...........................................................................................29

*San Diego Building Trades Council* v. *Garmon*,
  539 U.S. 236 (1959) .....................................................................................................46

*Sandoz Inc.* v. *Lannett Co., Inc.*,
  544 F. Supp. 3d 505 (E.D. Pa. 2021) ................................................................42, 43 n.26, 44

*Schachar* v. *Am. Acad. of Opthalmology, Inc.*,
  870 F.2d 397 (7th Cir. 1989) .........................................................................................17

*Sears, Roebuck & Co.* v. *San Diego Cnty. Dist. Council of Carpenters*,
  436 U.S. 180 (1978) .....................................................................................................46

*SecureInfo Corp.* v. *Bukstel*,
  2003 WL 21961370 (E.D. Pa. May 8, 2003) ....................................................................38

*SEI Glob. Servs., Inc.* v. *SS&C Advent*,
  2022 WL 2356730 (3d Cir. June 30, 2022) ...................................................................35 n.21

*Smart Commc'ns Holding, Inc.* v. *Glob. Tel-Link Corp.*,
  2024 WL 2158676 (M.D. Pa. May 13, 2024) ....................................................................43

*SMJ Grp., Inc.* v. *417 Lafayette Rest. LLC*,
  2006 WL 2516519 (S.D.N.Y. Aug. 30, 2006) ..............................................................16 n.8, 23

*Snyder* v. *Phelps*,
  562 U.S. 443 (2011) .....................................................................................................16

*Sosa* v. *DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ...........................................................................21 n.11

*Steward Health Care Sys., LLC* v. *Blue Cross & Blue Shield of R.I.*,
    311 F. Supp. 3d 468 (D.R.I. 2018)................................................................32

*Synthes (U.S.A.)* v. *Globus Medical, Inc.*,
    2005 WL 2233441 (E.D. Pa. Sept. 14, 2005) ..............................................42 n.24

*Tannous* v. *Cabrini Univ.*,
    697 F. Supp. 3d 350 (E.D. Pa. 2023) .............................................................16 n.8

*Taylor* v. *Loc. No. 7, Int'l Union of Journeymen Horseshoers of U.S.
    and Canada (AFL-CIO)*, 353 F.2d 593 (4th Cir. 1965)..........................48

*Ticor Title Ins.* v. *FTC*,
    998 F.2d 1129 (3d Cir. 1993)...........................................................................22

*TruePosition, Inc.* v. *LM Ericsson Tel. Co.*,
    844 F. Supp. 2d 571 (E.D. Pa. 2012) ............................................................33 n.19

*TYR Sport Inc.* v. *Warnaco Swimwear Inc.*,
    679 F. Supp. 2d 1120 (C.D. Cal. 2009) ........................................................17

*United Mine Workers of Am.* v. *Pennington*,
    381 U.S. 657 (1965)..........................................................................................3, 45

*United States* v. *Bell*,
    414 F.3d 474 (3d Cir. 2005).............................................................................17

*United States* v. *Buckingham Coal Co.*,
    2013 WL 1818611 (S.D. Ohio Apr. 29, 2013) ............................................40 n.23

*United States* v. *Employing Plasterers Ass'n of Chi.*,
    347 U.S. 186 (1954)..........................................................................................45

*United States* v. *Fish Smokers Trade Council, Inc.*,
    183 F. Supp. 227 (S.D.N.Y. 1960) .................................................................48

*United States* v. *Schiff*,
    379 F.3d 621 (9th Cir. 2004) ...........................................................................17

*V. & L. Cicione, Inc.* v. *C. Schmidt & Sons, Inc.*,
    403 F. Supp. 643 (E.D. Pa. 1975) ..................................................................36

*Walnut St. Assocs., Inc.* v. *Brokerage Concepts, Inc.*,
    20 A.3d 468 (Pa. 2011)....................................................................................40

*West Penn Allegheny Health Sys., Inc.* v. *UPMC*,
    627 F.3d 85 (3d Cir. 2010)................................................................................................ *passim*

*XTO Energy, Inc.* v. *Dominion Field Servs., Inc.*,
    2014 WL 10788907 (Pa. Super. Ct. Oct. 22, 2014)...................................................40

*Xtreme Caged Combat* v. *Cage Fury Fighting Championships*,
    2015 WL 3444274 (E.D. Pa. May 29, 2015) ...................................................40 n.22

## Constitutional Provisions

U.S. Const. amend. I .......................................................................................... *passim*

## Statutes and Rules

15 U.S.C. §§ 1, 2.................................................................................................. *passim*

15 U.S.C. § 26..................................................................................................................36

42 Pa. C.S. Sec. 8340.13 ...............................................................................................49

42 Pa. C.S. Sec. 8340.15 ...............................................................................................49

## Other Authorities

9 P. Areeda & H. Hovenkamp,
    Antitrust Law ¶ 335(b) (5th ed. 2024) ...........................................................36, 50

Restatement (Second) of Torts § 766A........................................................................39

Restatement (Second) of Torts § 767 cmt. c................................................................43

## PRELIMINARY STATEMENT

In their motions to dismiss, Defendants do not contest that the Complaint adequately pleads that Cliffs is a monopolist or near-monopolist in critical steel markets. Defendants do not contest that executing on their plans would have anticompetitive effects in those markets. And Defendants do not contest that U. S. Steel's merger with Nippon Steel would be fundamentally procompetitive, enhancing competition while at the same time preserving jobs in the Mon Valley and elsewhere.

Instead, Defendants principally argue that the Complaint solely challenges speech protected by the First Amendment and that Plaintiffs' claims are thus not actionable, regardless of the harm caused. In particular, Defendants mischaracterize the Complaint as alleging only an attempt to lobby the government to block the pending merger and identifying harm that flows only from a government block. In so doing, Defendants ignore the detailed allegations in the Complaint of an agreement between Defendants that *predates* the emergence of NSC as a buyer and that will *postdate* the deal with NSC if that deal is not consummated.[1] And they ignore that the Complaint alleges extensive private, commercial actions taken pursuant to that agreement, including efforts to induce breach, sink investor confidence, and negotiate in bad faith. Plaintiffs do not seek to enjoin Defendants' lobbying or political speech, but to enjoin Defendants' performance of an unlawful agreement that injures Plaintiffs every day that agreement is permitted to exist.

As for Defendants' argument that Plaintiffs' antitrust claims (Counts I and IV) plead only parallel conduct, Defendants again ignore the numerous and detailed factual allegations showing an agreement between Cliffs, U. S. Steel's chief competitor, and the USW, U. S. Steel's exclusive source of unionized labor, to force a Cliffs deal and obstruct any other. It is undisputed that in

---

[1] As used herein, "NSC" refers to Plaintiffs Nippon Steel Corporation and Nippon Steel North America, Inc., and "Merger" and "Merger Agreement" refer to NSC's merger with U. S. Steel.

August 2023, in conjunction with its hostile bid for U. S. Steel (*i.e.*, before U. S. Steel began its strategic alternatives process), *Cliffs* sent U. S. Steel a letter from the *USW* in which the USW's then-President stated that the union "unequivocally endorse[d]" Cliffs' bid and would refuse to "endorse *anyone* other than Cliffs" as a buyer of U. S. Steel.  Defendants try to cast the letter as nothing more than the USW's assignment of its right to bid for U. S. Steel.  But that ignores that the letter, which was dated August 3, predates the assignment of the USW's right to bid and that the USW's commitment in the letter extended beyond the scope of any right to bid.  Defendants likewise ignore the myriad additional pleaded facts strongly supporting the existence of the agreement, including coordinated actions that have continued even after the USW lost its legal challenge to the transaction and even after the Merger was blocked by President Biden.

And then there are the extensive admissions of such an agreement.  Just by way of example, McCall has publicly touted the USW-Cliffs relationship as a "partnership," and since obtaining the August 3 letter, Cliffs' CEO Lourenco Goncalves has stated:

- "[N]o one [other than Cliffs] has the union, and there is zero chance anyone [else] will have the union."

- "There's nothing that [NSC] can do that's gonna bring the [USW] on their side. Nothing."

- "[Cliffs has] a de-facto veto power to disallow the acquisition of the entirety of U. S. Steel or USW-represented assets by anyone else other than Cleveland-Cliffs."

- "We have a very, very strong partnership with the USW.  It's unusual.  It's not common. And it's . . . about time for investors to take notice."

Against the backdrop of these allegations, Defendants' generic contention that Plaintiffs have not pleaded an "agreement" amounts to, at most, a factual dispute that cannot be resolved on a motion to dismiss.  The proper forum for that factual dispute is the evidentiary hearing that Plaintiffs seek, where the Court can weigh the evidence and the credibility of the witnesses.

Contrary to McCall's suggestion here, such an agreement is illegal, no matter that it may

be in service of an end claimed to be in the union's interests. As the Supreme Court has made clear, defendants "may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy." *United Mine Workers of Am.* v. *Pennington*, 381 U.S. 657, 665-66 (1965). That is exactly what McCall and the USW have sought to do here, and "the methods [they have] chose[n] are not immune from antitrust sanctions" even if they claim their motivations are pure. *Connell Constr. Co.* v. *Plumbers and Steamfitters Loc. Union No. 100*, 421 U.S. 616, 625 (1975).

Defendants' separate arguments to dismiss Plaintiffs' tortious interference claims (Counts VIII and IX)—which are not dependent on any agreement among the Defendants—also lack merit. Defendants argue that there has been no breach of the Merger Agreement, and thus no interference with it. But that ignores, among other things, that tortious interference claims are routinely brought to enjoin actions *intended* to cause breach or non-performance, as is the case here. And McCall's effort to immunize his tortious conduct under various labor laws ignores that Plaintiffs' claims are not premised on any labor dispute. Rather, they are premised on an ongoing effort to constrain U. S. Steel's ability to participate in any M&A transaction besides one with Cliffs and NSC's ability to expand in the U.S. market. McCall's status as the unelected President of the USW does not give him carte blanche to tortiously interfere with the Merger Agreement.

The proper forum to assess Defendants' asserted defenses to Counts I, IV, VIII, and IX is an evidentiary hearing on Plaintiffs' motion for a preliminary injunction, which Plaintiffs respectfully submit should be set promptly.

## STATEMENT OF FACTS

### A.    Cliffs Acquires a Monopoly in Critical Steel Markets.

Over the last five years, Cliffs has executed a series of acquisitions that transformed it from the largest U.S. iron ore producer into one of the largest steel producers in North America. ¶¶ 24,

44.  Cliffs accomplished its transformation working hand-in-glove with USW leadership, whose support Cliffs has described as "crucial" to its acquisition strategy.  ¶ 103.  As a result, Cliffs has or is approaching monopoly power in four key North American markets:  exposed automotive steel, two high-grade electrical steel products, and iron ore pellets.  ¶¶ 120, 126, 139, 149.[2]

(1)  Exposed automotive steel, commercially manufactured only in blast furnaces (as distinct from electric arc furnaces), is necessary to make new cars.  ¶ 131.  Through its recent acquisitions, Cliffs controls almost half of North America's blast furnace capacity and half of the production of exposed automotive steel.  ¶ 5.  U. S. Steel controls about 30% of blast furnace capacity and is Cliffs' only remaining major competitor in exposed automotive steel.  ¶¶ 8, 229.

(2)  High-grade electrical steel is required to produce electric vehicles and transformers for the U.S. power grid, in addition to countless consumer products.  ¶¶ 115, 122.  Through its acquisitions, Cliffs—as Goncalves has declared—is now the "only producer of electrical steels in North America."  ¶ 113.  U. S. Steel is the most credible threat to Cliffs in this market as a result of its recent substantial investments in its (non-unionized) Big River Steel facility.  ¶¶ 5, 45, 127.

(3)  Iron ore pellets are required inputs for both exposed automotive steel and high-grade electrical steel.  ¶¶ 144-47.  Cliffs owns 70% of North American iron reserves, with U. S. Steel controlling most of the remainder, and has already been found by another court to be a monopolist in iron ore.  ¶¶ 8, 24 & n.1, 148.

Cliffs has openly boasted that its goal is to use its monopoly power to increase prices and extract supracompetitive profits.  While electrical steel customers warn of "skyrocketing demand and limited availability of domestically produced electrical steel," Cliffs touts its "ab[ility] to

---

[2] References to "¶" are to the specified paragraph of the Complaint.  Capitalized terms not defined have the same definition as in the Complaint.  Unless otherwise noted, emphasis is added and internal citations and quotation marks are omitted.

achieve unprecedented price increases" because of its vise-like grip on the market. ¶¶ 113, 126, 161. Goncalves has been explicit about his strategy to maintain shortages to inflate prices: "[Could we] sell[] more tonnage [of steel]? Absolutely, but we'll be selling more tonnage for lower prices. . . . So, tonnage is not the answer; the answer is profitability." ¶ 137. Goncalves said the same about iron: Cliffs "limit[s] the tonnage of iron [it] sell[s] to third parties" and refuses "to supply [competitors]." ¶ 160. Goncalves promised investors that "the domestic U.S. market will starve" for iron and that he will not build new capacity because he "like[s] shortages." ¶ 149.

The USW's leadership supports Cliffs' monopolization campaign—to the detriment of competition and consumers—because Cliffs can sustain using higher-priced union labor at aging blast furnaces by charging supracompetitive prices, safeguarding McCall's and the USW's power and influence. ¶ 239. In its 2022 labor agreement with Cliffs, the USW committed to help Cliffs "aggressively pursue opportunities" to "acquire steelmaking capacity" and "expand[] its ownership of raw material." ¶ 103. When Cliffs acquired Stelco, the last remaining North American blast furnace operator besides U. S. Steel, McCall extolled the acquisition, noting his "delight[]" to "further expand [the] already great partnership between Cliffs and the USW." ¶ 105.

