**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES STEEL CORPORATION, NIPPON STEEL CORPORATION, and NIPPON STEEL NORTH AMERICA, INC. | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 2:25-cv-15 |
| v. | ) ) | Hon. Marilyn J. Horan |
| CLEVELAND- CLIFFS INC., LOURENCO GONCALVES, AND DAVID MCCALL | ) ) ) ) | |
| Defendants. | ) ) | |

<u>**DEFENDANT DAVID MCCALL'S REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS THE EXPEDITED CLAIMS AND FOR AN AWARD OF ATTORNEY FEES, COURT COSTS, AND LITIGATION EXPENSES**</u>

Bruce Lerner* (DC 384757)
Leon Dayan* (DC 444144)
Joshua Shiffrin* (DC 501008)
Derrick C. Rice* (DC 90007390)
Lane Shadgett* (DC 90009847)
Rachel Casper* (DC 90017405)
BREDHOFF & KAISER, P.L.L.C.
805 15th Street NW
Suite 1000
Washington, DC 20005
(202) 842-2600
blerner@bredhoff.com
ldayan@bredhoff.com
jshiffrin@bredhoff.com
drice@bredhoff.com
lshadgett@bredhoff.com
rcasper@bredhoff.com

*Admitted Pro Hac Vice

Micheal Healey (PA 27283)
HEALEY BLOCK LLC
PO Box 81918
Pittsburgh, PA 15217
(412) 760-0342
mike@unionlawyers.net

David R. Jury (PA 77015)
Nathan L. Kilbert (PA 313939)
Anthony Resnick (PA 319682)
UNITED STEELWORKERS
INTERNATIONAL
60 Boulevard of the Allies, Room 807
Five Gateway Center
Pittsburgh, PA 15222
(412) 562-2545
djury@usw.org
nkilbert@usw.org
aresnick@usw.org

*Counsel to Defendant David McCall*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii

ARGUMENT ....................................................................................................................... 2

    I.    Plaintiffs' Expedited Claims Are Barred by the Noerr-Pennington Doctrine ..................... 2

    II.   Plaintiffs' Section 1 Claim Fails Because No Restraint of Trade Is Alleged ..................... 5

    III.  Plaintiffs' Section 2 Claim Fails Because There is No Specific Intent Alleged on the Part
        of Mr. McCall ...............................................................................................................11

    IV.  Plaintiffs' Tortious Interference Claims are Preempted .................................................. 12

    V.   The Norris-LaGuardia Act (NLGA) Bars Plaintiffs' Prayer for Injunctive Relief .......... 13

CONCLUSION.................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen Bradley Co. v. Loc. Union No. 3, Int'l. Bhd. of Elec. Workers*,
   325 U.S. 797 (1945)..................................................................................................8

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
   486 U.S. 492 (1988)...............................................................................................2, 5

*Altemose Constr. Co.* v. *Bldg. & Constr. Trades Council of Phila. & Vicinity*,
   751 F.2d 653 (3d Cir. 1985)...................................................................................15

*Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l Hosp.*,
   185 F.3d 154 (3d Cir. 1999)....................................................................................4

*Armstrong World Indus., Inc. v. Adams*,
   961 F.2d 405 (3d Cir. 1992)..................................................................................11

*Bensel* v. *Allied Pilots Ass'n*,
   387 F.3d 298 (3d Cir. 2004)..................................................................................13

*Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps.*,
   481 U.S. 429 (1987)..............................................................................................14

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
   168 F.3d 119 (3d Cir. 1999)....................................................................................5

*City of Columbia v. Omni Outdoor Advert., Inc.*,
   499 U.S. 365 (1991)..............................................................................................2, 5

*Connell Constr. Co. v. Plumbers & Steamfitters Loc. Union No. 100*,
   421 U.S. 616 (1975)................................................................................................8

*DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
   485 U.S. 568 (1988)................................................................................................9

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961)................................................................................................3

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
   821 F.3d 394 (3d Cir. 2016)................................................................................6, 10

*ES Dev. Inc. v. RWM Enters., Inc.*,
   939 F.2d 547 (8th Cir. 1991) ..................................................................................7

*FTC v. Superior Ct. Trial Laws Ass'n*,
   493 U.S. 411 (1990)................................................................................................7

*Indivior Inc. v. Dr. Reddy's Lab'ys S.A.*,
2020 WL 4932547 (D.N.J. Aug. 24, 2020) ...........................................................................11

*Int'l Longshoreman's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n*,
389 U.S. 64 (1967) ...................................................................................................................15

*Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv.*
*'s Servs., Inc.*, 175 F.3d 848 (10th Cir. 1999) ....................................................................8

*Lukens Steel Co. v. USW*,
989 F.2d 668 (3d Cir. 1993) ...................................................................................................14

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011) ....................................................................................................4

*In re Merck Mumps Vaccine Antitrust Litig.*,
No. 23-3089, 2024 WL 4432076 (3d Cir. Oct. 7, 2024) ........................................................2

*Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*,
596 F.2d 573 (3d Cir. 1979) ...................................................................................................11