**B.      Cliffs and the USW Agree to Force a Cliffs Acquisition of U. S. Steel.**

In mid-2023, Cliffs set in motion a plan to "take out" U. S. Steel, its last substantial competitor in the relevant steel markets. A U. S. Steel acquisition would give Cliffs a stranglehold over North American exposed automotive steel supply and iron reserves, as well as thwart the only threat to Cliffs' monopoly position in high-grade electrical steel. ¶ 110. As Cliffs' Senior Vice President of Finance, Paul Finan, explained, with U. S. Steel "taken out," "[t]here will be one less competitor pushing down prices." ¶¶ 3, 83.

No later than July 28, 2023—before NSC was on the scene as a potential bidder for U. S. Steel—Cliffs and the USW agreed to work together to force U. S. Steel to sell itself to Cliffs, and *only* to Cliffs. ¶ 46-47. The object of the agreement was three-fold: (i) to eliminate U. S. Steel as competitor; (ii) to expand Cliffs' monopoly power; and (iii) to otherwise prevent U. S. Steel from securing the additional investments and technology it needed to compete most effectively, including, if necessary, with non-unionized labor. ¶¶ 43, 162, 239.

On July 28, Goncalves informed U. S. Steel's CEO, David Burritt, that Cliffs was making an unsolicited bid for the company. ¶ 46. Cliffs demanded a response to its proposal by August 7. ¶ 46. Cliffs' bid letter highlighted the companies' competing blast furnaces as a reason for the acquisition, and touted Cliffs' "unique" positioning because of its "very good relationship" with the USW. ¶ 46; Ex. A (July 28 letter) (cited at ¶ 46) at 2.

On August 3, before Cliffs' bid was made public, the USW wrote a letter to U. S. Steel, affirming not only that USW leadership "unequivocally endorse[d]" Cliffs' bid, but stating that it would refuse to "endorse *anyone* other than Cliffs" for an acquisition. ¶ 47; Ex. B (Aug. 3 letter) (cited at ¶ 47). To drive home that the USW stood hand-in-hand with Cliffs in making this hostile bid, the USW had *Cliffs* deliver its letter to U. S. Steel. ECF No. 52-9 at 36.

Consistent with the Board's fiduciary duties, U. S. Steel refused to be strong-armed by Cliffs and the USW and instead announced it would undertake a strategic review process to evaluate alternatives. ¶ 49. In response, Cliffs lashed out to ward off other bidders, telling the market that the USW had "de-facto veto power" over any sale of U. S. Steel because a sale "could not be consummated without the support of the USW." ¶ 50.

On August 17, the USW also assigned to Cliffs its own right to bid under U. S. Steel's Basic Labor Agreement ("BLA") with the USW. ¶ 51.

**C.    U. S. Steel Commences an Auction Process and Agrees to a Deal with NSC.**

After a thorough review, U. S. Steel agreed to the Merger with NSC on December 17, 2023. ¶ 55.  Out of more than 50 potential bidders contacted, NSC was one of only two bidders other than Cliffs willing to proceed in the face of Defendants' threats and offer to buy all of U. S. Steel. ¶ 170; ECF No. 52-9.  Under the terms of the Merger Agreement, NSC would merge with U. S. Steel for $14.9 billion in cash, representing an approximately 142% premium to U. S. Steel's pre-auction share price.  NSC's bid was higher than Cliffs' final proposal; its bid was all in cash, whereas Cliffs' was half stock; and it presented minimal antitrust risk given the lack of competitive overlap between the companies.  ¶¶ 52-54.

U. S. Steel's deal with NSC was Cliffs' nightmare scenario.  Whereas Cliffs relies on limiting supply to maintain high prices, the NSC Merger promised a stronger U. S. Steel.  In addition to the advanced technology that NSC would bring to U. S. Steel, NSC pledged billions of dollars in capital expenditures to upgrade and extend the useful life of U. S. Steel's facilities, including U. S. Steel's blast furnaces in the Mon Valley and Gary, Indiana.  ¶ 14.  Whereas U. S. Steel's stand-alone plan prior to the Merger was to idle more unionized blast furnaces, leaving Cliffs as the dominant remaining blast furnace operator, Cliffs was now facing the prospect of more, and more efficiently produced, supply in the hands of its only significant domestic competitor.  ¶ 14.

The Merger also threatened Cliffs' ability to rely on the USW to further support its monopolization campaign.  Local USW members in the Mon Valley, for example, have bucked the USW's leadership by holding rallies in support of the Merger—and, recognizing the enormous

benefits the Merger would bring to their communities, local mayors have followed suit. ¶ 15.[3]

**D.    After Losing the Auction, Defendants Wage War on Plaintiffs and the Merger.**

Even after losing the auction, Cliffs could have tried to top NSC's bid, as permitted by the Merger Agreement. But it did not. Instead, Cliffs and the USW, through McCall, decided to wage war on U. S. Steel and NSC until either or both agreed to sell U. S. Steel's assets to Cliffs, completing its monopolies. Consistent with their agreement to press only a Cliffs deal and oppose any other, Defendants launched a closely coordinated campaign on multiple fronts—both public and private—to kill the Merger and weaken U. S. Steel as part of their "merge or murder" strategy.

True to their agreement, Defendants proceeded in lockstep. On December 18, the day the Merger was announced, Goncalves appeared on CNBC to tell the market, "this thing is far from over" because "I am the only viable buyer," and adding "[w]e can't allow a foreign company . . . to take over what we have here." ¶¶ 59, 194. The same day, USW leadership followed with the same sentiment, deriding NSC as a foreign-owned company even though NSC has operated in the U.S. for decades and has several hundred USW-represented employees at facilities in Pennsylvania and West Virginia. ¶¶ 33-34, 60.[4] Since then, Defendants have continued to jointly hammer home their warning to U. S. Steel, NSC, other potential bidders, U. S. Steel's investors, and U. S. Steel's employees—that the USW would make life impossible for NSC or any bidder other than Cliffs.

On March 14, Goncalves said in a Bloomberg interview that it was "abundantly clear between me and Dave McCall that the only buyer the union accepts . . . is Cleveland-Cliffs." ¶ 72.

---

[3] *See also* Brief for Local Government Officials and Local Union Members as Amici Curiae Supporting Petitioners, *U.S. Steel Co.* v. *CFIUS*, No. 25-1004, Doc. No. 2099804 (D.C. Cir. Feb. 10, 2025); Brief for Allegheny Conference as Amici Curiae Supporting Petitioners, *U.S. Steel Co.* v. *CFIUS*, No. 25-1004, Doc. No. 2099807 (D.C. Cir. Feb. 10, 2025); Brief for Pennsylvania Chambers of Commerce and Trade Organizations as Amici Curiae Supporting Petitioners, *U.S. Steel Co.* v. *CFIUS*, No. 25-1004, Doc. No. 2099839 (D.C. Cir. Feb. 10, 2025).

[4] https://usw.org/press-release/usw-slams-nippon-plan-to-acquire-us/.

Goncalves even boasted in front of investors that he could call McCall on the spot and have him confirm that the USW would never accept NSC.  ¶ 74.  Defendants have repeated this admonition incessantly since Cliffs launched its hostile bid.  *E.g.*, ¶ 169 (Goncalves: "no one else has the union, and there is zero chance anyone [else] will have the union").

Five days later on March 19, this time on CNBC, Goncalves was even more explicit:  The "Titanic ha[d] already hit the iceberg," and Cliffs would "wait until the deal is unraveled and [then] pick up the pieces at the other side."  ¶ 169.[5]  And as the full interview reflects:  "We have a very, very strong partnership with the USW.  It's unusual.  It's not common.  And it's . . . about time for investors to take notice."  In addition to their public messaging, Defendants have also worked in private and in a highly coordinated fashion on at least three fronts:

(1)  Attempting to pressure U. S. Steel to abandon the Merger so it could swoop in, Cliffs used its agreement with the USW as a cudgel to convince investors that the Merger could not close, leaving a Cliffs acquisition as the only alternative.  Speaking directly to U. S. Steel's largest active shareholder in a one-on-one call, Lourenco Goncalves said the Merger could not possibly close.  Why?  "[T]here's no deal with the Union.  That's not gonna happen."  ¶ 73.  The full transcript of the call makes clear Goncalves was even more explicit:  "[N]obody, nobody has a relationship with the union as I have."  Ex. C at 1 (cited at ¶ 73).[6]

---

[5] CNBC, *Cleveland-Cliffs CEO: Have full conviction a Nippon Steel-USW deal 'will never happen'*, at 6:00 (Mar. 19, 2024), https://www.cnbc.com/video/2024/03/19/cleveland-cliffs-ceo-have-full-conviction-a-nippon-steel-usw-deal-will-never-happen.html.

[6] Defendants cite this phone call as an example of "petitioning activity."  Cliffs Br. 7.  But calling U. S. Steel's largest shareholder to try to interfere with the Merger is not petitioning the government.  Defendants' counsel demanded a copy of the full transcript claiming, incorrectly, that it was illegally recorded.  Plaintiffs provided it to Defendants before they filed their motions to dismiss and attach it here for the Court's review.

Even after U. S. Steel's stockholders overwhelmingly approved the Merger in April 2024, Defendants did not relent. Less than two weeks after the vote, Celso Goncalves told investors that "[t]he Nippon deal is dead" and "the list of real buyers for [U. S. Steel] is . . . a party of one." ¶ 78.

(2) Cliffs also coordinated with the USW in what was supposed to be a confidential arbitration with U. S. Steel in which the USW disputed whether NSC fulfilled its successorship obligations under the BLA. On January 3, 2024, Cliffs appointed Ron Bloom, a former union negotiator with experience helping the USW block deals, to its board. ¶ 61. Six days later, Robert Fischer, Cliffs' head of labor relations, told investors on a call hosted by the investment bank Jefferies that he was in active dialogue with the USW, that Cliffs had the union's "ear," and that the USW would file grievances very soon. ¶ 62. Fischer was right: within days, the USW launched two separate (and ultimately unsuccessful) disputes seeking to prevent the transaction. ¶ 60.

Cliffs remained privy to the USW's arbitration strategy throughout the proceedings. As Goncalves laid it out for investors, McCall would stonewall—"they will negotiate for a long, long time"—but "they are not going to allow a lawyer to say they are not in compliance because they aren't negotiating." ¶ 73. And that is exactly what USW leadership did—delay, for months, the resolution of its own grievance. ¶ 86. Once the grievance was finally heard, it was rejected by the Board of Arbitration. ¶ 86. Still, McCall continued to claim that NSC had not fulfilled its successorship obligations (¶ 92)—a claim he now concedes was false. McCall Br. 5 n.2.

(3) Defendants also solicited Plaintiffs directly to abandon their contract. In February 2024, Goncalves asked one of NSC's advisors to deliver a proposal to NSC that it abandon the Merger and instead agree to a separate transaction with Cliffs to carve up U. S. Steel between the two of them. ¶ 71. Goncalves also called one of U. S. Steel's largest shareholders and proposed a similar carve-up: "[C]ut a deal with me in which [you] will keep Big River . . . [and] all the rest

comes to Cliffs . . . .  There's no other way."  Ex. C at 1 (cited at  ¶¶ 20, 72, 73, and 189).  And in

October, McCall urged U. S. Steel's Board to abandon the Merger, claiming U. S. Steel had been

"beaten" by the USW's resistance.  ¶ 87.

Separately, Defendants also coordinated to pervert the CFIUS national security review and

deny Plaintiffs due process.  Before the CFIUS process had even begun, and on the same day that

President Biden "told USW members he [had their] backs," ¶ 178, Celso Goncalves told investors

that President Biden would block the Merger even if CFIUS failed to "find any evidence of a . . .

national security problem" because his "buddy" Dave McCall "doesn't want the deal."  ¶ 65.  The

USW endorsed President Biden for reelection days later.  ¶ 180.  Lourenco Goncalves revealed

that the former President had requested the USW's endorsement "now" and, in return, provided

assurances that CFIUS would block the Merger—a backroom political deal having nothing to do

with national security or CFIUS's mandate.  ¶ 180.  Goncalves told a major U. S. Steel investor

that he was personally "behind" President Biden's announcement of opposition to the Merger, and

that the USW was "holding off" on its endorsement until the President "officially killed" the

Merger.  ¶ 72; Ex. C (cited at ¶ 72).  As Goncalves himself put it:  "[T]here's no process.  This is

not going to be a process.  *CFIUS is just cover for a President to kill a deal.*"  ¶ 189.

Toward the end of 2024, Cliffs continued to leverage its lockstep coordination with McCall

to undermine investor confidence, including by leaking information about the CFIUS review

process to the public notwithstanding CFIUS's statutory confidentiality requirements.  ¶¶ 21, 193.

Celso Goncalves was apparently aware of McCall's itinerary on November 22, 2024, when he told

investors that McCall had no plans to meet with NSC but that McCall was headed to the White

House that evening (which he did).  ¶¶ 94, 185.  That same day, Celso Goncalves leaked

information to U. S. Steel's investors regarding the "lack of consensus within CFIUS" weeks

before it became public.  ¶ 193.  U. S. Steel was told by an investor that Cliffs caused sell-offs in U. S. Steel's stock because "[Cliffs] seem[s] to have had inside information in the past and maybe have [it] again."  ¶ 95.  Lourenco Goncalves likewise continued to tell investors that "[i]t's just a matter of time" before the Merger fails, and as one of those investors told U. S. Steel, "[t]o hear [Goncalves] say it as consistently as he has been saying that has been discouraging."  ¶ 95.

**E.    After the Merger Is Blocked, Defendants Try Again to Force a Sale to Cliffs.**

On December 23, 2024, consistent with the inside information Celso Goncalves had shared with U. S. Steel investors a month earlier, CFIUS deadlocked and referred the Merger to President Biden.  ¶¶ 21, 177, 188.  President Biden blocked the transaction with an executive order on January 3, 2025.  ¶ 177.  On January 6, 2025, the same day Plaintiffs filed this lawsuit, Plaintiffs filed a separate lawsuit in the D.C. Circuit challenging CFIUS's review process.  ¶ 195.  On January 13, the D.C. Circuit ordered expedited briefing, scheduled to be completed in March 2025.