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
435 U.S. 679 (1978) ..................................................................................................................7

*In re NCAA Student-Athlete Name & Likeness Litig.*,
2010 WL 5644656 (N.D. Cal. Dec. 17, 2010) ........................................................................8

*Ord. of R. R. Telegraphers v. Chi. & Nw. R. Co.*,
362 U.S. 330 (1960) ................................................................................................................15

*Phila. Marine Trade Ass'n v. Int'l Longshoremen's Ass'n, Loc. 1291*,
368 F.2d 932 (3d Cir. 1966) ...................................................................................................15

*Phila. Taxi Ass'n v. Uber Techs.*,
886 F.3d 332 (3d Cir. 2018) ...................................................................................................12

*Plains All Am. Pipeline L.P. v. Cook*,
866 F.3d 534 (3d Cir. 2017) ...................................................................................................11

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
614 F.3d 57 (3d Cir. 2010) .......................................................................................................2

*Sanderson v. Culligan Int'l Co.*,
415 F.3d 620 (7th Cir. 2005) ....................................................................................................6

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
401 F.3d 123 (3d Cir. 2005) ...........................................................................................5, 6, 10

*Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*,
    436 U.S. 180 (1978)......................................................................................................13

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)......................................................................................................11

*Taylor v. Loc. No. 7, Int'l Union of Journeymen Horseshoers*,
    353 F.2d 593 (4th Cir. 1965) ......................................................................................16

*TYR Sport Inc. v. Warnaco Swimwear Inc.*,
    679 F.Supp.2d 1120 (C.D. Cal. 2009) .........................................................................7

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965)..................................................................................................3, 8

*United States* v. *Employing Plasterers Ass'n of Chi.*,
    347 U.S. 186 (1954)......................................................................................................8

*United States v. Fish Smokers Trade Council, Inc.*,
    183 F. Supp. 227 (S.D.N.Y. 1960) .............................................................................16

*West Penn Allegheny Health System, Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010)............................................................................................7

**Statutes**

15 U.S.C. § 15(a) ....................................................................................................................10

29 U.S.C. 158(c) .......................................................................................................................9

29 U.S.C. § 104(e) ..................................................................................................................14

29 U.S.C. § 113(c) ..................................................................................................................14

50 U.S.C. § 4565(e) ..................................................................................................................5

**Other Authorities**

31 C.F.R. 800.801(a)................................................................................................................4

31 C.F.R. § 800.601(e)..............................................................................................................4

Exec. Order No. 13,456 § 6(a), 73 Fed. Reg. 4677, 4678 (Jan. 23, 2008) ..............................4

Plaintiffs' responsive brief attempts to downplay what spurred this case: President Biden's order blocking their Merger on national security grounds. It was that order—and that order alone, given that the Merger had already received shareholder approval—that caused the harm Plaintiffs allege. As a result, Defendants' alleged conduct in furtherance of their "public campaign against the Merger," Compl. ¶ 62, cannot be the basis for antitrust or tort liability, *even if* Defendants' conduct was motivated by an anticompetitive motive.

To avoid dismissal of their antitrust claims, Plaintiffs seek to focus the Court on Cliffs' communications with investors and the like that they argue were not part of the alleged public campaign. But those efforts do not save their claims. It is evident from the Complaint that Plaintiffs' alleged injuries stem from the failure of the Merger at the hand of the government, not any other conduct. Further, none of the conduct allegedly undertaken by Defendants, whether considered as part of their public campaign or not, involved a restraint of trade. Rather, Defendants' entreaties to investors, shareholders, and the public were the types of non-coercive speech and persuasion activities that the Third Circuit has held—in a case Plaintiffs fail to acknowledge—are not unlawful under the Sherman Act.

As to the Plaintiffs' tortious interference claims against Mr. McCall, we demonstrated in our opening brief that these claims are preempted under federal labor law because they seek to proscribe conduct that falls within the ambit of Section 7 of the National Labor Relations Act. Plaintiffs essentially concede as much, as they do not engage seriously with our showing, let alone demonstrate that it was wrong. Thus, those claims must be dismissed for that and other reasons. Similarly, Plaintiffs misstate the applicable law with respect to the Norris LaGuardia Act, which we have shown bars Plaintiffs' claims for injunctive relief and puts to rest any purported need for expedition in this case. The expedited claims should be dismissed with prejudice.

## ARGUMENT

**I.    Plaintiffs' Expedited Claims Are Barred by the *Noerr-Pennington* Doctrine**

1.    We showed in our opening brief that Defendants are immune under the *Noerr-Pennington* doctrine from both antitrust and tort liability based on conduct undertaken to influence a government decisionmaker.[1] McCall Br. 7–11. That is true even if the conduct involved false or deceptive statements to the public, *id.* at 8–9; *see Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499–500 (1988), or political corruption, *see City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 378–79 (1991).