In the weeks since Plaintiffs initiated this litigation, Defendants have continued full steam ahead, making clear that they would continue to perform their anticompetitive agreement if the Merger failed.  On January 13, Goncalves held a press conference at Butler Works reaffirming Cliffs' resolve to "continue to fight" against the Merger.  ECF No. 56 at 1.  He claimed that Japan is "evil," that it had not "learn[ed] anything since 1945," and that it must "stop sucking our blood." *Id.*  He suggested NSC's leaders would "commit seppuku" (ritual suicide).  *Id.*

Goncalves also confirmed press reports that Cliffs planned a renewed bid for U. S. Steel if the Merger is abandoned.  *Id.* at 1, 5 n.5.  And he reiterated Cliffs' monopolistic aims:  "People remember the traditional names of steel companies.  . . .  [Now,] they are all inside Cleveland-Cliffs."  *Id.* at 1.  Asked about his plans if Cliffs acquires U. S. Steel, Goncalves corrected the questioner: "Not if, *when*."  *Id.*  And, only weeks later, a Cleveland-based shareholder activism firm, which has coordinated with Cliffs before, launched a proxy campaign on a platform that U. S.

12

Steel should abandon the Merger.  Its proposed replacement CEO is the former chief of Stelco (Cliffs' most recent acquisition) and now a large Cliffs shareholder as a result.

Finally, after President Trump announced on February 7, 2025 that NSC would be prepared to invest in, not purchase, U. S. Steel, McCall reaffirmed his commitment to try to block procompetitive investment in Cliffs' closest competitor:  "Our concerns regarding Nippon's continued interest in U. S. Steel remain unchanged."[7]

Not surprisingly, the agreement between U. S. Steel's chief competitor and the union that is U. S. Steel's sole source of unionized labor has left U. S. Steel hobbled.  As Goncalves put it on May 14, 2024, U. S. Steel is "like a sick patient that sits on a bed with a bunch of tubes and sensors around him."  ¶ 80.  Cliffs' Finan told investors that U. S. Steel was now primed to be acquired "on the cheap," while Goncalves talked of "schedul[ing] [U. S. Steel's] funeral."  ¶¶ 58, 169.  And on a July 2024 earnings call, Goncalves made plain his motivation:  "I can't let [U. S. Steel] go, and for my price that's now in the 20s"—*i.e.*, less than half of what Cliffs offered at the end of the auction process—"we can have a deal."  ¶ 81.

## LEGAL STANDARD

In ruling on a motion to dismiss, the court "must accept all factual allegations, and all reasonable inferences therefrom, as true and view them in the light most favorable to the plaintiff."  *In re Flat Glass Antitrust Litig. (II)*, 2009 WL 331361, at *1 (W.D. Pa. Feb. 11, 2009) (citing *Phillips* v. *Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  The court considers whether the facts alleged "sufficiently demonstrate that the plaintiff has a plausible claim for relief."  *Premier Comp Sols. LLC* v. *UPMC*, 163 F. Supp. 3d 268, 275 (W.D. Pa. 2016).  The

---

[7]  *Trump says Nippon Steel will invest in US Steel*, Reuters (Feb. 7, 2025), https://www.reuters.com/markets/commodities/trump-considering-allowing-nippon-steels-149-bln-us-steel-takeover-cbs-news-2025-02-07/.

plausibility standard "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the claim. *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 545 (2007). What matters "is not whether a plaintiff will ultimately prevail," but "whether the claimant is entitled to offer evidence to support the claims." *Maio* v. *Aetna, Inc.*, 221 F.3d 472, 482 (3d Cir. 2000). The standard for dismissal of antitrust claims, moreover, is "somewhat higher" because "motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Premier Comp*, 163 F. Supp. at 275. Courts "liberally construe antitrust complaints at this stage of the proceeding," and "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Id.*

## ARGUMENT

### I. THE FIRST AMENDMENT DOES NOT IMMUNIZE DEFENDANTS' UNLAWFUL AGREEMENT.

#### A. The Complaint Challenges an Illegal Agreement, Not Constitutionally Protected Speech.

Defendants' motions as to all of the challenged counts are predicated on the fallacy that the Complaint is "nothing more than a challenge to Defendants' exercise of" protected First Amendment speech. Cliffs Br. 2; *see also* McCall Br. 2. What the Complaint challenges is not Defendants' protected speech, but "their unlawful agreement to force U. S. Steel to merge with Cliffs and prevent U. S. Steel from being sold to *anyone* else." ¶¶ 2, 51, 201, *supra* p. 6. It is that *agreement*—to eliminate Cliffs' chief competitor, expand Cliffs' monopoly power, and prevent potential entry of non-unionized labor—that is anticompetitive (a point Defendants do not contest) and which violates the Sherman Act. ¶¶ 43, 162, 239; Point II *infra*.

The law is crystal clear that an agreement is not protected speech. As the Supreme Court has explained, "agreements and course[s] of conduct [are] in most instances brought about through

speaking or writing." *Cal. Motor Transp. Co.* v. *Trucking Unlimited*, 404 U.S. 508, 514 (1972). But an agreement in violation of the antitrust laws is not protected by the First Amendment "merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* (emphasizing that "[s]uch an expansive interpretation . . . would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society"). Countless cases are in accord:

- *FTC* v. *Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 430-32 (1990): "The most blatant, naked price-fixing *agreement* is a product of communication, but that is surely not a reason for viewing it with special solicitude."

- *Nat'l Soc'y of Pro. Eng'rs.* v. *United States,* 435 U.S. 679, 684 (1978) (affirming "injunction terminating the unlawful *agreement*"): "The First Amendment does not make it . . . impossible ever to enforce laws against *agreements* in restraint of trade."

- *ES Dev., Inc.* v. *RWM Enterprises, Inc.*, 939 F.2d 547, 555-56 (8th Cir. 1991) (affirming injunction terminating "*agreement*" "to frustrate the entry of a new competitor"): "[T]he otherwise legal nature of appellants' activities in furtherance of their *conspiracy* do not shield them from antitrust liability."

- *In re NCAA Student-Athlete Name & Likeness Litig.*, 2010 WL 5644656, at *4 (N.D. Cal. Dec. 17, 2010): "Defendants' *agreements* enabling the production of the video games are at issue, and EA does not persuade the Court that the First Amendment immunizes it from all alleged wrongdoing."

Thus, and contrary to the crux of Defendants' motions, it is "well-established that the exercise" of otherwise "protected first amendment commercial speech . . . as an integral part of an illegal conspiracy will not shield the conspirators from antitrust liability." *ES Dev.*, 939 F.2d at 556. Even Defendants' own authority explains that "a course of conduct found to constitute a restraint of trade" remains actionable notwithstanding that "speech w[as] used to further the scheme." *Jefferson Cnty. Sch. Dist. No. R-1* v. *Moody's Investor's Servs., Inc.*, 175 F.3d 848, 860 (10th Cir. 1999) (cited at Cliffs Br. 3).

Defendants' claim that the Complaint fails to allege "any actual economic restraints that are divorced from speech" is likewise incorrect. Cliffs Br. 2. Defendants' illegal agreement *is* the anticompetitive restraint. Their speech is "evidence[]" of the agreement. *Cal. Motor*, 404 U.S. at 514; Point II.A *infra* (compiling examples of Defendants' coordinated speech). The remaining "proof is largely in the hands of the alleged conspirators"—their internal communications and communications with one another. *Premier Comp*, 163 F. Supp. 3d at 275. As this court has recognized, that is not a ground for dismissal, but, rather, a reason to allow Plaintiffs the "opportunity for discovery." *Id.*

Nor does the fact that the fate of U. S. Steel may be a "matter[] of public concern" (Cliffs Br. 3) provide Defendants a license to violate the antitrust laws. The Supreme Court has said precisely the opposite: that the "harms" produced by collusion may be "matters of public concern . . . is no reason for removing the prohibition [on illegal antitrust conspiracies]." *Trial Lawyers*, 493 U.S. at 431-32. *Snyder* v. *Phelps*, on which Defendants principally rely (Cliffs Br. 3-4), had nothing to do with antitrust laws, tortious interference laws, or commercial speech at all. It concerned the First Amendment's application to an anti-gay demonstration near a deceased military service member's funeral by the Westboro Baptist Church, 562 U.S. 443, 454 (2011), and the Supreme Court emphasized that its holding was "narrow" and "limited by the particular facts." *Id.* at 460; *see also Krajewski* v. *Gusoff*, 53 A.3d 793, 808 n.5 (Pa. Sup. Ct. 2012) ("in *Snyder*, the high Court circumscribed its ruling, limiting its effect to the parameters of that case").[8]

---

[8] Defendants' remaining cases are similarly far afield or support Plaintiffs, not Defendants. *See, e.g.*, *Am. Freedom Def. Initiative* v. *Se. Penn. Transp. Auth.*, 92 F. Supp. 3d 314, 322, 324 (E.D. Pa. 2015) (concerning refusal to post an advertisement "reflect[ing] [p]laintiffs' interpretation of a religious text"); *Tannous* v. *Cabrini Univ.*, 697 F. Supp. 3d 350, 367 (E.D. Pa. 2023) (concerning professor's termination after being accused of "publishing antisemitic tweets"); *SMJ Grp., Inc.* v. *417 Lafayette Rest. LLC*, 2006 WL 2516519, at *7 (S.D.N.Y. Aug. 30, 2006) (*denying* motion to

And in any event, because the speech at issue here is "false or unlawful commercial speech," it is "unprotected" in the first place. *United States* v. *Bell*, 414 F.3d 474, 481 (3d Cir. 2005); *United States* v. *Schiff*, 379 F.3d 621, 629 (9th Cir. 2004) (same); ¶¶ 60, 66, 70, 92, 194.

Defendants observe that "a defendant 'does not restrain trade or monopolize an industry by speaking out on an issue.'" Cliffs Br. 3 (citing *Mass. Sch. of Law at Andover, Inc.* v. *Am. Bar Ass'n*, 937 F. Supp. 435, 444 (E.D. Pa. 1996) ("*Mass I*") and *Schachar* v. *Am. Acad. of Opthalmology, Inc.*, 870 F.2d 397, 398 (7th Cir. 1989)). But Defendants did *not* "merely state[] [their] position," as the ABA did in *Mass I*, or as the American Academy of Ophthalmology did in *Schachar*. As pleaded in great detail here, and unlike in those cases, Defendants "formed an agreement" to leverage the USW's "de-facto veto power" to "hobble [Cliffs'] primary rival" and cement Cliffs' monopoly in critical steel markets. ¶¶ 10, 83; *see Mass. I* at 443-44 (no "agreement" or "conspiracy"); *Schachar*, 870 F.2d at 398 ("Plaintiffs concede that the Academy did not attempt to coordinate activities"); *TYR Sport Inc.* v. *Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1128, 1131-32 (C.D. Cal. 2009) (distinguishing *Schachar* and sustaining complaint where defendants allegedly "agreed to exclude or limit" competitor's products).

And as detailed below, when defendants collude to "weaken" a competitor and exercise "veto power" to prevent competition, they violate the antitrust laws. *See West Penn Allegheny Health Sys., Inc.* v. *UPMC*, 627 F.3d 85, 100, 104 (3d Cir. 2010) (upholding Sherman Act claims where a hospital and a health insurance provider "formed an agreement" to "hobble" and "weaken [the hospital's] primary rival"); *ES Dev.*, 939 F.2d at 555 (affirming Sherman Act liability where defendants "concertedly exercise[d] their independent contract rights to . . . exercise[] a sort of

---

dismiss tortious interference claim: "[t]he mere fact that some portion of defendants' activity is expressive does not render defendants immune from suit under federal and state trademark law").

veto over the entry of a new competitor to the market"); Point II, *infra*.  Because Defendants "conspired to concertedly exercise their [] rights of commercial speech" in violation of the antitrust laws, the Court should "reject[] [Defendants'] constitutional arguments."  *ES Dev.*, 939 F.2d at 556 (holding that First Amendment does not immunize a "conspiracy" implemented through "constitutionally protected rights of commercial speech"); cases cited *supra* p. 15.

      **B.**     **Plaintiffs' Claims Are Not Barred by the *Noerr-Pennington* Doctrine.**

          **1.**     **The Complaint Challenges Unlawful Private Commercial Conduct, Not Protected Petitioning Activity.**

      Likewise unavailing is Defendants' argument that "the Constitution's protection for petitioning activity" requires dismissal of Plaintiffs' claims.  Cliffs Br. 6.

      The *Noerr-Pennington* doctrine provides "immunity from liability to those who petition the government, including administrative agencies and courts, for redress of their grievances." *Hanover 3201 Realty, LLC* v. *Vill. Supermarkets, Inc.*, 806 F.3d 162, 178 (3d Cir. 2015).  This immunity for petitioning activity does not extend to "private commercial activity," however. *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 (1962).  Defendants' agreement to eliminate Cliffs' chief competitor and expand its monopoly power (Point II, *infra*), and interference with the Merger and Plaintiffs' business opportunities (Point III, *infra*), constitute quintessentially "private commercial conduct" outside the bounds of *Noerr-Pennington*.

      Defendants' argument (Cliffs Br. 7) that *Noerr-Pennington* "require[s] dismissal of all of Plaintiffs' claims, because all of them are grounded in either direct appeals to the relevant governmental decision-makers or appeals made 'indirect[ly] . . . through the media or other avenues'" cannot be squared with the facts pleaded in the Complaint, which make plain that Plaintiffs seek to hold Defendants liable for an unlawful agreement and conduct aimed at private parties to prevent the sale of U. S. Steel to any buyer other than Cliffs:

(1)   The Complaint challenges an agreement that *predates* any governmental process. Defendants' agreement that the USW would only support Cliffs was struck *before* NSC entered the picture—and therefore had nothing to do with any effort or anticipated effort to influence *any* governmental decision-maker.  ¶¶ 47, 175.  "Until the governmental process is initiated . . . *Noerr-Pennington* immunity should not extend to actions occurring in an essentially private context." *See Mid-Tex. Comm'cns Sys., Inc.* v. *Am. Tel. and Tel. Co.*, 615 F.2d 1372, 1383 (5th Cir. 1980).