Despite Plaintiffs' attempts to downplay the role of the government action in this case, they cannot disguise the fact that all of their injuries flow from the President's order blocking the Merger. *See* McCall Br. 6 (summarizing Plaintiffs' allegations). Put differently, had the government approved the Merger, permitting it to be consummated at the agreed-upon price, none of Plaintiffs' alleged injuries would exist. Based on the Third Circuit's reasoning in *Merck*, and principles of antitrust standing, the fact that Plaintiffs' injuries "flow[] from" government action places Plaintiffs' claims squarely within the *Noerr-Pennington* doctrine. *In re Merck Mumps Vaccine Antitrust Litig.*, No. 23-3089, 2024 WL 4432076, at *9 (3d Cir. Oct. 7, 2024); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010).

Defendants are not liable for conduct in connection with their "public campaign" to "pressur[e] President Biden to block" the Merger. Compl. ¶¶ 62, 178. That is so even if some of the "public campaign" was directed at non-governmental audiences or caused incidental harm to Plaintiffs. *See E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 143 (1961).

---

[1]    Plaintiffs do not contest that, if *Noerr-Pennington* bars their antitrust claims, it also bars their tortious interference claims. *See* Pls.' Br. 38–44.

2.    In recognition of the problems *Noerr-Pennington* poses for their claims, Plaintiffs avoid discussion of their allegations of a "public campaign" by the Defendants that allegedly contributed to the failure of the Merger at the hands of the government. Instead, they attempt to recast this as a case about outreach to investors and other similar activities, *see* Pls.' Br. 9–11, in furtherance of a supposed "agreement" to prevent U.S. Steel from merging with anyone other than Cliffs. *See id.* at 18–23. But that tactic does not rescue their claims from *Noerr-Pennington*.

At the threshold, as *Pennington* itself makes clear, *Noerr-Pennington* immunity applies to petitioning conduct even if that conduct is part of a larger anticompetitive scheme. *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 660–61, 669–70 (1965). Indeed, Plaintiffs concede (as they must) that "some" of Defendants' conduct may be protected by *Noerr-Pennington*. Pls.' Br. 23, *see also id.* at 1 ("Plaintiffs do not seek to enjoin Defendants' lobbying or political speech."). Thus, even if there was indeed some enduring "agreement" involving activities beyond those in connection their public campaign, the Defendants would, at a minimum, be immune with respect to the activities undertaken in connection with their public campaign, as well as any alleged injuries that flow from the failure of the Merger. Compl. ¶¶ 62, 178.

Plaintiffs have alleged that statements to investors and other public statements were part of Defendants' "public campaign against the Merger." *Id.* ¶ 62; *see* McCall Br. 7–9. But even if they were not, these activities did not cause Plaintiffs any cognizable injury: notably, Plaintiffs' response identifies no such harm, despite their attempts to identify some. *See* Cliffs Br. 9–10, Pls.' Br. 23–25. Further, for the reasons fully discussed in Part II *infra*, none of the Defendants' alleged conduct constituted a restraint of trade.

3.    Defendants briefly seek to resuscitate their arguments under *Noerr*'s so-called "sham exception" by asserting, without any analysis, that the CFIUS process was "adjudicative"

in nature, invoking a remark by the Supreme Court suggesting that antitrust immunity may not extend to the submission of knowingly false information to an adjudicative tribunal. *See* Pls.' Br. 25–26 (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 512–13, 515 (1972)). That gambit fails for several reasons. First, that proposition does not appear to be good law in this Circuit. *Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l Hosp.*, 185 F.3d 154, 160 (3d Cir. 1999) (noting that the Supreme Court "has never . . . held" that an exception for adjudications exists and that "since *California Motor*, the Supreme Court has decided a case that casts doubt on whether such an exception exists under any circumstances").

Second, although the Court need not reach this issue, the CFIUS process is not adjudicative in any event. *See Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 845 (7th Cir. 2011) (describing factors for determining whether a proceeding is adjudicative). As in *Mercatus*, the CFIUS process did not involve the compilation of an evidentiary record through formal proceedings. Rather, CFIUS's assessment was premised upon a decentralized and informal fact-gathering process, which includes submissions by non-parties. *See* Exec. Order No. 13,456 § 6(a), 73 Fed. Reg. 4677, 4678 (Jan. 23, 2008) (permitting "[a]ny member" of CFIUS to "conduct its own inquiry with respect to the potential national security risk posed by a transaction"); 31 C.F.R. § 800.601(e) (permitting CFIUS to act "based upon the facts set forth in the declaration or notice … or any other information available to the Committee"); 31 C.F.R. 800.801(a) (contemplating that non-parties to a transaction will submit information to CFIUS); *cf. Armstrong Surgical Ctr.*, 185 F.3d at 164 n.8 (*Noerr-Pennington* applies where the decisionmakers are not wholly dependent on information from the defendants). Also, the ultimate decision was made by President Biden in an exercise of essentially unreviewable authority. *See* 50 U.S.C. § 4565(e); *Allied Tube*, 486 U.S. 492 at 499–500 (*Noerr-Pennington* applies to efforts "seeking . . . executive action.").