(2)   The Complaint also challenges an agreement that will *postdate* any governmental process.  As evidenced by Defendants' own statements and conduct, Defendants' agreement will not terminate regardless of whether the Merger remains blocked.  *See supra* p. 12; ¶¶ 18, 24, 27, 175, 198.  It will, as alleged, persist until Defendants' objective of forcing a deal with Cliffs, or neutering U. S. Steel and NSC's ability to ever effectively compete with Cliffs, is realized.[9]  ¶ 175.  Without any governmental process to influence, the agreement can pertain only to "private commercial activity" to which *Noerr-Pennington* does not apply.  *Continental Ore*, 370 U.S. at 707; *see also Litton Sys., Inc.* v. *Am. Tel. & Tel. Co.*, 700 F.2d 785, 806-07 (2d Cir. 1983) (*Noerr-Pennington* inapplicable where defendants' "decision to impose and maintain the interface tariff was made in the AT & T boardroom, not at the FCC"); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 636 (E.D. Mich. 2000) (*Noerr-Pennington* inapplicable where "the source of the alleged anticompetitive harm is a private market allocation agreement").

---

[9] In fact, as noted above (*supra* pp. 12-13), recent events have borne out the Complaint's prediction.  Even with the Merger presently blocked, Goncalves reaffirmed his intention to acquire U. S. Steel in a press conference just last month.  *Butler Press Conference*, YouTube, at 1:05:00-1:07:48 (Jan. 13, 2025), https://www.youtube.com/watch?v=nDmOdTbTVGg.   Activist shareholders linked to Goncalves and Cliffs are seeking to replace the U. S. Steel Board on a platform of abandoning the Merger.  And McCall continues to oppose even an investment by NSC into U. S. Steel as suggested by President Trump.

(3) The Complaint is replete with allegations of "activities in furtherance of their conspiracy," *ES Dev.*, 939 F.2d at 555, that were not plausibly directed—even "indirectly"—to government officials. Rather, these statements were directed at investors and industry participants, warning them that Cliffs and the USW would make life impossible for any bidder other than Cliffs—central to a strategy designed to induce breach, and deter other potential bidders and investors, thereby directly harming U. S. Steel. Examples include statements to:

- ***NSC's investment advisor in a private phone call***:  soliciting NSC to abandon the Merger and instead carve up U. S. Steel between Cliffs and NSC.  ¶ 71.

- ***Investors at an investor conference hosted by J.P. Morgan***:  stating, "I can work my magic to make a deal that I don't agree with not . . . close," and "[n]obody has a relationship with the Union as I have."  ¶ 74.

- ***Investors at an investor conference hosted by UBS***:  calling NSC and U. S. Steel "deranged," and boasting that after a Cliffs acquisition "[t]here will be one less competitor pushing down prices."  ¶ 83.

- ***Investors on a webinar hosted by Raymond James***:  describing U. S. Steel directors as incompetent stewards, ¶ 65, claiming that NSC "assign[ed] no value to the unionized plants" and could do "nothing" to "bring the [USW] on their side," ¶ 66.

- ***Investors on an investor call hosted by TD Cowen***:  claiming that Japanese people cannot be trusted.  ¶ 70.

- ***U. S. Steel's largest active stockholder in a one-on-one phone call***:  detailing efforts to induce NSC to carve up U. S. Steel between the two companies, Ex. C (cited at ¶¶ 72-73), and boasting, "I promise you there's no deal with the Union."  ¶¶ 72-73.

- ***U. S. Steel's investors in a series of private phone calls***:  claiming that "McCall has no plan to meet with Mori."  ¶¶ 21, 93-95.

- ***Investors at another investor conference***:  predicting that NSC's management would "commit seppuku" (ritual suicide) if the Merger failed.  ¶¶ 70, 192.

- ***Investors on Cliffs' earnings calls***:  claiming "[t]hat [the U. S. Steel] management team . . . had one goal in mind, and the goal was to break the back of the United Steelworkers," ¶ 63, that "[t]he Nippon deal is dead," ¶ 78, that "the list of real buyers for [U. S. Steel] is . . . a party of one," *id.*, and that "I can't let [U. S. Steel] go, and for my price that's now in the 20s, we can have a deal," ¶ 81.

- ***Steel market participants***:  comparing U. S. Steel to "a sick patient that sits on a bed with a bunch of tubes and sensors around him."  ¶ 80.

None of these statements were "made in the context of petitioning activity" or are "sufficiently related" to such activity. Cliffs Br. 7. Indeed, Defendants' own hand-picked example of supposed "petitioning activity" is plucked from a *one-on-one phone call* with NSC's financial advisor. *Id.* (citing ¶ 71); *see CT Espresso LLC* v. *Lavazza Premium Coffees Corp.*, 2022 WL 17156759 at *4 (S.D.N.Y. Nov. 22, 2022) (because *Noerr* protection is "derived from the First Amendment right to petition the government for a redress of grievances," statements that attempted to "influence Amazon's decisionmaking" were not protected).[10]

Defendants rely heavily on the Supreme Court's decision in *Noerr* itself (Cliffs Br. 6-7), but that decision shows why Plaintiffs' claims fall squarely outside of *Noerr*'s ambit. The Court held in *Noerr* that "a publicity campaign to influence governmental action falls clearly into the category of political activity" that was protected from Sherman Act liability. *E. R.R. Presidents Conf.* v. *Noerr Motor Freight, Inc.*, 365 U.S. 127, 140-41 (1961). As detailed above, Defendants here cannot similarly or credibly claim that their alleged conduct—which took place pursuant to an agreement that predated (and will postdate) any governmental process, and was overwhelmingly directed to private market participants on investors calls, at investor and industry conferences, and in even private solicitations with investors and financial advisors—was actually disguised indirect "political activity" to "influence government action."[11]

---

[10] By contrast, defendants' statement in *Evans Hotels, LLC* v. *Unite Here Loc. 30*, were "made in the context of [d]efendants discussing past lawsuits," and therefore subject to *Noerr-Pennington* protection. *See* 433 F. Supp. 3d 1130, 1147 (S.D. Cal. 2020) (Cliffs Br. 7).

[11] Defendants' remaining cases stand for the unexceptional propositions that *Noerr-Pennington* applies to communications related to "petitioning activity," lobbying campaigns directed at "public officials," and appeals made to "governmental" decision-makers. *See Sosa* v. *DIRECTV, Inc.*, 437 F.3d 923, 935 (9th Cir. 2006); *City of Columbia* v. *Omni Outdoor Advert., Inc.*, 499 U.S. 365, 383-84 (1991); *Mass. Sch. of Law at Andover, Inc.* v. *Am. Bar Ass'n*, 107 F.3d 1026 (3d Cir. 1997); *Geomatrix, LLC* v. *NSF Int'l*, 82 F.4th 466, 482 (6th Cir. 2023) (also recognizing that "private conduct" and "independent marketplace harm" fall outside of *Noerr-Pennington*).

As *Noerr* and its progeny make clear, the *Noerr-Pennington* doctrine has no application to such "action[s] in a private marketplace." *Ticor Title Ins.* v. *FTC*, 998 F.2d 1129, 1138 (3d Cir. 1993); *see also In re Suboxone Antitrust Litig.*, 622 F. Supp. 3d 22, 77 (E.D. Pa. 2022) (holding speech "directed" at private entities not protected by *Noerr-Pennington*).  And even if it were the case that Defendants' private "commercial activity" also had a "political impact," that still would not bring it within *Noerr-Pennington*'s ambit.  *See Ticor*, 998 F.2d at 1138 (*Noerr-Pennington* inapplicable to "commercial activity with a political impact" as opposed to "political activity with a commercial impact"); *In re Suboxone*, 622 F. Supp. 3d at 76 (same).

The court is required to "accept[] as true" "at this stage of the proceeding" the factual allegations of the complaint, *Premier Comp*, 163 F. Supp. 3d at 274-75, and *Noerr-Pennington* is not a basis for dismissal where, as here, a complaint alleges unlawful conduct that is not protected petitioning activity.  *See, e.g.*, *Coal. for ICANN Transparency, Inc.* v. *VeriSign, Inc.*, 611 F.3d 495, 505-06 (9th Cir. 2010) ("[T]he district court erroneously construed the allegation in the complaint as pertaining solely to VeriSign's litigation against ICANN [which it considered to be petitioning activity], rather than to the predatory and harassing activities that accompanied that litigation.  The district court's reliance on the *Noerr-Pennington* immunity doctrine therefore was misplaced, because *Noerr-Pennington* immunizes only [petitioning] activity, not other forms of threats or harassment."); *hiQ Labs, Inc.* v. *Linkedin Corp.*, 485 F. Supp. 3d 1137, 1147, 1155 (N.D. Cal. 2020) (denying motion to dismiss); *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 372-73, 380 (S.D.N.Y. 2002) (same).[12]

---

[12] At minimum, the applicability of *Noerr-Pennington* to Defendants' private and nongovernmental activities implicates questions of fact more appropriate for resolution at an evidentiary hearing.  *See IGT* v. *Alliance Gaming Corp.*, 2006 WL 8441916, at *4 (D. Nev. Jan. 10, 2006) (applicability of *Noerr-Pennington* "is a question of fact at best"); *In re Suboxone*, 622

And even if *some* of Defendants' alleged conduct is protected by *Noerr-Pennington*, the "remaining challenged conduct in the aggregate . . . is sufficient to support antitrust liability." *In re Suboxone*, 622 F. Supp. 3d at 77; *see also SMJ Grp.*, 2006 WL 2516519, at *7 (cited at Cliffs Br. 5) ("The mere fact that some portion of defendants' activity is expressive does not render defendants immune from suit under federal and state trademark law."). The court's recent decision in *In re Suboxone* is instructive. In that case, the defendant "directed" its anticompetitive petitioning "to both *private* MCOs and governmental Medicaid agencies." 622 F. Supp. at 77 (emphasis in original). Judge Goldberg found, on summary judgment, that "even if the efforts to convince the Medicaid agencies to give formulary preference . . . are immunized, the efforts to convince private MCOs to give such formulary preference are not." *Id.* Likewise here, Plaintiffs "are not seeking to hold [Defendants] liable based on [their] statements to" CFIUS or the President, but for an unlawful agreement and conduct aimed at private parties, including U. S. Steel's investors, NSC, and any other potential transaction partners, to force a sale of U. S. Steel to Cliffs and obstruct any other transaction. *Id.*; *see supra* pp. 8-9. "Plaintiffs are permitted to establish that [Defendants' petitioning] activity, lawful or not, was just another building block in causing the overall anticompetitive injury." *Id.*

### 2. The Complaint Alleges Harm Independent of and Not Incidental to Any Petitioning Activity.

Defendants' claim that "Plaintiffs have not alleged any harm **other than** the consequences of the President's decision to block the Merger or Defendants' purported efforts to procure that decision" likewise misses the mark. Cliffs Br. 9 (emphasis in original). The wrong that the Complaint seeks to remedy is not President Biden's decision to block the Merger or Defendants'

---

F. Supp. at 77, 80 (evaluating applicability of *Noerr-Pennington* and denying summary judgment because "issues of material fact exist").

efforts to corrupt the CFIUS process, but Defendants' unlawful and anticompetitive *agreement*.

As alleged, that agreement is *not* limited to the Merger, will *not* terminate if the Merger is permanently blocked (or if the block is lifted), and will *continue* to act as a yoke on U. S. Steel until Defendants succeed in their effort to acquire its assets or prevent it from acquiring the resources it needs to effectively compete. ¶¶ 43, 162, 175. Put more succinctly: it's merge or murder. And if the Merger is permanently blocked, even Defendants could not argue that their agreement constitutes "protected petitioning activity" because there will no longer be any deal to "petition" about. Accordingly, Defendants' syllogism (Cliffs Br. 10)—that because Plaintiffs "will be able to consummate" the Merger if the CFIUS block is reversed, "the source of the complained of injuries" must be President Biden's decision—is both logically flawed and incompatible with Plaintiffs' pleading.

Defendants' cited authority is thus inapposite. "[T]he harm associated with" Defendants' conspiracy is not "merely incidental to the harm associated with the governmental action," Cliffs Br. 9 (quoting *Mass. I*, 937 F. Supp. at 440), but existed before the CFIUS process commenced and will exist after such "governmental action" has concluded. If anything, Defendants' attack on the Merger is "incidental" to the underlying conspiracy, which is broader in both duration and scope. Likewise, "the true harm alleged" is not "one born from state action," but from Defendants' illegal agreement. *Id.* (quoting *Geomatrix*, 82 F.4th at 482). And Defendants have harmed Plaintiffs not as "an incidental effect of a legitimate attempt to influence governmental action," *id.* (quoting *Mass. II*, 107 F.3d at 1035), but directly by making false and misleading statements about Plaintiffs' financial health and business practices to the "private marketplace," *see* Point I.B.1, *supra*, and most fundamentally as regards U. S. Steel, by warning off any other potential sources of capital through the exercise of their "de-facto veto power." ¶ 10.

24

That Plaintiffs' complained-of harm flows from Defendants' *agreement* and unprotected conduct—as opposed to President Biden's decision—is further evident from Plaintiffs' proposed preliminary injunction order.  Ex. D.  Consistent with the Court's direction at the hearing on the expedition motion, Plaintiffs drafted and shared this proposed order with Defendants, detailing the precise conduct they submit should be enjoined in order to address the harm caused by Defendants.[13]  Tr. 64:15-18.  Despite pressing to receive the proposed order before their motions to dismiss were due, Defendants made no mention of the draft in their briefing as it belies their claim that Plaintiffs seek a remedy focused on governmental speech.