Further, Plaintiffs do not allege that Defendants submitted false information to CFIUS, let alone that CFIUS or the President relied on such false information. *See Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 124 (3d Cir. 1999). Ultimately, Plaintiffs are left arguing that the CFIUS process was corrupted by political influence. Pls.' Br. 26. That assertion does not place this matter within the "sham" exception. Rather, it confirms that Defendants' conduct is subject to *Noerr-Pennington* immunity. *See Omni Outdoor Advert.*, 499 U.S. at 378–79 (allegations that a government process was corrupt cannot support an antitrust claim under *Noerr-Pennington*).

## II.    Plaintiffs' Section 1 Claim Fails Because No Restraint of Trade Is Alleged

1.    In our opening brief, we explained that there can be no antitrust liability for speech in the marketplace that does not restrain trade, even setting aside the protection that speech may enjoy under the First Amendment or *Noerr-Pennington*. Thus, Plaintiffs' Section 1 claim is due to be dismissed because *all* the alleged conduct—including, for example, Cliffs' communications to investors—are nonactionable under the Sherman Act. *See* McCall Br. 12–13. Plaintiffs do not seriously address this argument; indeed, they fail even to acknowledge, let alone discuss, the primary case we rely on for that proposition, *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 125–26, 128 (3d Cir. 2005). McCall Br. 12–13.

In *Santana Products*, a manufacturer of toilet partitions accused a competitor of conspiring with others to provide false information about its products to government architects, successfully convincing the government to adopt specifications in defendants' favor. 401 F.3d at 125–26. The Third Circuit found that although there was evidence of concerted action, the conduct at issue did not constitute a restraint of trade, and it therefore could not violate Section 1. *Id.* at 129, 131. The *Santana Products* court reasoned that the misrepresentations did not restrain trade because the plaintiff was free to respond in kind, whether to tout its own products or to prove to the government

architects that the defendants' representations were incorrect. *Id.* at 133. As the court observed, the defendant did not engage in any "coercive measures that prevented Santana from selling its products to any willing buyer or prevented others from dealing with Santana." *Id.* at 132. Rather, it "confine[d] itself to efforts to persuade an independent decisionmaker." *Id.* at 134 (quoting *Allied Tube*, 486 U.S. at 507). Without some kind of "enforcement device that operated to restrain trade," *id.*, a "campaign . . . aimed primarily at persuading" decisionmakers is not proscribed by Section 1, *id.* at 133.[2] *See also Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005) ("False statements about a rival's goods do not curtail output in either the short or the long run. They just set the stage for competition in a different venue: the advertising market.").

*Santana Products* forecloses Plaintiffs' Section 1 claim. Even on Plaintiffs' telling, the "war[fare]" that Defendants allegedly engaged in consisted of public statements to reporters deriding Nippon, efforts to "convince" investors that the Merger could not close, and "solicitation" of Nippon and U.S. Steel investors to abandon the Merger. Pls.' Br. 9–10, 20; *see also* Compl. ¶ 59 (referring to Defendants' alleged "misinformation campaign"). Those efforts were nothing more than non-coercive attempts at persuasion. Plaintiffs were able to respond in kind through their own campaign touting the Merger's benefits. There is no plausible allegation that either Cliffs or the USW exercised (or even threatened to exercise) in those communications any "enforcement device" to achieve their allegedly anticompetitive objective.[3]

---

[2]    Following *Santana*, the Third Circuit recognized that "in 'rare[]' circumstances" false or deceptive statements may violate the antitrust laws. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 407 n.40 (3d Cir. 2016). "[A]t minimum," a plaintiff would have to show that such statements "induced or were likely to induce reasonable reliance by consumers," and that the plaintiff did not have an opportunity to correct the alleged misstatements. *Id.* Plaintiffs have not attempted to make such a showing here, nor could they do so.

[3]    The non-speech conduct by the USW—filing and pursuing a grievance deemed to be well founded by the arbitration panel that considered it, and not engaging in negotiations with Nippon to the Plaintiffs' satisfaction—also did not involve the use of any coercive market pressure. *See*

This point is fatal to Plaintiffs' claim, as their own cited caselaw demonstrates. *All* of the cases relied upon by Plaintiffs in support of their Section 1 claim involve the exercise of coercive market mechanisms beyond mere persuasive speech. For example, in *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85, 103–05, 109–10 (3d Cir. 2010), a health-care provider conspired with an insurer to distort the medical labor market by offering non-market salaries and to use the insurer's monopsony power to artificially depress reimbursement rates. False statements made by defendants to investors was found to be only one component of an overall coercive strategy. *Id.* at 110. *See also ES Dev. Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 555–56 (8th Cir. 1991) (car dealers exercised legal rights under franchise agreements in a concerted manner to achieve anti-competitive goal); *FTC v. Superior Ct. Trial Laws Ass'n*, 493 U.S. 411, 422–23 (1990) (lawyers engaged in boycott of provision of legal services); *TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F.Supp.2d 1120, 1131–32 (C.D. Cal. 2009) (coach used his position to coerce swimmers to wear Speedo swimsuits or be left home from the Olympics). *See also Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978) (code of ethics "operate[d] as an absolute ban on competitive bidding").[4]

Plaintiffs similarly do not rebut our observation that there are no cases finding antitrust liability on behalf of unions or their officers for engaging in non-coercive advocacy activities.