### 3.    Any Purported Petitioning Activity Is an Unprotected "Sham."

Even if *some* of Defendants' unlawful conduct qualified as "petitioning" (and it does not), such conduct would fall within *Noerr-Pennington*'s "sham" exception, which withholds protection from activity that "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor."  *Hanover 3201*, 806 F.3d at 178 (quoting *Noerr*, 365 U.S. at 144).  The Complaint details a pattern of "unethical conduct in the setting of the [CFIUS] adjudicatory process" that renders *Noerr-Pennington* inapplicable.  *Cal. Motor*, 404 U.S. at 512, 515; ¶¶ 177-89.  As alleged in the Complaint and summarized above (*supra* p. 11), Defendants procured an arrangement that wholly corrupted the CFIUS process, including by piercing its statutory confidentiality requirements.  ¶¶ 21, 193.  Goncalves acknowledged as much: "*[T]here's no process.  This is not going to be a process.  CFIUS is just cover for a President to kill a deal.*"  ¶ 189.  Indeed, as the Department of Justice explained just

---

[13] As Plaintiffs noted when sharing the proposed order with Defendants, it is based on information presently available.  Plaintiffs anticipate that its precise contours will change to reflect the evidentiary record as it develops through discovery and at the preliminary injunction hearing.  *See, e.g.*, *Danieli Corp.* v. *SMS Grp., Inc.*, 2022 WL 2541981, at *2 (W.D. Pa. Mar. 18, 2022).

days ago in opposing the USW's effort to intervene in Plaintiffs' D.C. Circuit challenge, the USW "lacks any cognizable interest in the challenged Presidential order" and "had no legally cognizable interest in procuring [that order] in the first place."[14]  The same is true of Cliffs.  Because Defendants' "unethical conduct" sought to "eliminate . . . a competitor by denying him free and meaningful access to the agencies," the doctrine's "sham" exception applies.[15]  *Cal. Motor*, 404 U.S. at 513, 515; *Hanover 3201*, 806 F.3d at 181-83.[16]

Defendants' argument that the sham exception cannot apply because, Defendants assert, their lobbying efforts in this regard were "successful" in causing the former President to block the Merger (Cliffs Br. 11) gets the inquiry backwards.  Plaintiffs allege that the CFIUS process was *itself* corrupted by Defendants' interference—factual allegations that must be credited on a motion to dismiss and which Defendants ignore in their telling of events.  *See Premier Comp*, 163 F. Supp. 3d at 275.  Regardless, whether Defendants' efforts were "successful"—a fact question that should not be resolved on a motion to dismiss—will ultimately be decided by the D.C. Circuit.  *See Cap. Builders, Inc.* v. *Twp. of Robinson*, 2024 WL 1285776, at *10 (W.D. Pa. Mar. 26, 2024) ("whether a petition is a sham is generally a question of fact").

---

[14] Respondents' Opposition to Motion to Intervene, *U.S. Steel Co.* v. *CFIUS*, No. 25-1004, at 8-9 (D.C. Cir. Feb. 18, 2025).

[15] Defendants' reliance (Cliffs Br. 11) on the Supreme Court's articulation of the sham exception in *Pro. Real Est. Invs., Inc.* v. *Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) is misplaced because Plaintiffs allege a wholesale denial of process under *California Motor*.  As the case law makes clear, it does not matter whether Defendants made a "series" of filings or any actual filing, so long as Defendants' interference prevented Plaintiffs from securing "free and meaningful access" to the adjudicatory process.  *See Inline Packaging, LLC* v. *Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117, 1133 (D. Minn. 2016) (applying *California Motor* without any filings).

[16] Also incorrect is Defendants' claim that "[l]iability for injuries caused by . . . state action is precluded even where it is alleged that a private party urging the action did so by bribery, deceit, or other wrongful conduct."  Cliffs Br. 12.  Such "unethical conduct" is not "immunized" in an adjudicatory context like CFIUS.  *Cal. Motor*, 404 U.S. at 512-13.

II.    **PLAINTIFFS ADEQUATELY PLEAD CLAIMS UNDER THE SHERMAN ACT.**

Defendants alternatively move to dismiss Plaintiffs' antitrust claims at issue here—Counts I and IV,  alleging violations of Sections 1 and 2 of the Sherman Act, respectively.  To state a claim under Section 1, a plaintiff must plead two elements:  (1) an agreement (2) which imposed an unreasonable restraint on trade.  *Gen. Nutrition Corp.* v. *Javaid*, 2018 WL 1089758, at *1 (W.D. Pa. Feb. 26, 2018) (citing *Burch* v. *Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011)).

A Section 2 conspiracy claim has four elements:  (1) an agreement (as with a Section 1 claim); (2) an overt act in furtherance of the conspiracy; (3) specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged.  *Howard Hess Dental Lab'ys. Inc.* v. *Dentsply Int'l., Inc.*, 602 F.3d 237, 253 (3d Cir. 2010).  Defendants base their motions to dismiss these claims primarily on the grounds that (1) the Complaint fails to adequately plead the existence of an agreement between and among Defendants, and (2) Plaintiffs have not adequately alleged a "dangerous probability" that the conspiracy will be successful—which, as explained below, is not a required element of either claim.

Notably, Defendants do *not* contest that the Complaint adequately alleges that Cliffs is a monopolist in the markets for electrical steel and iron ore pellets, or that the alleged agreement at the center of this case—to force a sale of U. S. Steel to Cliffs or block a deal with anyone else—unreasonably restrains trade (in violation of Section 1) and furthers Cliffs' monopolistic ambitions (in violation of Section 2).  Cliffs Br. 12-16; McCall Br. 15.

As detailed below, Plaintiffs more than satisfy their pleading burden.

A.    **The Complaint Adequately Pleads an Agreement.**

Defendants advance a counter-narrative that it was not an agreement, but a fortuitous alignment of interests, that led Cliffs, Goncalves, McCall, and the USW to "independently" work—at the same time and often in tandem—to pressure U. S. Steel into a deal with Cliffs and

against any other deal.  That these "aligned interests" would cement Cliffs' monopoly and lead to an unreasonable restraint on trade is, according to Defendants, an equally fortuitous result.  Cliffs Br. 12; McCall Br. 13.  In disputing the facts pleaded in the Complaint, Defendants misapprehend what constitutes an agreement under the antitrust laws and what factual allegations are necessary to plead that one exists.

Under Sections 1 and 2, "[a]n agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." *West Penn*, 627 F.3d at 99.  Plaintiffs allege that, no later than July 2023, Cliffs and the USW leadership struck an "agreement to support only Cliffs as a buyer of U. S. Steel, to try to force U. S. Steel to acquiesce in such a transaction, and to oppose any other potential bidder." ¶¶ 9, 66, 175, 201, 241.  The agreement here is like many that antitrust courts have found illegal. Cliffs reached an agreement with USW leadership to hobble Cliffs' chief competitor, while protecting the USW's ability to supply unionized labor into the relevant markets by sidelining less-favored operators.  In this way, it is no different than the agreement in *West Penn*, another antitrust conspiracy injurious to Western Pennsylvania.  In that case, the University of Pittsburgh Medical Center, the dominant medical provider in Allegheny County, conspired with Highmark, the dominant insurer, to "hobble" and "destroy investor confidence" in the plaintiff, the Medical Center's key competitor, and exclude alternative sources of health insurance.  627 F.3d at 94, 104, 105, 109.  And it is also no different from the many examples where *unions* conspired with other market participants to "eliminate competitors from the industry" perceived as a threat to union labor.  *See* Point IV.A, *infra* (citing cases).

The Complaint sets forth, in great factual detail, both direct and circumstantial evidence of Defendants' agreement.  As direct evidence, it alleges that within days of Cliffs making a hostile

28

bid for U. S. Steel, the USW's leadership wrote a letter on August 3—delivered by *Cliffs* to U. S. Steel—revealing that the two had reached an agreement whereby the USW would "unequivocally endorse" Cliffs' bid and "not endorse *anyone* other than Cliffs" in *any* bid for U. S. Steel.  ¶ 47.

Defendants try to downplay the letter as nothing more than the USW's exercise of its right under the BLA with U. S. Steel to assign its right to bid for U. S. Steel to Cliffs.  Cliffs Br. 14; McCall Br. 15.  But the agreement reflected in the letter both *predates* the assignment of the USW's right to bid and reaches well *beyond* a mere assignment of that right—it reflects the USW's commitment to "unequivocally" support Cliffs' bid and "not endorse anyone other than Cliffs" for a purchase of U. S. Steel, even after Cliffs' bid failed.  ¶ 47; ECF No. 80-3 (BLA) Art. 11.C.  As Goncalves explained in his own words, the USW's commitment not only to support Cliffs, but also actively obstruct *any other* bidder (¶¶ 2, 51, 84, 169), with no expiration date, gives Cliffs "*de-facto veto power* to disallow the acquisition of U. S. Steel or USW-represented assets by anyone else other than Cleveland-Cliffs."  ¶ 10; *see also* ¶ 50 (Goncalves: "Cliffs is the only realistic buyer.  . . .  [A sale] could not be consummated without the support of the USW").

As explained above (and is not in dispute), an agreement to "exercise [] veto power" over a competitor's commercial activity "constitutes a patently unreasonable restraint of trade," *ES Dev.*, 939 F.2d at 555; *supra* p. 17, and the August 3 letter is explicit "direct evidence" of such an agreement that is plainly "sufficient to survive a motion to dismiss."  *West Penn*, 627 F.3d at 100; *see, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 950-51 (N.D. Ill. 2018) (allegations that defendants had agreed to "support each other's" businesses and "therefore block [] competitors" were "textbook examples of adequate direct-evidence allegations"); *Rossi* v. *Standard Roofing, Inc.*, 156 F.3d 452, 468-69 (3d Cir. 1998) (allegations that "competitors had

discussed and agreed to act jointly to prevent [plaintiff] from competing with them" was "direct evidence" of conspiracy).

Defendants argue that the August 3 letter is just an "endorsement" and not an "agreement." Cliffs Br. 4; McCall Br. 18.  Putting aside that this contention raises a question of fact, Plaintiffs have also alleged a host of evidence in the form of Defendants' *own* statements that demonstrate *they* understood that "endorsement" to be the agreement alleged, including by way of example:

- "As we have explained to U. S. Steel since day 1, the United Steelworkers (USW) has declared they would only support Cleveland-Cliffs for a proposed acquisition of U. S. Steel.  ***We see that as a de-facto veto power to disallow the acquisition of the entirety of U. S. Steel or USW-represented assets by anyone else other than Cleveland-Cliffs***." ¶ 10.
- "No one else has the [U]nion . . . and there is ***zero*** chance anyone [else] will have the Union. . . . I have already fixed the situation in a way so that it cannot go against me." ¶¶ 74, 169.
- "I promise you there's no deal with the Union.  That's not gonna happen." ¶ 73.  And "[n]obody has a relationship with the Union as I have." ¶ 74.
- "There's nothing that [NSC] can do that's gonna bring the [USW] on their side. Nothing." ¶¶ 62, 66.
- McCall's expressed "delight[]" to "further expand [the] already great ***partnership*** between Cliffs and the USW." ¶ 105.

Whether taken as further direct evidence of an agreement or circumstantial evidence "from which the fact finder may infer [an] agreement," they are more than enough to satisfy Plaintiffs' pleading burden.  *See Norfolk Monument Co.* v. *Woodlawn Mem'l Gardens, Inc.*, 394 U.S. 700, 704 (1969); *see also Continental Ore*, 370 U.S. at 699 ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole").

In addition to this direct evidence, the Complaint pleads extensive circumstantial evidence of the conspiracy.  The Complaint is packed with factual allegations "that the [D]efendants got together" and "adopted a common plan"—a form of circumstantial evidence "implying a traditional conspiracy" and one of the recognized "plus factors" that support the finding of an

agreement.[17]  *See Lifewatch Services Inc.* v. *Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004) (traditional evidence of a conspiracy included allegations of information exchanges among defendants' upper ranks that were tightly linked with concerted behavior); *In re Domestic Drywall Antitrust Litig.*, 2019 WL 3254090, at *31 (E.D. Pa. July 19, 2019) (denying summary judgment based on traditional evidence of a conspiracy which included communications between defendants that "[t]ogether . . . present[ed] a foundation from which a jury could conclude that [defendants were] coordinating").

Examples abound.  The USW was not only privy to Cliffs' unsolicited bid for U. S. Steel, but it had *Cliffs* deliver the USW's letter declaring it would not support any other bidder at a time when Cliffs' bid was still nonpublic.  ¶ 46.  When Cliffs' executives preemptively warned investors that the USW would file successorship grievances imminently attacking the Merger, the USW did so by the end of the week.  ¶¶ 60, 62.  When McCall went to the White House in the evening of November 22, 2024, Celso Goncalves knew about it beforehand (and told investors).  ¶¶ 94, 185.

These few examples (and there's much more, *see supra* pp. 8-10), go well beyond an "opportunity to conspire" or "exchange information or make agreements," which may by itself "support[] an inference of an agreement."  *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 449-50 (E.D. Pa. 2018).  They confirm what Goncalves has admitted publicly: "[n]obody has a relationship with the Union as I have."  ¶ 74.  *See also Int'l Constr. Prods. LLC* v. *Caterpillar Inc.*, 2016 WL 4445232, at *4 (D. Del. Aug. 22, 2016) (denying motion to dismiss where plaintiff pleaded that defendants made the same threats toward plaintiff, at roughly the same

---

[17] Notably, the "parallel conduct" that Defendants concede (Cliffs Br. 14) is itself a common form of circumstantial evidence of conspiracy.  *See, e.g.*, *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 440 (E.D. Pa. 2018); *Avenarius* v. *Eaton Corp.*, 898 F. Supp. 2d 729, 738 (D. Del. 2012) (same).

time, using the same means, in support of a conspiracy to exclude the plaintiff from the market); *Steward Health Care Sys., LLC* v. *Blue Cross & Blue Shield of R.I.*, 311 F. Supp. 3d 468, 502 (D.R.I. 2018) (denying summary judgment based on traditional evidence of conspiracy, including "assurances, conversations, and exchanges of value" between defendants to support "illicit agreement to keep [competitor] out of [relevant market]").[18]

In addition to ignoring the facts set forth in the Complaint, Cliffs also mischaracterizes what the law requires to plead an agreement at this preliminary stage of the proceedings. *First*, citing *Twombly*, Cliffs claims that the facts pleaded "must be 'adequate' to show why 'parallel conduct that could just as well be independent action' is actually ***more likely*** to reflect a secret, illegal conspiracy." Cliffs Br. 12. But *Twombly* stands for the opposite:

> Asking for plausible grounds to infer an agreement does ***not*** impose a ***probability requirement*** at the pleading stage . . . . And, of course, a well-pleaded complaint may proceed ***even if it strikes a savvy judge that actual proof of those facts is improbable*** . . . .