---

Pls.' Br. 20; McCall Br. 15 n.4. Further, any effort to limit a union's exercise of rights under a collectively bargained BLA would trench upon core union interests protected by federal labor law.

[4]    *In re NCAA Student-Athlete Name & Likeness Litigation*, 2010 WL 5644656, at *4 (N.D. Cal. Dec. 17, 2010), likewise does not support Plaintiffs' theory. At issue there was merely whether the court would stay proceedings in light of an interlocutory appeal regarding a First Amendment defense. In declining to issue a stay, the court found that the antitrust claims did not turn on that First Amendment defense. Nor does *Jefferson County School District No. R-1 v. Moody's Investor's Services, Inc.*, 175 F.3d 848, 860 (10th Cir. 1999), support the Plaintiffs, as the court affirmed the dismissal of the antitrust claim in that case given the lack of any actual restraint of trade posed by the speech at issue. *Id.* ("In our view, the First Amendment does not allow antitrust claims to be predicated solely on protected speech.").

McCall Br. 19–21. On the contrary, the only cases Plaintiffs cite on that point, Pls.' Br. 45, all involve a union's exercise of its market power over the supply of labor, not mere persuasion. *Allen Bradley Co. v. Loc. Union No. 3, Int'l. Bhd. of Elec. Workers*, 325 U.S. 797, 799–800 (1945) (use of work stoppages to bring recalcitrant contractors in line); *United States* v. *Employing Plasterers Ass'n of Chi.*, 347 U.S. 186, 188, 190 (1954); (union "examining board" barred entry of new contractors into market); *Pennington*, 381 U.S. at 660, 666–67 (union "impose[d]" contract terms in negotiations); *Connell Constr. Co. v. Plumbers & Steamfitters Loc. Union No. 100*, 421 U.S. 616, 620 (1975) (work stoppage to achieve anti-competitive agreement).

2.      None of Plaintiffs' efforts to avoid the impact of these principles is availing. First, Plaintiffs point to Mr. Goncalves' statement about the USW's "de facto veto power" as evidence that Defendants "exercise[d]" their power to restrain trade. *See* Pls.' Br. 17 (quoting *ES Dev.*, 939 F.2d at 555), *see also id.* at 6, 24; Compl. ¶ 10. But Plaintiffs specifically allege that USW did *not have* veto power over the Merger. Compl. ¶¶ 11, 48, 50–51, 198. That is, on Plaintiffs' allegations, Mr. Goncalves' statement about a "de facto veto" was merely false speech. They cannot have it both ways. Plaintiffs do not identify any *actual* "enforcement device" that Defendants "exercised" (or threatened to exercise) to block the Merger or achieve any other anti-competitive end.

Second, Plaintiffs appear to suggest that *all* of Mr. McCall's and the Defendants' statements were imbued with the implicit threat that the USW would engage in a strike or other work stoppage. *See* Pls.' Br. 44–45. But there is no allegation that Mr. McCall (or the USW) ever made any such threat.[5] Indeed, such a notion is belied by the USW's pursuit of its successorship grievance through

---

[5]      In their 93-page Complaint, the only allegation that Plaintiffs suggest could even be construed as a threat of strike, *see* Compl. ¶ 45, is a comment by *Mr. Goncalves* that "the USW will 'burn down the plants if the deal [is] approved.'" *Id.* ¶ 18. This colorful comment is included in the Complaint without any context as to when or to whom it was made. Indeed, the Complaint does not even relay Mr. Goncalves's full remarks, but simply a fragment of a sentence. This single

the parties' conventional grievance process, as well as the total absence of any actual economic pressure or slowdown by the Union during the pendency of the Merger. Persuasion is an important tool for unions, and the law has long recognized that unions are permitted to engage in advocacy without that advocacy being understood as a threat. *See, e.g.,* 29 U.S.C. 158(c) ("The expressing of any views, argument, or opinion, or the dissemination thereof . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force . . .."); *DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 578–79 (1988) (union consumer hand-billing is not inherently coercive). A union would be hobbled in its ability to fulfill its function and obligations on behalf of its members if courts recharacterized every statement that it made about a dispute with an employer as a threat of unlawful economic pressure.

Finally, Plaintiffs argue at length that what is at issue in this case is an illegal *agreement* in the abstract, rather than conduct undertaken in furtherance of that agreement. Pls.' Br. 16, 23–24 ("The wrong that the Complaint seeks to remedy is . . . Defendants' unlawful and anticompetitive agreement."). But it is not enough to allege that an "agreement" exists; to state a successful claim Section 1 claim, a private plaintiff must allege *conduct* that both restrains trade and harms the plaintiff. *See* 15 U.S.C. § 15(a); *Santana Products*, 401 F.3d at 129–32; *Eisai, Inc.*, 821 F.3d at 402 ("To establish an actionable antitrust violation, [the plaintiff] must show both that [the defendant] engaged in anticompetitive *conduct* and that [the plaintiff] suffered antitrust injury as a result.") (emphasis added). As discussed above, Plaintiffs have not identified any conduct that is an illegal restraint of trade. Nor have they identified any injuries that flow from Defendants' conduct, other than the harm caused by the government's decision to block the Merger.