550 U.S. at 556; *see also Phillips*, 515 F.3d at 233 ("The [Supreme] Court emphasized throughout its opinion [in *Twombly*] that it was neither demanding a heightened pleading of specifics nor imposing a probability requirement.").

*Second*, Cliffs asserts that at the pleading stage plaintiffs must furnish evidence that "tend[s] to *exclude* the possibility that the alleged co-conspirators were acting independently." Cliffs Br. 14 (citing *Monsanto Co.* v. *Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)). But *Monsanto* was not a pleading decision—it described the proof necessary to show illegal conspiracy on a

---

[18] Courts and antitrust regulators have routinely found that "collusive communications can be based upon circumstantial evidence and can occur in speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F.Supp.2d 1348, 1360 (N.D. Ga. 2011); *see also, e.g.*, *In re Valassis Commc'ns, Inc.*, 2006 WL 1367833 (F.T.C. Complaint Apr. 19, 2006) (same); *In re Travel Agency Comm'n Antitrust Litig.*, 898 F. Supp. 685, 690 (D. Minn. 1995) (same).

motion for a directed verdict *at trial*. *See id.* at 768; *see also Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (citing *Monsanto* for the evidentiary requirement "[t]o survive a motion for summary judgment or for a directed verdict"). By contrast, *Twombly*—a pleadings decision issued more than 20 years after *Monsanto*—makes clear that to survive a motion to dismiss a plaintiff need only plead "enough factual matter (taken as true) to *suggest* that an agreement was made." 550 U.S. at 556. The Complaint more than satisfies this standard.

*Third*, Defendants contend that Plaintiffs are also *required* to allege as "plus factors" (i) a "motive" to enter into the illegal agreement, as well as (ii) "conduct against interest," to adequately plead an antitrust conspiracy based on circumstantial evidence. Cliffs Br. 15; McCall Br. 15. Not so. Because evidence implying the existence of a conspiracy can depend on context, courts instead recognize that there is no exhaustive list of plus factors and that a plaintiff must only establish one to state a claim when relying on parallel conduct.[19] *Flat Glass*, 385 F.3d at 360; *Deborah Heart & Lung Ctr.* v. *Penn Presbyterian Med. Ctr.*, 2012 WL 1390249, at *3 (D.N.J. Apr. 19, 2012).

Here, no "plus factor" is necessary because of the direct evidence of the conspiracy that the Complaint pleads, as described above. But even putting that aside, not only does the Complaint plead coordination (a recognized "plus factor"), it pleads both of the "motive" and "conduct against interest" plus factors as well. In particular, the Complaint pleads that (i) Cliffs was motivated to enter into the illegal agreement to further its quest to acquire U. S. Steel, to cement its monopoly

---

[19] Defendants rely on *TruePosition, Inc.* v. *LM Ericsson Tel. Co.*, 844 F. Supp. 2d 571, 596-97 (E.D. Pa. 2012) (Cliffs Br. 15), but none of the Third Circuit cases it relies on say that pleading conduct against interest is a required plus factor. In fact, they say the opposite. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010) ("plaintiffs relying on parallel conduct must allege facts that, if true, would establish at least one 'plus factor'"); *In re Flat Glass*, 385 F.3d at 361 n.12 (neither of first two plus factors is "necessary"); *Burtch*, 662 F.3d at 22-29 (same).

power and to (as Goncalves himself put it) control "everything" (¶ 7), whereas McCall sought to safeguard the USW's leadership's power by helping to consolidate unionized blast furnace steelmaking under Cliffs' control (¶¶ 4, 9, 158, 239) and (ii) McCall's decision to exclusively support Cliffs is contrary to the USW's rank-and-file members' interests because they would gain greater job security and other benefits through the Merger (¶¶ 15-16).[20]

*Finally*, Defendants criticize Plaintiffs for not producing a "smoking gun," Cliffs Br. 13, but the multiple public acknowledgements by Defendants of the existence of their agreement (*supra* p. 2), necessitate nothing more. In any event, "it is axiomatic that the typical conspiracy . . . must almost always be proved by inferences that may be drawn from the behavior of the alleged conspirators." *ES Dev.*, 939 F.2d at 553-54; *see, also*, *e.g.*, *In re Diisocyanates Antitrust Litig.*, 2022 WL 17668470, at *6-7 (W.D. Pa. Oct. 19, 2022).

## B.    The Complaint Adequately Pleads Antitrust Standing.

Defendants also argue that Plaintiffs have not alleged "antitrust injury" by mischaracterizing the harm that Plaintiffs allege. Cliffs Br. 16. Plaintiffs' claims of antitrust injury are *not* premised on whether or not U. S. Steel and NSC "are able to merge or are instead blocked by the government," as Defendants assert. Cliffs Br. 17. As explained above, Plaintiffs' injury results instead from Defendants' concerted efforts to deny U. S. Steel the substantial investment— from NSC *or from anyone else*—needed to compete most effectively against Cliffs. ¶¶ 170-72. That threatened harm is squarely an "injury of the type the antitrust laws were intended to prevent

---

[20] In addition, while "conduct against interest" makes sense as a plus factor in the face of otherwise irrational market behavior by horizontal competitors, it has less relevance in the context of a largely out-in-the-open conspiracy between an industry participant and a labor union. *In re Flat Glass*, 385 F.3d at 360-61 ("Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market. . . . Put differently, in analyzing this factor a court looks to evidence that the market behaved in a noncompetitive manner.").

and that flows from that which makes [the] defendants' acts unlawful." *West Penn*, 627 F.3d at

101.  And NSC, as a potential competitor to a monopolist, also suffers independent antitrust injury.

*See id.*; *Gulf States Reorganization Grp., Inc.* v. *Nucor Corp.*, 466 F.3d 961, 967-68 (11th Cir.

2006) ("the injury to the [plaintiff]" is "its exclusion from the relevant market").

Nor is there any merit to Defendants' accompanying argument that Plaintiffs are not the

"proper parties" to seek redress for this harm.  Cliffs Br. 16.  Again, Defendants do not dispute

that Cliffs seeks to acquire or weaken U. S. Steel to achieve anticompetitive goals and prevent

NSC from entering the market.  *Supra* p. 5.  Indeed, Defendants do not even address the *Mesabi*

decision referenced in Plaintiffs' Complaint that held, on an evidentiary basis, that Cliffs is an

anticompetitive monopolist.  ¶ 24 n.1.  The harm from Cliffs' scheme here is not simply denying

U. S. Steel its "preferred source" of capital, as Defendants suggest, but rather impairing U. S. Steel

as a competitor to bolster Cliffs' monopoly power in critical steel markets and preventing NSC

from competing in them.[21]  The Complaint demonstrates that both U. S. Steel and NSC are directly

affected by Defendants' conduct and are, therefore, proper parties.  As "competitors in the

restrained market" and "those whose injuries are the means by which the defendants seek to

achieve their anticompetitive ends," Plaintiffs fall squarely in the class of plaintiffs entitled to seek

redress.  *West Penn*, 627 F.3d at 102.

Equally unavailing is Defendants' argument that the Complaint fails to allege harm that

"flows from that which makes defendants acts unlawful."  Cliffs Br. 17-18.  That argument is also

predicated on the false premise that the "sole injury [Plaintiffs] allege is due to the [former]

---

[21] Defendants' reliance on *SEI Glob. Servs., Inc.* v. *SS&C Advent*, 2022 WL 2356730, at *3 (3d Cir. June 30, 2022), is misplaced because the sole injury alleged was defendant's refusal to provide plaintiff with access to defendant's software on which plaintiff "chose to root its business model" and for which there were alternatives available.  *Id.*  Here, Defendants' agreement seeks to prevent U. S. Steel from obtaining needed investment *from anyone* and to stifle competition.  ¶¶ 50, 279.

President's Order" blocking the Merger. *Id.* But as explained above (Point I.B, *supra*), Plaintiffs' harm "flows" from an agreement that was entered into before NSC was in the picture and which will continue to encumber U. S. Steel if the Merger remains blocked. And if the former President's Order is reversed, Defendants have made clear their resolve to continue "to fight." *Supra* pp. 12-13. Those continued efforts to deny NSC entry into the U.S. market likewise cause it harm.

That these harms have not yet been fully realized is no bar under the antitrust laws, which make clear that an antitrust plaintiff is "entitled to sue for and have injunctive relief . . . against *threatened* loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26; *Mid-West Paper Prods. Co.* v. *Continental Grp., Inc.*, 596 F.2d 573, 594 (3d Cir. 1979) (upholding standing to seek injunctive relief); 9 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 335(b) (5th ed. 2024) ("[A]n injunction is available before any actual loss or damage—speculative, duplicative, or otherwise—occurs, § 16 requires only that injury be 'threatened.'"). Nor is such harm merely "speculative." Cliffs Br. 17; McCall Br. 16-17. Indeed, Defendants themselves have stated that U. S. Steel is materially damaged. *See supra* p. 13. And, as pleaded in the Complaint, U. S. Steel's standalone plan absent a transaction was and remains to idle more blast furnaces, leaving Cliffs in an even more dominant market position. ¶ 14. There is nothing speculative about it.

### C. The Complaint Adequately Pleads a Conspiracy to Monopolize.

Lastly, Defendants argue that because a Cliffs acquisition of U. S. Steel would be subject to DOJ antitrust review, Plaintiffs have failed to plead a "dangerous probability of success" with respect to Plaintiffs' Section 2 conspiracy to monopolize claim in Count IV. McCall Br. 15-17; Cliffs Br. 18-19. This argument is flawed in multiple respects:

*First*, and foremost, a "dangerous probability of success" is *not* an element of a conspiracy to monopolize claim. Defendants' contrary argument relies on *V. & L. Cicione, Inc.* v. *C. Schmidt & Sons, Inc.*, 403 F. Supp. 643, 651 (E.D. Pa. 1975), *aff'd*, 565 F.2d 154 (3d Cir. 1977), but if that

proposition was ever good law in this Circuit, it is not any longer. Although courts were "divided" in the past "over whether a dangerous probability of success is required," *Black Box Corp.* v. *Avaya, Inc.*, 2008 WL 4117844, at *8 (D.N.J. Aug. 29, 2008), more recent cases have rejected such a requirement, *e.g.*, *Invidior Inc.* v. *Dr. Reddy's Lab'ys S.A.*, 2020 WL 4932547, at *6-7 (D.N.J. Aug. 24, 2020) (enumerating the elements of both a claim for attempted monopolization and a claim for conspiracy to monopolize). And recent Third Circuit precedent confirms that a dangerous probability of success is not an element of a conspiracy claim. *E.g.*, *Howard Hess Dental Lab'ys., Inc.* v. *Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010) (listing elements).

*Second*, even if dangerous probability of monopolization were an element, Plaintiffs sufficiently plead it: Defendants ignore Plaintiffs' allegations that Cliffs need not succeed in its takeover goal for Cliffs to successfully monopolize, or maintain its monopolies. ¶¶ 17, 30, 43, 69, 119, 141, 162. Defendants' "merge *or* murder" conspiracy is premised on "*either* acquir[ing] U. S. Steel *or* prevent[ing] anyone else from doing so, leaving U. S. Steel deprived of the capital and technology it needs to compete effectively." ¶ 162. If regulators block a Cliffs acquisition after Defendants have successfully warded off all other sources of the capital support to U. S. Steel, then Cliffs will have succeeded in maintaining its monopoly in electrical steel and securing greater dominance over blast furnace production without having shelled out for U. S. Steel's assets. Cliffs' own executives articulated the plan: "U. S. Steel can either shut down [its blast furnaces] or sell them to us on the cheap"; either way, "[t]here will be less competition." ¶ 58.

*Third*, Cliffs has claimed that with the USW in its pocket, it will clear any antitrust regulatory hurdles despite the anticompetitive nature of an acquisition. ¶ 108 ("With labor support, we always felt good about antitrust, especially under [the Biden] administration, and maybe even

under another administration.").  But even if that is wrong, U. S. Steel would be hamstrung during the period of antitrust review, aiding Cliffs regardless of whatever action DOJ takes.  ¶ 69.

### III.    PLAINTIFFS ADEQUATELY PLEAD CLAIMS FOR TORTIOUS INTERFERENCE.

To state a claim for tortious interference with existing or prospective contractual relations, Plaintiffs must plead (1) the existence of a contractual or prospective contractual relation; (2) purposeful action by Defendants to harm that relation; (3) the absence of privilege or justification on part of Defendants; and (4) actual legal damage as a result of Defendants' conduct.  *Bral Corp.* v. *Johnstown Am. Corp.*, 919 F. Supp. 2d 599, 612 (W.D. Pa. 2013).  Plaintiffs plead each element.