---

metaphorical sentence fragment without context, allegedly made by a speaker other than the USW itself, to an unknown audience, does not plausibly establish that all statements by the Defendants were imbued with the implicit threat of a work stoppage by the USW.

Moreover, contrary to Plaintiffs' contentions (Pls.' Br. 29), the Union's August 2023 statement endorsing Cliffs' bid for U.S. Steel does not establish the existence of any agreement, let alone an illegal one. There is nothing inherently illegal or anticompetitive about the USW's August 2023 endorsement of Cliffs' bid for U.S. Steel. Indeed, the Basic Labor Agreement (BLA), which gives the USW significant rights regarding corporate mergers and other transactions, *invites* the USW to make such an endorsement, McCall Br. 3, and a union is entitled to speak publicly about, and even negotiate over, successorship issues pertaining to its members, *see id.* at 21, including voicing its preference for one potential successor over another. What is more, it is not plausible to construe a statement of *support* for Cliffs' bid as an agreement to "actively obstruct any other bidder" through *illegal restraints of trade*, Pls.' Br. 29, particularly in absence of any allegations that Defendants ever engaged in any such illegal restraints.

That leaves Plaintiffs to argue that they *might* suffer harm in the future *if* Plaintiffs lose their appeal at the D.C. Circuit and Defendants, in combination with one another, take unspecified actions—of a type not alleged in the Complaint[6]—to successfully interfere with unspecified, prospective bidders. *See* Pls.' Br. 29, 47. Such speculation does not state a claim. *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 411–12 (3d Cir. 1992) ("Where the plaintiff's action is based on a contingency, it is unlikely that the parties' interests will be sufficiently adverse to give rise to a case or controversy within the meaning of Article III."); *see also Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 (3d Cir. 2017).[7]

---

[6]     Plaintiffs reach beyond the Complaint to identify post-Merger facts for their contention that Defendants' unlawful conduct has continued unabated. Pls.' Br. 12–13. But the conduct Plaintiffs identify consists of the same type of general speech activities that do not state a Sherman Act claim. *See id.* at 13 (quoting Mr. McCall's statement that "[o]ur concerns regarding Nippon's continued interest in U.S. Steel remain unchanged").

[7]     Plaintiffs misleadingly suggest that the Clayton Act permits the court to award injunctive relief based on speculative injuries. Pls.' Br. 36 (citing *Mid-West Paper Prods. Co.* v. *Cont'l Grp.,*

### III.    Plaintiffs' Section 2 Claim Fails Because There is No Specific Intent Alleged on the Part of Mr. McCall

Plaintiffs' argument that "dangerous probability of success" does not always appear in the standard list of elements for a conspiracy claim under Section 2, Pls.' Br. 36–37, overlooks the basic point that this element is required where the underlying theory is attempted monopolization. McCall Br. 15; *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *see also Indivior Inc. v. Dr. Reddy's Lab'ys S.A.*, 2020 WL 4932547, at *6–7 (D.N.J. Aug. 24, 2020) (cited in Pls.' Br. 37). As we demonstrated, Plaintiffs have not alleged facts that plausibly establish this necessary element of their attempted monopolization claim. McCall Br. 16–17.

As to Plaintiffs' maintenance of monopoly theory, we showed that Plaintiffs' claim fails because there are no allegations that Mr. McCall had any role in Cliffs' historical efforts to acquire other steel companies, or that he personally possessed the specific intent to help Cliffs maintain its purported monopolies in various steel sub-markets. *See* McCall Br. 17–18. Plaintiffs assert that a number of allegations show that Mr. McCall had the requisite intent, *see* Pls.' Br. 46 (citing Compl. ¶¶ 4, 6, 9, 77, 111, 158), but that assertion does not withstand scrutiny. *All* of the cited allegations pertain to the USW generally and not to Mr. McCall personally. Further, none plausibly establish that Mr. McCall acted with any intent to specifically help Cliffs maintain a monopoly, rather than merely pursue the USW's "legitimate business aims" in ensuring that steel is manufactured in union-represented facilities.[8] *Phila. Taxi Ass'n v. Uber Techs.,* 886 F.3d 332, 341 (3d Cir. 2018).

---

*Inc.*, 596 F.2d 573, 594 (3d Cir. 1979)). *Mid-West Paper* stands for no such thing. That case held only that indirect purchasers who were actually harmed by a price-fixing scheme, though barred by precedent from seeking treble damages, could still seek injunctive relief. 596 F.2d at 594.