#### A.    The Complaint Adequately Pleads Tortious Interference with Contract.

Defendants argue that Plaintiffs' claim for tortious interference with contract (Count VIII) should be dismissed because "[t]he Complaint does not allege that the Merger Agreement, or any other contract, has been breached."  Cliffs Br. 20.  But there is no requirement that a breach have already occurred before a plaintiff may seek injunctive relief on a claim for tortious interference. Indeed, such a requirement would be nonsensical, which is why courts routinely recognize claims for tortious interference where a defendant is *attempting* to induce a breach or nonperformance of a contract, and then grant injunctive relief to enjoin the interference.  *See, e.g.*, *SecureInfo Corp.* v. *Bukstel*, 2003 WL 21961370, at *6 (E.D. Pa. May 8, 2003) (granting preliminary injunction on tortious interference claim because, though plaintiff had not "point[ed] to any specific business client or customer that [it] had lost," there was a "real danger" that defendant's "vendetta" would eventually cause "actual loss of business"); *Ride the Ducks of Phila., LLC*, 2005 WL 1583514, at *2 (3d Cir. 2005) (affirming preliminary injunction even though "injury ha[d] not yet occurred" and noting that "the purpose of a preliminary injunction is to prevent the occurrence of injuries"); *BIEC Int'l, Inc.* v. *Glob. Steel Servs., Ltd.*, 791 F. Supp. 489, 549 (E.D. Pa. 1992) (granting

preliminary injunction and noting that attempts to induce breach are "precisely the kind of interference with existing contractual relations . . . the common law was designed to protect").

That is precisely what Plaintiffs allege here. As set forth in the Complaint, Cliffs has already expressly *solicited* NSC to breach the agreement and cut a new deal involving Cliffs. ¶ 71; *supra* p. 20. Plaintiffs have also alleged that Defendants have sought and will continue to seek to delay closing such that the Merger Agreement fails in connection with the June 18, 2025, contractual deadline by which the conditions to closing must be met. ¶¶ 167, 267. Allegations, such as these, that Defendants are seeking to induce a termination of the Merger Agreement, even if not through breach, likewise state a claim for tortious interference. *See, e.g., Neyer, Tiseo & Hindo, Ltd.* v. *Russell*, 1993 WL 334951, at *8 (E.D. Pa. Aug. 26, 1993) (finding defendants liable for tortious interference where the defendants caused the plaintiff's client to lawfully terminate a "contract [that] was terminable at will"). Under the law, Defendants cannot fend off an injunction by asserting that Plaintiffs must wait for Defendants' scheme to fully and finally succeed and the Merger Agreement to fail—*i.e.*, when it would be too late for an injunction to matter.

Further, even apart from an attempt to induce a breach or termination of the Merger Agreement, the Complaint also states a tortious interference claim for "causing [Plaintiffs'] performance to be more expensive or burdensome." Restatement (Second) of Torts § 766A; ¶¶ 30, 168, 172, 267-69, 279. Defendants do not dispute that their interference has rendered performance of the Merger Agreement "more expensive or burdensome." Cliffs Br. 21. Instead, they argue that "tortious interference claims based on increased burden . . . are not available under Pennsylvania law," based on *Gemini Physical Therapy & Rehab., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63 (3d Cir. 1994), in which the Third Circuit predicted that the Pennsylvania Supreme Court would reject Section 766A of the Restatement. Cliffs Br. 21. But in 2011, the

Pennsylvania Supreme Court favorably cited Section 766A as part of "a detailed framework for analyzing claims of tortious interference with contractual relations," *Walnut St. Assocs., Inc.* v. *Brokerage Concepts, Inc.*, 20 A.3d 468, 476 n.11 (Pa. 2011); multiple Pennsylvania state courts, including the Superior Court of Pennsylvania, *XTO Energy, Inc.* v. *Dominion Field Servs., Inc.*, 2014 WL 10788907, at *17 (Pa. Super. Ct. Oct. 22, 2014), have also since applied Section 766A as reflecting Pennsylvania law, *see, e.g., P.V.C. Realty ex rel. Zamias* v. *Weis Markets*, 56 Pa. D. & C. 4th 304, at *16-17 (Cambria Cty. Ct. Com. P. 2000) ("[T]here is nothing in the case law to suggest that, if faced with an appropriate case, our Supreme Court would reject section 766A as an accurate statement of the law"). Courts in this Circuit afford "due deference" to a state's intermediate court rulings, notwithstanding prior contrary predictions by the Third Circuit. *Crystallex Int'l Corp.* v. *Petroleos De Venezuela, S.A.*, 879 F.3d 79, 84 (3d Cir. 2018).[22] Defendants are thus incorrect that Section 766A's recognition of a tortious interference claim for making contractual performance "more expensive or burdensome" does not apply in Pennsylvania.[23]

---

[22] The Third Circuit's interpretation of Pennsylvania law is not binding if "it is inconsistent with a subsequent holding of the state Supreme or intermediate appellate courts." *Xtreme Caged Combat* v. *Cage Fury Fighting Championships*, 2015 WL 3444274, at *9 n.10 (E.D. Pa. May 29, 2015). "[W]hen the Pennsylvania intermediate appellate courts have ruled to the contrary and their decisions have not been overruled by the state's highest court," a district court is "no longer compelled to follow the Third Circuit's prediction." *Busch* v. *Domb*, 2017 WL 6525779, at *5 (E.D. Pa. Dec. 21, 2017).

[23] Other states with an interest in this cause of action each recognize Section 766A as well, and, as a result, no conflict of laws analysis is necessary to sustain Plaintiffs' claims. *See, e.g.*, *United States* v. *Buckingham Coal Co.*, 2013 WL 1818611, at *8 (S.D. Ohio Apr. 29, 2013) (Ohio law); *Allen Fam. Foods, Inc.* v. *Capitol Carbonic Corp.*, 2011 WL 1205138, at *5 (Del. Super. Ct. Mar. 31, 2011) (Delaware). Ohio is where all Defendants reside and where the conduct causing Plaintiffs' injury occurred (¶¶ 35-37), and Delaware law governs the Merger Agreement (¶ 12).

B.    **The Complaint Adequately Pleads Tortious Interference with Prospective Contractual Relations.**

Defendants contend that Plaintiffs' claim for tortious interference with prospective contractual relations (Count IX) should be dismissed because the "pleadings . . . do not identify any 'prospective' relationship with the specificity required." Cliffs Br. 22. To the contrary, the Complaint specifically alleges that NSC has pledged to make substantial additional investments in U. S. Steel's operations upon completion of the Merger—beyond the requirements of the Merger Agreement—including $2.7 billion into USW-represented blast furnace facilities, with approximately $300 million earmarked to revamp Blast Furnace #14 at U. S. Steel's Gary Works and at least $1 billion to enhance the competitiveness of the Mon Valley Works. ¶ 166. These are commitments that were made in writing to both the USW and CFIUS and there is accordingly *more* than an "objectively reasonable likelihood or probability" that they will "materialize[]" if the Merger is completed free of "[Defendants'] interference." *Acumed LLC* v. *Advanced Surgical Servs., Inc.*, 561 F.3d 199, 213 (3d Cir. 2009) (cited at Cliffs Br. 22).

Plaintiffs are thus not relying simply on a past "historical relationship . . . as a basis of any likelihood or probability of a prospective contract." Cliffs Br. 22-23. Quite the opposite—and unlike all of the cases Defendants cite—Plaintiffs are relying on *specific* commitments made by NSC in the context of the parties' *current* dealings. That more than suffices. *See, e.g.*, *Bral Corp.*, 919 F. Supp. at 614 ("reasonable probability may result from an unenforceable express agreement, an offer, or the parties' current dealings, but not merely from prior dealings or an existing business relationship between the parties").

Defendants point to the Merger Agreement's "exclusivity" clause, claiming that this provision stands as a bar to any prospective tortious interference claim. Cliffs Br. 23. But that clause has no bearing on the additional, extra-contractual investments by NSC. ¶ 166. Moreover,

Defendants will undoubtedly seek to prevent any alternative transaction between NSC and U. S. Steel if the Merger, in its current form, is not completed.  And even apart from these prospective investments, Defendants have sought to wield the USW's "de-facto veto power" to prevent any bidder other than Cliffs—not just NSC—from acquiring U. S. Steel.[24]  ¶ 10.  If the Merger falls through, Defendants' interference will deter other potential strategic partners from transacting with U. S. Steel (¶¶ 83, 198)—a point that Defendants cannot seriously contest, having proclaimed as much repeatedly and publicly (*e.g.*, ¶¶ 50, 78, 84).[25]

Moreover, courts are properly reluctant to dismiss tortious interference claims at the motion to dismiss stage, particularly "when the factual record has not yet been developed."  *Lin* v. *Rohm & Haas Co.*, 865 F. Supp. 2d 649, 671 (E.D. Pa. 2012) (denying motion to dismiss and noting that whether plaintiff established "reasonable probability" of harm to future business relations is "not appropriate at this motion-to-dismiss stage"); *Sandoz Inc.* v. *Lannett Co., Inc.*, 544 F. Supp. 3d 505, 512 (E.D. Pa. 2021) (denying motion to dismiss and noting that "[t]he reasonableness of the plaintiff's expectation [of a prospective relationship] generally involves questions of fact");

---

[24] Contrary to Defendants' assertion (Cliffs Br. 22), the Complaint does not need to specify "by name" the potential bidders that have been deterred by Defendants' interference.  *See Synthes (U.S.A.)* v. *Globus Medical, Inc.*, 2005 WL 2233441, at \*7 (E.D. Pa. Sept. 14, 2005) (allegation that defendant's "defamatory statements were directed toward potential employees, users, and purchasers of [plaintiff's] products" sufficient because "plaintiff is not required to identify a potential contractual partner by name").

[25] Cliffs attempts to downplay its statements aimed at chilling potential bidders by noting that, as detailed in U. S. Steel's Proxy Statement (ECF No. 52-9), U. S. Steel executed NDAs with "19 potential bidders" and considered five "final proposals to acquire all or parts of USS."  Cliffs Br. 4 n.5.  But out of the 54 bidders contacted (ECF No. 52-9 at 37), NSC was one of only two other than Cliffs willing to buy the entirety of U. S. Steel, including its unionized blast furnace operations, and "honor all commitments in all USW Agreements"—further evidence of the impact of the Defendants' unlawful agreement on the bidding process.  And in any event, these bids were made *before* Defendants demonstrated their resolve to interfere with U. S. Steel's chosen acquirer. There is no reason to think anyone will sign up to serve as a strategic partner with U. S. Steel going forward, given the events detailed in the Complaint.

*E. Frank Hopkins Seafood, Co.* v. *Olizi*, 2017 WL 2619000, at \*4 (E.D. Pa. June 16, 2017) (denying motion to dismiss and noting the "fact-intensive nature" of weighing whether interference was unjustified "before discovery is generally inappropriate"). There is no occasion to do so here.

### C.    The Complaint Adequately Pleads the Absence of Privilege.

Defendants' final argument for dismissal of Plaintiffs' tortious interference claims—that the Complaint fails to plead "the absence of privilege or justification on the part of the defendant"—is likewise misplaced. Cliffs Br. 23. Nothing can be more unworthy of this privilege than Defendants' conduct here: after losing an open and fair bidding process, Defendants have sought to undo the agreement with the winning bidder in order to swoop in at a price lower than previously offered. Not surprisingly, all of Defendants' arguments on this point are without basis.

Defendants' "first" contention for why their interference was purportedly privileged (Cliffs Br. 24) simply rehashes their First Amendment and *Noerr-Pennington* arguments, which fails for the reasons addressed above. Point I, *supra*.

Defendants alternatively claim that their interference was justified because they were "protect[ing] an existing legitimate business concern." Cliffs Br. 24. But no such concern justifies Defendants' false and misleading statements about Plaintiffs and the deal. *See, e.g.*, ¶¶ 60, 66, 70, 86-87, 92, 94-95, 194; *supra* p. 10.[26] And "wrongful means" like these render their "interference improper." Restatement (Second) of Torts § 767 cmt. c (1979); *Smart Commc'ns Holding, Inc.* v. *Glob. Tel-Link Corp.*, 2024 WL 2158676, at \*7 (M.D. Pa. May 13, 2024) (denying motion to dismiss where plaintiff alleged defendant made false and misleading statements concerning

---

[26] That Defendants attempt to dispute whether their statements were, in fact, false or misleading is not a reason to dismiss Plaintiffs' tortious interference claims; it is a reason to deny Defendants' motions. *See Sandoz*, 544 F. Supp. 3d at 516 (denying motion to dismiss where defendant allegedly made "false or misleading statements to customers" and "myriad factual issues . . . preclude[d] a finding of privilege under [Restatement] § 768 as a matter of law").

plaintiff's ability "to carry through on their contractual obligations"); *Allegheny Eng'g Co.* v. *Havtech LLC*, 2018 WL 4599882, at \*4 (W.D. Pa. Jan. 30, 2018) (denying motion to dismiss where plaintiff alleged "false or misleading statements . . . concerning [p]laintiff's capabilities and performance"), *report and recommendation adopted*, 2018 WL 4599876 (W.D. Pa. Feb. 14, 2018); *Sandoz*, 544 F. Supp. 3d at 516 (same).

The same is true of Defendants' alleged violations of the antitrust laws, Point II, *supra*, which form an independent basis to reject any claim of privilege. *See NIBCO Inc.* v. *Viega LLC*, 354 F. Supp. 3d 566, 584 (M.D. Pa. 2018) (denying motion to dismiss where plaintiff "ple[]d[] independently actionable wrongdoing by articulating plausible violations of the antitrust laws").

## IV.    DEFENDANT MCCALL'S SEPARATE ARGUMENTS ARE MERITLESS.

McCall separately asserts a series of arguments seeking dismissal of the claims asserted against him that are at issue on this motion.  None of these arguments has merit either.

### A.    Plaintiffs Have Adequately Alleged a Section 1 Claim Against McCall.

McCall echoes Cliffs' mischaracterization of Plaintiffs' Section 1 claim as merely complaining about a publicity campaign to "convinc[e] the government and the public of their point of view."  McCall Br. 12-13.  Plaintiffs have refuted that contention in Point I, *supra*.  And contrary to McCall's contention (McCall Br. 17-19), the Complaint is replete with allegations specific to him.  *E.g.*, ¶¶ 47 (August 3 letter); 60-62 (campaign of lies directed and spread by McCall); 67 (McCall:  "I want to kill this deal"); 73-77, 82 (McCall's refusal to negotiate in good faith with NSC); 87-88, 92 (coordination with Cliffs on disinformation campaign).