[8]        The only evidence of "vocal support" by Mr. McCall for Cliffs' acquisition of Stelco is a press release issued by Cliffs *after* the Stelco transaction was announced. *See* Compl. ¶ 105; *Cleveland-Cliffs Announces the Acquisition of Stelco*, Cleveland-Cliffs (July 15, 2024, 6:00 PM), https://www.clevelandcliffs.com/news/news-releases/detail/643/cleveland-cliffs-announces-the-acquisition-of-stelco. This statement does not plausibly establish any specific intent to assist Cliffs

## IV.    Plaintiffs' Tortious Interference Claims are Preempted

As an initial matter, though Plaintiffs acknowledge that their tortious interference claims must be separately evaluated for each Defendant, Pls.' Br. 3, they do not address Mr. McCall's arguments that (a) Plaintiffs have failed to allege any tortious act of interference by him, personally, McCall Br. 19, and (b) that in any event none of Mr. McCall's alleged conduct was (or plausibly would become) the cause of any breach or non-performance, *id.* at 19–20. The tortious interference claims against Mr. McCall should be dismissed on those unrebutted grounds alone.

Plaintiffs make a cursory attempt to rebut Mr. McCall's argument that their tortious interference claims against him are preempted under federal labor law. *See* McCall Br. 20; Pls.' Br. 46–47. In doing so, Plaintiffs misstate the breadth of *Garmon* preemption, a doctrine that preempts state-law causes of action that "concern conduct that is actually or arguably either protected or prohibited by federal labor relations law." *Bensel* v. *Allied Pilots Ass'n*, 387 F.3d 298, 321 (3d Cir. 2004). As we demonstrated at length in our opening brief, Mr. McCall's alleged conduct consisted of public advocacy regarding working conditions for union workers at U.S. Steel, lobbying public officials on behalf of those employees, and pursuing a grievance to enforce the terms of its BLA— activities that have all been recognized to fall within the ambit of Section 7 of the National Labor Relations Act. McCall Br. 21–22 (citing cases). Against this showing, Plaintiffs cite a single district court case from Texas, which found on the unique, distinguishable facts in that case—involving a union standing up a business to compete with a company with which it had a collective bargaining agreement—that *Garmon* preemption did not apply. *See* Pls.' Br. 46 (citing *Galveston Linehandlers, Inc. v. Int'l Longshoremen's Ass'n*, 140 F. Supp. 2d 741, 747 (S.D. Tex. 2001)).

---

in maintenance of the alleged monopoly. *See Cleveland-Cliffs Announces the Acquisition of Stelco*, ("On behalf of our entire membership, I am excited for this transaction and proud to support a deal that is great for the resilience of manufacturing and Union jobs in North America.").

Plaintiffs also grossly misread Justice Powell's concurrence in *Sears, Roebuck & Co. v. San Diego County District Council of Carpenters*, 436 U.S. 180, 213 (1978). The Court did not categorically hold, as Plaintiffs suggest (*see* Pls.' Br. 46–47), that "*Garmon* preemption does not apply" absent the availability of an equivalent remedy under the NLRA. Rather, the Court considered a number of factors, including "the strength of the argument that [Section] 7 does in fact protect the disputed conduct," *Sears*, 436 U.S. at 203, in determining that a state trespassing law was not preempted with respect to the picketing activity at issue in that case. The Court has never so held with respect to tortious interference claims, which have regularly been found to have been preempted. *See* McCall Br. 20 (citing cases).

## V.    The Norris-LaGuardia Act (NLGA) Bars Plaintiffs' Prayer for Injunctive Relief

As we have explained, the NLGA broadly divests federal courts from issuing injunctions against any "persons participating" in "any case involving or growing out of any labor dispute." McCall Br. 23 (citing 29 U.S.C. § 104). Because the NLGA bars all the injunctive relief sought by the Plaintiffs against any Defendant, *see* ECF No. 84-6 (Plaintiffs' proposed injunction), all claims for injunctive relief should be dismissed for failure to state a claim.

Plaintiffs seek to avoid application of the NLGA's injunction bar mainly by arguing that this case does not involve a "labor dispute." Pls.' Br. 47. That is wrong. Under the NLGA, "[t]he term 'labor dispute'" is broadly defined to "include[] any controversy concerning terms or conditions of employment, or concerning the association or representation of persons . . . regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 113(c); *see also Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 441 (1987) ("Congress made the definition of 'labor dispute' broad because it wanted it to be broad."). A labor dispute can have its "'genesis in political protest[]' as opposed to

13

economic self-interest," *Burlington N.*, 481 U.S. at 429, and need not involve "one party . . . using its economic power to bring pressure on the other." *Lukens Steel Co. v. USW*, 989 F.2d 668, 677 (3d Cir. 1993) (an arbitration to enforce a CBA is a labor dispute under the NLGA). In addition to traditional labor actions like striking, the NLGA expressly states that "giving publicity to . . . the facts involved in" a dispute is one type of activity that cannot be enjoined. 29 U.S.C. § 104(e).