McCall also argues that, since the USW is not alleged to have explicitly "threatened to withhold labor from Plaintiffs, such as through a strike or picket," there can be no concerted or coercive conduct by the USW that undergirds a threatened restraint on trade.  McCall Br. 14-15. But Section 1 contains no such special dispensations for labor unions, and in any event,

Defendants' claim of a "de-facto veto power" can only be reasonably understood as backed by the USW's power over steelmaking labor—a public threat to any bidder other than Cliffs that an acquisition of U. S. Steel may be met with labor unrest. Goncalves admitted as much when he warned that the USW would strike and "burn down the plants if the deal [is] approved." ¶ 18.

In fact, this case is like numerous others where unions have violated the antitrust laws by conspiring with third-party businesses, both through the threat of strikes and otherwise. *E.g.*, *United States* v. *Employing Plasterers Ass'n of Chi.*, 347 U.S. 186, 188, 190 (1954) (local union and union president were liable where they combined with trade association to "bar entry of new [competitors]"); *Allen Bradley Co.* v. *Local Union No. 3, Int'l. Broth. of Elec. Workers*, 325 U.S. 797, 799-800 (1945) (union and its officials were liable where they combined with market participants to exclude non-unionized competition). As in those cases, the union here is seeking to protect unionized labor and the union-friendly firm (Cliffs) is seeking to protect its market position. ¶ 239. McCall makes much of its position that Cliffs' dominance is in the union's "legitimate and stated interest." McCall Br. 18. But that does not make their agreement legal. *See Connell Constr. Co., Inc.* v. *Plumbers and Steamfitters Loc. Union No. 100*, 421 U.S. 616, 625 (1975) ("[T]he methods the union chose are not immune from antitrust sanctions simply because the goal is legal."). As the Supreme Court made clear in *Pennington*: "One group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy." *United Mine Workers of Am.* v. *Pennington*, 381 U.S. 657, 665-66 (1965).

### B.    Plaintiffs Have Adequately Alleged a Section 2 Claim Against McCall.

McCall also argues that Plaintiffs have not adequately alleged that McCall had a specific intent "to help Cliffs maintain its alleged market dominance in the electrical steel or iron ore markets," faulting the Complaint for not specifying what McCall did to aid and abet Cliffs' pre-

2023 steel company acquisitions through which it achieved that dominance. McCall Br. 17-18. But the relevant question is whether McCall acted with specific intent to maintain those monopolies—and secure a monopoly in exposed automotive steel—by conspiring to ensure that Cliffs, and no one else, acquired U. S. Steel. The Complaint unquestionably alleges facts showing he did. ¶¶ 4, 6, 9, 77, 111, 158. And such specific intent is reinforced by Cliffs' commitment to use only union labor in the markets in which it seeks to obtain or cement monopoly power, and McCall's vocal support for Cliffs' recent acquisition of Stelco. ¶ 239.

### C.    Plaintiffs' Tortious Interference Claims Against McCall Are Not Preempted.

McCall argues that the state law tortious interference claims against him are preempted by the National Labor Relations Act ("NLRA"), which preempts state-law causes of action "where they concern conduct that is actually or arguably either protected or prohibited by [the NLRA]." *Bensel* v. *Allied Pilots Ass'n*, 387 F.3d 298, 321 (3d Cir. 2004); *San Diego Building Trades Council* v. *Garmon*, 539 U.S. 236 (1959); McCall Br. 20. A party claiming NLRA preemption must present "more than a conclusory assertion" of the NLRA's applicability. *Glacier Northwest, Inc*. v. *International Brotherhood of Teamsters Local Union No. 174*, 598 U.S. 771, 776 (2023).

The law is clear: NLRA preemption does not extend to matters of only "peripheral concern to federal labor relations law." *Bensel*, 387 F.3d at 321. This case does not concern federal labor relations law at all, and *Garmon* preemption has been found inapplicable where, as here, labor unions commit business torts not to gain leverage in a labor dispute but to benefit a rival company. *Galveston Linehandlers, Inc.* v. *Int'l Longshoremen's Ass'n*, 140 F. Supp. 2d 741, 747 (S.D. Tex. 2001). Similarly, *Garmon* preemption does not apply "absent the availability of an equivalent remedy under the [NLRA]," which McCall has not identified. *See Sears, Roebuck & Co.* v. *San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 213 (Powell, J., concurring) (1978)

(refusing to apply *Garmon* preemption to state trespass claim when doing so would leave plaintiff without any way to challenge union's conduct); *see also id.* at 206-07.

**D.    The Norris-LaGuardia Act Does Not Bar Injunctive Relief.**

McCall also argues that at least some of the injunctive relief sought against him is precluded by the Norris-LaGuardia Act ("NLGA"), which excludes certain acts from injunctions in a "case involving or growing out of any labor dispute." But this case neither involves nor grew out of a "labor dispute." The only labor dispute between U. S. Steel and USW referenced in the Complaint was the USW's challenge to the Merger based on the successorship provision of the BLA. The Board of Arbitration rejected that grievance in September 2024. ¶ 86. A case does not "involve or grow out of" a labor dispute that is over. *See Phila. Marine Trade Ass'n* v. *Int'l Longshoremen's Ass'n*, 368 F.2d 932, 934 (3d Cir. 1966) (labor dispute that "had been settled by the arbitrator's award . . . was no longer alive"), *rev'd on other grounds*, 389 U.S. 64 (1967).

Nor does the mere fact that this litigation involves a union officer render the NLGA applicable. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW* v. *Mack Trucks, Inc.*, 820 F.2d 91, 98 (3d Cir. 1987) ("[T]he [NLGA] cannot be construed as an immutable and inflexible bar against injunctive relief because of the circumstance that a union is one of the parties in the litigation.").

As the Third Circuit has recognized in the antitrust context, the NLGA's bar on injunctive relief is "inapplicable to concerted action or agreements between unions and non-labor parties having effects outside the parties' collective bargaining relationship." *Altemose Constr. Co.* v. *Bldg. & Constr. Trades Council of Philadelphia & Vicinity*, 751 F.2d 653, 658-59 (3d Cir. 1985). Unlike McCall's cited cases, the "matrix of the controversy" in the instant action is not the "employer-employee relationship" or "collective bargaining relationship" between U. S. Steel and its steelworkers. *Cf. Burlington N. Santa Fe Ry. Co.* v. *Int'l Bhd. of Teamsters Loc. 174*, 203 F.3d

703, 709 (9th Cir. 2000) (McCall Br. 24). Rather, this case is about a conspiracy between Cliffs and the USW to take out Cliffs' main competitor and Defendants' efforts to tortiously interfere with the Merger. On that subject, U. S. Steel and its employees in the Mon Valley stand on the same side, in opposition to Cliffs' and the USW's scheme. A case centered on the corporate strategic alternatives available to U. S. Steel—and Defendants' attempt to wrongfully interfere with those alternatives—has nothing to do with the wages, working conditions, or employment terms of U. S. Steel's employees; accordingly, it does not implicate the NLGA's prohibitions. *See Taylor* v. *Loc. No. 7, Int'l Union of Journeymen Horseshoers of U.S. and Canada (AFL-CIO)*, 353 F.2d 593, 606 (4th Cir. 1965) (injunction may issue against unions for boycotting and price-fixing activities not in aid of wages, hours, or working conditions); *United States* v. *Fish Smokers Trade Council, Inc.*, 183 F. Supp. 227, 235-36 (S.D.N.Y. 1960) (issuing injunction where anticompetitive agreement between union and nonlabor groups not aimed at settling "labor dispute").

The cases cited by McCall all involved efforts to enjoin labor activity through the antitrust laws in connection with a quintessential labor dispute. *See Burlington*, 203 F.3d at 710 (employer sought to enjoin union from picketing to compel subcontractors into signing collective bargaining agreements); *Milk Wagon Drivers' Union, Loc. No. 753* v. *Lake Valley Farm Prods.*, 311 U.S. 91, 97 (1940) (efforts by union to unionize dairy employees); *Crowe & Assocs., Inc.* v. *Bricklayers & Masons Union Loc. No. 2 of Detroit*, 713 F.2d 211, 213 (6th Cir. 1983) (employer's failure to make pension fund payments under collective bargaining agreement). These cases are inapposite for the reasons set forth above. This case is about an illegal antitrust agreement, not a labor dispute.

And even if there were an issue of whether and to what extent the NLGA applied here, that question could not be resolved on a motion to dismiss. Even if the "matrix" of the case could somehow be considered centered on the employer-employee relationship—and not Cliffs',

48

Goncalves', and McCall's ongoing efforts to stymie the Merger and further Cliffs' monopolistic ambitions—that would at very least be a disputed question of fact.  *See Flood* v. *Kuhn*, 309 F. Supp. 793, 809 (S.D.N.Y. 1970) ("Whether plaintiff's action grows out of a labor dispute . . . present[s] substantial, complicated and difficult questions of fact and law.").

## V.    PA-UPEPA HAS NO APPLICATION TO PLAINTIFFS' STATE LAW CLAIMS.

The Pennsylvania Uniform Public Expression Protection Act ("PA-UPEPA") does not bar Plaintiffs' state law claims.  Cliffs Br. 24-25; McCall Br. 25.  As an initial matter, Plaintiffs do not challenge Defendants' "protected public expression," as defined in the statute, *see* 42 Pa. C.S. Sec. 8340.13, but rather their unlawful interference through private conduct and commercial speech directed at investors and industry participants, *see supra* p. 20.  Because Plaintiffs are not asserting "a cause of action based on protected public expression," the PA-UPEPA has no bearing here.

Moreover, the statute does not, as Defendants imply, create some sort of free-standing immunity.  Rather, it simply provides that a "person is immune from civil liability for a cause of action based on protected public expression" *if* the party asserting the claim fails to state a claim, establish a prima facie case, or there is no genuine issue as to any material fact.  42 Pa. C.S. Sec. 8340.15.  Here, Plaintiffs have more than sufficiently alleged their tortious interference claims.  *See* Point III, *supra*; *Boshears* v. *PeopleConnect, Inc.*, 2022 WL 888300, at *7 (W.D. Wash. Mar. 25, 2022) ("because [plaintiff] has stated a claim under Indiana common law, the UPEPA claim cannot be maintained").

*        *        *

Following the Court's January 17 hearing, Plaintiffs and Defendants have been conferring on the proposed scope of discovery in advance of a potential preliminary injunction hearing. During the meet-and-confer process, Defendants have taken the position that even if Plaintiffs'

claims survive dismissal, Defendants will still not produce the discovery the Court instructed they "be ready to deliver" following "a merits assessment." *See* Tr. 64:1, 6-7. Defendants instead have asserted that they will not proceed with expedited discovery unless and until Plaintiffs file a renewed motion for expedited proceedings, the parties brief the issue again, and the Court rules on expedition once again. Plaintiffs believe that Defendants' position is directly inconsistent with the Court's instructions from the January 17 hearing and a naked delay tactic in a proceeding where time is of the essence. *See id.* 64:1-13 ("once we have that [a merits assessment] . . . we are going to be looking at an expedited delivery of that identified discovery information. . . . so load your bullets but don't fire them"). To the extent required, however, Plaintiffs request that the Court treat their instant opposition to Defendants' motions to dismiss as a renewed request for expedition.

The Complaint sets out an extensive conspiracy by Defendants to undermine U. S. Steel's ability to compete—whether through a Merger with NSC or otherwise. It challenges an anticompetitive agreement between Cliffs, U. S. Steel's chief competitor, and the USW leadership that controls U. S. Steel's principal source of labor. If this agreement persists, it will not only do grievous harm to U. S. Steel, NSC, and American steel markets, but also to the local communities in which U. S. Steel operates. Antitrust law does not require an injured party to wait until the harm is fully realized in order to sue—rather, "an injunction is available before any actual loss or damage" occurs. 9 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 335(b). Plaintiffs respectfully request that this Court deny the motions to dismiss and order an expedited hearing on their motion for a preliminary injunction.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motions to Dismiss.

February 21, 2025

Respectfully submitted,

OF COUNSEL:

Grant R. Mainland (NY 4628319)
James H. Weingarten (DC 985070)
MILBANK LLP
55 Hudson Yards
New York, NY  10001
Phone:  (212) 530-5000
Fax:  (212) 530-5219
gmainland@milbank.com
jweingarten@milbank.com

Jonathan M. Moses (NY 2836054)
Steven Winter (NY 4677225)
Adam L. Goodman (NY 5207816)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
Phone:  (212) 403-1000
Fax:  (212) 403-2000
jmmoses@wlrk.com
swinter@wlrk.com
algoodman@wlrk.com

OF COUNSEL:

David B. Hennes (NY 2773190)
Alexander B. Simkin (NY 4463691)
Andrew S. Todres (NY 5347521)
Stefan P. Schropp (DC 1026864)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY  10036
Phone:  (212) 596-9000
David.Hennes@ropesgray.com
Alexander.Simkin@ropesgray.com
Andrew.Todres@ropesgray.com
Stefan.Schropp@ropesgray.com

*/s/ Thomas E. Birsic*
Thomas E. Birsic (PA 31092)
Eric R.I. Cottle (PA 78152)
Wesley A. Prichard (PA 324411)
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA  15222
Phone:  (412) 355-6538
Fax:  (412) 355-6501
thomas.birsic@klgates.com
eric.cottle@klgates.com
wesley.prichard@klgates.com

*Attorneys for Plaintiff United States Steel Corporation*

*/s/ Daniel I. Booker*
Daniel I. Booker (PA 10319)
Christopher R. Brennan (PA 313534)
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
Phone:  (412) 288-3131
Fax:  (412) 288-3063
DBooker@reedsmith.com
CBrennan@reedsmith.com

*Attorneys for Plaintiffs Nippon Steel Corporation and Nippon Steel North America, Inc.*