A labor dispute has and continues to exist between the USW and U.S. Steel as to whether, and on what terms, Nippon may become a successor to U.S. Steel. As we showed in our opening brief, terms of successorship are a mandatory subject of bargaining that directly affect working conditions—and, to that point, are specifically addressed in the BLA between USW and U.S. Steel. McCall Br. 21 (citing cases). At the center of the Union's advocacy was its criticism of Nippon's trade practices that harm American steelworkers and concerns about Nippon's plans to transfer production to non-union facilities—speech that Plaintiffs specifically seek to enjoin. *See* Compl. ¶¶ 60, 87, 92; ECF No. 84-6; *cf. Ord. of R. R. Telegraphers v. Chi. & Nw. R. Co.*, 362 U.S. 330, 336 (1960) (union's opposition to railroad's plan to close stations was a labor dispute because it affected job security). This criticism pertains to core concerns of the USW and the employees it represents regarding the Merger. Plaintiffs cannot seriously contend that this case does not "involve" a labor dispute simply because the union's successorship grievance was denied in September 2024—nine months *after* the beginning of the alleged public campaign. *See* Pls.' Br. 47. Nor has the arbitration brought an end to the Union's public advocacy against the Merger, which continues to pose a threat to the USW's members.[9]

---

[9]    The sole authority Plaintiffs cite on this point is *Phila. Marine Trade Ass'n* v. *Int'l Longshoremen's Ass'n, Loc. 1291*, 368 F.2d 932, 934 (3d Cir. 1966), which is inapposite. The key finding in that case was that the relevant order was not an injunction at all; it was a court order for specific performance of an arbitration award. In dicta, the court observed that the union's refusal to comply with that order was too divorced from the labor dispute to be part of it. The Supreme

As we have explained, the NLGA bars injunctive relief even where the relevant claims sound in antitrust. McCall Br. 23–24. Plaintiffs purport to cite authority to the contrary in *Altemose Constr. Co.* v. *Bldg. & Constr. Trades Council of Phila. & Vicinity*, 751 F.2d 653, 658–59 (3d Cir. 1985), but their citation is wholly misleading. Plaintiffs quote language from that case that does not refer to the NLGA, but rather to the so-called labor "statutory exemption" from antitrust liability, which is a separate doctrine and law. *Id.*; Pls.' Br. 47. Plaintiffs' other citations are similarly not applicable. Pls.' Br. 48. In those cases, courts ordered injunctions after finding that the "employees" at issue were not in fact employees at all, but instead independent businessmen not subject to federal labor law. *See Taylor v. Loc. No. 7, Int'l Union of Journeymen Horseshoers*, 353 F.2d 593, 606 (4th Cir. 1965); *United States v. Fish Smokers Trade Council, Inc.*, 183 F. Supp. 227, 235–36 (S.D.N.Y. 1960).[10]

## **CONCLUSION**

For the foregoing reasons, Mr. McCall's Motion to Dismiss should be granted, and Mr. McCall should be awarded his attorneys' fees, court costs, and expenses.

---

Court later reversed the Third Circuit, finding that the District Court's "decree . . . was too vague to be sustained as a valid exercise of federal judicial authority." *Int'l Longshoreman's Ass'n, Loc. 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 73–74 (1967).

[10]     The lack of any available injunctive relief dispels the need for expedition in this case. In that respect, Plaintiffs' renewed request for expedited discovery (Pls.' Br. 49–50) is both unnecessary and premature. Mr. McCall has fully complied with the Court's direction to confer, gather, and review potentially responsive documents in preparation for production should the Plaintiffs—in the Court's words—demonstrate an "entitlement" to that information. Jan. 17, 2025 Tr. at 64. There has not been a determination that good cause exists for any expedited discovery, and any such determination must first await resolution of the instant motion to dismiss.

Dated: February 28, 2025


Respectfully submitted,


*/s/ Joshua Shiffrin*
Bruce Lerner* (DC 384757)
Leon Dayan* (DC 444144)
Joshua Shiffrin* (DC 501008)
Derrick C. Rice* (DC 90007390)
Lane Shadgett* (DC 90009847)
Rachel Casper* (DC 90017405)
BREDHOFF & KAISER, P.L.L.C.
805 15th Street NW
Suite 1000
Washington, D.C. 20005
(202) 842-2600
blerner@bredhoff.com
ldayan@bredhoff.com
jshiffrin@bredhoff.com
drice@bredhoff.com
lshadgett@bredhoff.com
rcasper@bredhoff.com


*Admitted* Pro Hac Vice

Micheal Healey (PA 27283)
HEALEY BLOCK LLC
PO Box 81918
Pittsburgh, PA 15217
(412) 760-0342
mike@unionlawyers.net

David R. Jury (PA 77015)
Nathan L. Kilbert (PA 313939)
Anthony Resnick (PA 319682)
UNITED STEELWORKERS
INTERNATIONAL
60 Boulevard of the Allies, Room 807
Five Gateway Center
Pittsburgh, PA 15222
(412) 562-2545
djury@usw.org
nkilbert@usw.org
aresnick@usw.org

*Counsel to Defendant David McCall*

16